Lincoln Davis Wilson (N.J. Bar No. 02011-2008)
Timothy A. Garrison (Mo. Bar No. 51033)*
Gabriella McIntyre (D.C. Bar No. 1672424)*
Mercer Martin (Ariz. Bar No. 038138)*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
lwilson@ADFLegal.org
tgarrison@ADFLegal.org
gmcintyre@ADFLegal.org
mmartin@ADFLegal.org

*Counsel for Plaintiff*
*\*Motion for pro hac vice admission filed concurrently*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| **FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.** | |
| *Plaintiff,* | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **MATTHEW PLATKIN**, in his official capacity as Attorney General for the State of New Jersey, | **Civil Action File No. _** |
| | *Document Filed Electronically* |
| *Defendant.* | |

## INTRODUCTION

1.     This is an action by Plaintiff First Choice Women's Resource Centers, Inc. ("First Choice," or "the Ministry"), a nonprofit faith-based entity organized under the laws of New Jersey, with a principal place of business of 82 Speedwell Avenue, Second Floor, Morristown, New Jersey 07960, against Defendant Matthew

Platkin ("AG Platkin"), in his official capacity as the Attorney General of the State of New Jersey, with a principal place of business of Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, New Jersey 08611.

2.     This action seeks to enjoin enforcement of an unreasonable and improper subpoena that mandates disclosure of privileged and/or irrelevant materials to advance an investigation that does not appear to be based on a complaint or other reason to suspect unlawful activity, and which selectively and unlawfully targets First Choice.

3.     First Choice is a faith-based pregnancy resource center that serves women and men in unplanned pregnancies by providing counseling, medical services, and practical support.

4.     Defendant is the Attorney General of New Jersey, who is nationally prominent among elected officials for his fervent advocacy for abortion, and prolific in his pronouncements of hostility toward and suspicion of pregnancy resource centers like those operated by First Choice.

5.     AG Platkin has issued a subpoena (the "Subpoena") demanding production of a broad range of documents under the pretense of conducting a civil investigation into possible violations of "the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -227, specifically N.J.S.A. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J.S.A. 45:17 A-18 to -40, specifically N.J.S.A. 45:17A-33(c), and the Attorney General's investigative authority regarding Professions and Occupations, N.J.S.A. 45:1-18" relating to the Ministry's handling of patient data and statements about the lawful practice of Abortion Pill Reversal.

6.     AG Platkin has never cited any complaint or other substantive evidence of wrongdoing to justify his demands but has launched an exploratory probe into the lawful activities, constitutionally protected speech, religious observance, constitutionally protected associations, and nonpublic internal communications and records of a non-profit organization that holds a view with which he disagrees as a matter of public policy.

7.     The information and documentation demanded by AG Platkin's Subpoena is so overbroad, it would sweep up massive amounts of information, confidential internal communications, and documents unrelated to his stated purpose for the investigation.

8.     First Choice has been singled out as a target of AG Platkin's demands even though dozens of other organizations operating in New Jersey also advertise their provision of many similar services and similarly collect sensitive client information.

9.     These demands violate First Choice's rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and should be enjoined.

10.     Compliance with AG Platkin's demands would thwart First Choice's efforts to achieve its mission to serve women experiencing both planned and unplanned pregnancies in New Jersey.

11.     To avoid further violation of First Choice's constitutional rights and to limit additional time and resources that the Ministry is forced to spend to comply with unconstitutional investigative demands, the Ministry requests that this Court enjoin enforcement of AG Platkin's subpoena so that it may freely speak its beliefs,

exercise its faith, associate with like-minded individuals and organizations, and continue to provide services in a caring and compassionate environment to women and men facing difficult pregnancy circumstances.

## JURISDICTION AND VENUE

12.     This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13.     This Court has subject matter jurisdiction over First Choice's federal claims under 28 U.S.C. §§ 1331 and 1343.

14.     This court can issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and FED. R. CIV. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

15.     Venue lies in this district pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims detailed herein occurred within the District of New Jersey and Defendant resides and operates in the District of New Jersey.

## FACTUAL BACKGROUND

**First Choice**

16.     First Choice serves women and men in unplanned pregnancies by providing counseling, medical services, and practical support.

17.     First Choice was incorporated as a religious nonprofit organization under the laws of New Jersey in 2007.

18.     First Choice currently operates out of five separate locations in New Jersey: Jersey City, Montclair, Morristown, Newark, and New Brunswick.

19.     First Choice aims to help pregnant women facing unplanned pregnancies evaluate their alternatives, empowering them to make informed decisions concerning the outcome of their pregnancies. Further, First Choice seeks to provide counsel to women and men experiencing unplanned or unwanted pregnancies to help them cope and take control of their lives.

20.     To achieve these aims, First Choice provides a variety of wrap-around services under the direction of a Medical Director, who is a licensed physician, including, but not limited to: pregnancy testing; pregnancy options counseling; sexually transmitted disease (STD) and sexually transmitted infection (STI) testing and referral; limited obstetric ultrasounds; parenting education; and the administration of material support, such as baby clothes and furnishing, diapers, maternity clothes, and food.

21.     First Choice began providing services in 1985 and has since served over 36,000 women facing unplanned pregnancies.

