Lincoln Davis Wilson (N.J. Bar No. 02011-2008)
Timothy A. Garrison (Mo. Bar No. 51033)*
Gabriella McIntyre (D.C. Bar No. 1672424)*
Mercer Martin (Ariz. Bar No. 038138)*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
lwilson@ADFLegal.org
tgarrison@ADFLegal.org
gmcintyre@ADFLegal.org
mmartin@ADFLegal.org

*Counsel for Plaintiff*
*\*Motion for pro hac vice admission filed concurrently*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE**

| | |
|---|---|
| **FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.,**<br><br>*Plaintiff,*<br><br>v.<br><br>**MATTHEW PLATKIN**, in his official capacity as Attorney General for the State of New Jersey,<br><br>*Defendant.* | Civil Action File No.: <u>3:23-cv-23076</u><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S PROPOSED ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>MOTION DAY: JANUARY 16, 2023<br><br>ORAL ARGUMENT REQUESTED<br><br>*Document Filed Electronically* |

## **TABLE OF CONTENTS**

Table of Authorities ................................................................. iii

Introduction .............................................................................1

Factual Background ..................................................................4

    The First Choice Ministry............................................................4

    First Choice's Services ................................................................5

    AG Platkin's Abortion Advocacy and Hostility to Pregnancy Centers ..........7

    AG Platkin's Unreasonable Subpoena .........................................10

Argument................................................................................15

I.   First Choice is likely to succeed on its constitutional claims. ...........................15

    A.   AG Platkin's demands violate the First Amendment...........................15

        1.   AG Platkin violates First Choice's free speech. .........................15

        2.   AG Platkin violates First Choice's free exercise. ........................20

        3.   AG Platkin violates First Choice's free association. ...................24

        4.   AG Platkin violates First Amendment privilege.........................26

    B.   The Subpoena violates the Fourth Amendment. ...................................28

    C.   The CRIA investigatory provisions are facially invalid. .......................31

        1.   The investigatory provisions are overbroad................................31

        2.   The investigatory provisions are vague. .....................................35

        3.   The investigatory provisions confer unbridled discretion. ..........36

II.   First Choice meets the other injunction factors. ...............................................38

III.  First Choice is entitled to a temporary restraining order. .................................39

Conclusion ...........................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Africa v. Commonwealth of Pennsylvania*,
    662 F.2d 1025 (3d Cir. 1981) .........................................................................20

*Amalgamated Transit Union Loc. 85 v. Port Authority of Allegheny County*,
    39 F.4th 95 (3d Cir. 2022) ..............................................................................39

*Americans for Prosperity Foundation v. Bonta*,
    141 S. Ct. 2373 (2021)....................................................................................25

*Bella Health & Wellness v. Weiser*,
    115 Fed. R. Serv. 3d 690, 2023 WL 2978108, at *2 (D. Colo. Apr. 15,
    2023) ..................................................................................................................6

*Bella Health & Wellness v. Weiser*,
    No. 1:23-CV-00939DDDSKC, 2023 WL 6996860, at *1 (D. Colo. Oct.
    21, 2023) ............................................................................................................7

*Blankenship v. Manchin*,
    471 F.3d 523 (4th Cir. 2006) ..........................................................................19

*Brown v. City of Pittsburgh*,
    586 F.3d 263 (3d Cir. 2009) ...........................................................................18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)................................................................................. 21, 22

*Citizens For A Better Lawnside, Inc. v. Bryant*,
    No. CIV 05-4286, 2007 WL 1557479 (D.N.J. May 24, 2007) .............. 16, 19

*City of Chicago v. Morales*,
    527 U.S. 41 (1999).........................................................................................31

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988)........................................................................................37

*Cox v. Louisiana*,
    379 U.S. 536 (1965)........................................................................................37

*Elrod v. Burns*,
    427 U.S. 347 (1976)......................................................................................38

*ERISA Industry Committee v. Asaro-Angelo*,
    No. CV-20-10094, 2023 WL 2808105 (D.N.J. Apr. 6, 2023) .....................27

*Federal Election Commission v. Wisconsin Right to Life, Inc.*,
    551 U.S. 449 (2007)......................................................................................27

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
    82 F.4th 664 (9th Cir. 2023) ................................................................. 22, 23

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)......................................................................................37

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) .........................................................................21

*Fraternal Order of Police Pennsylvania Lodge v. Township of Springfield*,
    No. CV 23-332, 115 Fed.R.Serv.3d 808, 2023 WL 2839093, (E.D. Pa. Apr. 6, 2023) .................................................................................... 25, 26, 28

*Frederick Douglass Foundation, Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023).....................................................................18

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021)........................................................................... 21, 23

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................................36

*Greater Philadelphia Chamber of Commerce v. City of Philadelphia*,
    949 F.3d 116 (3d Cir. 2020) .........................................................................38

*Hartman v. Moore*,
    547 U.S. 250 (2006)......................................................................................16

*Harvard v. Cesnalis*,
    973 F.3d 190 (3d Cir. 2020) .........................................................................17

*Hernandez v. Commissioner*,
    490 U.S. 680 (1989)......................................................................................23

*Hill v. City of Scranton*,
411 F.3d 118 (3d Cir. 2005) ................................................................. 17, 18

*Hill v. Colorado*,
530 U.S. 703 (2000)........................................................................35

*Hope v. Warden York County Prison*,
972 F.3d 310 (3d Cir. 2020) ..........................................................15

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*,
515 U.S. 557 (1995)........................................................................20

*In re McVane*,
44 F.3d 1127 (2d Cir. 1995) ...........................................................28

*International Union, United Automobile, Aerospace & Agricultural Implement
Workers of America, & its Locals 1093, 558 & 25 v. National Right to Work
Legal Defense & Education Foundation, Inc.*,
590 F.2d 1139 (D.C. Cir. 1978).......................................................24

*Jurista v. Amerinox Processing, Inc.*,
492 B.R. 707 (D.N.J. 2013)............................................................39

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022).....................................................................20

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992) ..........................................................35

*Kriss v. Fayette County*,
504 Fed. Appx. 182 (3d Cir. 2012) .................................................19

*Leone v. Essex County Prosecutor's Office*,
No. CV2112786SDWESK, 2021 WL 4317240 (D.N.J. Sept. 23, 2021)......20

*Lewis v. Wilson*,
253 F.3d 1077 (8th Cir. 2001) .........................................................37

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018)................................................................ 21, 22

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...........................................................39

*National Association for Advancement of Colored People v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958)........................................................................25

*National Institute of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018)....................................................................16

*Obria Group Inc. v. Ferguson*,
   No. 3:23-cv-06093 (W.D. Wash. Dec. 22, 2023)..........................................14

*Powell v. Noble*,
   798 F.3d 690 (8th Cir. 2015) ..........................................................35

*Real Alternatives, Inc. v. Secretary Department of Health & Human Services*,
   867 F.3d 338 (3d Cir. 2017) ..........................................................17

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)................................................................ 24, 25

*San Filippo v. Bongiovanni*,
   961 F.2d 1125 (3d Cir. 1992) .........................................................36

