# EXHIBIT #8

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
**Division of Law**
**124 Halsey Street – 5th Floor**
**P.O. Box 45029**
**Newark, New Jersey 07101**
**Attorney for New Jersey Division of Consumer Affairs**



**By:   Chanel Van Dyke**
**Deputy Attorney General**
**Consumer Fraud Prosecution Section**
**Chanel.VanDyke@law.njoag.gov**

### ADMINISTRATIVE ACTION

### SUBPOENA DUCES TECUM

**THE STATE OF NEW JERSEY to:**         **First Choice Women's Resource Centers, Inc.**
**c/o Aimee Huber, Registered Agent**
**82 Speedwell Avenue**
**Morristown, New Jersey 07960**

You are hereby commanded to produce to the New Jersey Division of Consumer Affairs,

Office of Consumer Protection ("Division") through Chanel Van Dyke, Deputy Attorney General, at

124 Halsey Street, 5th Floor, Newark, New Jersey 07101, on or before **December 15, 2023**, at 10:00

a.m., the following:

### See **Attached Schedule.**

In lieu of your appearance, you may provide the documents and information identified in the

attached Schedule on or before the return date at the address listed above by Certified Mail, Return

Receipt Requested, addressed to the attention of Chanel Van Dyke, Deputy Attorney General,

Consumer Fraud Prosecution Section, 124 Halsey Street, 5th Floor, Newark, New Jersey 07101.

You may, at your option and expense, provide certified, true copies in lieu of the original documents

identified in the attached Schedule by completing and returning the Certification attached hereto.

In addition, you may supply the documents via email to Chanel.VanDyke@law.njoag.gov.

Failure to comply with this Subpoena may render you liable for contempt of Court and such other penalties as are provided by law.  This Subpoena is issued pursuant to the authority of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -227, specifically N.J.S.A. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J.S.A. 45:17A-18 to -40, specifically N.J.S.A. 45:17A-33(c), and the Attorney General's investigative authority regarding Professions and Occupations, N.J.S.A. 45:1-18.  You have an obligation to retain, and continue to maintain the requested Documents. Failure to comply with this Subpoena may render you liable for contempt of court and such other penalties as are provided by law.


s / *Chanel Van Dyke*
Chanel Van Dyke
Deputy Attorney General


Dated: 11/15/23

2

## CERTIFICATION OF COMPLIANCE

I _____, certify as follows:

1. I am employed by First Choice Women's Resource Centers, Inc. in the position of _____;

2. First Choice Women's Resource Centers, Inc.'s productions and responses to the Subpoena of the Attorney General of the State of New Jersey, dated November 15, 2023 ("Subpoena"), were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete, and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the Instructions and Definitions set forth in the Subpoena;

4. First Choice Women's Resource Centers, Inc.'s production and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the Subpoena have been withheld from First Choice Women's Resource Centers, Inc.'s production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the Instructions in the Subpoena;

7. The Documents contained in First Choice Women's Resource Centers, Inc.'s productions and responses to the Subpoena are authentic, genuine, and what they purport to be;

8. Attached is a schedule representing a true and accurate record of all Persons who prepared and assembled any productions and responses to the Subpoena, all Persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all Persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such Person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

4

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: _____


_____

Name (signature)


_____

Name (print)


_____

Title or Position

## SCHEDULE

## INSTRUCTIONS AND DEFINITIONS

**A.    INSTRUCTIONS:**

1.      This Request is directed to First Choice Women's Resource Centers, Inc., as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, subsidiaries, affiliates, successors, assigns or any other individual or entity acting or purporting to act on its behalf.

2.      Unless otherwise specifically indicated, the period of time encompassed by this Request shall be from January 1, 2021 to the date of your response to this Subpoena.

3.      Unless otherwise specifically indicated, capitalized terms are defined as set forth in the Definitions below.

4.      You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence. No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Subpoena and/or Your preservation obligations under the law, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish Your aforementioned preservation obligations, nor shall You act in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under the law.

5.      If there are no Documents responsive to any particular Subpoena request, You shall so certify in writing in the Certification of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

6.      If a Subpoena Request requires the production of Documents the form and/or content of which has changed over the relevant period, identify the period of time during which each such Document was used and/or otherwise in effect.

7.      Unless otherwise specifically stated, each and every Document produced shall be Bates-stamped or Bates-labeled or otherwise consecutively numbered and the Person making such production shall identify the corresponding Subpoena Request Number[s] to which each Document or group of Documents responds.

