UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

|  |  |
|---|---|
| FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC., <br><br>    Plaintiff, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, <br><br>    Defendant. | Hon. Michael A. Shipp, U.S.D.J. <br> Hon. Tonianne J. Bongiovanni, U.S.M.J. <br><br> Docket No. 23-CV-23076 <br><br><br> **CIVIL ACTION** <br> **(ELECTRONICALLY FILED)** |

DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendant*

Angela Cai (NJ Bar 121692014)
 *Deputy Solicitor General*
David Leit
Jennifer S. Schiefelbein
 *Assistant Attorneys General*
Samuel L. Rubinstein
Lauren E. Van Driesen
 *Deputy Attorneys General*
 Of Counsel And On The Brief

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ...................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY .............3

    A.    Relevant Statutory Framework ................................................4

    B.    The Investigation And Subpoena ............................................6

    C.    Procedural History...................................................................10

LEGAL STANDARD..................................................................................11

ARGUMENT .............................................................................................12

  I.    PLAINTIFF CANNOT MEET ITS BURDEN OF DEMONSTRATING THE EQUITABLE FACTORS NECESSARY FOR A TRO............................12

  II.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS. ...............22

    A.    The Subpoena Is Reasonably Relevant To An Authorized Inquiry.........22

    B.    Plaintiff's First Amendment Claims Fail. .................................30

CONCLUSION...........................................................................................37

CERTIFICATE OF SERVICE ....................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ...........................................................................................19

*Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty.*,
    39 F.4th 95 (3d Cir. 2022) .....................................................................11, 18, 21

*Am. Home Prod. Corp. v. FTC*,
    695 F.2d 681 (3d Cir. 1982)...................................................................................29

*Am. for Prosperity Fdn. v. Bonta*,
    141 S. Ct. 2373 (2021) ...........................................................................................35

*Anderson v. Davila*,
    125 F.3d 148 (3d Cir. 1997)...................................................................................17

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ...........................................................................................17

*Campbell Soup Co. v. ConAgra, Inc.*,
    977 F.2d 86 (3d Cir 1992)...............................................................................12, 15

*Chao v. Cmty. Trust Co.*,
    474 F.3d 75 (3d Cir. 2007)....................................................................................22

*Chez Sez III Corp. v. Twp. of Union*,
    945 F.2d 628 (3d Cir. 1991)..............................................................................26, 27

*Church of Scientology of Calif. v. United States*,
    506 U.S. 9 (1992)...................................................................................................16

*CMR D.N. Corp. v. City of Phila.*,
    703 F.3d 612 (3d Cir. 2013)...................................................................................28

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023) .......................................................................................15

*Conchatta v. Evanko*,
   83 F. App'x 437 (3d Cir. 2003) ...................................................................17

*Def. Distributed v. U.S. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) ........................................................................19

*DeMartini v. Town of Gulf Stream*,
   942 F.3d 1277 (11th Cir. 2019) ....................................................................31

*D.T. v. Sumner Cnty. Sch.*,
   942 F.3d 324 (6th Cir. 2019) ........................................................................17

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................17, 18

*Employment Div., Dep't of Human Resources of Ore. v. Smith*,
   494 U.S. 872 (1990) .......................................................................................33

*Exxon Mobil Corp. v. Healey*,
   28 F.4th 383 (2d Cir. 2022) ...................................................................16, 30

*Exxon Mobil v. Schneiderman*,
   316 F. Supp. 3d 679 (S.D.N.Y. 2018) .....................................................30, 32

*Fischer v. Governor of N.J.*,
   842 F. App'x 741 (3d Cir. 2021) .............................................................25, 27

*FTC v. Church & Dwight Co.*,
   756 F. Supp. 2d 81 (D.D.C. 2010) ...............................................................16

*FTC v. Standard Oil Co. of Calif.*,
   449 U.S. 232 (1980) ...................................................................3, 13, 14, 15

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) .........................................................................28

*Fulton v. City of Phila.*,
    141 S. Ct. 1868 (2021) ....................................................................................33

*Georgevich v. Strauss*,
    772 F.2d 1078 (3d Cir. 1986) .......................................................................26

*Gomez v. Extra Space Storage, Inc.*,
    No. 13-dv-0929, 2015 WL 1472263 (D.N.J. Mar. 31, 2015) ......................28

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ........................................................................17

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers
    Loc. No. 70 of Alameda Cnty.*,
    415 U.S. 423 (1974) ...........................................................................2, 12, 22

*Harnish v. Widener Univ. Sch. of Law*,
    931 F. Supp. 2d 641 (D.N.J. 2013) ...............................................................26

*Hartman v. Moore*,
    547 U.S. 250 (2006) ......................................................................................31

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989) ...........................................................................17

*Hope v. Warden York County Prison*,
    972 F.3d 310 (3rd Cir. 2020) ........................................................................27

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ................................................................................28, 35

*In re Fine Paper Antitrust Litig.*,
    685 F.2d 810 (3d Cir. 1982) .........................................................................36

*In re Platinum Partners Value Arbitrage Fund*,
    No. 18-5176, 2018 WL 3207119 (S.D.N.Y. June 29, 2018) ........................16

*In re Subpoena Duces Tecum*,
    228 F.3d 341 (4th Cir. 2000) ........................................................................29

*Interstate Commerce Comm'n v. Gould*,
   629 F.2d 847 (3d Cir. 1980)....................................................................3, 20

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018)...........................................................................25

*LaSpina v. SEIU Pa. State Council*,
   985 F.3d 278 (3d Cir. 2021)..........................................................................25, 27

*Marxe v. Jackson*,
   833 F.2d 1121 (3d Cir. 1987)............................................................................12

*Mason v. Roman Cath. Archdiocese of Trenton*,
   2019 U.S. Dist. LEXIS 48212 (D.N.J. Mar. 22, 2019)........................................26

*New York v. VDARE Fdn., Inc.*,
   No. 453196/2022, 2023 N.Y. Misc. LEXIS 293
   (N.Y. Sup. Ct. Jan. 23, 2023).............................................................................35

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................................18

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*,
   477 U.S. 619 (1986)............................................................................................30

*Okla. Press Publ'g Co. v. Walling*,
   327 U.S. 186 (1946).......................................................................................22, 29

*Omnistone Corp. v. Cuomo*,
   485 F. Supp. 3d 365 (E.D.N.Y. 2020) ...............................................................16

*Petroleum Exploration, Inc. v. Public Serv. Comm'n*,
   304 U.S. 209 (1938)............................................................................................15

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017)....................................................................11, 12, 21

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
   415 U.S. 1 (1974)................................................................................................15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ...................................................................................28, 35

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) ...............................................................................................26

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) ...................................................................................18

*SEC v. McGoff*,
    647 F.2d 185 (D.C. Cir. 1981) ..........................................................................29, 31

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
    648 F.2d 118 (3d Cir. 1981) ...................................................................................32

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) .............................................................................17

*Sunbelt Rentals, Inc. v. McAndrews*,
    552 F. Supp. 3d 319 (D. Conn. 2021) ....................................................................12

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002) ...................................................................................33