22.     First Choice provides all of its services entirely free of charge.

23.     First Choice does not discriminate in providing services based on the race, creed, color, national origin, age, or marital status of its clients.

24.     First Choice does not perform or refer for abortions, which it states on its websites and in its welcome forms to clients; but it does provide medically accurate information about abortion procedures and risks.

25.     First Choice solicits feedback from all clients in the form of exit interviews and online reviews. Client reviews are overwhelmingly positive, each location receiving either a 4.8- or 4.9-star average rating from public reviews on Google.

26.    Additionally, First Choice is a leading organization nationally in the administration of Abortion Pill Reversal ("APR"). Under the APR protocol, upon request from pregnant women who have taken mifepristone to begin the two-step chemical abortion pill regimen but who changed their minds before taking the second medication and wish to continue their pregnancies, First Choice prescribes progesterone to counter the effects of mifepristone. First Choice diligently attempts to follow up with all patients to whom it administers APR to track its effectiveness.

27.    APR is not guaranteed to save a pregnancy, and First Choice makes that clear to women seeking APR.

**First Choice's Religious Beliefs**

28.    First Choice is a Christian faith-based, nonprofit organization.

29.    All of the Ministry's employees, board members, and volunteers must adhere to its statement of faith.

30.    The Ministry believes and affirms that life begins at conception, at which time the full genetic blueprint for life is in place. Accordingly, First Choice believes that its expression of love and service to God requires that it work to protect and honor life in all stages of development. This belief also compels First Choice's statements regarding APR.

31.    The Ministry is therefore committed to providing clients with accurate and complete information about both prenatal development and abortion.

32.    To be true to its beliefs, teaching, missions, and values, First Choice abides by its Christian beliefs in how it operates, including in what it teaches and how it treats others.

**Defendant's Promotion of Abortion and Hostility Towards Pro-Life Pregnancy Resource Centers.**

33.    First Choice has no reason to believe that it possesses information relevant to a violation of New Jersey law.

34.    Defendant, however, has a well-documented zeal for abortion, strong antipathy toward organizations that protect pregnant women and unborn children from the harms of abortion, and a particular animus toward pregnancy resource centers like those operated by First Choice.

35.    On February 3, 2022, Defendant was appointed by New Jersey Governor Phil Murphy, who is a vocal supporter of expansive abortion policy, and confirmed by the New Jersey Senate as the state's Attorney General on September 29, 2022.

36.    During his short tenure in office, Defendant has made the liberalization of laws and regulations relating to abortion a central focus of his policy advocacy and political persona.

37.    Defendant has referred to the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturning *Roe v. Wade*, 410 U.S. 113 (1973), as an "extreme right-wing decision"[1] that is a

---

[1] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin, U.S. Attorney Sellinger Establish State-Federal Partnership to Ensure Protection of Individuals Seeking Abortion and Security of Abortion Providers (July 20, 2022), https://www.njoag.gov/acting-ag-platkin-u-s-attorney-sellinger-establish-state-federal-partnership-to-ensure-protection-of-individuals-seeking-abortion-and-security-of-abortion-providers/.

"devastating setback for women's rights in America" and threatens to "harm millions throughout the country[.]"[2]

38.    Defendant responded to the *Dobbs* decision in a joint statement with a coalition of attorneys general, stating "[i]f you seek access to abortion . . . we're committed to using the full force of the law to support you. You have our word."[3] He further stated he would "continue to use all legal tools at our disposal to fight for your rights," despite the plain language of *Dobbs* establishing that there is no constitutional right to abortion.

39.    Defendant has referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need" and accused the United States Supreme Court of making it "abundantly clear that the rights of women will not be protected" in its jurisprudence on abortion.[4]

---

[2] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin Establishes "Reproductive Rights Strike Force" to Protect Access to Abortion Care for New Jerseyans and Residents of Other States (July 11, 2022), https://www.njoag.gov/acting-ag-platkin-establishes-reproductive-rights-strike-force-to-protect-access-to-abortion-care-for-new-jerseyans-and-residents-of-other-states/.

[3] Press Release, New Jersey Office of the Attorney General, Despite U.S. Supreme Court decision, national coalition of 22 Attorneys General emphasizes that abortion remains safe and legal in states across the country (Jun. 27, 2022), https://www.njoag.gov/acting-attorney-general-platkin-national-coalition-of-attorneys-general-issue-joint-statement-reaffirming-commitment-to-protecting-access-to-abortion-care/.

[4] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (October 11, 2023, 1:49 PM), https://twitter.com/NewJerseyOAG/status/1712163603552342274.

40.     Just months into his tenure as *acting* Attorney General, Defendant established a "Reproductive Rights Strike Force" in his office.[5]

41.     Defendant also instituted a state-federal partnership with the U.S. Attorney for the District of New Jersey to ensure access to abortion for New Jersey residents and non-residents.[6]

42.     In the wake of *Dobbs*, Defendant issued guidance to all New Jersey's County Prosecutors "about charges they may bring against individuals who interfere with access to abortion rights."[7]

43.     Also in response to *Dobbs*, Defendant—the state's chief *legal* official—instituted a $5 million grant program to fund abortion training and expand the pool of abortion providers in New Jersey.[8]

44.     Defendant has referred to the plaintiff in the case *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023), who is challenging the FDA's approval of the abortion pill mifepristone, as a "shadowy organization" and

---

[5] New Jersey Office of the Attorney General, *supra* note 2.