*See v. City of Seattle*,
   387 U.S. 541 (1967)......................................................................28

*Starnes v. Butler County Court of Common Pleas, 50th Judicial Distrist*,
   971 F.3d 416 (3d Cir. 2020) ..........................................................16

*Susan B. Anthony List v. Driehaus*,
   814 F.3d 466 (6th Cir. 2016) .........................................................32

*Sypniewski v. Warren Hills Regional Board of Education*,
   307 F.3d 243 (3d Cir. 2002) ..........................................................32

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021).......................................................... 21, 22, 24

*Tenafly Eruv Association, Inc. v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002) ................................................... 21, 22, 23

*United States v. Westinghouse Electric Corporation*,
   788 F.2d 164 (3d Cir. 1986) ..........................................................29

*United States v. Williams*,
    553 U.S. 285 (2008)........................................................................ 32, 33, 35

*Village of Hoffman Estates v. Flipside, Hoffman Estates*, Inc.,
    455 U.S. 489 (1982)........................................................................36

*Virginia v. Hicks*,
    539 U.S. 113 (2003)........................................................................32

*Wayte v. United States*,
    470 U.S. 598 (1985)........................................................................17

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ......................................................19

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)............................................................................15

## Statutes

N.J.S.A. 45:17A-18-40,

    Charitable Registration and Investigation Act ...................................... 31, 32

N.J.S.A. 56:8–3,
    New Jersey Consumer Fraud Act ....................................................29

Vt. Stat. Ann. tit. 3, § 129a(29)..............................................................7

## Other Authorities

Blake M. Autry & Roopma Wadhwa, *Mifepristone*, Library Of Medicine,
    National Center Fer Biotechnology Information (May 8, 2022) ........6

Errol R. Norwitz & Aaron B. Caughey, *Progesterone Supplementation and the
    Prevention of Preterm Birth*, 4 Reviews In Obstet. & Gynecol. 60, 61
    (2011)............................................................................................6

George Delgado et al., *A case series detailing the successful reversal of the effects
    of mifepristone using progesterone*, 33 Issues In Law & Med. 21, 21-31
    (2018)............................................................................................6

Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to
    keep it that way*, nj.com (April 30, 2023) ......................................8

Mitchell D. Creinin, et al., *Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, OBSTETRICS & GYNECOLOGY 135(1), 158-165 (2020) ..........................................................10

Steven Ertelt, *Pro-Life Attorneys Sue Washington State to Stop It From Shutting Down Pregnancy Centers*, LIFENEWS (Nov. 30, 2023)................................11

## **INTRODUCTION**

Plaintiff First Choice Women's Resource Centers, Inc. ("First Choice" or "the Ministry") is a Christian pro-life nonprofit that serves pregnant mothers, mothers of newborns, and fathers. Defendant Attorney General Matthew Platkin ("AG Platkin") openly opposes such organizations, having publicly aligned himself with Planned Parenthood's pro-abortion mission. While he is entitled to those personal views, he has no right to use the authority of his office to harm those who disagree with him. But that is exactly what he has done: he has collaborated with Planned Parenthood and other pro-abortion organizations to issue a consumer alert against pregnancy centers. And now, he has selectively targeted First Choice based on its religious speech and pro-life views with a wide-ranging, unfounded, and burdensome subpoena that will cause substantial injury to the Ministry. This violates the Constitution, entitling First Choice to a temporary restraining order and preliminary injunction.

AG Platkin has invoked the New Jersey Consumer Fraud Act, the Charitable Registration Act, and his investigative authority over Professions and Occupations to serve First Choice with a Subpoena that requires extensive document production on pain of judicial sanctions. Based on the scope of the demands, he appears to be concerned about First Choice's statements about Abortion Pill Reversal (APR)—a lawful and life-saving treatment that First Choice provides. But he cites no complaint

or other substantive evidence to show any basis for suspicion of wrongdoing, and he demands unrelated information.

AG Platkin's exorbitant demands leverage the threat of sanctions under New Jersey law to frustrate First Choice's Christian, pro-life mission. Complying with the subpoena would require the expenditure of significant amounts of time and resources, frustrate First Choice's speech and mission, disrupt its relationships, and discourage support. The subpoena is unlawful under the First and Fourth Amendments, and this Court should stop it.

*First*, AG Platkin's demands violate bedrock guarantees of the First Amendment: freedom of speech, freedom of religion, freedom of association, and the First Amendment privilege. He has violated First Choice's right to free speech by serving it with retaliatory demands, targeting its viewpoint, and selectively enforcing New Jersey law against it based on disagreement with its views on abortion. He has injured the Ministry's exercise of religion by singling out the Ministry's religious views about abortion for hostile action. He threatens First Choice's freedom of association by harming its relationships with others. And he wrongly demands production of internal communications and documents from the Ministry that are protected by the First Amendment privilege. This Court should enjoin these First Amendment violations.

*Second*, AG Platkin's expansive demands constitute an unreasonable search and seizure. The primary statute AG Platkin invokes—the Consumer Fraud Act—specifically *exempts* nonprofit organizations like the Ministry from its sweep and thus cannot constitutionally support an investigation. And the Subpoena fails to allege what, if any, potential violation of the law has occurred to justify a civil investigation. This is unreasonable and unconstitutional. And AG Platkin's unspecific and sweeping demands for information—asking about First Choice's organizational structure; personal information of leadership, volunteers, and personnel; associations; internal policies; and tax-exempt status—far exceed the scope of any valid investigation.

*Third*, the investigatory provisions of the Charitable Registration Act that AG Platkin invokes are facially invalid under the First Amendment. These provisions—which purport to allow AG Platkin to investigate both false *and true* statements from regulated actors regardless of harm, intent, or any other qualification—suffer fatally under the doctrines of overbreadth, vagueness, and unbridled restraint. AG Platkin's as-applied enforcement only highlights these facial deficiencies.

These constitutional violations irreparably harm First Choice and warrant an injunction.

# FACTUAL BACKGROUND

## *The First Choice Ministry*

First Choice is a New Jersey pregnancy resource center that serves women and men in unplanned pregnancies by providing counseling, medical services, and practical support. Compl. ¶ 3. It has been serving New Jersey women since 1985 and was incorporated as a religious nonprofit organization under the laws of New Jersey in 2007. *Id.* ¶ 1, 17. It currently operates out of five separate locations in New Jersey: Jersey City, Montclair, Morristown, Newark, and New Brunswick. *Id.* ¶ 18.

First Choice's mission is to help pregnant women facing unplanned pregnancies evaluate the alternatives to abortion, enabling them to make informed decisions concerning the outcome of their pregnancies. *Id.* ¶ 19. Since its inception in 1985, First Choice has served over 36,000 women facing unplanned pregnancies. *Id.* ¶ 21.