8.      Electronically Stored Information should be produced in the format specified in Exhibit A.

9.      Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, Including production of any Document or other material indicating filing or other organization. Such production shall Include any file folder, file jacket, cover, or similar organization material, Including any folder bearing any title or legend that contains no Document. Likewise, all Documents physically attached to each other in Your files shall remain so

6

attached in any production; or, if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

10.     If one or more Documents or any portions thereof requested herein are withheld under a claim of privilege or otherwise, identify each Document or portion thereof as to which the objection is made, together with the following information:

a.      The Bates-stamp or Bates-label of the Document or portion thereof as to which the objection is made;

b.      Each author or maker of the Document;

c.      Each addressee or recipient of the Document or Person to whom its contents were disclosed or explained;

d.      The date thereof;

e.      The title or description of the general nature of the subject matter of the Document and the number of pages;

f.      The present location of the Document;

g.      Each Person who has possession, custody or control of the Document;

h.      The legal ground for withholding or redacting the Document; and

i.      If the legal ground is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

11.     In the event that any Document that would have been responsive to these Subpoena Requests has been destroyed or discarded, provide the: (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author[s] and recipient[s], and also include:

a.      Date of the Document's destruction or discard;

b.      Reason for the destruction or discard; and

c.      Person[s] authorizing and/or carrying out such destruction or discard.

12.     A copy of the Certification of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this Subpoena, and You shall submit such Certification(s) of Compliance with Your response to this Subpoena.

13.     In a schedule attached to the Certification of Compliance provided herewith, You shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able to competently testify: (a) that such productions and

responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be.

**B.   DEFINITIONS**

1.      "Abortion Pill Reversal" refers to a drug protocol purportedly used to stop the process of medicated abortion and continue a pregnancy—specifically, the administration of progesterone after a pregnant person has taken mifepristone, misoprostol, or methotrexate.

2.      "Advertisement" shall be defined in accordance with N.J.S.A. 56:8-1(a) and/or N.J.A.C. 13:45A-9.1 and shall Include Endorsements and any attempt to induce any Person to use Your Services. This definition applies to other forms of the word "Advertisement," Including "Advertised" and "Advertising."

3.      "Any" includes "all" and vice versa.

4.      "Charitable Purpose" shall be defined in accordance with N.J.S.A. 45:17A-20.

5.      "Claim(s)" means all statements, implications, messages, or suggestions made in any Advertisement, Solicitation, Pamphlet, commercial, Endorsement, or other Communication.

6.      "Client[s]" refers to Persons who use or have used Your Services, or Persons to whom You Advertise Your Services.

7.      "Client Solicitation Page" refers to the website in which First Choice engages in Solicitation and requests for donations, specifically located at the First Choice Website and at https://myegiving.com/App/Form/24dff450-d338-49d3-b2f9-7ac52352d9f4.

8.      "Communication(s)" means any conversation, discussion, letter, email, text message, Social Media message or post, memorandum, meeting, note, picture, post, blog, or any other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means, and shall Include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.  Except where otherwise stated, a request for "Communications" means a request for all such Communications.

9.      "Concerning" means relating to, pertaining to, referring to, describing, evidencing or constituting.

10.     "Contribution[s]" shall be defined in accordance with N.J.S.A. 45:17A-20.

11.     "Document" Includes all writings, word processing documents, records saved as a .pdf, spreadsheets, charts, presentations, graphics/drawings, images, emails and any attachments, instant messages, text messages, phone records, websites, audio files, and any other Electronically Stored Information.  Documents Include drafts, originals and non-identical duplicates.  If a printout of an electronic record is a non-identical copy of the electronic version (for example, because the printout has a signature, handwritten notation, other mark, or attachment not included in the computer document), both the electronic version in which the Document was created and the non-identical original Document must be produced.

12. "Donor[s]" refers to Persons who make or have made Contributions to First Choice, or who You Solicit to make Contributions to First Choice.

13. "Donor Solicitation Page" refers to the website in which First Choice engages in Solicitation and requests for donations, specifically located at the First Choice Donor Website and at https://www.myegiving.com/App/Giving/firstchoicewrc.

14. "Electronically Stored Information" or "ESI" means any Document, Communication, or information stored or maintained in electronic format.