*UMDNJ v. Corrigan*,
    347 F.3d 57 (3d Cir. 2003) ...............................................................................22, 29

*United States v. Hansen*,
    599 U.S. 762 (2023) ...........................................................................................27, 28

*United States v. Zadeh*,
    820 F.3d 746 (5th Cir. 2016) .................................................................................22

*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................11, 18

**Statutes**

42 U.S.C. § 1983 ...............................................................................................................19

1994 NJ Sess. Law Serv. Ch. 16 § 15 ..............................................................................27

N.J. Stat. Ann. § 2C:28-1 ...................................................................................28

N.J. Stat. Ann. § 45:1-18 ...............................................................1, 4, 19, 23, 36

N.J. Stat. Ann. § 45:1-18.2 ....................................................................1, 5, 24

N.J. Stat. Ann. § 45:1-19 ...................................................................................13

N.J. Stat. Ann. § 45:1-21 ....................................................................1, 5, 24

N.J. Stat. Ann. § 45:17A-32 ...................................................................passim

N.J. Stat. Ann. § 45:17A-33 ...................................................................passim

N.J. Stat. Ann. § 56:8-2 .....................................................................1, 4, 23, 24

N.J. Stat. Ann. § 56:8-3 .........................................................................1, 4, 23

N.J. Stat. Ann. § 56:8-6 ...............................................................................13, 19, 36

N.J. Stat. Ann. § 56:8-47 ..................................................................................25, 26

N.J. Admin. Code § 13:35-6.10 ...............................................................1, 5, 6, 24

P.L. 1987, Ch. 238 .............................................................................................26

## PRELIMINARY STATEMENT

After a preliminary investigation revealed concerns that Plaintiff First Choice Women's Resource Center may have engaged in conduct that misleads the public and otherwise violates state statutes and regulations, the New Jersey Attorney General and the Division of Consumer Affairs issued an informational subpoena to First Choice on November 15, 2023. That Subpoena rests on multiple sources of state authority, including the New Jersey Consumer Fraud Act, the Charitable Registration and Investigation Act, and the Professions and Occupations law. Each of these state statutes tasks the Attorney General with investigating whether an entity is engaged in fraudulent or deceptive practices. The Subpoena therefore requests documents that would allow the State to evaluate whether First Choice or its employees are engaging in conduct that these statutes prohibit, such as misleading donors and clients or engaging in the unlicensed practice of medicine or professional misconduct. *See* N.J. Stat. Ann. §§ 56:8-2 & -3; 45:17A-32(c) & -33(c); 45:1-18, -18.2, -21; N.J. Admin. Code § 13:35-6.10.

Rather than contact the State, respond to any part of the Subpoena, or request to meet and confer regarding its scope, Plaintiff sued the State in federal court on December 13—two days before responses were due. Plaintiff sought a temporary restraining order and preliminary injunction. As directed by the Court, the parties will brief the preliminary injunction motion in February, which will allow this Court

to promptly resolve the motion with a better developed record. Nevertheless, Plaintiff insists that it is entitled to a TRO during this interim period. It is not: Plaintiff's claims all fail to meet the high burden necessary on the merits to justify that relief. But the Court need not even reach the merits to dispose of the pending TRO application because Plaintiff fails to satisfy its burden on the other "gateway factor" for emergency relief: demonstrating irreparable harm that requires immediate relief. Because a TRO is an extraordinary remedy, Plaintiff's failure to establish irreparable harm is itself fatal. *See* Ex. A (proposed form of order).

Specifically, Plaintiff is entitled to a TRO only if it can establish that irreparable harm would occur between now and this Court's adjudication of the PI motion. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (TROs exist to avoid "irreparable harm just so long as is necessary to hold a hearing"). But the only action that would happen between now and the disposition of the pending motion for a preliminary injunction is that the State will *initiate* an action in the New Jersey Superior Court—a process required by state law for the State to obtain any document-production order, and which will allow the parties to litigate any state-law challenges Plaintiff has without substantial delay. Nothing else will happen. The State will not seek statutory sanctions in the New Jersey Superior Court for Plaintiff's failure to respond to the Subpoena by the return date. Nor is there any

2

chance that Plaintiff will be required to actually produce any documents before this Court rules on the PI motion. Absent penalties and absent production, the only claimed harm left is the burden of litigating in an otherwise-proper state-law forum—an argument the Supreme Court has roundly rejected. *See FTC v. Standard Oil Co. of Calif.*, 449 U.S. 232, 244 (1980).

By contrast, entering a TRO would significantly harm the State and the public interest. A TRO would delay the State's ability to even begin the process of litigating state-law claims and obtaining a document-production order—the only way the State can enforce its rights, and those of the public, under three state laws. *See Interstate Commerce Comm'n v. Gould*, 629 F.2d 847, 851-52 (3d Cir. 1980). Requiring the adjudication of the federal claims, and only then beginning adjudication of the state-law claims, risks delaying the State's investigation by the better part of this year, or longer. And entry of this TRO would incentivize other subpoena-recipients to resist compliance, refuse meet-and-confers, and rush into federal court to obtain delay too, compromising the State's investigatory abilities. Weighed against Plaintiff's non-existent irreparable harm, those harms to the State require denial of a TRO.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

Although the State anticipates developing a more fulsome record with its PI opposition, it highlights certain relevant facts here.

A. <u>Relevant Statutory Framework</u>

Three different statutes—along with their implementing regulations—grant the State the authority to investigate the issues relevant to this case: the New Jersey Consumer Fraud Act ("CFA"), the Charitable Registration and Investigations Act ("CRIA"), and the Professions and Occupations law ("P&O law"). Each statute empowers the Attorney General to issue subpoenas and initiate investigations to ascertain whether an entity is engaged in an unlawful practice. *See* N.J. Stat. Ann. § 56:8-3 (CFA); § 45:17A-33(c) (CRIA); § 45:1-18 (P&O law).

Each statute defines a number of substantive unlawful practices. For example, the CFA broadly prohibits "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2.

The CRIA addresses deceptive and misleading statements or omissions, made by charitable organizations or those soliciting donations on its behalf, relating to "the planning, conduct, or execution of any solicitation or charitable sales promotion," including applicable violations of the CFA and including the use of "information, statements or communications that, although literally true, are presented in a manner that has the capacity to mislead the average consumer." N.J. Stat. Ann. § 45:17A-

4

32(c)(3), (7); *see* § 45:17A-32(a) (referring to misleading statements made "on behalf of a charitable organization by persons including, but not limited to commercial co-venturers, fund raising counsels, independent paid fund raisers or solicitors").