[6] New Jersey Office of the Attorney General, *supra* note 1.

[7] *Id.*

[8] Press Release, New Jersey Office of the Attorney General, AG Platkin Announces $5 Million in Grant Funding to Provide Training and Education to Expand Pool of Abortion Providers in New Jersey (December 2, 2022), https://www.njoag.gov/ag-platkin-announces-5-million-in-grant-funding-to-provide-training-and-education-to-expand-pool-of-abortion-providers-in-new-jersey/.

accused its lawsuit of "unleash[ing] significant confusion and misinformation about the medical safety and legal status of both mifepristone and abortion itself."[9]

45.    Defendant has joined over 20 other states in supporting the federal government in the FDA litigation to "support[] mifepristone's legality[.]"[10]

46.    Defendant has worked strategically with other state officials to attack pro-life laws enacted by a host of states, including Idaho,[11] Indiana,[12] and Texas.[13]

47.    Defendant has been transparent in his support for organizations such as Planned Parenthood that perform abortions and share his expansive views on abortion policy.

---

[9] Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to keep it that way*, NJ.COM (April 30, 2023), https://www.nj.com/opinion/2023/04/ag-mifepristone-is-available-in-new-jersey-and-well-fight-to-keep-it-that-way-opinion.html; *see* David C. Reardon et al., *Deaths Associated with Abortion Compared to Childbirth—A Review of New and Old Data and the Medical and Legal Implications*, THE JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY, 20 (2), 279 (2004), https://scholarship.law.edu/jchlp/vol20/iss2/4/?utm_source=scholarship.law.edu%2Fjchlp%2Fvol20%2Fiss2%2F4&utm_medium=PDF&utm_campaign=PDFCoverPages.

[10] Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to keep it that way*, NJ.COM, April 30, 2023, https://www.nj.com/opinion/2023/04/ag-mifepristone-is-available-in-new-jersey-and-well-fight-to-keep-it-that-way-opinion.html (last visited Dec. 12, 2023).

[11] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Aug. 2, 2023, 11:03 AM), https://twitter.com/NewJerseyOAG/status/1686754712048009217.

[12] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Nov. 9, 2021, 4:18 PM), https://twitter.com/NewJerseyOAG/status/1458182141922222084.

[13] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Oct. 27, 2021, 3:02 PM), https://twitter.com/NewJerseyOAG/status/1453437059771813889.

48.     Defendant has spoken alongside the CEO of Planned Parenthood of Metropolitan New Jersey at a roundtable hosted by Vice President Kamala Harris with "advocates who are fighting on the frontlines to protect reproductive rights."[14]

49.     Defendant has participated in events hosted by the Planned Parenthood Action Fund of New Jersey.[15]

50.     Planned Parenthood publicly praised Defendant's appointment of Sundeep Iyer as Director of the New Jersey Division on Civil Rights, highlighting its approval of Mr. Iyer's commitment to the abortion provider's concept of reproductive rights.[16]

51.     On the main page of his office website, Defendant lists "Standing Up for Reproductive Rights" as one of the top five "spotlights" of his office.[17]

---

[14] Press Release, The White House, Readout of Vice President Kamala Harris's Meeting with New Jersey State Legislators on Reproductive Rights (July 18, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/18/readout-of-vice-president-kamala-harriss-meeting-with-new-jersey-state-legislators-on-reproductive-rights/.

[15] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (April 26, 2022, 12:35 PM), https://twitter.com/NewJerseyOAG/status/1518992190294351872.

[16] Press Release, New Jersey Office of the Governor, ICYMI: Attorney General Platkin Appoints Sundeep Iyer as Director of the New Jersey Division on Civil Rights, (Dec. 16, 2022), https://www.nj.gov/governor/news/news/562022/20221216c.shtml.

[17] NEW JERSEY OFFICE OF ATTORNEY GENERAL, njoag.gov (last visited Dec. 8, 2023).

52.     On a page entitled, "Standing Up for Reproductive Rights," Defendant boasts of his Reproductive Rights Strike Force and partnership with the U.S. Attorney's Office for the District of New Jersey.[18]

53.     On the same page, under the heading, "Safeguarding patient privacy," Defendant lists steps he has taken "to protect consumers' private reproductive health data[.]"[19] In this same paragraph on patient privacy and data security, Defendant highlights his "warning" to the public about pregnancy resource centers like those operated by First Choice.

54.     Defendant makes no reference to several large, recent, and well-publicized instances of the Planned Parenthood Federation of America exposing consumer data without consent, causing breaches of sensitive patient information such as abortion method used and the specific Planned Parenthood clinic where an appointment was booked.[20]

---

[18] *Standing Up for Reproductive Rights*, NEW JERSEY OFFICE OF ATTORNEY GENERAL, https://www.njoag.gov/spotlight/standing-up-for-reproductive-rights/ (last visited Dec. 8, 2023).