First Choice is a Christian faith-based organization and views itself as an outreach ministry of Jesus Christ through His church. *Id.* ¶¶ 28–30. All of its employees, board members, and volunteers must adhere to its statement of faith. *Id.* ¶ 29. The Ministry believes and affirms that life begins at conception, at which time the full genetic blueprint for life is in place. *Id.* ¶ 30. Thus, First Choice believes that its expression of love and service to God requires that it work to protect and honor life in all stages of creation. *Id.* It is therefore committed to providing clients with

4

accurate and complete information about both prenatal development and abortion. *Id.* ¶ 31. First Choice abides by its Christian beliefs in how it operates, including in what it teaches and how it treats others. *Id.* ¶ 32. It serves patients without regard to race, creed, color, national origin, age, or marital status and provides all of its services free. *Id.* ¶¶ 22–23.

### First Choice's Services

Under a physician as Medical Director, First Choice provides many services, including pregnancy testing; pregnancy options counseling; STD and STI testing and referral; ultrasounds; parenting education; and material support, such as baby clothes and diapers, maternity clothes, and food. *Id.* ¶ 20. As stated on its website and in its facilities, First Choice does not provide abortions but provides accurate information about abortion, including its risks. *Id.* ¶ 24.

One of the most important services First Choice provides is Abortion Pill Reversal ("APR"). Under the standard APR protocol, a pregnant woman who changes her mind after taking the first but not second chemical abortion drug may request progesterone to counter the effects of mifepristone. *Id.* ¶ 26. In appropriate circumstances, First Choice's medical director prescribes progesterone, a naturally occurring pregnancy hormone commonly administered to women at risk of

miscarrying.[1] Mifepristone, the first drug in the two-drug medication abortion regime, is a progesterone antagonist that causes hemorrhaging and typically kills the developing fetus.[2] If APR is begun quickly after taking mifepristone, it can counter mifepristone's effects. One study showed that about two-thirds of pregnancies were successfully continued after APR, with no apparent risk of birth defects.[3] First Choice is a leading administrator of APR, which it has administered nearly 100 times so far this year. *Id.* ¶ 26. First Choice attempts to follow up with all patients to whom it administers APR to track its effectiveness. *Id.*

Indeed, at least one court recently recognized that, consistent with progesterone's routine administration to pregnant women to prevent miscarriage, APR "does not appear to pose severe health risks to patients who receive it." *Bella Health & Wellness v. Weiser*, 115 Fed. R. Serv. 3d 690, 2023 WL 2978108, at *2 (D. Colo. Apr. 15, 2023). The treatment is legal in forty-eight states, including New Jersey, and a law against it in Colorado has been enjoined. *See Bella Health &*

---

[1] *See, e.g.*, Errol R. Norwitz & Aaron B. Caughey, *Progesterone Supplementation and the Prevention of Preterm Birth*, 4 REVIEWS IN OBSTET. & GYNECOL. 60, 61 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3218546/.

[2] Blake M. Autry & Roopma Wadhwa, *Mifepristone*, LIBR. OF MED., NAT'L CTR. FOR BIOTECHNOLOGY INFO. (May 8, 2022), https://www.ncbi.nlm.nih.gov/books/NBK557612/.

[3] George Delgado et al., *A case series detailing the successful reversal of the effects of mifepristone using progesterone*, 33 ISSUES IN LAW & MED. 21, 21-31 (2018), https://pubmed.ncbi.nlm.nih.gov/30831017/.

*Wellness v. Weiser*, No. 1:23-CV-00939DDDSKC, 2023 WL 6996860, at *1 (D. Colo. Oct. 21, 2023).[4]

### *AG Platkin's Abortion Advocacy and Hostility to Pregnancy Centers*

AG Platkin has made no secret of his support for abortion businesses and his corresponding hostility towards religious pregnancy care centers like First Choice. He is open about his support for Planned Parenthood, having spoken at events hosted by the organization[5] and with a Planned Parenthood director at a pro-abortion roundtable hosted by Vice President Kamala Harris.[6] And he has made abortion advocacy a central tenet of his administration and public persona. In his short tenure in office, he has instituted a $5 million grant program to fund training for abortion providers,[7] created a special "Reproductive Rights Strike Force" in his office,[8] and established a state-federal partnership with New Jersey's United States Attorney

---

[4] Vermont recently passed a bill to include "[p]roviding or claiming to provide services or medications that are purported to reverse the effects of a medication abortion" in its list of "Unprofessional Conduct" for healthcare providers. VT. STAT. ANN. tit. 3, § 129a(29).

[5] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (April 26, 2022, 12:35 PM), https://bit.ly/3RJs1x7.

[6] Press Release, The White House, Readout of Vice President Kamala Harris's Meeting with New Jersey State Legislators on Reproductive Rights (July 18, 2022), https://bit.ly/4adVx5e.

[7] Press Release, New Jersey Office of the Attorney General, AG Platkin Announces $5 Million in Grant Funding to Provide Training and Education to Expand Pool of Abortion Providers in New Jersey (Dec. 2, 2022), https://bit.ly/48rOwfx.

[8] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin Establishes "Reproductive Rights Strike Force" to Protect Access to Abortion Care for New Jerseyans and Residents of Other States (July 11, 2022), https://bit.ly/3GAI75G.

related to abortion.[9] Preserving abortion in New Jersey is not enough: AG Platkin has also brought New Jersey into litigation in several other states seeking to block their pro-life laws.[10]

AG Platkin has also shown open animus to organizations like First Choice that provide pregnancy services without performing abortions. In one egregious example, AG Platkin issued a statewide "consumer alert" alleging, with no evidentiary support, that pregnancy care centers like First Choice "provide[] false or misleading information."[11] The alert accuses pregnancy care centers of lying about the services they provide, providing inaccurate or misleading ultrasounds, and providing false information about abortion. AG Platkin urges women to avoid pregnancy care centers and explicitly encourages them to seek out pro-abortion facilities like Planned Parenthood and the National Abortion Federation.

---

[9] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin, U.S. Attorney Sellinger Establish State-Federal Partnership to Ensure Protection of Individuals Seeking Abortion and Security of Abortion Providers (July 20, 2022), https://bit.ly/3GD8DeJ.

[10] Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to keep it that way*, NJ.COM (April 30, 2023), https://bit.ly/3R6TVBi; Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Aug. 2, 2023, 11:03 AM), https://bit.ly/3NGWKIL; Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (November 9, 2021, 4:18 PM), https://bit.ly/46RAl22; Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Oct. 27, 2021, 3:02 PM), https://bit.ly/3Th5Mzp.

[11] Press Release, New Jersey Office of the Attorney General, Consumer Alert, Crisis Pregnancy Centers (Dec. 7, 2022), https://bit.ly/3ThAuc2.