15. "Employee" means any Person presently or formerly employed for hire including, but not limited to, independent contractors, any Person who manages or oversees the work of another, and any Person whose earnings are based in whole or in part on salary or commission for work performed.

16. "Endorsement(s)" means any message (Including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual of the name or seal of an organization) that Clients and/or Donors are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser.

17. "First Choice" means First Choice Women's Resource Centers, Inc., as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, subsidiaries, affiliates, successors, assigns, or any other Person acting or purporting to act on its behalf.

18. "First Choice Donor Website" means the website located at https://1stchoicefriends.org and Includes the Donor Solicitation Page.

19. "First Choice Facebook" means the Facebook page located at https://www.facebook.com/FirstChoiceWRC/, as well as any other Facebook page owned or controlled by First Choice through which it engages in Solicitation or promotes its Services.

20. "First Choice Instagram" means the Instagram page located at https://www.instagram.com/firstchoicewrc/, as well as any other Instagram page owned or controlled by First Choice through which it engages in Solicitation or promotes its Services.

21. "First Choice Website" means the website located at https://1stchoice.org and includes the Client Solicitation Page.

22. "First Choice Website 2" means the website located at https://firstchoicewomancenter.com.

23. "Identify" with respect to Persons, means to give, to the extent known, the Person's (a) full name; (b) present or last known address; (c) phone number; and when referring to a natural person, additionally, his or her (d) present or last known place of employment; (e) title(s) or position(s) held within Your organization, if any; and (f) dates of employment or time period in which You used the Person for their services generally or as a volunteer.

9

24.      "Include" and "Including" shall be construed as broadly as possible and shall mean "without limitation."

25.      "New Jersey" shall refer to the State of New Jersey.

26.      "Pamphlet[s]" shall be defined as any Document or collection of Documents which are given to Clients or Donors and which provide information on subject matters related to Your Charitable Purpose or Your Services.

27.      "Person[s]" shall be defined in accordance with N.J.S.A. 56:8-1(d).

28.      "Personnel" refers to Employees, volunteers, and other Persons You use to provide Your Services or support Your infrastructure, management, and day-to-day operations.

29.      "Policies" shall Include any procedures, practices, and/or established courses of action, whether written or oral.

30.      "Professional Licensee[s]" refers to Personnel licensed by any of the New Jersey Division of Consumer Affairs' Professional and Occupational Boards and Committees, or by any other State's Professional and Occupational Board responsible for professional licensure and professional regulation. This definition applies to other forms of the word "Professional Licensee," Including "Professionally Licensed" and "Professional Licensure."

31.      "Service(s)" shall be defined as the resources, practices, procedures, and actions that You provide or offer to provide to Clients in furtherance of Your Charitable Purpose, including but not limited to: Telehealth Nurse Consultation, Pregnancy Testing, Limited Obstetric Ultrasound, Intravaginal Ultrasound, Abdominal Ultrasound, Abortion Info Consultation, STD/STI testing, Consultation about option to carry to term or have an abortion, Counseling, After-abortion care, Referrals for Abortion Pill Reversal, OB-GYN Referrals, Referrals for Adoption or other financial resources.

32.      "Social Media" means any website and applications that enable users to create and store content or to participate in social networking, Including Facebook, Instagram, LinkedIn, Snapchat, TikTok, Twitter, and YouTube.

33.      "Solicitation[s]" shall be defined in accordance with N.J.S.A. 45:17A-20.

34.      "You" and "Your" mean First Choice.

35.      As used herein, the terms "all" and "each" shall be construed as all and each.

36.      As used herein, the conjunctions "and" and "or" shall be interpreted conjunctively and shall not be interpreted disjunctively to exclude any information otherwise within the scope of this Subpoena.

37.      As used herein, the plural shall Include the singular, and the singular shall Include the plural.

## DOCUMENT REQUESTS

1.  True, accurate, and complete copies of each and every Solicitation and Advertisement Concerning Services or goods offered in furtherance of Your Charitable Purpose, Including Solicitations and Advertisements appearing in or on any of the following:

    a.  First Choice Website;

    b.  First Choice Website 2;

    c.  First Choice Donor Website;

    d.  Social Media, Including, but not limited to First Choice Facebook and First Choice Instagram;

    e.  Print media, including newspapers and magazines;

    f.  Amazon or any other e-commerce platform;

    g.  Sponsored content;

    h.  Digital Advertising;

    i.  Video Advertising;

    j.  Native Advertising;

    k.  Other websites;

    l.  Pinterest;

    m.  Radio;

    n.  Podcasts; and

    o.  Pamphlets.