The P&O law prohibits the unlicensed practice of medicine. N.J. Stat. Ann. § 45:1-18.2. Other provisions and the law's implementing regulations also prohibit licensed medical professionals from engaging in multiple specific deceptive and misleading practices and other forms of professional misconduct. *See, e.g.*, N.J. Stat. Ann. § 45:1-21 (establishing that professional licensees may not, among other acts, employ "dishonesty, fraud, deception, misrepresentation, false promise or false pretense," engage in "professional or occupational misconduct," or "permit[] an unlicensed person" to engage in unlicensed practice of medicine); N.J. Admin. Code § 13:35-6.10(c) (prohibiting medical advertising employing "[a]ny misrepresentation of a material fact," "suppression, omission or concealment of any material fact" that the professional "knows or should know" would "prohibit[] a prospective patient from making a full and informed judgment on the basis of the information set forth in the advertisement," "[a] technique or communication which appears to intimidate, exert undue pressure or to unduly influence a prospective patient or consumer," and/or "[a]n offer to pay, give or accept a fee or other consideration to or from a third party for the referral of a patient"). Moreover, "[a]ny

5

person offering free or discounted medical services shall file copies of any such advertisement with the Board within 30 days of initial publication." N.J. Admin. Code § 13:35-6.10(g)(4). The relevant Board that regulates the professional also "may require a licensee to substantiate the truthfulness of any assertion or representation set forth in an advertisement." N.J. Admin. Code § 13:35-6.10(d).

B. <u>The Investigation And Subpoena</u>

In light of public reporting and actions taken by other jurisdictions, the State learned that certain nonprofit organizations may be misleading donors and potential clients, among others, into believing that they provide comprehensive reproductive health care services, including abortion care and contraception, when they in fact have an objective of deterring individuals from seeking such services.

The Division of Consumer Affairs ("the Division") therefore initiated a confidential investigation to determine whether certain actions taken by First Choice violated New Jersey statutes and regulations. The Division's ongoing investigation included—among other investigative steps—a review of First Choice's registration status with the Charities Registration & Investigation Unit and a review of publicly available information, including First Choice's own divergent representations across its multiple websites and social media accounts. Based on the Division's findings, the Division determined that a subpoena was warranted to gather further information about First Choice's activities and representations, including previous

representations to potential clients and potential donors. Ex. B, Certif. of Gregory K. Turner, ¶¶ 4-10 ("Turner Cert.").

Among the initial evidence that led the Division to determine that a subpoena is warranted, the investigation revealed that First Choice maintains multiple websites intended for different audiences, which have dramatically different representations about its work. One website, https://1stchoicefriends.org/, states First Choice's "pro-life" mission and confirms that its services are intended to "protect the unborn." Turner Cert. Ex. 2 at AG181-82. Its donation-solicitation page states that "pro-life donors like you have saved lives and served women considering abortion in New Jersey." *Id.* Similarly, that website's Volunteer Application states that First Choice is "committed to assisting women to carry to term" and that First Choice does "not recommend, provide, or refer for abortion or abortifacients." *Id.* at AG177.

But First Choice maintains other websites, https://1stchoice.org (which https://1stchoicefriends.org/ describes as a "Client Site") and https://firstchoicewomancenter.com, that omit any reference to the organization's mission and practices. Instead, language on these sites even suggests that First Choice in fact provides medical consultations for people seeking abortions. For example, one passage states:

> You may be considering abortion as an option. Before you decide, it is important to remember that abortion is a medical procedure and, like any other medical procedure, you should consult a medical professional beforehand. We are a network of clinics providing the best care and

7

> most up-to-date information on your pregnancy and pregnancy options and have multiple locations to serve you. We are dedicated to providing you with everything you need to make an informed decision about abortion, at no cost to you. . . . It is important to determine the viability of your pregnancy before paying a high cost for an abortion.

Turner Cert. Ex. 3 at AG235. These sites invite anyone "considering an abortion" to connect with First Choice to "[l]earn more about the abortion pill, abortion procedures, and your options in New Jersey," Turner Cert. Ex. 1 at AG001, and the website touts that "the Right to Choose Includes the Right to Know," *Id.* at AG072. One of these websites provides a donation page, but—in stark contrast to the donation page on the website describing the organization's pro-life mission—omits any mention whatsoever of First Choice's mission or purpose. *Id.* at AG023-26. In short, there are significant discrepancies in how First Choice describes its mission and services across its different websites, based on the distinct audiences each website is intended to reach. *See* Turner Cert. ¶ 5.

First Choice represents that its services are overseen by physicians and that it has nurses on staff. *See, e.g.*, Turner Cert. Ex. 3 at AG215; Dkt. 6 at 5. First Choice repeatedly represents that it has medical personnel to provide services. For example, it invites potential clients to contact First Choice to consult with "a licensed medical professional," and states that its "medical staff can answer all of [clients'] questions… with professional accuracy," Turner Cert. Ex. 1 at AG072. *See also id.* at AG001, AG066, AG079, AG081 (images of medical staff, including pictures of

individuals wearing scrubs, stethoscopes, and white lab coats). First Choice also makes numerous statements purporting to convey medical information that may be misleading or untrue. For example, one statement claims that "[b]ecause of the risk of serious complications, the abortion pill is only available through a restricted program," Turner Cert. Ex. 1 at AG076, and that it can lead to "sepsis" and "rupturing of the uterus," *Id.* at AG080. *See also* Turner Cert. Ex. 3 at AG249 ("[A] pre-abortion ultrasound is generally required before you take the abortion pill[.]").

Additional investigation by the Division revealed that First Choice represents in phone calls with potential clients that it has nurses on staff and has doctors who oversee medical services. *See* Turner Cert. ¶ 6. That investigation further showed that, when First Choice meets with potential clients at its facility, it informs potential clients that it has a doctor that oversees the facility, although it admits that it does not have a doctor onsite. *Id.* ¶ 7. First Choice also offers to conduct a pregnancy test and ultrasound, but does not provide information about the risks of abortion absent an agreement to submit to a pregnancy test. *Id.* ¶ 8

This investigation raised significant concerns about the information First Choice provides to potential clients, donors, and the public, about the services it offers, and about the personnel who deliver those services. To learn more, on November 15, 2023, the Division served a subpoena on First Choice's registered agent in New Jersey. Turner Cert. Ex. 4 at AG282. Among other things, the

9

Subpoena sought copies of First Choice's solicitations and advertisements, documents substantiating the claims made therein, and identification of the medical personnel involved in the provision of its services. *Id.* at AG290-95. The Subpoena set a December 15, 2023 deadline for First Choice to respond. *Id.* at AG280.

    C. <u>Procedural History</u>

Two days before the Subpoena's return date, Plaintiff filed suit in federal court, raising a host of constitutional claims against the Subpoena and CRIA. Dkt. 13. On December 15, 2023, the Subpoena's return date, Plaintiff filed an emergency motion seeking a TRO and PI. Dkt. 12. Plaintiff had not previously communicated with the State regarding the Subpoena, made any effort to obtain an extension for its response, or requested to meet and confer with the State prior to filing suit.

After a telephonic conference on December 19, the Court ordered the parties to meet and confer on a briefing schedule for the motion and on the possibility of an interim agreement. When the parties met, the State proposed that the State would suspend the Subpoena's return date if Plaintiff agreed to comply with the Subpoena within 30 days after a denial of the PI motion (should the Court so decide), without requiring the State to file a second, successive state-court action. Plaintiff declined, reserving its full rights to litigate additional state-law defenses to the Subpoena, but refusing to litigate those defenses forthwith in state court. *See* Dkt. 17.