[19] *Id.*

[20] *See, e.g.*, Tatum Hunter, *You scheduled an abortion. Planned Parenthood's website could tell Facebook*, WASHINGTON POST (June 29, 2022), https://www.washingtonpost.com/technology/2022/06/29/planned-parenthood-privacy/; Gregory Yee & Christian Martinez, *Hack exposes personal information of 400,000 Planned Parenthood Los Angeles patients,* L.A. TIMES (Dec. 1, 2021), https://www.latimes.com/california/story/2021-12-01/data-breach-planned-parenthood-los-angeles-patients; and Brittany Renee Mayes, *D.C.'s Planned Parenthood reports data was breached last fall,* WASHINGTON POST (Apr. 16, 2021), https://www.washingtonpost.com/dc-md-va/2021/04/16/data-breach-planned-parenthood-dc/.

55.     Citing no evidentiary support, Defendant issued a statewide "consumer alert" alleging that pregnancy care centers like First Choice "provide[] false or misleading information[.]"[21]

56.     Through the alert, Defendant accuses pregnancy care centers of lying about the services they provide, providing inaccurate or misleading ultrasounds, and providing inaccurate information about reproductive health care services.

57.     Defendant urges women to avoid pregnancy care centers and explicitly encourages them to seek out abortion facilities instead, such as Planned Parenthood and the National Abortion Federation.

58.     Defendant enlisted the assistance of pro-abortion groups and abortion businesses such as the ACLU and Planned Parenthood, who are outspokenly opposed to pro-life pregnancy centers, to help his office draft the consumer alert.

59.     Specifically, on October 17, 2022, Sundeep Iyer forwarded a draft of the consumer alert and requested comment from Kaitlyn Wojtowicz, Vice President of Public Affairs at Planned Parenthood Action Fund of New Jersey. Exhibit 1. Ms. Wojtowicz responded with comments and suggested edits to the alert. Exhibit 2.

60.     The same day, Mr. Iyer forwarded a draft of the consumer alert and requested comment from Amol Sinha, Executive Director of ACLU New Jersey. Exhibit 3. Jeanne LoCicero, Legal Director for the ACLU of New Jersey, responded with comments and questions for consideration. Exhibit 4.

---

[21] Press Release, New Jersey Office of the Attorney General, AG Platkin Announces Actions to Protect Reproductive Health Care Providers and Those Seeking Reproductive Care in New Jersey, (December 7, 2022), https://www.njoag.gov/ag-platkin-announces-actions-to-protect-reproductive-health-care-providers-and-those-seeking-reproductive-care-in-new-jersey/.

61.    Mr. Iyer also forwarded a draft and requested comment from Roxanne Sutocky, Director of Community Engagement for The Women's Centers,[22] a group of abortion providers with facilities in New Jersey, Connecticut, Georgia, and Pennsylvania.[23] Exhibit 5. Ms. Sutocky responded with comments on the alert, referencing similar alerts issued in Massachusetts, Minnesota, and California. Exhibits 6, 7.

62.    In speaking about the alert, defendant has warned: "[i]f you're seeking reproductive care, beware of Crisis Pregnancy Centers!" And he has accused pro-life pregnancy centers of "pretend[ing] to be legitimate medical facilities."[24]

63.    Defendant's consumer alert has been exploited by other New Jersey elected officials to disparage pregnancy resource centers like those operated by First Choice; one New Jersey congressman cited the consumer alert in a press release calling pregnancy resource centers "Brainwashing Cult Clinics."[25]

---

[22] *Roxanne Sutocky*, ACLU NEW JERSEY, https://www.aclu-nj.org/en/biographies/roxanne-sutocky (last visited Dec. 12, 2023).

[23] THE WOMEN'S CENTERS, https://www.thewomenscenters.com/ (last visited Dec. 12, 2023).

[24] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (December 7, 2022, 3:20 PM), https://twitter.com/NewJerseyOAG/status/1600585960265228288.

[25] Press Release, U.S. House of Representatives Office of Josh Gottheimer, Gottheimer Launches Campaign to Shutdown [sic] Deceptive Anti-Choice Clinics Posing as Women's Healthcare Providers in NJ; Brainwashing Cult Clinics Are Dangerous to Women's Health (Oct. 6, 2023), https://gottheimer.house.gov/posts/release-gottheimer-launches-campaign-to-shutdown-deceptive-anti-choice-clinics-posing-as-womens-healthcare-providers-in-nj.

**Misstatements of Fact by Abortion Providers**

64.    Planned Parenthood makes erroneous public statements about chemical abortion that mislead women.

65.    Planned Parenthood states, for example, that a woman may have an abortion "[u]sing only misoprostol" and claims that "it's safe, effective, and legal to use in states where abortion is legal. It works 85-95% of the time and can be used up to 11 weeks from the first day of your last period."[26] This statement has been proven false by several studies showing that chemical abortions attempted using only misoprostol have high failure rates and are dangerous.[27]

66.    Despite the well-publicized data breaches and false statements made by Planned Parenthood, upon knowledge and belief, Defendant has not issued a single subpoena related to consumer fraud or the "privacy policies" of Planned Parenthood, its New Jersey affiliates, any of the abortion clinics in New Jersey, or any individual or entity that refers for abortion or advocates for increased availability of abortion.

---

[26] Planned Parenthood, *How do I have an abortion using only misoprostol?*, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-do-i-have-an-abortion-using-only-misoprostol (last visited December 12, 2023).