It is no surprise that the alert shows blatant favoritism to pro-abortion businesses because AG Platkin enlisted them to help him draft it. Sundeep Iyer, AG Platkin's director of the Division on Civil Rights, forwarded a draft of the consumer alert and requested comment from Kaitlyn Wojtowicz, Vice President of Public Affairs at Planned Parenthood Action Fund of New Jersey. Compl. Ex. 1. The same day, Iyer forwarded a draft and requested comment from Amol Sinha, Executive Director of ACLU New Jersey. Compl. Ex. 3. Iyer also sought input from Roxanne Sutocky, Director of Community Engagement for The Women's Centers, a group of abortion providers with facilities in several East Coast states. Compl. Ex. 5. All responded with comments or suggested edits to the alert. Compl. Exs. 2, 4, 6–7. Other pro-abortion politicians seized on AG Platkin's consumer alert; one New Jersey congressman cited it in calling pregnancy resource centers "Brainwashing Cult Clinics."[12]

AG Platkin has warned that "[i]f you're seeking reproductive care, beware of Crisis Pregnancy Centers!"[13] He has accused pro-life pregnancy centers of

---

[12] Press Release, U.S. House of Representatives Office of Josh Gottheimer, Gottheimer Launches Campaign to Shutdown [sic] Deceptive Anti-Choice Clinics Posing as Women's Healthcare Providers in NJ; Brainwashing Cult Clinics Are Dangerous to Women's Health (Oct. 6, 2023), https://gottheimer.house.gov/posts/release-gottheimer-launches-campaign-to-shutdown-deceptive-anti-choice-clinics-posing-as-womens-healthcare-providers-in-nj).

[13] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Dec. 7, 2022, 3:20 PM), https://bit.ly/3uXydIx.

"pretend[ing] to be legitimate medical facilities,"[14] referred to the Supreme Court's decision overturning *Roe v. Wade* as an "extreme right-wing decision,"[15] and referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need."[16] And AG Platkin joined a letter with fifteen other state attorneys general that made sweeping accusations about pregnancy centers.[17] They criticized centers that do not offer abortion and specifically targeted APR as "an unproven and potentially risky medical protocol."[18]

### *AG Platkin's Unreasonable Subpoena*

These state attorneys general have not limited their hostility to pregnancy centers to mere words. California's attorney general sued two pregnancy centers

---

[14] *Id.*

[15] New Jersey Office of the Attorney General, *supra* n.9.

[16] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (October 11, 2023, 1:49 PM), https://bit.ly/47PBqZh.

[17] Open Letter from Attorneys General Regarding CPC Misinformation and Harm (Oct. 23, 2023), https://bit.ly/3R9cmp8.

[18] *Id.* The letter implied that the mere study of APR sent three study participants by ambulance to the hospital for "severe vaginal bleeding." *Id.* This itself is misleading: in the actual study, two of the three women who needed emergency treatment for hemorrhaging received a placebo, not APR—mifepristone caused massive hemorrhaging, not progesterone. Mitchell D. Creinin, et al., *Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, OBSTETRICS & GYNECOLOGY 135(1), 158-165 (2020), https://journals.lww.com/greenjournal/abstract/2020/01000/mifepristone_antagonization_with_progesterone_to.21.aspx.

under his state's consumer protection act.[19] Washington's attorney general issued civil investigative demands against two pregnancy centers.[20] And now AG Platkin has pursued a similar tack by serving subpoenas on pregnancy centers in New Jersey.

The Subpoena AG Platkin served on First Choice states it was issued under the New Jersey Consumer Fraud Act ("CFA"), the Charitable Registration and Investigation Act ("CRIA"), and the Attorney General's investigative authority over Professions and Occupations. Compl. Ex. 8. AG Platkin cited no factual basis for the Subpoena. The Subpoena requires First Choice to provide responsive documents from as early as December 1, 2013, to the date of First Choice's response. *Id.* at 11. It demands documents related to a broad host of topics, including First Choice's communications, internal procedures, and associations. *Id.* at 11–16. It requires, among many other things, production of (emphasis added):

> a.      A copy of *every* solicitation and advertisement, including those appearing on any First Choice website, social media, print media, including newspapers and magazines, Amazon or other e-commerce platform, sponsored content, digital advertising, video advertising, other websites, Pinterest, radio, podcasts, and pamphlets.

> b.      *All* documents from December 1, 2013, substantiating a broad host of statements made on First Choice's websites.

---

[19] Press Release, State of California Office of the Attorney General, *Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients* (Sept. 21, 2023), https://bit.ly/3GBzW9m.
[20] Steven Ertelt, *Pro-Life Attorneys Sue Washington State to Stop It From Shutting Down Pregnancy Centers*, Lɪ𝗙ᴇNᴇᴡs (Nov. 30, 2023), https://bit.ly/48dhEHf.

  c.  "*All* Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets."

  d.  "*All* Documents Concerning representations made by [First choice] to Clients about the confidentiality of Client information, Including privacy policies."

  e.  "*All* Documents Concerning *any* complaints or identifying *any* concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors."

  f.  "Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service."

  g.  "Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images."

  h.  *All* documents concerning Heartbeat International, the Abortion Pill Reversal Network, and Care Net.

  i.  Documents sufficient to identify the identity of First Choice's owners, officers, directors (including medical directors), partners, shareholders, and board members.

  j.  "Documents sufficient to Identify donations made to First Choice . . .."

*Id.* at "Document Requests," ¶¶ 1, 3, 5–7, 11, 16, 18, 22–23, 26.

The Subpoena places First Choice in an untenable position. If it does not comply, it faces potentially severe judicial sanctions. The Subpoena twice emphasizes that "[f]ailure to comply with this Subpoena may render you liable for contempt of court and such other penalties as are provided by law." *Id.* at 2. It states

that First Choice has "an obligation to retain, and continue to maintain the requested Documents." *Id.* at 2. And it demands compliance by December 15, 2023. *Id.*

On the other hand, complying with the Subpoena would inflict severe harm on First Choice in several ways. It would be reasonable for an organization faced with such demands to chill its speech about APR. But regardless of whether First Choice ceases its truthful and mission-based speech, AG Platkin can effectively limit its speech by draining and diverting First Choice's resources away from its mission and into Subpoena compliance.

Given the inherent constraints of working as a nonprofit with limited resources and staffing, employees are currently required to perform a range of functions, and every minute spent on other tasks is less time devoted to the ministry's mission. Compl. ¶¶ 71–74. Yet complying with the Subpoena would bury First Choice in an absurd amount of work. *Id.* The ministry estimates that it would take several staff members at least an entire month to produce all requested documents. *Id.* ¶ 72. Diverting so many resources to this task would severely impede the ministry's ability to perform its core functions, to say nothing of the financial costs, including attorneys' fees. *Id.* ¶ 73. Staff members who normally devote their time to serving women in need, informing women about their options, including APR, and communicating with essential supporters would have to cease their mission-driven activities to comply with AG Platkin's oppressive demands. *Id.* ¶ 74. Complying

13

with the Subpoena would become the driving focus of the Ministry, not its Christ-centered mission of serving women in need. *Id.*

Complying with the Subpoena would also harm First Choice's working relationships. The Subpoena requires First Choice to identify its donors, Compl. Ex. 8, "Document Requests" ¶¶ 11, 26, which will likely reduce donations from those wary of the risk of retaliation and public exposure. Compl. ¶ 76. Likewise, disclosing the identities of First Choice's employees and volunteers, *see* Compl. Ex. 4, "Document Requests" ¶¶ 16, 18, 24, may cause employees to leave the already short-staffed Ministry or deter prospective employees from applying out of the reasonable fear of retaliation and public disclosure. Compl. ¶ 77. And disclosing the nature of First Choice's relationships with other organizations, *see* Compl. Ex. 8, "Document Requests" ¶¶ 10, 14, 16, 18, 22–23, may sour those relationships for the same reasons, or for fear that AG Platkin will target them too. Compl. ¶ 78. That has already happened with other organizations served with similar demands. Mot. for Prelim. Injunction, ECF No. 4, at 18, *Obria Grp. Inc. v. Ferguson*, No. 3:23-cv-06093 (W.D. Wash. Dec. 22, 2023).