2.  All Documents Concerning distribution or placement of the Advertisements and Solicitations produced in response to Request No. 1, Including any criteria or algorithms used to determine the target audience for Advertisements and Solicitations, and any research used to identify and/or target the Persons or demographics that the Advertisements and Solicitations are intended to reach.

3.  All Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets.

4.  All videos shown to Clients and/or Donors in the course of providing Your Services or soliciting donations, Including but not limited to those videos Concerning abortion procedures and their purported effects.

11

5.     All Documents Concerning representations made by You to Clients about the confidentiality of Client information, Including privacy policies.

6.     From December 1, 2013, to the date of Your response to this Subpoena, all Documents substantiating the following Claims made on the First Choice Website:

    a.   "The only sure way to confirm a pregnancy is with an ultrasound";

    b.   "Abortion Pill: Side Effects – Bleeding can last 9 to 16 days and possibly up to 30 days";

    c.   "If the pregnancy is not viable, the abortion pill should not be taken";

    d.   "A sexually transmitted infection should be ruled out prior to an abortion procedure to reduce your risk of complications and infection";

    e.   "[The Abortion Pill] is even used beyond 10 weeks from [the Last Menstrual Period], despite an increasing failure rate";

    f.   "One woman in 100 need a surgical scraping to stop the bleeding [from an Abortion Pill]";

    g.   "D&E After Viability – [] This procedure typically takes 2-3 days and is associated with increased risk to the life and health of the mother";

    h.   With respect to dilation and evacuation after viability, "[t]he 'Intact D&E' pulls the fetus out legs first, then crushes the skull in order to remove the fetus in one piece";

    i.   "For [medication abortion], you may need as many as three appointments";

    j.   "Because of the risk of serious complications, the abortion pill is only available through a restricted program";

    k.   "In states that have been measuring the side-effects, reported complications from the abortion pill have increased in the past several years";

    l.   "Taking the abortion pill without seeing a doctor or having an ultrasound is never recommended";

    m.   "The effects [of taking the abortion pill] range from unpleasant [] to life-threatening (sepsis, rupturing of the uterus, [], and more)";

    n.   "An aspiration abortion procedure can be performed up to 13 weeks after a woman's LMP";

    o.   "A D&E is typically performed between 9-20 weeks although late-term abortions can also be performed via D&E";

    p.   "The cost of an abortion . . . is determined after an ultrasound is performed";

12

q.  "After the abortion, the sense of relief may be replaced by some of the following: depression, sadness, eating disorders, anxiety, feelings of low self-esteem, desire to avoid pregnant women and/or babies, recurring nightmares or flashbacks to the abortion experience, various types of addictive behaviors";

r.  "Many credible studies have been done and psychologists are now recognizing PAS (Post-Abortion Stress) as a type of post-traumatic stress disorder";

s.  "During an abortion, the cervix is opened. If you have an infection, this can increase the risk of the STI spreading to other organs";

t.  "Having an abortion procedure while infected with chlamydia or gonorrhea, two of the most common STIs, can lead to Pelvic Inflammatory Disease (PID)";

u.  "The medical community does not broadly recommend a misoprostol-only abortion due to the increased side effects and pain";

v.  "Side effects of a misoprostol-only abortion are: … inability to urinate, heavy sweating, hot and dry skin and feeling very thirsty …";

w.  "If I took the first dose, can I still decide to continue my pregnancy? Yes, if only the first dose of the abortion pill has been taken, it may be possible to stop the abortion and continue your pregnancy";

x.  "The abortion pill reversal process involves a prescription for progesterone to counteract the mifepristone";

y.  "Women typically need to start the protocol within 24 hours of taking mifepristone for the abortion pill reversal to be successful";

z.  "According to Abortion Pill Rescue Network, there have also been successful reversals when treatment was starting within 72 hours of taking the first abortion pill";

aa.  "Is it safe to stop or reverse the abortion pill? Yes. Bioidentical progesterone has been used to safely support healthy pregnancies since the 1950s, receiving FDA approval in 1998";

bb.  "What is the success rate of abortion pill reversal? Initial studies of APR have shown it has a 64-68% success rate"; and

cc.  "APR has been shown to increase the chances of allowing the pregnancy to continue."