On December 22, this Court issued an order adopting the parties' agreed-upon PI briefing schedule and included a provision regarding interim relief. Dkt. 20. After a telephonic hearing on January 2, 2024, this Court issued a text order stating that it "finds good cause to amend the December 22, 2023 Order" and requiring briefing on Plaintiff's motion for a TRO. Dkt. 23.[1]

## LEGAL STANDARD

Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. A movant for a TRO must first establish two prerequisites: "a reasonable probability of success on the merits" and that "irreparable harm would result if the relief sought is not granted." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022). Even if Plaintiff can demonstrate both "gateway factors," courts must also assess "the possibility of harm to other interested persons from the grant or denial of the injunction, and [ ] the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). Only if "all four factors, taken together, balance in favor of granting the requested preliminary relief" may an emergency injunction be granted. *Id.* at 179.

---

[1] The parties both understand this Court's text order to leave in place the previously-ordered schedule for the PI motion, and to be setting an expedited schedule for the TRO application alone. As a result, the State is filing this TRO opposition brief, to which Plaintiff will reply on January 9. The State intends to file its opposition to the PI on February 2, to which Plaintiff will reply on February 23.

11

## **ARGUMENT**

The Court should deny this TRO application. Most fundamentally, Plaintiff cannot satisfy the "gateway factor" of demonstrating that it will suffer irreparable harm unless a TRO is entered. The two additional equitable factors, which require the Court to consider the harm on other interested parties and the public interest, weigh decidedly against entry of a TRO. Finally, if this Court considers the merits, Plaintiff has fallen far short of its burden at this stage.

## I.  **PLAINTIFF CANNOT MEET ITS BURDEN OF DEMONSTRATING THE EQUITABLE FACTORS NECESSARY FOR A TRO.**

Plaintiff's motion fails because Plaintiff cannot meet its "burden of proving a clear showing of immediate irreparable injury." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir 1992). As noted above, irreparable harm is always one of the required "gateway factors[]" for emergency relief. *Reilly*, 858 F.3d at 179. But such harm is especially crucial in the context of a TRO, which requires establishing such urgency that a court *must* act to restrain a party even before receiving briefing, evidence, and argument on the PI motion. *See Granny Goose*, 415 U.S. at 439 (TROs exist only for courts to prevent "irreparable harm just so long as is necessary to hold a hearing"). It thus requires Plaintiff to "produce affirmative evidence indicating that he or she will be irreparably harmed" between now and any decision from this Court on the pending PI motion. *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987); *see also, e.g.*, *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 324 (D.

12

Conn. 2021) ("The Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a [TRO], while the temporal context of a preliminary injunction takes a longer view.").

1. Plaintiff cannot show irreparable harm. The only action that would happen between now and this Court's decision on the PI application, absent a TRO, is that the State will *initiate* a state-court proceeding, which is the only avenue for the State to obtain a document-production order. Plaintiff will not face sanctions, and will not even be required to produce any documents prior to a decision on the PI. Having to litigate a subpoena in state court will not cause Plaintiff irreparable harm. *See FTC*, 449 U.S. at 244.

While Plaintiff claims it might face penalties or sanctions for noncompliance with this Subpoena, *see* Dkt. 6 at 39, that speculative assertion of harm will not occur because the State has already committed not to seek penalties that are ordinarily available for non-compliance with state subpoenas, *see, e.g.*, Dkt. 17 at 2; Dkt. 21 at 1, and does so here once again. *See* Ex. A (proposed form of order incorporating the State's commitment not to seek penalties or sanctions for noncompliance). Thus, although New Jersey law permits the Attorney General to seek sanctions, including penalties or the revocation of an organization's charter, N.J. Stat. Ann. § 56:8-6(d) (CFA); *id.* § 45:17A-33(g) (CRIA); *id.* § 45:1-19 (P&O law), Plaintiff obviously

13

cannot be irreparably harmed by those potential penalties when the Attorney General has committed not to seek them for not complying with the Subpoena.

Instead, the State would only initiate a state-court suit to obtain a document-production order. *See* Dkt. 17 at 2; Dkt. 21 at 1. The State has both an immediate and powerful need to do so, because only the state court can issue an order requiring Plaintiff to produce the documents. *See infra* at 32–33 (explaining that while this Court can adjudicate Plaintiff's constitutional claims, it cannot compel document production). Merely litigating the bases for a document-production order is not an irreparable harm: All Plaintiff would have to do is submit briefs and potentially attend hearings in a state-court action that would decide whether to order document production. Had Plaintiff filed a motion to quash in the normal course, including by raising all defenses or counter-claims, it would have litigated federal-law defenses and state-law defenses on the same schedule. Plaintiff will therefore suffer no irreparable harm by litigating the Subpoena in state court while the PI proceeds.

Plaintiff's various responses are unavailing. First, Plaintiff contends that even having to *litigate* in state court is irreparable harm, a position the Supreme Court has squarely rejected. In *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), defendant challenged the FTC's initiation of an administrative complaint, arguing the agency lacked a basis for issuing the complaint and requesting injunctive relief and declaratory relief in federal court. *Id.* at 235. In seeking an injunction, Standard

14

Oil, much like First Choice here, argued "that the expense and disruption of defending itself in protracted adjudicatory proceedings constitutes irreparable harm." *Id.* at 244. The Supreme Court pointedly disagreed. Instead, the Court held that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Id.* (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)); *see also, e.g.*, *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 746 (2023); *Petroleum Exploration, Inc. v. Public Serv. Comm'n*, 304 U.S. 209, 222 (1938). The "litigation expense" Plaintiff describes here is no different.

Second, Plaintiff errs in claiming that it will be irreparably harmed by facing the prospect of a document-production order before this Court resolves the pending PI application. *See* Dkt 6 at 30–31. For one, given the amount of time that it will take to initiate a state-court action, for both parties to file briefs, for a state court to hold a hearing, and for the court to rule, there is virtually no chance that any document-production order from the state court would issue before this Court rules on the PI motion. In any event, as the State explained in the January 2, 2024 conference, even if a state-court document production order issued first, the State would not require Plaintiff to comply with that state-court production order until this Court resolves the pending PI application. In other words, even if the mere production of documents *could* be a harm, under the circumstances here that harm *cannot* materialize during the interim period before the PI is decided. *See Campbell*

*Soup*, 977 F.2d at 92–93 (injunction not warranted since movant produced no evidence that harm was impending during relevant period); *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) (agreeing "demonstration of irreparable harm must be considered in conjunction with the time frame involved").

Regardless, the mere production of documents does not harm Plaintiff in this case. Plaintiff is wrong to suggest that production of documents—in the event this Court denies a PI and the appellate courts decline to issue emergency relief—would "moot this proceeding" or "require it to forego a merits adjudication on appeal." Dkt. 17 at 3. Just as "the conclusion of an investigation will not ordinarily moot a challenge to a subpoena if a court can order 'meaningful relief' by, for example, 'ordering the … return [of] records,'" the same is true for production of documents. *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 393 (2d Cir. 2022) (quoting *Church of Scientology of Calif. v. United States*, 506 U.S. 9, 12-13 (1992)). Moreover, merely having to produce documents is not irreparable harm. *See FTC v. Church & Dwight Co.*, 756 F. Supp. 2d 81, 87 (D.D.C. 2010); *In re Platinum Partners Value Arbitrage Fund*, No. 18-5176, 2018 WL 3207119, at *6 (S.D.N.Y. June 29, 2018).