[27] *See*, *e.g.*, Vauzelle C, et al., *Birth defects after exposure to misoprostol in the first trimester of pregnancy: prospective follow-up study*, 36 Reprod. Toxicol. 98 (2012), doi: 10.1016/j.reprotox.2012.11.009 (2010 study comparing administration of standard mifepristone and misoprostol with administration of misoprostol alone documenting that using misoprostol only to induce abortion led to 23.8 percent failure rate requiring surgery).

**Defendant's Subpoena**

67. On November 15, 2023, Defendant issued a Subpoena to First Choice. Exhibit 8.

68. The Subpoena states that it was issued pursuant to the authority of the New Jersey Consumer Fraud Act ("CFA"), the Charitable Registration and Investigation Act ("CRIA"), and the Attorney General's investigative authority regarding Professions and Occupations.

69. The Subpoena demands, among other things, during the stated period, the production of (emphasis added):

a. A copy of *every* solicitation and advertisement, including those appearing on any First Choice website, social media, print media, including newspapers and magazines, Amazon or other e-commerce platform, sponsored content, digital advertising, video advertising, other websites, Pinterest, radio, podcasts, and pamphlets.

b. *All* documents from December 1, 2013, substantiating a broad host of statements made on First Choice's websites, including statements that:

    i. "Knowing the gestational age, and viability of your pregnancy will determine if a medical abortion is even an option";

    ii. "The abortion pill reversal process involves a prescription for progesterone to counteract the mifepristone"; and

    iii. "According to the Abortion Pill Rescue Network, there have also been successful reversals when treatment was starting within 72 hours of taking the first abortion pill."

16

c.     "*All* Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets."

d.     "*All* Documents Concerning representations made by [First choice] to Clients about the confidentiality of Client information, Including privacy policies."

e.     "*All* Documents Concerning any complaints or identifying any concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors."

f.     "Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service."

g.     "Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images."

h.     *All* documents concerning Heartbeat International, the Abortion Pill Reversal Network, and Care Net.

i.     Documents sufficient to identify the identity of First Choice's owners, officers, directors (including medical directors), partners, shareholders, and board members.

j.     "Documents sufficient to Identify donations made to First Choice."

70.    The Subpoena does not reflect the existence of a complaint, nor does it reflect any factual basis for suspecting a violation of the cited New Jersey laws.

**Effect of the Subpoena on First Choice**

71.     Since the COVID-19 pandemic, First Choice has struggled to maintain its desired levels of full staffing. Accordingly, staff currently perform a range of functions to fulfill the Ministry's mission.

72.     Complying with the Subpoena would bury First Choice in an inordinate amount of work. The Ministry estimates that it would take several staff members—including the Executive Director, the volunteer Medical Director, the finance department, and all medical staff—at least an entire month to produce all requested documents.

73.     Already short-staffed, diverting resources to document compilation would severely impede the Ministry's ability to perform its core functions. Staff members who normally devote their time to serving women in need and communicating with essential supporters would have to cease their mission-driven activities to comply with AG Platkin's oppressive demands.

74.     Complying with the Subpoena would require such a large deployment of staff and resources that document production would become the driving focus of the Ministry, not its mission of serving women and men in need.

75.     Complying with the Subpoena would also harm First Choice's working relationships.

76.     Disclosure of documents that identify First Choice's donors, as required by the Subpoena, will likely result in a decrease in donations, as donors will be hesitant to associate with the Ministry out of fear of retaliation and public exposure. Donor anonymity is of paramount importance to First Choice, as its donors give for

personal or faith-driven reasons. First Choice therefore does not publish a list of donors or donation amounts.

77.    Disclosure of the identities of First Choice's employees will likely cause current employees to leave the already short-staffed Ministry and will deter prospective employees from applying out of the reasonable fear of retaliation and public disclosure.

78.    Disclosure of the nature of First Choice's relationships with other organizations, as the Subpoena demands, will likely cause those associates to end their association with the Ministry out of fear of retaliation, public disclosure, and investigation into their own activities.

79.    This risk of loss of donors, employees, and associates greatly jeopardizes the Ministry's ability to carry out its religious mission.

**FIRST CAUSE OF ACTION**

**First Amendment: Retaliatory Discrimination**

80.    Plaintiff repeats and realleges each allegation in paragraphs 1–79 of this complaint.

81.    The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out.

82.    A plaintiff is subject to unlawful retaliation if (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a causal connection between the protected activity and the retaliatory action.

83.     If a plaintiff proves these elements, the burden shifts to the government to show that it would have taken the same action even in the absence of the protected conduct.

84.     First Choice has engaged in constitutionally protected speech advancing a pro-life message, including providing information about APR.

85.     By subjecting First Choice to extensive and invasive investigations of that speech, Defendant has engaged in conduct that would chill a person of ordinary fitness from continuing to engage in protected speech.

86.     Defendant's animus for First Choice's pro-life messaging and pro-life organizations was a substantial or motivating factor in his decision to issue the Subpoena.

87.     Defendant cannot show that he would have investigated First Choice anyway, as he has refused to investigate similarly situated organizations that share his commitment to abortion.

88.     Accordingly, Defendant is liable to First Choice for unlawful retaliation against First Choice for exercise of its First Amendment rights.