Upon information and belief, AG Platkin has not initiated similar investigations against pro-abortion and for-profit pregnancy centers like Planned Parenthood, despite publicized and recurring data breaches and misleading public statements about chemical abortion. Compl. ¶¶ 54, 64–66. While these data breaches

and misleading statements have flown comfortably under AG Platkin's radar, the Subpoena against First Choice jeopardizes the Ministry's ability to carry out its religious mission. First Choice moves to enjoin it.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The third and fourth factors merge when the Government is the opposing party." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). First Choice meets all these factors.

## I. First Choice is likely to succeed on its constitutional claims.

### A. AG Platkin's demands violate the First Amendment.

#### 1. AG Platkin violates First Choice's free speech.

The Subpoena violates First Choice's freedom of speech in two critical respects—as unlawful retaliation, and as content- and viewpoint-based selective enforcement.

*First*, AG Platkin's actions are unlawful retaliation against protected speech. "[T]he law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To demonstrate unlawful retaliation, a plaintiff must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising h[er] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 429 (3d Cir. 2020) (quoting *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017)).

These elements are met here. First Choice has engaged in constitutionally protected speech advancing a pro-life message, including providing information about APR. Compl. ¶ 84; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2377–78 (2018). By subjecting the ministry to extensive and invasive investigations of that speech—which is core to the Ministry's religious mission and from which First Choice garners no profit—AG Platkin has engaged in conduct that would chill a person of ordinary firmness from continuing to engage in protected speech. *See Citizens For A Better Lawnside, Inc. v. Bryant*, No. CIV 05-4286, 2007 WL 1557479, at *5 (D.N.J. May 24, 2007) (holding borough council investigation into background of reverend who vocally opposed zoning plan could chill reverend's speech). And First Choice's pro-life messaging "was a substantial factor" in AG Platkin's decision to issue the Subpoena. *Hill v. City of Scranton*, 411 F.3d 118, 125

(3d Cir. 2005) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). He has worked with pro-abortion groups to draft a "consumer alert" besmirching pro-life pregnancy centers like First Choice, has baselessly accused pro-life pregnancy centers of providing false and misleading information, and has made opposition to the pro-life cause a central agenda item for his office. Compl. ¶¶ 34–63. Not only that, but he ignores well-established violations by pro-abortion groups while investigating the Ministry with no stated evidentiary support. First Choice is thus likely to succeed on its retaliation theory.

*Second*, AG Platkin has selectively enforced the law based on viewpoint. "[A]lthough prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). In a selective enforcement claim, which can be evaluated under both a First Amendment/Viewpoint Discrimination and a Fourteenth Amendment/Equal Protection Framework, a plaintiff must show two things: (1) that he was treated differently from "other similarly situated individuals"; and (2) "that this selective treatment was based on an unjustifiable standard, such as . . . to prevent the exercise of a fundamental right." *Hill*, 411 F.3d at 125 (internal quotation omitted); *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 348 (3d Cir. 2017).

Parties are similarly situated "when they are alike 'in all relevant aspects.'" *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Nordlinger v. Hahn*,

505 U.S. 1, 10 (1992)). AG Platkin overlooks dozens of reproductive health-related organizations while targeting First Choice. The similarities these organizations share with the Ministry include clientele—*i.e.*, women and men seeking reproductive health services—and many services they provide—*e.g.*, pregnancy testing, STD testing, ultrasounds, adoption referrals, and so on. Yet AG Platkin declines to investigate reproductive health-related organizations that share his view on abortion—instead, he asks them to help him draft his consumer alert disparaging pregnancy centers. And for organizations that, like First Choice, do not share his views on abortion, he imposes unfounded and overbroad investigative demands into their truthful statements about a lawful treatment.

Through his selective enforcement of New Jersey law, AG Platkin has discriminated on the basis of viewpoint and prevented the exercise of First Choice's First Amendment rights. "[G]overnment favoritism in public debate is so pernicious to liberty and democratic decisionmaking that viewpoint discrimination will almost always be rendered unconstitutional." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation omitted). Discriminatory intent may be demonstrated through either a pattern of discriminatory enforcement or direct evidence of animus. *Brown v. City of Pittsburgh*, 586 F.3d 263, 293–94 & n.37 (3d Cir. 2009); *Hill*, 411 F.3d at 131–32. There is little question about AG Platkin's discriminatory intent, as examples of disparate enforcement and animus

18

are both demonstrated here. AG Platkin does not hide his hostility to pregnancy centers, making it a central feature of his political persona. Compl. ¶¶ 33–63. And he has shown a record of selectively targeting for enforcement pregnancy centers that hold views on abortion with which he disagrees, *id.* ¶ 66.

These actions would deter all but the bravest of speakers. Proving a First Amendment violation does not require that a plaintiff be "actually deterred from doing anything" so long as an official's acts are "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Kriss v. Fayette County*, 504 Fed. Appx. 182 (3d Cir. 2012). AG Platkin has instituted a groundless investigation into the details of First Choice's communications, associations, personnel, clients, and organizational structure. Such an expansive intrusion into an organization's protected activity and inner workings by a government official with the force of law easily meets the "ordinary firmness" standard. *See Bryant*, 2007 WL 1557479, at *5; *White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (holding HUD investigation into plaintiffs who vocally opposed multi-family housing facility chilled plaintiffs' speech); *Blankenship v. Manchin*, 471 F.3d 523, 532 (4th Cir. 2006) (holding Governor's investigation into coal business based on owner's opposition to bond amendment would chill speech of business owner of ordinary firmness). AG Platkin's open animus against pregnancy centers gives First Choice

every reason to believe he will use his investigation to punish the Ministry for its pro-life advocacy.

The government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). The Court should enjoin AG Platkin's effort to do so here.

### 2.    AG Platkin violates First Choice's free exercise.

Just as AG Platkin's demands violate First Choice's freedom of speech, they also violate the First Amendment's Free Exercise clause, which "work[s] in tandem" with its protection of speech. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). There is no question that the Ministry's pro-life beliefs are "sincerely held" and "religious in nature." *Leone v. Essex Cnty. Prosecutor's Off.*, No. CV2112786SDWESK, 2021 WL 4317240, at *3 (D.N.J. Sept. 23, 2021) (citing *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275 (3d Cir. 2007)); *Africa v. Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981). AG Platkin's demands violate the Free Exercise Clause by singling out these religious beliefs for unfavorable treatment.