7.  From December 1, 2013, to the date of Your response to this Subpoena, all Documents substantiating the following Claims made on the First Choice Website 2:

a.  "Knowing the gestational age, and viability of your pregnancy will determine if a medical abortion is even an option";

13

b. "An abortion pill or Surgical abortion would not even be needed if your pregnancy is not progressing";

c. "According to Planned Parenthood, the cost of a surgical abortion can be as high as $1500 for a first trimester abortion and even more after the first trimester";

d. "Other risks of both medical and surgical abortion include: hemorrhage (life-threatening heavy bleeding), infection, damage to organs (tearing or puncture by abortion instruments during surgical abortion), pre-term birth in later pregnancies, life-threatening anesthesia complications (surgical abortion)";

e. "Some women experience a range of long-term adverse psychological and emotional effects [after abortion]";

f. "According to WebMD as many as 50% of all pregnancies end in a miscarriage";

g. "After undergoing a Medical Abortion a follow-up appointment is generally required to determine if the abortion process is complete. An abortion doctor or abortion staff member will want to confirm that everything was expelled from your uterus";

h. "When should I take a pregnancy test? Normally, you would want to wait for 1 week after you missed your period";

i. "A pre-abortion ultrasound is generally required before you take the abortion pill and it can require several visits to a medical abortion facility, an abortion center, or to an abortion provider's office"; and

j. With respect to false negatives on pregnancy tests, "being on birth control ... can [] be [a] reason[] for a false negative."

8. To the extent not already produced, all Documents Concerning any test, study, publication, analysis, or evaluation You considered in making the Claims referenced in Request Nos. 6 and 7 above, Including sub-parts.

9. To the extent not already produced, all Documents, Including any tests, studies, publications, analyses, evaluations, or Communications received or made by You or on Your behalf, Concerning Abortion Pill Reversal, the risks of abortion, and contraceptives.

10. All Documents, Including Communications, Concerning the development of content for the First Choice Website, First Choice Website 2, and the First Choice Donor Website, Including the Client Solicitation Page and the Donor Solicitation Page.

11. All Documents Concerning any complaints or identifying any concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors.

12. All Documents Concerning any settlements, judgments, mediations, arbitrations, cease and

14

desist orders, consent orders, assurances of voluntary compliance, lawsuits, court proceedings, or administrative/other proceedings against You in any jurisdiction within the United States, Including proceedings Concerning Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims.

13.   All Documents Concerning any compliance Policies or procedures You utilize with respect to offering or providing Your Services.

14.   Documents sufficient to Identify Professional Licensees that render any Services on Your behalf.

15.   All Documents Concerning whether Professional Licensure is required to perform any of the Services You provide or offer to provide to Clients.

16.   Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service.

17.   Documents sufficient to identify the ultrasound imaging technology utilized by You and the purposes for which it is used.

18.   Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images.

19.   All Documents, Policies, and Communications that You provide to Personnel to guide their interactions with Clients before, during, or after any of Your Services, Including volunteer handbooks, volunteer agreements, dress code policy, training materials, and scripts for phone calls, consultations, or use during ultrasounds.

20.   All Documents, Policies, and Communications Concerning resources that You provide to Personnel to guide their interactions with Donors, Including resources that explain solicitation strategies and/or that instruct Personnel on how to describe Your Charitable Purpose.

21.   All Documents Concerning and explaining the job description of "Client Advocate" and "Client Consultant" at First Choice.

22.   All Documents Concerning Heartbeat International, Inc. and/or the Abortion Pill Reversal Network, Including the "Abortion Pill Reversal Hotline" referenced in Your Communications with Clients.

23.   All Documents Concerning Your affiliation with Care Net, Including Your Care Net Certificate of Compliance, Pregnancy Center Statistical Report, and training, marketing, and informational materials provided to You by Care Net.

24.   Documents sufficient to Identify the organizational structure of First Choice, Including:

    a.   Date and location of formation;

    b.   Principle place(s) of business;

    c.  All trade names;

    d.  All name changes, as well as the date(s) thereof;

    e.  Identity of owners, officers, directors (Including medical directors), partners, shareholders and/or board members, Including the dates each became associated with First Choice;

    f.  Articles and/or Certificates of Incorporation, as well as any amendments thereto;

    g.  By-Laws, as well as any amendments thereto;

    h.  Annual Reports filed with the Secretary of State, as well as any amendments thereto;

    i.  Certificates of fictitious or alternate name(s);

    j.  All organizational charts; and

    k.  If a partnership, all partnership Documents.