Third, Plaintiff cannot overcome a lack of irreparable harm merely by pressing constitutional claims. *See* Dkt. 6 at 38 (arguing "constitutional violations constitute irreparable harm"). Courts have repeatedly rejected the argument that the "likelihood of success" and "irreparable harm" prongs automatically merge where a challenge

16

raises constitutional or First Amendment claims. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (reiterating that a preliminary injunction "does not follow as a matter of course" from likelihood of success); *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (confirming that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement"); *Siegel v. LePore*, 234 F.3d 1163, 1177–78 (11th Cir. 2000) (rejecting claim "that a violation of constitutional rights always constitutes irreparable harm"). "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989).

The plurality opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), is not to the contrary. The Third Circuit has repeatedly rejected an understating of *Elrod* that finds the irreparable harm requirement satisfied in every First Amendment case. *See, e.g.*, *Hohe*, 868 F.2d at 73 (holding that showing likelihood of success on First Amendment claim "does not automatically require a finding of irreparable injury"); *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997) ("Nothing in [*Elrod*] suggests that the Court meant to do away with the traditional prerequisites for injunctive relief simply because First Amendment freedoms were implicated."); *Conchatta v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003) (same); *see also Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot

17

substitute for the presence of an imminent, non-speculative irreparable injury.").[2] But even if the active abridgment of First Amendment rights generally warranted emergent relief, the harm Plaintiff complains of here—having to litigate state-court defenses—is not a First Amendment harm at all. Since there is no possibility that Plaintiff will face sanctions or have to turn over documents while this Court considers the pending PI motion, there is no basis for interim injunctive relief—because there is no potential harm, irreparable or otherwise, to enjoin.

2. Beyond the lack of irreparable harm, the equities militate strongly against issuing a TRO. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (when the State is a defendant, the other equitable factors—harm to opposing party and public interest—are combined). Injunctive relief can be denied on that basis alone. *See, e.g.*, *Winter v. NRDC*, 555 U.S. at 23 (declining to address merits at PI posture and holding that "even if plaintiffs have shown irreparable injury […] any such injury is outweighed

---

[2] Plaintiff's cited cases are not to the contrary, but instead follow from the actual scenario presented in *Elrod*. *Elrod* itself identified case-specific facts that showed irreparable harm in that case, including the fact that the public employee plaintiffs were "threatened with discharge" based on continued expression of political beliefs, and thus "that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." 427 U.S. at 373. In cases where the specific nature of the First Amendment injury inherently poses irreparable harm, such as employer discipline for political expression, *see Amalgamated Transit*, 39 F.4th at 101, or prior prosecution of a family member for identical conduct, *see Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 123 (3d Cir. 2023), courts have followed *Elrod* to not require separate showings of irreparable harm. But that is a far cry from this case, where the exclusive action would be initiation of a separate action in state court seeking the production of documents, while this Court considers the PI.

by the public interest and the Navy's interest in effective, realistic training of its sailors"); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016) (affirming denial of PI based on last two factors alone).

Although the State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State" generally, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018), the harm to the State and therefore to the public is particularly profound here. At least three different state laws afford the Attorney General power to investigate potential misconduct in this matter. *See* N.J. Stat. Ann. § 56:8-6(d) (CFA); *id.* § 45:17A-33(g) (CRIA); *id.* § 45:1-18 (P&O law). Each of those statutes empowers the New Jersey Attorney General to issue subpoenas in service of investigations. And each provides that the Attorney General's remedy for non-compliance— seeking an order requiring the production of documents—lies exclusively in the Superior Court. Thus, while this Court can determine whether this Subpoena violates First Amendment or Fourth Amendment rights in a 42 U.S.C. § 1983 federal action, it cannot compel production of documents, and Plaintiff would remain free to raise state-law defenses even if the federal case concludes in the State's favor. Preventing the State from accessing the only forum in which it can enforce its rights—and the rights of the public—under three state laws is a significant harm to the State and its citizens.

Plaintiff's submissions make this clear. Plaintiff says that it wishes to pursue state-law defenses in state court, a process that will take time as the state court must accept initiating documents, set a schedule, obtain submissions from the parties, hold a hearing, and issue a decision. If that process cannot even *begin* until after this Court rules on the PI motion and after any emergency applications for injunctions pending appeal are decided, the State would be hampered in its investigation of potentially fraudulent and misleading activity for an extended period. The PI motion will not be fully briefed until late February; no decision will likely issue until March or April; and emergency applications to the appellate courts might not conclude until June. The State could not even initiate a subpoena-enforcement action until July, followed by months of litigation in state court. Despite a Subpoena return date of December 2023, Plaintiff would avoid compliance until at least fall of 2024. In contrast to the lack of irreparable harm Plaintiff would incur, the State would suffer a real harm if its ongoing investigative work is stymied for such an extended period. *See Interstate Commerce Comm'n v. Gould*, 629 F.2d 847, 851–52 (3d Cir. 1980) (agencies "must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the [agency's] regulatory authority").

Granting this TRO also would incentivize other subpoena recipients to seek federal-court review to delay analogous subpoena-compliance deadlines. Although

20

the State ordinarily consents to extensions of time when the parties are engaging in meet-and-confer sessions about the scope of a subpoena, here, Plaintiff declined the State's offer of such sessions, taking the position that its objective is to not comply with *any* part of the Subpoena. Allowing entities who have no intention of complying with a duly-issued state subpoena to circumvent the State's statutory authority will have significant repercussions. Such delaying tactics would compromise the State's investigatory abilities. Those real harms outweigh any specter of injury that Plaintiff asserts—injury that, again, is neither imminent nor irreparable.

Finally, Plaintiff incorrectly claims that the public interest favors an injunction when a First Amendment claim is raised. Dkt. 6 at 38. The language Plaintiff cites from *Amalgamated Transit* refers to the burdens on the likelihood-of-success prong, not the equitable factors. 39 F.4th at 109. Indeed, on the merits, "the burdens at the preliminary injunction stage track the burdens at trial." *Reilly*, 858 F.3d at 173. That means Plaintiff "still retains the burden of proof in two principal ways: it must prove that the law restricts protected speech and that it will suffer irreparable harm." *Id.* at 180 n.5 (citation omitted). Only after Plaintiff meets that burden would the burden shift to the government to "justify its restriction on speech under whatever level of scrutiny is appropriate." *Id.* At bottom, given the lack of harm to Plaintiff from mere state-court litigation about document production, and the tremendous harm to the State and public from delays, the equities clearly counsel against the entry of a TRO.

21

## II.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.

Although this Court need not reach the merits in light of Plaintiff's inability to demonstrate irreparable harm during the pendency of the PI motion, *see Granny Goose*, 415 U.S. at 439, Plaintiff also cannot meet its burden of demonstrating a sufficient probability of success on the merits at this stage. Although the State looks forward to further briefing and establishing a record in its response to the PI application, a number of merits defects are readily apparent at this early stage: first, the Attorney General has authority to issue this Subpoena; and second, Plaintiff has not met the high burden for its miscellaneous First Amendment claims.