## SECOND CAUSE OF ACTION

### First and Fourteenth Amendments: Selective Enforcement/Viewpoint Discrimination

89.     First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

90.     The First Amendment to the Constitution protects the First Choice's rights to speak and to be free from content and viewpoint discrimination.

91.    The Fourteenth Amendment to the Constitution protects the First Choice's right to the Equal Protection of the laws.

92.    Laws and regulations must not only be facially neutral but also enforced in a non-discriminatory and viewpoint-neutral manner.

93.    Defendant may not exercise enforcement discretion based upon viewpoint, targeting for investigative demands only organizations expressing one particular point of view on a controversial topic. Such action threatens and chills First Amendment rights.

94.    Upon information and belief, Defendant has not investigated any of dozens of similarly situated reproductive health-related clinics in New Jersey to examine the truthfulness of their marketing.

95.    First Choice is similar to these other entities in that they serve similar clientele—i.e., women and men seeking reproductive health services—and offer many of the same services—e.g., pregnancy testing, STD/STI testing, and ultrasounds.

96.    The most significant difference between First Choice and any of the dozens of abortion providers in New Jersey is that First Choice does not provide or refer for abortions, but this is not a legitimate basis upon which to base a decision to investigate First Choice's provision of *other* services.

97.    The dissimilar treatment of such similarly situated entities evinces viewpoint discrimination.

98.    Defendant's public statements also demonstrate that he is intentionally targeting First Choice with an unreasonable, intrusive, overbroad, and unduly burdensome Subpoena based on its speech and views on abortion.

99.    Since his appointment as Attorney General, Defendant has repeatedly allied himself with and spoken favorably toward organizations that perform abortions or advocate for the elimination of restrictions on abortion, while persistently and aggressively impugning the motives of pro-life entities like First Choice and accusing them of misleading their clients.

100.    Defendant issued the Subpoena based on the viewpoint of First Choice's speech targeting (among other things) its protected speech about Abortion Pill Reversal.

101.    Defendant's refusal to exercise his authority against similar entities who share his views on abortion while targeting First Choice violates the Ministry's First Amendment right to be free from viewpoint discrimination.

102.    Viewpoint-based enforcement of New Jersey law on the basis of views on abortion would have a chilling effect on a reasonable person's willingness to engage in protected activities.

103.    Investigating First Choice for engaging in constitutionally protected speech is not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

104.    Accordingly, Defendant's Subpoena is unconstitutional selective enforcement and viewpoint discrimination that violates First Choice's constitutional rights.

## THIRD CAUSE OF ACTION

### First Amendment: Free Exercise

105.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

106.   The Ministry's pro-life statement and beliefs, including its statements in support of APR, are sincere and rooted in their Christian faith.

107.   The Free Exercise Clause forbids government action that is not neutral toward religion unless it satisfies strict scrutiny.

108.   Defendant's service of the Subpoena on First Choice is not neutral to religion for several reasons.

109.   First, Defendant's discretion to decide where and when to serve subpoenas shows that his actions are not neutral to religion or generally applicable.

110.   Second, Defendant treats comparable secular activity—the operation of abortion facilities such as Planned Parenthood—more favorably than First Choice's religious activity, having declined to serve subpoenas on them despite their well-known failures in data security and misleading statements on their websites. The existence of an individualized assessment and discretionary mechanism to grant exemptions is sufficient to render a policy not generally applicable.

111.   Third, Defendant has shown direct hostility toward First Choice's Christian pro-life mission and its speech in support of that mission.

112.   Defendant lacks a legitimate or compelling state interest to justify his action against the Ministry, since First Choice is explicitly exempt from the New Jersey Consumer Fraud Act and the laws he invokes do not or cannot apply to the Ministry's conduct.

113.   Defendant's actions are not narrowly tailored or rationally related to furthering a legitimate or compelling state interest because he has not served subpoenas on Planned Parenthood, despite its well-known data breaches and misleading public statements.

114.   Accordingly, Defendant's subpoena fails to satisfy constitutional scrutiny and thus violates First Choice's First Amendment right to freely exercise its religion.

## FOURTH CAUSE OF ACTION

### First Amendment: Free Association

115.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

116.   An investigation that unjustifiably targets individuals and entities with whom First Choice associates violates the Ministry's First Amendment freedom of association.

117.   The First Amendment protects the right of people to associate with others in pursuit of many political, social, economic, educational, religious, and cultural ends.

118.   The First Amendment also prohibits the government from discouraging people from associating with others to express messages.

119.   First Choice is involved in an expressive association because people with like-minded beliefs, including those on staff and volunteers at its facilities, join together to serve and educate pregnant women and the fathers of their babies, and to express their beliefs about the value of unborn human life.

120.   The Ministry's directors, donors, staff, and volunteers, and many other people and organizations with whom First Choice associates advocate the view that unborn human life has value and deserves dignity and respect.

121.   First Choice likewise engages in expressive association when its staff and volunteers partner with each other and with pregnant mothers and expectant fathers to discuss these values.

122.   In offering services and education to those who seek them, First Choice expressively associates with pregnant women and the fathers of their babies to communicate desired messages to those individuals.

123.   Defendant's Subpoena demands that First Choice reveal the identities of and communications with its donors, clients, staff, vendors, ministry associates, owners, officers, directors, partners, shareholders, and board members.