The Free Exercise clause forbids "governmental hostility" to religion, whether it be "overt" or "masked." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,

508 U.S. 520, 534 (1993). Thus, when government action "targets religious conduct for distinctive treatment," it cannot be "shielded by mere compliance with the requirement of facial neutrality." *Id.* "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). The Third Circuit explains: "[I]f the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., if it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002) (citing *Lukumi*, 508 U.S. at 532). This mandate of neutrality prohibits governments from "deciding that secular motivations are more important than religious motivations." *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999). AG Platkin fails to pass the test of neutrality and general applicability for at least three reasons.

*First*, government action is not neutral if it "treat[s] any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). "[W]hether two activities are comparable for purposes of the

Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 1296. Planned Parenthood and First Choice are similarly situated in their clientele and in many services they provide, save for abortion. Yet AG Platkin has invited Planned Parenthood to help him draft a consumer alert against comparable religious activity. Thus, AG Platkin has exercised broad enforcement power against First Choice over its statements about APR, while leaving problematic statements about abortion procedures by Planned Parenthood alone. *See* Compl. ¶¶ 64–66. He has impermissibly "discriminate[d] between religiously motivated conduct and comparable secularly motivated conduct in a manner that devalues religious reasons for acting." *Tenafly*, 309 F.3d at 169.

*Second*, AG Platkin's campaign to malign and investigate pregnancy centers under a consumer protection theory divorced from any consumer relationship shows religious "hostility" that is "neither subtle nor covert." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Of Educ.*, 82 F.4th 664, 690 (9th Cir. 2023) (citing *Lukumi*, 508 U.S. at 546). The government may not act in a manner "hostile to . . . religious beliefs" or inconsistent with the Free Exercise Clause's bar on even "subtle departures from neutrality." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (citation omitted); *Lukumi*, 508 U.S. at 534. Hostility is readily apparent from AG Platkin's many statements and actions showing overt animus to religious pregnancy centers that do not perform or refer for abortions. *See* Compl. ¶¶ 33–63.

*Third*, AG Platkin has contravened the neutrality and general applicability requirements by "exempt[ing] some secularly motivated conduct but not comparable religiously motivated conduct." *Tenafly*, 309 F.3d at 165-166. A statute fails the test when it allows the government "to decide which reasons for not complying with the policy are worthy of solicitude on an ad hoc basis." *Fulton*, 141 S. Ct. at 1879 (internal quotations omitted). As the en banc Ninth Circuit has recently held, "the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Fellowship*, 82 F.4th at 664, 687–88 (en banc). That is exactly what AG Platkin has exercised here: using broad discretionary authority under three statutes to target organizations that make statements with which he disagrees. He has invoked his selective application authority against those whose views he dislikes and left alone the others.

AG Platkin's threat of civil sanctions places a substantial burden on the Ministry's religious speech and must (but cannot) satisfy strict scrutiny. *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). AG Platkin lacks a compelling state interest to investigate that speech. Even if the Statutes' pro-consumer and transparency purposes are compelling, these laws both explicitly exempt First Choice because it is a registered nonprofit organization, Compl. ¶ 1, and do not apply because the Statutes themselves are constitutionally vague and overbroad, *see infra* Sec. C. Nor

are AG Platkin's demands narrowly tailored—he cannot "show that measures less restrictive of the First Amendment activity could not address [his] interest." *Tandon*, 141 S. Ct. at 1296–97. Because AG Platkin "permits other activities" by Planned Parenthood despite its medically inaccurate statements about abortion, he cannot show that any concerns he has about First Choice make it somehow "more dangerous than those activities" he allows from Planned Parenthood. *Id.* at 1297. AG Platkin's targeting of the Ministry's religious exercise cannot survive strict scrutiny and the Court should enjoin enforcement of his unlawful Subpoena.

### 3.    AG Platkin violates First Choice's free association.

AG Platkin's groundless demands have also harmed First Choice's freedom of association by damaging its working relationships. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). These First Amendment associational rights apply "not only to the organization itself, but also to its staff, members, contributors, and others who affiliate with it." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., & its Locs. 1093, 558 & 25 v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978). Unconstitutional actions that infringe on the freedom of association "can take a number of forms." *Roberts*, 468 U.S. at 622.

These include penalizing individuals for membership in a disfavored group and interfering with the group's internal affairs. *Id*. at 622–23.

Thus, the government infringes on free association when it issues a baseless investigative process. A plaintiff can establish a violation of its free association right in this context by showing "enforcement of the [Subpoena] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Fraternal Ord. of Police Pa. Lodge v. Twp. of Springfield*, No. CV 23-332, 115 Fed.R.Serv.3d 808, 2023 WL 2839093, at *6 (E.D. Pa. Apr. 6, 2023). Infringements of associational rights are subject to "exacting scrutiny" which requires the government to demonstrate that its action is narrowly tailored to promote an important governmental interest. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021). "Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure." *Id.* at 2388 (emphasis in original) (quoting *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958)).

AG Platkin demands that First Choice reveal the identities of or communications with its donors, clients, staff, vendors, ministry associates, owners, officers, directors, partners, shareholders, and board members. Compl. Ex. 8,

"Document Requests" ¶¶ 10, 11, 16, 18, 22, 23, 26. Requiring identification of such a wide range of persons and entities, including those with no relation to the stated subject of his demands, both discourages new associations with First Choice and encourages withdrawal from existing relationships. Organizations associated with First Choice may now reasonably hesitate to engage with the organization out of fear that they too may be subject to retaliatory examination. Current volunteers and supporters will rationally resist subjecting themselves to investigation through their relationship with First Choice, as will prospective clients and donors. And this loss of organizational support will ultimately impede First Choice's mission of serving men and women in need. Ultimately, the stigma of AG Platkin's Subpoena jeopardizes First Choice's ability to associate with others to achieve its purposes.

### 4.   AG Platkin violates First Amendment privilege.

Even further, much of what AG Platkin demands about First Choice's other associational memberships is protected by First Amendment privilege. Invoking that privilege requires a showing "that enforcement of the [subpoenas] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Fraternal Ord. of Police*, 2023 WL 2839093, at \*6. The evidence offered need only make "a showing of reasonable probability" that disclosure "will lead to some form or specter of harassment, threat, or reprisal."

*ERISA Indus. Comm. v. Asaro-Angelo*, No. CV-20-10094, 2023 WL 2808105, at \*7 (D.N.J. Apr. 6, 2023) (quotation omitted). Once that showing is made, the burden shifts to the government "to demonstrate a compelling need for the information that will survive 'exacting scrutiny.'" *Id.* (quoting *In re Grand Jury Proceedings; A Grand Jury Witness v. United States*, 776 F.2d 1099, 1102–03 (2d Cir. 1985)). In close cases, "[w]here the First Amendment is implicated, the tie goes to the speaker." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474 (2007).

With remarkable boldness, AG Platkin demands a slew of internal, nonpublic information about First Choice's relationships with others:

- all "complaints" and "concerns" raised by clients and donors about First Choice's services;

- the identities of any individuals to whom First Choice refers for APR and any service that requires professional licensure;

- all documents about Heartbeat International Inc. and the Abortion Pill Hotline;

- all documents about First Choice's affiliation with Care Net;

- the identity of all owners, officers, directors, partners, shareholders, and board members of First Choice and the date they became associated with the organization.