25.    All Documents Concerning Your tax-exempt status with the Internal Revenue Service, and/or any other tax jurisdiction, Including but not limited to Letters of Determination, IRS Form 1023, exempt ruling letters, and/or notices of revocation.

26.    Documents sufficient to Identify donations made to First Choice by any means other than through the Donor Solicitation Page.

27.    Documents sufficient to identify any licenses and registrations obtained or held by or on behalf of First Choice, and issued by any municipal, county, State, or federal authority.

28.    All Documents Concerning Your record retention Policies.

# EXHIBIT A



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW

## Guidelines for the Production of Electronically Stored Information

These guidelines outline the technical requirements for producing scanned paper collections, email, and other electronically stored information (ESI) to the Division of Law (NJ DOL) in the New Jersey Attorney General's Office (NJ OAG), where the production will be loaded to *Relativity* software to search, review and retrieve documents. These guidelines are intended for use by a knowledgeable party that is familiar with the technical aspects of ESI including document storage, organization, and format issues. Any proposed production in a format other than those identified below must be discussed with and approved by the NJ OAG.

### I.   General Instructions

1. A cover letter should be included with each production. The cover letter should list each piece of media (hard drive, thumb drive, DVD or CD) included in the production along with the Bates range.

2. Documents created or stored electronically MUST be converted or processed to TIFF files, Bates numbered, and include fully searchable text (OCR), not printed to paper or .PDF files.

3. Data can be produced on CD, DVD, hard drive, or other removable media. Use the media requiring the least number of deliverables.

4. Each piece of media should be "self-contained," for example, if 5 CDs are provided, each must have its own associated load file. CD or other media can be separated over time and this practice ensures IT's ability to reload any particular piece of media at any time.

5. Label all media (printed not handwritten) with the following:
   a.   Case number
   b.   Production date
   c.   Bates range
   d.   Disk number (1 of X), if applicable

6. For a given project, all load files should use the same field names, ordering and structure as the first delivery.

7. Ensure there are no truncated file or folder names in your production. These would be indicated by a tilde ~. (E.g. AAA000~1.TIF).

8. When reviewing your load file, missing or empty folders indicate a potential problem. If your image folder contains subfolders 012, 013 and 015, your first question should be what happened to 001-011 and 014.

9. Organize productions by custodian, unless otherwise instructed. All documents from an individual custodian should be confined to a single load file.

10. All productions should be checked and produced free of computer viruses or other malware.

11. Passwords for documents, files, compressed archives and encrypted media should be provided separately either via email or in a separate cover letter from the custodian.

## II.   Delivery Formats

Subpart A of this section sets forth the standard production format. Under limited circumstances, it may not be possible to produce ESI in that preferred format. Under those circumstances, and with prior approval of the NJ OAG, .PDF files and Email native files may be produced in the formats provided in subparts B. and C. of this section, respectively.

### A.   Production Format

All scanned paper, email and native file collections should be converted or processed to TIFF files, Bates numbered, and include fully searchable text (OCR). Most document productions will contain the elements listed below:

**Folder labeled IMAGES**
**Folder labeled DATA**
**Folder labeled TEXT**
**Folder labeled NATIVES**

### 1.   Bates Numbering

The Bates number must be a unique, consistently formatted identifier consisting of an alpha prefix along with a fixed length number for each custodian, e.g., "ABC0000001". This format must remain consistent across all production numbers. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted. Avoid Bates prefixes containing characters other than A through Z.

### 2.   Images

#### a.   Generally

1.   Black and White images should be single-page, Group IV TIFS (1 bit), and scanned at 200-300 DPI (Presentation software such as PowerPoint, AUTOCAD images and Spreadsheet images are exceptions please see step 4 below.) Color images should be single-page JPGS.

2.   File names cannot contain embedded spaces.

3.   The number of TIFF files per folder should not exceed 1000 files.

4.   Rendering PowerPoint, AUTOCAD images and Excel files to images:
     i.   PowerPoint: All pages of the file should be scanned in full slide image format, with any speaker notes following the appropriate slide image.
     ii.   AUTOCAD images: If possible, files should be scanned to single page JPEG (.JPG) file format. Color images can be discussed on a case by case basis.
     iii.   Excel:  A placeholder image, named by the *IMAGEID* of the file, may be used.