### A.   The Subpoena Is Reasonably Relevant To An Authorized Inquiry.

The Attorney General has broad authority to issue the challenged Subpoena. In reviewing this question, courts take a deferential approach, requiring only that "(1) the inquiry must be within the authority of the agency, (2) the demand for production must not be too indefinite, and (3) the information sought must be reasonably relevant to the authorized inquiry." *Chao v. Cmty. Trust Co.*, 474 F.3d 75, 79 (3d Cir. 2007); *United States v. Zadeh*, 820 F.3d 746, 755–56 (5th Cir. 2016). That makes sense: "[t]he decision to investigate is normally seen as a *preliminary* step," *UMDNJ v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003), so the validity of a decision to investigate is not "limited . . . by . . . forecasts of the probable result of the investigation." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 216 (1946).

22

The challenged Subpoena makes requests that are "reasonably relevant to the" questions the Attorney General is "authorized" to investigate. The Subpoena itself identifies multiple distinct sources of state statutory authority—the CFA, the CRIA, and the P&O law. *See* Turner Cert. Ex. 4 at 2. Each law empowers the Attorney General to initiate an investigation and issue a subpoena if he 1) believes that an entity "engaged in, is engaging in, or is about to engage in" any unlawful practice, or 2) if he "believes it to be in the public interest that an investigation should be made to ascertain" the existence of an unlawful practice. N.J. Stat. Ann. § 56:8-3 (CFA); *see also* N.J. Stat. Ann. § 45:1-18 (same, for P&O law); N.J. Stat. Ann. § 45:17A-33(c) (same for CRIA). The unlawful practices they cover are broad: they protect, among others, consumers, charitable donors, and individuals receiving professional services from various forms of fraud and professional misconduct.

The Subpoena, on its face, includes inquiries that are "reasonably relevant to" determining whether Plaintiff or others engaged in any fraud, including on charitable donors, that violates state laws or other misconduct. For example, Requests ¶¶ 2, 10, 20, and 26 aim to investigate whether Plaintiff's use of multiple websites—with certain disclosures made on one set of websites, but omitted on others—violates the CFA and/or CRIA's prohibitions on false, misleading, or deceptive statements or omissions. *See* N.J. Stat. Ann. § 45:17A-32(c); § 56:8-2. Requests ¶¶ 14–18, 21, and 27 aim to evaluate whether Plaintiff or its staff is engaged in the unauthorized

practice of medicine or professional misconduct prohibited by N.J. Stat. Ann. §§ 45:1-18.2 and -21. Requests ¶¶ 6-9 call for documents substantiating medical claims that Plaintiff makes on its websites, to investigate whether those medical claims violate the CFA, CRIA, or the P&O laws. *See* N.J. Stat. Ann. § 45:17A-32(c); § 56:8-2; N.J. Admin. Code § 13:35-6.10. The State cannot yet know precisely what the Subpoena will yield, but its inquiries are plainly relevant to investigating potential statutory violations.

And there were good reasons for the Attorney General to investigate whether Plaintiff or its staff has violated these statutes. For one, initial review of First Choice's website materials revealed significant discrepancies across its websites, with some detailing a pro-life mission to counsel women against abortion, and others omitting that information about mission and purpose when stating that First Choice provides professional medical consultations and is "a network of clinics providing the best care and most up-to-date information on your pregnancy and pregnancy options." *Supra* at 7-8. Because donation pages exist on both websites, there are serious questions as to whether omissions on one site misleads potential or actual donors. Moreover, First Choice makes numerous medical claims—and links those claims to the purported involvement by doctors and nurses, which are licensed professionals—that raise concerns about whether it provides misleading information to clients, consumers, and donors. *See supra* at 8. While a decision has not yet been

24

made about whether to initiate civil or administrative actions for violations of these laws, there is clearly ample basis to ask further questions via a subpoena.

Plaintiff wrongly contends in response that even if it does engage in fraud, it cannot be subject to a CFA investigation, because *nothing* in the CFA applies to any nonprofit organization. *See* Dkt. 6 at 29 (citing N.J. Stat. Ann. § 56:8-47). But that runs into at least three problems at this early posture. <u>First</u>, this Court need not resolve this issue at this stage, because so long as *any* of the three statutes support the Subpoena, the Subpoena should not be restrained; Plaintiff's interpretation of the CFA is irrelevant if *other* laws support the Subpoena, too. *See LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021) (explaining a harm is only "fairly traceable" to an action if there is something "akin to 'but for' causation in tort," which would not be satisfied where independent bases support this Subpoena); *Fischer v. Governor of N.J.*, 842 F. App'x 741, 750–51 (3d Cir. 2021) (explaining that "the redressability element" of Article III is not satisfied where the desired result "would eliminate one of multiple causes of [the claimed] injury without actually decreasing the injury at all," which perfectly describes a Subpoena with multiple bases); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018). And Plaintiff cannot argue that it is immune from CRIA (or the P&O law).

Second, even if this Court gets past that Article III problem, this is a matter of state law, not of federal law. When parties' federal constitutional challenges turn on unsettled questions about the interpretation of state statutes, federal courts often abstain pursuant to *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941), to allow state courts to resolve the state-law statutory interpretation question in the first instance. *See Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991); *Georgevich v. Strauss*, 772 F.2d 1078, 1089 (3d Cir. 1985).

Third, on the merits, Plaintiff is wrong about the CFA. N.J. Stat. Ann. § 56:8-47 is part of one amendment to the CFA, which relates to the sellers of health club services. *See* P.L. 1987, Ch. 238, *attached as* Ex. C. The reference to exempting nonprofits from "this Act" was to the health club services act alone. That is especially apparent where CRIA itself acknowledges nonprofit entities can face liability for violating the CFA. *See* N.J. Stat. Ann. § 45:17A-32(c)(3). And that is why multiple courts have applied CFA provisions to nonprofit entities. *See Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641 (D.N.J. 2013); *Mason v. Roman Cath. Archdiocese of Trenton*, 2019 U.S. Dist. LEXIS 48212 at *28–29 (D.N.J. Mar. 22, 2019).

Plaintiff also errs in arguing that even if it engages in fraud, it could never be subject to any CRIA investigation either—arguing CRIA is facially unconstitutional. *See* Dkt. 6 at 31-38. Plaintiff is unlikely to succeed for at least four reasons. First,

Plaintiff the same Article III problem applies here, this time in reverse: if this Court agrees the Subpoena is justified by the CFA, it is irrelevant whether the Subpoena is independently justified by CRIA. *See LaSpina*, 985 F.3d at 284; *Fischer*, 842 F. App'x at 750–51. <u>Second</u>, this is another federal constitutional challenge that rests entirely on Plaintiff's reading of a state statute—that CRIA applies to *all* fraudulent representations, rather than to any more tailored set of fraudulent misrepresentations. But as above, federal courts often abstain under *Pullman* from deciding questions of constitutional law before state courts can properly consider the threshold questions of state-law statutory interpretation. *See, e.g.*, *Chez Sez*, 945 F.2d at 631. There is no basis to grant a TRO before this Court can even consider whether abstention is required. <u>Third</u>, Plaintiff cannot satisfy the requirement that it show an "indisputably clear" right to facial relief, *Hope*, 972 F.3d at 320, against a state law that has existed for three decades, *see* 1994 NJ Sess. Law Serv. Ch. 16 § 15 (codified at N.J. Stat. Ann. § 45:17A-32).