124.   By investigating First Choice without a complaint or other factual basis, Defendant will cause individuals and entities who associate with the Ministry to understandably infer that it has engaged in wrongdoing, thereby discouraging those individuals and entities from associating with First Choice.

125.   Defendant's investigation also may cause individuals and entities who associate with First Choice to reasonably fear that they themselves will face retaliation or public exposure and thus discourages those individuals and entities from associating with First Choice.

126.   Accordingly, Defendant's Subpoena violates First Choice's right of free association guaranteed by the First Amendment to the United States Constitution, as incorporated and applied to the States through the Fourteenth Amendment.

## FIFTH CAUSE OF ACTION

### First Amendment: Privilege

127.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

128.   The First Amendment freedom to speak and associate concerns the ability of persons and groups to retain privacy in their associations.

129.   The First Amendment protects First Choice's freedom to engage in broad and uninhibited internal, nonpublic communications to advance its shared operational and political goals.

130.   Compelled disclosure of associations adversely affects protected speech and association by inducing members to withdraw from the association and dissuading others from joining it for fear of exposure of their beliefs, speech, and associations.

131.   First Amendment protections extend not only to organizations, but also to their staff, members, and others who affiliate with them.

132.   Government actions that have a deterrent effect on the exercise of First Amendment rights are subject to rigorous scrutiny.

133.   The chilling effect on First Amendment rights is not diminished simply because disclosure of private information is compelled by government process.

134.   Defendant's subpoena demands, without limitation, disclosure of vast swathes of First Choice's sensitive and confidential information, communications, and policies such as—to name just a few examples—personal employee and volunteer information, documents related to First Choice's relationships with other

pro-life groups, all complaints lodged against First Choice, and identities of First Choice's officers and directors.

135.   These unreasonable demands harass First Choice and discourage individuals and entities from associating with the Ministry.

136.   Defendant has no substantive evidence that First Choice has engaged in any violation of New Jersey law, much less any grounds suggesting that the disclosures of the private information he seeks justifies the deterrent effect on the Ministry's exercise of the constitutionally protected right of association.

137.   Accordingly, Defendant's Subpoena violates First Choice's First Amendment privilege.

## SIXTH CAUSE OF ACTION

### Fourth Amendment: Unreasonable Search and Seizure

138.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

139.   The demands for information unrelated to an investigation authorized by law violate the Ministry's Fourth Amendment protection against unreasonable government searches and seizures.

140.   The Fourth Amendment to the United States Constitution—made applicable to the states through the Fourteenth Amendment—protects First Choice from unreasonable searches and seizures and imposes on Defendant the obligation to state with particularity the place to be searched and the things to be seized.

141.   Defendant's investigative demands must be reasonably related to legitimate investigative inquiries and based on more than mere speculation or animus toward First Choice's views, speech, and religion.

142.   Upon information and belief, Defendant's Subpoena is not based on a complaint or any reason to suspect that First Choice has information relating to a violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. 56:8-1 to -227, specifically N.J. STAT. ANN. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J. STAT. ANN. 45:17A-18-40, specifically N.J. STAT. ANN.45:17A-33(c), or the Professions and Occupations provision of N.J. STAT. ANN. 45:1-18. In fact, the Subpoena fails to allege what, if any, potential violation has occurred.

143.   Many requests for documentation and materials in the Subpoena have no rational relation to a legitimate investigation, and Defendant has no substantial evidence of any colorable violation of the aforementioned statutes.

144.   The New Jersey Consumer Fraud Act does not apply to First Choice because it explicitly exempts non-profit entities. N.J. STAT. ANN. 56:8-47 ("The provisions of this act shall not apply to any nonprofit public or private school, college or university; the State or any of its political subdivisions; or any bona fide nonprofit, religious, ethnic, or community organization.").

145.   AG Platkin has cited no practice declared unlawful that he may investigate under his Professions and Occupations authority.

146.   The Subpoena also calls for production of documents over a ten-year period even though the relevant statute of limitations is a maximum of six years.

147.   Defendant has made contemporaneous statements showing his disdain for organizations that seek to protect unborn human life in general and for pregnancy resource centers like those operated by First Choice in particular.

148.   Defendant is engaged in an intrusive, oppressive, unnecessary, unjustified, and irrelevant investigation of First Choice's organizational structure; personal information of leadership, volunteers, and personnel; associations; internal policies; irrelevant lawful activities; tax-exempt status; and other lawful aspects of First Choice's operations and relationships.

149.   Defendant's many unspecific demands for "any" and "all" information or materials, "without limitation," are not particular, as required by the Fourth Amendment.

150.   The overbreadth of Defendant's investigation in time and scope is unreasonable.

151.   Defendant's Subpoena harasses First Choice and causes the Ministry to spend limited time and resources responding to it for no apparent reason other than Defendant's disdain for First Choice's religious views and exercise.

152.   Defendant has threatened contempt of court and "other penalties" against First Choice to coerce the Ministry into complying with his unconstitutional demands.

153.   Thus, Defendant's Subpoena constitutes an unreasonable search and seizure under the Fourth Amendment.

**SEVENTH CAUSE OF ACTION**

**<u>First Amendment: Overbreadth</u>**

154.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

155.   The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of

29

the law are substantial when judged in relation to the statute's plainly legitimate sweep and no reasonable limiting construction is available that would render the policy unconstitutional.