Compl. Ex. 8, "Document Requests" ¶¶ 11, 15, 18, 22–24. Hardly narrow, AG Platkin casts his net to catch as many of the Ministry's associations as possible with no connection to any valid investigation.

Demands for the identities of and information about individuals and organizations with whom the Ministry has associated harm those relationships and risk the breakdown of support. The Subpoena accordingly "objectively suggest[s] an impact on, or chilling of, [First Choice's] associational rights." *Fraternal Ord. of Police*, 2023 WL 2839093, at \*6. The breadth of the investigation, even targeting by name certain organizations AG Platkin suspects of having a relationship with First Choice, also creates a reasonable fear that associates of First Choice will be subject to investigation and retaliation. Thus, the subpoena threatens "harassment, membership withdrawal, [and] discouragement of new members." *Id.* Because none of the information AG Platkin seeks is relevant to a legitimate investigation, this Court should issue the requested injunction.

### B.    The Subpoena violates the Fourth Amendment.

AG Platkin's demands also violate the Fourth Amendment, which "requires that [a] subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967). "The relevance of the sought-after information is measured against the general purposes of the agency's investigation, 'which necessarily presupposes an inquiry into the permissible range of investigation under the statute.'" *In re McVane*, 44 F.3d 1127, 1135–36 (2d Cir. 1995) (quoting *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*, 5 F.3d 1508, 1516

(D.C. Cir. 1993)). AG Platkin's Subpoena abuses his authority under the CFA, CRIA, and Professions and Occupations provision and vastly exceed the limits of the Fourth Amendment.

A subpoena is enforceable only if "(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166 (3d Cir. 1986); *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984). Further, enforcement "constitutes an abuse of the court's process" if it "is issued for an improper purpose, such as harassment." *Westinghouse*, 788 F.2d at 166.

*First*, the Subpoena is not within AG Platkin's authority. The CFA (N.J.S.A. 56:8–3 and 8–4) does not provide AG Platkin with investigative authority, since it explicitly exempts nonprofit entities like First Choice. N.J.S.A. 56:8–47. Further, AG Platkin has cited no practice engaged in by First Choice that has been declared unlawful and that he may investigate under his Professions and Occupations authority. Additionally, for the reasons set forth in Point C below, the referenced provisions of the CRIA are invalid on their face under the First Amendment.

*Second*, most of the materials requested by the Subpoena do not relate to the subject of the investigation. The Subpoena demands scores of documents with no conceivable relation to misleading statements to consumers or patients, charity

29

registration, or occupational licensing. Those unrelated demands seek all documents about *any* "complaints" or "concerns" from Clients or Donors; *any* legal action or proceeding in any jurisdiction over the Ministry's services; the technology used by the Ministry; the identities of the Ministry's medical referrals and personnel, including employees, volunteers, business affiliates, owners, officers, directors, partners, shareholders, and board members; internal employee handbooks and policies; materials provided by pro-life partners; documents about the Ministry's tax-exempt status; all documents "physically or electronically provided to Clients"; all "videos shown to Clients . . . in the course of providing [the] Services . . . [i]ncluding but not limited to those videos Concerning abortion procedures and their purported effects"; and all documents about "representations made . . . to Clients about the confidentiality of Client information, including privacy policies." Compl. Ex. 8, "Document Requests" ¶¶ 5, 10, 11, 16, 18, 22, 23, 26. Even more concerning is AG Platkin's expansive definition of "First Choice," which purports to reach all of its affiliates. *Id.* at 9. The Fourth Amendment does not permit fishing expeditions.

*Third*, for many of the same reasons, the Subpoena is overbroad and burdensome. For one, it seeks discovery over a ten-year period when the statute of limitations is only six years. And to collect and produce documents having no relation to a legitimate investigation would require up to a month of work by multiple personnel at First Choice. Compl. ¶ 72. That would be harmful enough for a small

business, but it would cripple the operations of a small nonprofit like First Choice. AG Platkin cannot use his investigative authority outside its proper bounds to impose such burdens that would impair the mission of an organization with which he disagrees.

### C.     The CRIA investigatory provisions are facially invalid.

#### 1.     The investigatory provisions are overbroad.

The CRIA investigatory provisions are unconstitutional on their face and as applied because they give AG Platkin broad discretion to restrict a substantial amount of constitutionally protected speech relative to the statute's purpose and scope. The statute allows the attorney general to investigate potential violations of the act, which include a breach of the duty that "*[a]ny* statement, whether oral or written, made by a charitable organization . . . *shall be truthful*." N.J.S.A. 45:17A-32 (emphasis added). A free-floating power to investigate whether all statements of charities are true in the view of the attorney general, regardless of their impact on anyone, is a grave violation of the First Amendment.

The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep," *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999), and "no reasonable limiting construction is available that would render the policy constitutional." *Sypniewski v.*

*Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002). The CRIA's overbreadth is apparent "from the text of the law and from actual fact." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (internal quotations and citations omitted).

"The first step in [an] overbreadth analysis is to construe the challenged statute" under plain language because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The CRIA purports to "protect the public from fraud and deceptive practices" by "requir[ing] the registration of charitable organizations, professional fund raisers, and solicitors with the Attorney General." 45:17A-19. The CRIA grants the Attorney General "the powers necessary to obtain and disseminate to the public data concerning fund raising practices of these persons." *Id.* That includes investigating whether any charity has breached its duty that all its statements "*shall be truthful*." N.J.S.A. 45:17A-32 (emphasis added). The statute neither defines "truthful" nor specifies what acts or practices meet or fail to meet the requirement, leaving it to the sole discretion of the enforcer. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (invalidating political false-statement law, noting even false speech merits First Amendment protection).

The CRIA also lists other practices that it treats as "unlawful as applied to the planning, conduct, or execution of any solicitation or charitable sales promotion." N.J.S.A. 45:A-31(c). These include: (1) "utiliz[ing] information, statements or

communications that, *although literally true*, are *presented in a manner that has the capacity to mislead the average consumer*"; and (2) "engag[ing] in other unlawful acts and practices *as may be determined* by rules adopted by the Attorney General." *Id.* (emphasis added). Thus, the CRIA gives the Attorney General wide latitude to determine whether a charitable organization's statements are or appear to be truthful.

The CRIA's investigatory provisions "reach[] a substantial amount of constitutionally protected conduct," *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004), and will "deter[] people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas," *Williams*, 553 U.S. at 292. Despite conceivably valid applications of the CRIA, it is neither "unrealistic" nor "far-fetched" that AG Platkin will enforce the CRIA against constitutionally protected conduct and speech he disfavors. *See Gibson*, 355 F.3d at 226. That is exactly what he has done against pregnancy centers that do not share his views on abortion. Untethered to any limiting definition or scope, the CRIA's subjective mandate on truthfulness could justify harassing any number of organizations whose speech AG Platkin does not like. That would not just be about Abortion Pill Reversal, but about the environment, drugs, or any other social or societal issue with which this AG or future attorneys general disagree. Left unchecked, the CRIA provides a broad sword against unpopular or controversial, but *constitutionally protected*, speech. And, despite AG Platkin's apparent interest in

punishing certain speech and promoting transparency in nonprofit solicitations, the same goals can be achieved with a more narrowly tailored provision that focuses solely on objectively false statements—a standard that would not reach a substantial amount of constitutionally protected conduct.