#### b.   Image Cross-Reference File

The image cross-reference file is needed to link the images to the database. It is a comma-delimited file consisting of seven fields per line. There must be a line in the cross-reference file for every image in the database. The format is as follows:

ImageID, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCount

| | |
|---|---|
| ImageID: | The unique designation that is used to identify an image. |
| | *Note*: This ImageID key must be a unique and fixed length number. This number will be used in the .DAT file as the ImageID field that links the database to the images. The format of this image key must be consistent across all productions. It is recommended that the format be a 7 digit number to allow for the possible increase in the size of a production. |
| VolumeLabel: | Optional, but names for volumes should not be longer than eight characters, with a suffix not wider than three characters. |
| ImageFilePath: | The full path to the image file. |
| DocumentBreak: | The letter "Y" denotes the first page of a document. If this field is blank, then the page is not the first page of a document. |
| FolderBreak: | Leave empty |
| BoxBreak: | Leave empty |
| PageCount: | Optional |

**Sample IMAGE Load file** (Often referred to as Opticon or .OPT file)....

IMG0000001,IMG01,E:\IMAGES\001\IMG0000001.TIF,Y,,,3
IMG0000002,IMG01,E:\IMAGES\001\IMG0000002.TIF,,,,
IMG0000003,IMG01,E:\IMAGES\001\IMG0000003.TIF,,,,

May 2019

IMG0000004,IMG01,E:\IMAGES\001\IMG0000004.TIF,Y,,,2
IMG0000005,IMG01,E:\IMAGES\001\IMG0000005.TIF,Y,,,,

The fields are, from left to right:

- Field One – (IMG0000001) – page identifier
- Field Two – (IMG01) – the volume identifier  not required
- Field Three – (E:\IMAGES\001\IMG0000001.TIF) – a path to the image to be loaded
- Field Four – (Y) – Document marker – a "Y" indicates the start of a unique document
- Field Five – (blank) – can be used to indicate a folder
- Field Six – (blank) – can be used to indicate box
- Field Seven – (3) – used to store page count

*Note*: Only images belong in the Opticon load file. If OCR files are included in the same folder as the images, errors will occur when retrieving the images.

### 3.    DATA Load File (.DAT file)

The data file (.DAT) contains all the fielded information that will be loaded into the database. Data can be delivered utilizing standard delimited files for coded data (.DAT) and .TXT files for OCR data. The data file (.DAT) contains all of the fielded information that will be loaded into the database:

1. The first line of the .DAT file must be a header row identifying the field names.

2. The best practice is to use the following standard delimiters in the .DAT file:

> The following chart represents the most common delimiter characters used in Relativity, along with its decimal equivalent. If the source program you are importing from uses a different font, it can change the symbolic representation of the delimiters. If this happens, match the delimiter characters with the decimal equivalents instead of relying on the displayed symbol. Using the decimal equivalents will always result in a correct delimiter match. For a complete list of delimited characters you may reference the following link.

https://help.relativity.com/9.7/Content/Relativity/Relativity_Desktop_Client/Importing/Load_fil e_specifications.htm

| Delimiter Name | Symbol | Decimal Equivalent |
|---|---|---|
| Comma | , | 044 |
| Paragraph | ¶ | 020 |
| Quote | þ | 254 |
| Newline | ® | 174 |
| semi-colon | ; | 059 |

3. Date fields should be provided in the format:  mm/dd/yyyy
   a.   E.g. "01/01/2004" and not "01/01/2004 12:01:01PM"

4.     Date and time fields must be two separate fields

5. All attachments should sequentially follow the parent document/email. Parent Email and attachment document families should be kept intact.

6. All metadata associated with email, audio files, and native electronic document collections should be produced.

7. The .DAT file for scanned paper collections must contain, at a minimum, the following fields:
   1) BEGBATES: Beginning Bates number
   2) ENDBATES: Ending Bates number
   3) IMAGEID: Image Key field
   4) CUSTODIAN: Individual from whom the document originated

8. The .DAT file should NOT include document text.

9. For all non-redacted documents, please include the General Metadata fields for all files and respective metadata fields for emails and electronic documents (e.g., MS Word, MS Excel, etc.) where available using industry standard techniques. With respect to redacted documents, some metadata may be withheld as needed to preserve  privileges.

10. Spaces and returns must match the original text. No odd characters, such as a semi-colon, should appear in lieu of a soft-return or a space.