<u>Fourth</u>, Plaintiff's claim is not likely to succeed on the merits. To show that a law is *facially* invalid, Plaintiff must establish "substantial" "overbreadth": that the "lawful sweep" of CRIA is overshadowed by a "substantially disproportionate" set of real-world applications that violate the First Amendment. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 770 (2023) (because facial invalidation of a statute is "strong medicine" that "destroys" even the many lawful applications of a statute, "a

27

law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep"); *id.* at 784 (requiring that "the ratio of unlawful-to-lawful applications is … lopsided"). Plaintiff cannot do so. As the Supreme Court has made clear, States have the power to prohibit any charitable organizations from engaging in "fraud" when they engage in "charitable solicitation." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 611–12 (2003); *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (agreeing "State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements"). That purpose lies at CRIA's core, and the Subpoena's requests fall well within this core. Plaintiff introduces no record evidence to support that CRIA would be applied in a "lopsided" way to constitutionally-protected conduct instead.[3]

---

[3] Nor has Plaintiff met its burden at the TRO posture to prove that CRIA is facially void for vagueness. Vagueness doctrine is "especially lax" for legislation that carries civil rather than criminal penalties; a law must be "so vague as to be no rule or standard at all." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015); *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013) (it is not enough to show a law "contain[s] some ambiguities"). The world "truthful" (*see* Section 32(a)) is a well-established concept found commonly in both statutes and everyday speech. *See, e.g.*, N.J. Stat. Ann. § 2C:28-1 (perjury). The phrase "capacity to mislead the average consumer" (Section 32(c)(7)) is a familiar standard that this Court, the New Jersey Supreme Court, and the Third Circuit endorse. *See, e.g.*, *Gomez v. Extra Space Storage, Inc.*, No. 13-cv-0929, 2015 WL 1472263, at *4 (D.N.J. Mar. 31, 2015) ("The capacity to mislead ... is the prime ingredient of all

Beyond their challenges to the Attorney General's authority under the CFA and the CRIA, Plaintiff's other objections to the Subpoena fare no better. Their contention that the State must identify specific "practices engaged in by First Choice that have been declared unlawful" to issue a valid Subpoena is backwards, Dkt. 6 at 29: "[t]he decision to investigate is normally seen as a preliminary step" to determine whether the law has in fact been violated, *UMDNJ*, 347 F.3d at 69; its validity is not "limited ... by forecasts of the probable result of the investigation," *Okla. Press*, 327 U.S. at 216. Plaintiff's argument that the Subpoena's contours are overbroad, Dkt. 6 at 29-30, fails because it made no "reasonable efforts ... to reach accommodation with the government," despite an invitation from the State. *In re Subpoena Duces Tecum,* 228 F.3d 341, 350-51 (4th Cir. 2000). In any event, given the scope of the state statutes and the breadth of the potentially unlawful activities, *see supra* at 4-10, "the nature of the inquiry precludes a trim list of requests." *SEC v. McGoff*, 647 F.2d 185, 193 (D.C. Cir. 1981). Finally, Plaintiff's argument that the Subpoena goes back too many years (Dkt. 6 at 30) fails too: it did not first try to "reach accommodation with the government," *In re Subpoena,* 228 F.3d at 351, and regardless, courts hold that "[e]vidence that [a subpoena recipient] made material misrepresentations before the limitations period is relevant to [its] present-day intent

---

types of consumer fraud."); *Am. Home Prod. Corp. v. FTC*, 695 F.2d 681, 686-87 (3d Cir. 1982). And Section 32(c)(10)'s reference to any "rules adopted by the Attorney General" is a typical way to grant agencies rulemaking authority.

and could be evidence of a continuing scheme that persisted into the limitations period." *Exxon Mobil v. Schneiderman*, 316 F. Supp. 3d 679, 711 (S.D.N.Y. 2018), *aff'd in part, appeal dismissed in part sub nom. Exxon Mobil v. Healey*, 28 F.4th 383 (2d Cir. 2022).

The Subpoena is based on multiple independent statutory sources. It includes questions reasonably related to evaluating violations of those laws. The State has a basis to ask those questions. Plaintiff's challenges to the underlying state statutes are inconsistent with central principles of standing, abstention, statutory interpretation, and facial overbreadth. Especially in light of Plaintiff's failure to prove irreparable harm, there is no basis for a TRO to restrain the State from initiating an action in state court that seeks only a document-production order.

B. Plaintiff's First Amendment Claims Fail.

Plaintiff's First Amendment theories likewise fail to justify its extraordinary demand for a TRO against this duly-issued state subpoena. As a threshold matter, the State has simply issued a subpoena and has not decided whether to ultimately bring any civil or administrative action against Plaintiff for substantive violations of these three laws. As the Supreme Court has rightly held, the State "violates no constitutional rights by merely investigating" conduct that may violate its laws. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 628 (1986). As the D.C. Circuit has held, such subpoenas "do not directly regulate the content, time,

30

place, or manner of expression." *McGoff*, 647 F.2d at 188. There is no precedent supporting Plaintiff's position that the mere production of non-privileged records in a state-law fraud and professional standards investigation is itself a violation of First Amendment rights. If there comes a time where the State does seek to enforce any or all of these three state provisions against Plaintiff, it can raise First Amendment defenses or claims at that time.

Besides that threshold issue, Plaintiff's specific First Amendment claims fail on their terms. First, Plaintiff cannot meet their burden for its retaliation, selective enforcement, and viewpoint discrimination claims, which rest on the contention that the Subpoena was issued not for valid cause, but to target Plaintiff's expressive activities. The burden Plaintiff faces is quite high; it must show not only that the enforcement agency was in fact driven by this improper purpose, but also that the agency lacked sufficient cause to justify the action. *See Hartman v. Moore*, 547 U.S. 250, 256–58 (2006) (in a selective prosecution case, plaintiff has burden of proving *lack* of probable cause to initiate a prosecution to overcome "presumption that a prosecutor has legitimate grounds for the action he takes"); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304–09 (11th Cir. 2019) (applying *Hartman*'s test to retaliatory-motive challenge against government-initiated civil suit). Plaintiff cannot show that the Division lacked any sufficient basis for this Subpoena, given what the Division uncovered, *see supra* at 6-10, and given that other jurisdictions have seen

31

reason to investigate or even litigate similar claims of fraud against crisis pregnancy centers, *see, e.g.*, *People v. Heartbeat Int'l, Inc.*, No. 23CV044940 (Cal. Sup. Ct.); *Obria Grp. Inc. v. Ferguson*, No. 3:23-cv-06093 (W.D. Wash.).