156. The CRIA's mandate that all statements made by charitable organizations "shall be truthful" is unconstitutionally overbroad and overbroad as applied, as is the authority it grants the enforcer to investigate statements that "although literally true, are presented in a manner that has the capacity to mislead the average consumer" (together, the "investigatory provisions").

157. First, these nebulous standards reach a substantial amount of constitutionally protected conduct that will deter people from engaging in constitutionally protected speech and inhibit the free exchange of ideas.

158. Second, the number of valid applications of the CRIA pales in comparison to the historic and likely frequency and the actual occurrence of impermissible applications against constitutionally protected conduct and speech AG Platkin disfavors, even outside the context of abortion.

159. Third, the activity or conduct sought to be regulated is the expression of First Choice's constitutional rights to speak and associate freely and to exercise its religion.

160. Fourth, the apparent interest in regulating false and deceptive speech in connection with charitable solicitations cannot possibly override the Ministry's constitutional liberties because (1) these purposes cannot be said to be compelling if they are only applied to pregnancy centers that do not support abortion, but not pregnancy centers that do support abortion; and (2) the statutes can be achieved with

a more narrowly tailored provision requiring a bona fide complaint or substantial evidence of wrongdoing.

161.   The statute's overbreadth has not only created a likelihood that its application will inhibit free expression; it has already had that actual effect.

162.   Thus, the CRIA's investigation provisions are unconstitutionally overbroad and overbroad as applied to the Ministry.

## EIGHTH CAUSE OF ACTION

### First and Fourteenth Amendment: Vagueness

163.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

164.   A statute will be invalidated for vagueness under the First Amendment if it endows officials with undue discretion to determine whether a given activity contravenes the law's mandates.

165.   A statute will be invalidated for vagueness under the Due Process Clause of the Fourteenth Amendment if it fails to provide people of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted or fails to give fair notice of what constitutes a violation.

166.   Laws that interfere with free speech are subject to more exacting scrutiny and require greater definiteness than other contexts.

167.   The CRIA's investigatory provisions fail to give persons of ordinary intelligence constitutionally fair notice of what constitutes a truthful statement and what has the capacity to mislead.

168.   The statute impermissibly delegates basic policy matters to AG Platkin for resolution on an ad hoc and subjective basis and has resulted in arbitrary and

discriminatory application against First Choice's constitutionally protected speech, association, and religious exercise.

169.   The statute fails to give fair warning of what is prohibited and is so imprecise that discriminatory enforcement is not only a real possibility but also a reality.

170.   Thus, the CRIA investigatory provisions are unconstitutionally vague and are vague as applied to the Ministry.

### NINTH CAUSE OF ACTION

### First Amendment: Unbridled Discretion

171.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

172.   A restriction on speech is constitutional only if the restriction is specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation.

173.   The CRIA's investigatory provisions lack objective standards for enforcement, empowering AG Platkin to punish any action he deems is in the public interest.

174.   The CRIA's investigatory provisions lack any objective standards for determining whether a true statement is presented in such a way that it will mislead an average consumer, or whether a restriction on speech is within the public interest.

175.   The statute necessarily requires AG Platkin to appraise facts, exercise judgment, and form an opinion that raises a danger of censorship and invites decisions based on the content of the speech and the viewpoint of the speaker.

176.   The statute allows AG Platkin to exercise arbitrary enforcement power to suppress pro-life points of view or any other point of view with which he disagrees.

177.   With so few restraints on AG Platkin's authority, this statute unlawfully grants the AG extraordinary power and unconstitutional unbridled discretion to suppress disfavored messages and is thus facially unconstitutional and unconstitutional as applied.

## PRAYER FOR RELIEF

First Choice respectfully prays for judgment against Defendant and requests the following relief:

A.    preliminary injunction enjoining enforcement of Defendant's Subpoena in its entirety or, in the alternative, modifying that Subpoena to eliminate those provisions that infringe on the constitutional protections of First Choice and their agents;

B.    permanent injunction granting the same relief;

C.    declaratory judgment that Defendant's subpoena violates First Choice's constitutional rights;

D.    an award of First Choice's costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

E.  any other relief that the Court deems equitable and just in the circumstances.

Respectfully submitted this 13th day of December, 2023.

*/s/ Lincoln Davis Wilson*
Lincoln Davis Wilson (N.J. Bar No 02011-2008)
Timothy A. Garrison (Mo. Bar No. 51033)*
Gabriella McIntyre (D.C. Bar No. 1672424)*
Mercer Martin (Ariz. Bar No. 03138)*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
lwilson@ADFLegal.org
tgarrison@ADFLegal.org
gmcintyre@ADFLegal.org
mmartin@ADFLegal.org

*Counsel for Plaintiff First Choice Women's Resource Centers, Inc.*

*\*Motion for pro hac vice admission filed concurrently*

## VERIFICATION OF COMPLAINT

I, Aimee Huber, a citizen of the United States and a resident of _Warren_, New Jersey, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.


Executed this _13th_ day of December, 2023, at _Morristown_, New Jersey.


_____
Aimee Huber