The university speech code cases helpfully illustrate this point. In *DeJohn v. Temple University*, for example, the Third Circuit found that Temple's sexual harassment policy was overbroad because it "provide[d] no shelter for core protected speech." 537 F.3d 301, 317–18 (3d Cir. 2008). The policy prohibited expression that had "the purpose or effect of creating an intimidating, hostile, or offensive environment," but the court found that the use of "broad and subjective" words in the definition allowed the policy to "conceivably be applied to cover any speech" including constitutionally protected political and religious speech. *Id.* at 316–18. The CRIA likewise covers a broad swath of speech and does not by its terms restrict arbitrary enforcement. In fact, the statute itself acknowledges its own overbreadth, stating that it may be applied to prohibit both untruthful *and* truthful speech that "has the capacity to mislead"—no matter if it has misled—"the average consumer." Truthful statements about APR may well be captured by this provision simply because the attorney general does not believe APR is an acceptable practice.

The overbreadth of these statutes has not only created a "likelihood" the policies will inhibit free expression; they have had that actual effect. The risk of

restricting or chilling the constitutional rights to speak freely and exercise religion far exceeds the social cost of "invalidating a law that in some of its applications is perfectly constitutional." *Williams*, 553 U.S. at 292.

### 2.    The investigatory provisions are vague.

First Amendment vagueness overlaps with, but is distinct from, an overbreadth challenge. *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1266 (3d Cir. 1992). "A meritorious First Amendment vagueness challenge will annul an unclear law that 'chills' protected First Amendment activities." *Id.* The vagueness doctrine has "roots in the due process clause" and therefore "finds repulsive laws that endow officials with undue discretion to determine whether a given activity contravenes the law's mandates." *Id.* Its purpose is to "ensure fair and non-discriminatory application of the laws." *Id.*

Due process under the Fourteenth Amendment also demands fair notice of prohibited behavior. The Supreme Court has routinely held that a regulation fails to provide adequate due process if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), such that individuals are not given "fair notice of what constitutes a violation," *Powell v. Noble*, 798 F.3d 690, 703 (8th Cir. 2015). And laws that interfere with free speech are subject to more exacting scrutiny and require greater definiteness than other contexts. *Vill. of Hoffman Ests. v. Flipside, Hoffman*

*Ests.*, Inc., 455 U.S. 489, 499 (1982) ("a more stringent vagueness test" applies to a law that "interferes with the right of free speech or of association"). The CRIA does not come close to meeting this standard facially or as applied.

As discussed above, the CRIA orders that all statements made by charitable organizations "shall be truthful." But it does not define "truthful," instead "impermissibly delegat[ing] basic policy matters to [AG Platkin] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The statute expands this power further, proscribing even truthful statements that "are presented in a manner that has the capacity to mislead the average consumer." The statute has no clarifying interpretation or settled usage to illuminate, for example, what constitutes an impermissible presentation of truthful statements, or the strength of the capacity to mislead, or how to define the average consumer. This does not constitute "fair warning of prohibited conduct" and "is so imprecise that discriminatory enforcement is a real possibility"—and in this case has become a reality. *Id.* at 1049; *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992).

### 3.   The investigatory provisions confer unbridled discretion.

The CRIA lacks objective standards for enforcement, empowering AG Platkin to punish any action he sees as is in the public interest. "A government regulation that allows arbitrary application . . . has the potential for becoming a means of

suppressing a particular point of view." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Thus, "[i]t is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted . . . by use of a statute providing a system of broad discretionary licensing power." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965). And so "[a] restriction on speech is constitutional only if . . . the restriction [is] specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation." *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2001).

The CRIA provisions authorize and invite arbitrary and discriminatory enforcement. By permitting investigation of any potentially false statement by a charity, these regulations necessarily require "the appraisal of facts, the exercise of judgment, and the formation of an opinion" that raise a danger of censorship. *Forsyth*, 505 U.S. at 131. And the statute invites decisions "based upon the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988). No written standards define how the enforcer is to determine whether a true statement will mislead an average consumer, or whether a restriction on speech is within the public interest. Nor does the statute try to define, for example, what the public interest is or limit its scope. With so few restraints on AG Platkin's authority, this statute confers extraordinary power on the

AG that allows him to suppress points of view he disfavors. The Court should recognize that as unlawful.

## II.    First Choice meets the other injunction factors.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). AG Platkin's unlawful demands infringe on First Choice's protected speech, discriminate against its viewpoint and its religious exercise, harm its association rights, and burden it with unwarranted production of documents that distract from its mission. Those constitutional violations constitute irreparable harm, and only an injunction can stop them.

The balance of harms and public interest also favor First Choice. "In First Amendment cases . . . [t]he government bears the burden of proving that the [challenged] law is constitutional; thus, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law." *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020). Under this "mirror-image preliminary injunction analysis [courts] apply in First Amendment cases, that rule favors the grant of an injunction." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022). AG Platkin faces no legitimate hardship in being denied an opportunity at selective

harassment of speech and religion through a fishing expedition into records and activities predating the statute of limitations by many years.

First Choice, however, faces very real hardship. It must choose between risking sanctions, on one hand, or submitting to discriminatory and burdensome demands for sensitive and constitutionally protected information. To submit would be to alienate directors, employees, donors, volunteers, and vendors, while draining the Ministry's resources through extensive responses to discovery requests. What's more, First Choice has shown that the constitutional harm it will suffer is irreparable. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted), and "[t]here is a strong public interest in upholding the requirements of the First Amendment." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022).

## III.   First Choice is entitled to a temporary restraining order.

"Applications for temporary restraining orders are governed by the same standards as motions for preliminary injunctions." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 777 n.53 (D.N.J. 2013). Accordingly, for the reasons stated above, AG Platkin should be temporarily restrained from enforcing the Subpoena until the Court determines whether to issue a preliminary injunction.

## **CONCLUSION**

The Court should grant a temporary restraining order and preliminary injunction against the Subpoena.

Respectfully submitted this 13th day of December, 2023.

> */s/ Lincoln Davis Wilson*
> Lincoln D. Wilson(N.J. Bar No. 02011-2008)
> Timothy A. Garrison (Mo. Bar No. 51033)*
> Gabriella McIntyre (D.C. Bar No. 1672424)*
> Mercer Martin (Ariz. Bar No. 038138)*
> ALLIANCE DEFENDING FREEDOM
> 440 First Street NW, Suite 600
> Washington, DC 20001
> Telephone: (202) 393-8690
> Facsimile: (202) 347-3622
> lwilson@ADFLegal.org
> tgarrison@ADFLegal.org
> gmcintyre@ADFLegal.org
> mmartin@ADFLegal.org
>
> *Counsel for Plaintiff*
> *\*Motion for pro hac vice admission filed concurrently*