11. Fields provided in a .DAT file may include the following:

| GENERAL Metadata | Definition | Field Name |
|---|---|---|
| BEG BATES | The start  bates  of  the document | Bates Beg |
| END BATES | The end bates of the document | Bates End |
| BEG ATTACH | start  bates  of attachment | Bates Beg Attach |
| END ATTACH | The end bates of attachment | Bates End Attach |
| Page Count | Number of pages | Pages |
| Custodian | The name of the original custodian  of the  file | Custodian |
| File extension | The extension  of the file | File Extension |
| Confidential | Value | Confidential |
| Email type | Defines if a message file is an email or attachment | Record Type |
| Email Attachment | Defines if email has an attachment | Email Has Attachment |
| File path | The address where the file resides on the electronic media | Source Path |
| File Size | The amount of space the file takes up on the electronic | File Size |
| MD5Hash | The MD5 Hash for the original file | MD5 Hash |
| Native File Link | Relative path of submitted native files | Native File |
|  |  |  |

| Email Metadata | Definition | Field Name |
|---|---|---|
| FROM | The person who authored the email | Email From |
| TO | Recipient(s) of the email | Email To |
| COPIED | Person(s) copied on the email | Email CC |
| BCC | Person(s) blind copied on the email | Email BCC |

May 2019

| Date Sent | Date the email was sent expressed usually Eastern Standard Time if in US | Email Sent Date |
|---|---|---|
| Time Sent | Time the email was sent expressed usually Eastern Standard Time if in US | Email Sent Time |
| Time Zone | The time zone in which the emails were standardized | Time Zone Field |
| Date Received | Date Received Date received in EST | Email Received Date |
| Time Received | Time Received Date received in EST | Email Received Time |
| Subject | Subject line of email | Email Subject |
| Attachment Count | Number of attachments | Number of Attachments |
| INTFILEPATH | Original location of email including original file name | Email Folder Path |
| INTMSGID | Unique Message ID | Message ID |

| EDocs Metadata | Definition | Field Name |
|---|---|---|
| Author | The person who authored the document | Author |
| Date Created | Date the document was created | Created Date |
| Time Created | Time the document was created | Created Time |
| Date Last Modified | Date the file was last changed/saved | Last Modified Date |
| Time Last Modified | Time the file was last changed/saved | Last Modified Time |
| Printed Date | Date that the file was last printed | Last Printed Date |
| Title | Title of the document | Title |
| Extracted Text/OCR Path | Path to extracted text of the native file | Extracted Text |
| Path | Path where native file document was stored including | File Path |

12. No more than one document per database record. The database and load files should be sorted sequentially by Bates number. Relativity displays records in the same order they are loaded.

### 4.     Text

Searchable text of the entire document must be provided for every record, at the document level. For redacted documents, provide the full text for the redacted version. Delivery should be as follows:

1. The text should be delivered as multi-page ASCII text files with the files named the same as the ImageID field.

2. Text files must be placed in a separate folder labeled TEXT.

3. The number of files per folder should be limited to 1000 files.

4. Note:
   a. DO NOT include the searchable text in the same folder as the IMAGES folder.
   b. DO NOT include searchable text in the .DAT file.

### 5.     Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

1. Native files must be named with the same naming convention associated with its associated files in the production:

EXAMPLE:

NJOAG0012345 – beginning bates number from the load file.
NJOAG0012345.tif – associated image file
NJOAG0012345.txt – associated text file
NJOAG0012345.xls – associated native Excel spreadsheet.

2. The full path of the native file must be provided in the .DAT file for the LINK field.

3. The number of native files per folder should not exceed 1000 files.

4. These files should be located in a folder named NATIVE.

## B.    .PDF File Production

Production in this format requires prior approval from the NJ OAG.

1. When approved, .PDF files may be produced in native file format.

2. .PDF files should be produced in separate folders.

3. All .PDFs must be unitized at the document level, i.e. each .PDF should represent a distinct document; a single .PDF file cannot contain multiple documents.

4. All .PDF files must contain embedded text that includes all discernable words within the document, not selected text only. This requires all layers of the .PDF to be flattened first.

5. If .PDF files are Bates endorsed, the .PDF files must be named by the Bates range.

## C.    Email Native File Production

Production in this format requires prior approval from the NJ OAG. When approved, Outlook (e.g., .PST) email files may be produced in native file format. A separate folder should be provided for each custodian.

May 2019