Moreover, Plaintiff fails to show improper motive. As another district court thoroughly and persuasively explained, statements by an investigating official of his political views and meeting with advocates are not enough to establish an improper motive. *See Exxon Mobil*, 316 F. Supp. 3d at 707. Otherwise, statements about climate change will bar officials from investigating fraud by Exxon, and statements about the dangers of opioids will prevent officials from filing suits against Purdue. *See id.* at 710 n.29. That has never been the law; more is required to show that a state-law fraud investigation is "not based on a good faith belief that [the subpoena recipient] may have violated state laws." *Id.* at 686, 704. Meetings with advocates likewise do not show either that advocates have an "improper," non-fraud-related purpose, or that the Attorney General shared such an "improper" purpose. *Id.* at 708–09; *see SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 130 (3d Cir. 1981) (same). That the Attorney General supports access to reproductive health care, and that he (and multiple other officials) have had reason to warn the public of potential fraud by pregnancy centers broadly, "does not mean [he] does not also have reason to believe that [First Choice] may have committed fraud" based on the

representations that the Division has uncovered to date. *Exxon Mobil*, 316 F. Supp. 3d at 707.

Second, Plaintiff's free exercise claim likewise fails. Each of the statutes—the CFA, the CRIA, and the P&O law—are neutral laws of general application, and are therefore subject to rational basis review. *Emp. Div., Dep't of Human. Res. of Ore. v. Smith*, 494 U.S. 872, 878–82 (1990). They prohibit fraudulent and misleading statements and/or omissions in the context of consumer transactions, doctor-patient interactions, and/or charitable solicitations, and prohibit the unlawful practice of medicine. Plaintiff offers no evidence that the State is improperly targeting it with this Subpoena based on its religious views or activities. Plaintiff bears the burden of showing "comparable secular" activity that was not regulated in the same way by the State. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002); *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021). It has not done so. Plaintiff points to no "comparable secular" entity that has, *inter alia*, published divergent statements regarding its conduct across websites that raise comparable concerns regarding consumer, client, and donor fraud—let alone that linked representations about the involvement of medical professionals to potentially misleading medical information. *See supra* at 6-10. All Plaintiff offers is a comparison to out-of-state organizations offering abortion care that had data-breach incidents—hardly comparable to the concerns animating this Subpoena.

33

Finally, First Choice's associational claims cannot justify a TRO. First Choice overstates the scope of the requested disclosures, complaining that the Subpoena seeks information regarding its "donors, clients, staff, vendors … officers, directors" and others. Dkt. 6 at 25–27 (citing subpoena requests ¶¶ 10, 11, 15, 16, 18, 22–24, 26). But the State does not seek a comprehensive list of their donors. Subpoena Request ¶ 11 seeks only documents concerning complaints made by clients or donors. And Request ¶ 26 requests only identifying information for donors who donated "by any means other than through the Donor Solicitation Page"—that is, the donors who gave money on the site that conceals First Choice's pro-life mission and practices. These requests are tailored to investigate whether First Choice's donors were misled, especially donors who gave money without being informed of First Choice's mission and practices—a mission that it is free to pursue, but not one it can mislead its donors about. *See supra* at 6-10.[4] Moreover, if First Choice has *specific* concerns about specific requests contained with the Subpoena, this is precisely the

---

[4] Likewise, the Subpoena does not seek general disclosure of First Choice's vendors, but rather only communications related to development of these multiple websites (Request ¶ 10). And it does not seek identifying information for all of First Choice's staff, only those relevant to the State's investigation of unlicensed practice of medicine and professional misconduct (*see* Requests ¶¶ 15, 16, 18, seeking licensure information, ultrasound personnel, and ultrasound interpretation referral information). And because the veracity of First Choice's claims regarding "Abortion Pill Reversal" (APR) support an inquiry into whether individuals—including donors—were misled, the Subpoena seeks information related to First Choice's APR services, including with national organizations regarding APR. (Request ¶ 22).

34

sort of subject the parties can meet and confer to discuss, not a basis to collaterally attack the subpoena through a federal suit demanding an immediate order that restrains the State's efforts to even begin the state-court process of document production.

First Choice's reliance on *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), only highlights the reasonableness of the State's approach. *AFP* concerned California's prophylactic disclosures, known as "Schedule B," which required all charities to disclose every donor who gave over $5,000 on their annual tax registrations. *Id.* at 2379–80. The Court acknowledged the state's legitimate anti-fraud interest, but found that requiring annual disclosures from 60,000 charities was overbroad. *Id.* at 2385. The Court, however, expressly held that the State *could* use narrower alternatives "such as a subpoena or audit letter," when the State had a basis to collect that information to investigate specific concerns about fraud. *Id.* at 2385–86. Here, New Jersey seeks to do just that. *See Madigan*, 538 U.S. at 624 (discussing validity of the State's efforts to combat fraud on charitable donors); *Riley*, 487 U.S. at 800 (same); *New York v. VDARE Fdn., Inc.*, No. 453196/2022, 2023 N.Y. Misc. LEXIS 293 (N.Y. Sup. Ct. Jan. 23, 2023) (enforcing civil subpoena to VDARE, a

white-supremacist website, concerning allegations that VDARE had misused donor funds, and rejecting VDARE's reliance on *AFP*).[5]

*          *          *

Plaintiff cannot prevail on these constitutional claims. But the Court need not even reach the merits of Plaintiff's claims, because the lack of any irreparable harm and the powerful equities on the other side are fatal. All the State seeks to do here is *initiate* a state-court action for document production in the only court that could eventually grant such relief—the state Superior Court. Doing so is necessary to avoid inordinate delays. First Choice, however, cannot be harmed, because it will suffer no penalties or production. First Choice need only litigate the very state defenses it is holding in reserve—which is not an irreparable harm at all.

---

[5] Finally, Plaintiff has cited no case—and the State is aware of none—holding that federal courts have "general case management authority" to alter or suspend the deadline for a state-law subpoena. *See* Dkt. 17, at 3. After all, state statutes authorize the Attorney General to issue subpoenas and designate the New Jersey Superior Court as the only court that can enforce them. *See* N.J. Stat. Ann. § 56:8-6(d); N.J. Stat. Ann. § 45:17A-33(g); N.J. Stat. Ann. § 45:1-18. To order that the State suspend the Subpoena's deadline, Plaintiff has to meet the elements for emergency injunctive relief. Plaintiff's reliance on *In re Fine Paper Antitrust Litig.*, 685 F.2d 810 (3d Cir. 1982), is wholly misplaced, since that case discusses a federal district court's docket-management power over its *own* discovery deadlines, not the deadlines of a state subpoena or the timing of a state-court proceeding. Nor does the first-filed rule support Plaintiff's argument either—that rule allows a court to stay the proceeding before it, not the proceeding before a separate tribunal.

## <u>CONCLUSION</u>

This Court should deny Plaintiff's motion for a temporary restraining order.

*See* Ex. A (proposed form of order).

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   <u>*/s/ Angela Cai*</u>
Angela Cai
Deputy Solicitor General

Dated:  January 5, 2024

37

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 5, 2024 I electronically filed the foregoing Opposition To Plaintiff's Motion for a Temporary Restraining Order with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By:    */s/Angela Cai*
       Angela Cai
       Deputy Solicitor General

Dated:  January 5, 2024