**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

FIRST CHOICE WOMEN'S RESOURCE
CENTERS, INC.,

                Plaintiff,

                v.

MATTHEW J. PLATKIN, in his official
capacity as Attorney General for the State of
New Jersey,

                Defendant.

Civil Action No. 23-23076 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court upon Plaintiff First Choice Women's Resource Centers, Inc.'s ("Plaintiff" or "First Choice") motion for a temporary restraining order ("TRO") and preliminary injunction ("PI"). (ECF No. 41.) Defendant Matthew J. Platkin, in his official capacity as Attorney General for the State of New Jersey ("Defendant" or the "State"), opposed (ECF No. 44), and Plaintiff replied (ECF No. 45). On October 15, 2024, the Court held oral argument on Plaintiff's motion. (ECF No. 61.) After consideration of the parties' arguments and submissions, Plaintiff's motion is denied.

## I.      BACKGROUND

      For purposes of considering the instant motion, the Court summarizes its previous decision, subsequent developments in this case, and relevant guiding precedent. For all other factual and

procedural background, the parties are directed to this Court's previous Memorandum Opinion dismissing Plaintiff's Complaint (the "Previous Opinion"). (Previous Op. 11, ECF No. 28.)

A.    **The Previous Opinion**

On January 12, 2024, this Court found that Plaintiff's constitutional claims relating to a non-self-executing state administrative investigatory subpoena (the "Subpoena") served upon it by the State were not yet ripe for this Court's review. (*Id.* at 8.) The more nuanced reason for this finding, as expressed in the Previous Opinion, was because the statutes from which the Subpoena derived its power (the "Authorizing Statutes") required a state court to first enforce the Subpoena before Plaintiff could be required by law to comply with it. (*See id.* at 7-9); N.J. STAT. ANN. § 56:8-6 (the Consumer Fraud Act (the "CFA")) (allowing the State to move before the New Jersey Superior Court for relief should a plaintiff not comply with an investigatory subpoena served on it by the State); N.J. STAT. ANN. § 45:17A-33(g) (the Charities Registration & Investigation Act (the "CRIA")) (same). In other words, the Court found that it lacked subject-matter jurisdiction over Plaintiff's claims because there was no ripe controversy where Plaintiff simply could decline to comply with the Subpoena with no legal consequence. Instead, the Court found, "Plaintiff's claims related to the Subpoena's enforceability in this matter would ripen only after the contingent future event that forms the basis of its alleged injury occurs, i.e., if and when the state court enforces the Subpoena in its current form." (Previous Op. 8.) Accordingly, Plaintiff's Complaint was dismissed without prejudice until such time, if ever, that its claims ripened.

B.    **Appellate Efforts & State Court Proceedings**

On January 22, 2024, Plaintiff filed its appeal of this Court's subject-matter jurisdiction findings in the Third Circuit Court of Appeals (the "Third Circuit"). (ECF No. 32.) While Plaintiff's appeal to the Third Circuit was pending, the State initiated enforcement proceedings in

the New Jersey Superior Court, Chancery Division, Essex County (the "Superior Court") citing Plaintiff's failure to comply with the Subpoena. (May 20, 2024 Hearing Tr. 8, ECF No. 41-11; Def.'s Superior Court Order to Show Cause Mem. 19, ECF No. 44-9 (requesting that the State-initiated proceedings proceed "in a summary manner pursuant to [N.J. STAT. ANN.] § 45:17A-33(e), § 56:8-8, [N.J. Ct. R.] 4:67-1(a), and [N.J. Ct. R.] 1:9-6" and that First Choice be directed to "fully comply with the Subpoena within thirty days").) Plaintiff responded by filing a motion to quash the Subpoena, as permitted by New Jersey law, and the Honorable Lisa Adubato, J.S.C., presided over the enforcement proceeding. (May 20, 2024 Hearing Tr. 4, 8); N.J. Ct. R. 1:9-2 ("The court on motion made promptly may quash or modify [a] subpoena [in a civil action] . . . if compliance would be unreasonable or oppressive."). Judge Adubato held oral argument on May 20, 2024, and on May 28, 2024, Judge Adubato issued a bench decision allowing the matter to commence by order to show cause as a summary proceeding and denying Plaintiff's motion to quash. (May 20, 2024 Hearing Tr. 66; May 28, 2024 Bench Decision 17, ECF No. 41-4; June 18, 2024 Order (the "Initial Compliance Order"), ECF No. 41-3.) Judge Adubato's Order memorializing her bench decision required First Choice to fully respond to the Subpoena within thirty days of the Order, but did not threaten contempt should First Choice fail to do so. (Initial Compliance Order *3[1].)

In denying Plaintiff's motion to quash, Judge Adubato expressly stated that she considered Plaintiff's constitutional arguments. (May 28, 2024 Bench Decision 23 ("I did consider all of, you know, those types of arguments when looking at what were made—constitutional arguments that were made . . . .").) Judge Adubato ultimately found, however, that those issues were not ripe or

---

[1] All page numbers preceded by an asterisk correspond with the page number in the document's ECF header.

formidable enough to merit quashing the Subpoena. (May 28, 2024 Bench Decision 16 ("This [c]ourt finds that the [State] has not, at this very preliminary juncture of this matter, violated any statutory or constitutional tenets which would lead to a quashing of the [S]ubpoena . . . ."); *id.* at 22 ("My determination, as pointed out by the [State] here, is that there are not ripe constitutional arguments."); *id.* at 29 ("You're asking me to get into the idea of the association and how that's going to, on its face, be a constitutional violation of your client's rights[,] and I've already decided that it isn't, based on the reasons that I've given.").) Judge Adubato also instructed First Choice that her decision with respect to the motion to quash was final, but that she anticipated further discussion on the constitutional issues. (*Id.* at 32 ("In large part, the constitutional arguments, number one, as I already indicated, are premature, and number two, not as a way of weighing this in recalcitrance, I think was the word - - not looking at that, I'm looking at the fact that there is, built into my order, the belief that the parties will confer going forward, and it's possible that the concerns of [Plaintiff] could be addressed in an agreement between the parties. So I don't find that the irreparable harm has been established."); *id.* at 13-15 (crediting language from the New Jersey Appellate Division where it found that a subpoena recipient subject to subpoena enforcement proceeding would suffer "no hardship" where a court declined "to address [the subpoena recipient's] constitutional arguments" because the subpoena recipient "preserved its claims" and "the parties, in conjunction with the trial court . . . can take steps to protect any proprietary materials identified during discovery").)

Shortly after Judge Adubato's May 28, 2024 bench decision, the State filed a motion to dismiss First Choice's appeal to the Third Circuit representing that Plaintiff's appeal before it was moot because, given the May 28, 2024 bench decision and accompanying Initial Compliance Order, Plaintiff's constitutional claims were ripe. (*See* Certified Order, ECF No. 38.) First Choice

did not oppose that its claims were ripe for a federal court's review. (*See id.* (providing the language of the Third Circuit in remanding this matter where the Third Circuit indicated that "it is now *undisputed* that [Plaintiff's] claims are ripe") (emphasis added).) Accordingly, with nothing left disputed between the parties, the Third Circuit found that Plaintiff's appeal was moot and remanded the matter to this Court for consideration. (*Id.*) On subsequent remand, Plaintiff filed a renewed TRO. (ECF No. 41.) The State opposed (ECF No. 44), and Plaintiff replied (ECF No. 45).

On September 20, 2024, while Plaintiff's renewed motion was pending before this Court, Judge Adubato held another hearing to assess new motions filed by the parties after her Initial Compliance Order. (*See* Sept. 20, 2024 Hearing Tr., ECF No. 56-1.) Specifically, Judge Adubato heard from the parties as to: (1) Plaintiff's motion for a protective order;[2] (2) the State's motion to enforce litigant's rights;[3] and (3) Plaintiff's motion to stay the Initial Compliance Order "in light of the pending federal proceedings."[4] (*Id.* at 8, 11-12.) Ultimately, however, Judge Adubato declined to decide the parties' new motions. (*Id.* at 16.) In denying the State's motion to enforce litigant's rights, Judge Adubato noted that she was "not necessarily declining the motion [or] making any substantive ruling" as to compliance. (*Id.* at 16.) Instead, Judge Adubato decided to hold the State's motion to enforce her previous order "in abeyance" pending a decision by the

---

[2] Judge Adubato considered Plaintiff's motion "a reconsideration motion [of her motion to quash ruling] based on [this Court] having jurisdiction." (Sept. 20, 2024 Hearing Tr. 8.)

[3] To this end, Judge Adubato further characterized the State's motion as asking the Court to compel Plaintiff to comply with her previous order, which ordered Plaintiff to produce all documents requested in the Subpoena. (*See* Sept. 20 Hearing Tr. 8, 11.)

[4] Plaintiff understood the Superior Court's previous ruling as deciding not to rule on Plaintiff's constitutional claims, and asked for a stay presumedly so that this Court could. (*See* Sept. 20 Hearing Tr. 11-12.)

Appellate Division on whether the Superior Court correctly refused to quash the Subpoena. (*Id.* at 19.) In so finding, Judge Adubato noted that the parties still disputed the scope of the Subpoena, and that she made no finding as to whether Plaintiff appropriately complied with the Subpoena at the time of the hearing. (*Id.* at 20.)

This Court is now left with the question of whether it can grant Plaintiff the relief it seeks, i.e., a TRO or PI enjoining or modifying the Subpoena, in light of the above state court developments.[5]

## C.    The *Smith & Wesson* Litigation

In assessing this question, this Court is not entirely without guidance. Instead, in a prior factually-adjacent litigation, a procedural labyrinth sprouted from six different decisions made by four different courts across the federal and state systems with respect to a similar investigatory subpoena served by the State on the gun manufacturer Smith & Wesson (the "*Smith & Wesson* Litigation"). (*See Smith & Wesson Brands, Inc.*, No. 20-19047, Hon. Jodi Lee Alper, J.S.C. State Court Order & Op., ECF No. 41-13 ("*Smith & Wesson (I)*")); *Smith & Wesson Brands, Inc. v. Grewal*, No. 20-19047, 2021 WL 3287072 (D.N.J. Aug. 2, 2021); ("*Smith & Wesson (II)*"); *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886 (3d Cir. 2022) ("*Smith & Wesson (III)*"); *Smith & Wesson*, No. 20-19047, 2022 WL 17959579 (D.N.J. Dec. 27, 2022) ("*Smith & Wesson (IV)*"); *Platkin v. Smith & Wesson Sales Co., Inc.*, 289 A.3d 481 (N.J. Super. Ct. App. Div. 2023) ("*Smith & Wesson (V)*"); *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 105 F.4th 67 (3d Cir. 2024) ("*Smith & Wesson (VI)*"). An abbreviated recitation of the decisions in the *Smith & Wesson*

---

[5] On November 7, 2024, the Appellate Division "temporarily remanded" First Choice's appeal to the Superior Court so that the Superior Court could "consider enforcement" which would require First Choice to "comply with a subpoena." (The State's Nov. 7, 2024 Correspondence, ECF No. 65.) This Memorandum Opinion is conscious of this development.

Litigation is essential for contextualizing the Court's findings, as the decisions that comprise the *Smith & Wesson* Litigation offer a traceable framework for the narrow and novel questions in this case.

### 1. *Smith & Wesson (I): Subpoena Enforcement Proceedings in Superior Court*

The basic facts underlying the *Smith & Wesson* Litigation were first set out in written form by the Superior Court in subpoena enforcement proceedings brought before it by the State. (*See generally Smith & Wesson (I)*.) Similar to this matter, the *Smith & Wesson* Litigation began in earnest when the State served an investigatory subpoena on Smith & Wesson pursuant to the CFA. (*Id.* at 1.) Like here, instead of producing the required documents, Smith & Wesson filed a lawsuit in federal court asserting its constitutional objections to the State's subpoena prior to enforcement proceedings beginning. (*Id.* at 7.) Thus, as soon as the enforcement proceedings began in *Smith & Wesson (I)*, parallel proceedings ensued.

While parallel proceedings were ongoing,[6] the State sought an order to show cause to enforce its subpoena against Smith & Wesson in the Superior Court, like the State did here. (*Id.* at 1.) Similarly, as here, Smith & Wesson moved to quash the subpoena as unconstitutional, citing several different theories of constitutional violation. (*Id.* at 3-4.)[7]

---

[6] The *Smith & Wesson* Litigation posture differed subtly from the proceedings before this Court only in that in the *Smith & Wesson* Litigation, the Superior Court was the first court to address constitutional arguments. (*See generally Smith & Wesson (I)*.) Here, this Court, in the Previous Opinion, was the first court to write an Opinion responsive to Plaintiff's TRO request before enforcement proceedings had even begun.

[7] These constitutional violations are similar to those at issue here. (*See generally* Compl. ECF No. 1; *Smith & Wesson (I)*.) Notably, however, Smith & Wesson did not allege that its right to freedom of association was violated. (*See generally Smith & Wesson (I)*.)

When rendering its decision, the Superior Court expressed disapproval of Smith & Wesson's race to federal court finding that: (1) the "expected action" in subpoena enforcement proceedings is for a subpoena-recipient to wait until enforcement proceedings are initiated in state court and file "a cross-motion . . . to dismiss, quash, or stay the subpoena;" and (2) the subpoena enforcement proceedings before it "involve[] state interest[s] that overcome considerations of comity" and deference to federal court proceedings, even if filed first. (*See id.* at 7-8.) Moreover, the Superior Court, at least partially, reached the substance of Smith & Wesson's constitutional claims, making an effort to set forth Smith & Wesson's constitutional arguments with specificity and engaging in a brief discussion about *NAACP v. Alabama*, 357 U.S. 449 (1958), and Second Amendment concerns before rejecting the concerns. (*Id.* at 3-4 (setting forth Smith & Wesson's constitutional contentions); *id.* at 8-9 (containing one paragraph of substantive constitutional discussion by the Court regarding *NAACP*); *id.* at 12-13 (containing two paragraphs about Smith & Wesson's contention that the State had an improper motive in serving the investigatory subpoena upon it, namely, that the State sought "to undermine the constitutional right to bear arms").)[8] Ultimately, despite Smith & Wesson's constitutional protestations, the Superior Court

---

[8] In totality, for purposes of considering Plaintiff's instant motion, the only pertinent difference between *Smith & Wesson (I)* and the Superior Court's May 28, 2024 Bench Decision is that *Smith & Wesson (I)* dealt in some express way with Plaintiff's constitutional claims, whereas here, the Superior Court did not adjudicate Plaintiff's constitutional claims based on facial deficiencies and state ripeness considerations. (*See, e.g.*, May 28, 2024 Bench Decision 16 ("This [c]ourt finds that the [State] has not, at this very preliminary juncture of this matter, violated any statutory or constitutional tenets which would lead to a quashing of the subpoena."); *id.* at 22 ("My determination, as pointed out by the [State] here, is that there are no ripe constitutional arguments."); *id.* at 23 ("I did consider all of, you know, those types of arguments when looking at what were made—constitutional arguments that were made and I—as I said, I ruled that they're not ripe yet."); *id.* at 29 ("You're asking me to get into the idea of the association and how that's going to, on its face, be a constitutional violation of your client's rights, and I've already decided that it isn't, based on the reasons that I've given."); *Smith & Wesson (I)* at 3-4, 12-13 (discussing substantively the failings of Smith & Wesson's constitutional arguments, albeit briefly).)

found the subpoena before it was "valid on its face." (*Id.* at 13.) Accordingly, like here, the State's request for an order to show cause to enforce the subpoena was granted, and Smith & Wesson's motion to dismiss, stay, or quash the subpoena was "denied in its entirety." (*Id.*)

### 2.    *Smith & Wesson (II): This Court Abstains Under Younger*

About a month after the Superior Court's enforcement decision, this Court entered the fray with an opinion on a TRO and PI application that Smith & Wesson filed relating to the constitutionality of the same subpoena considered by the Superior Court. *Smith & Wesson (II)* at *1. After setting forth largely the same facts outlined by the Superior Court in *Smith & Wesson (I)*, this Court noted that Smith & Wesson sought in federal court, as Plaintiff seems to do here, that "[t]his Court stay enforcement of the . . . administrative subpoena until the threshold questions of its constitutionality [were] resolved by this Court." *Id.* at *2; (*see also* Sept. 20, 2024 Hearing Tr. 11-12 (insinuating that the progression of federal court proceedings might justify a stay of any formal enforcement so that this Court can again consider Plaintiff's constitutional claims, but this time on the merits).)

After considering the parties' contentions, this Court opted to abstain under *Younger v. Harris*, 401 U.S. 37 (1971). *Id.* at *3-4. Specifically, this Court found *Younger* abstention appropriate after considering the Supreme Court's decision in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), and concluded that the State's enforcement of the administrative subpoena constituted a "civil proceeding[] involving certain orders uniquely in furtherance of the

state court's ability to perform their judicial functions ("*Sprint* Category Three")." *Id.* at *3-4 (quoting *Sprint*, 571 U.S. at 78).[9]

### 3. *Smith & Wesson (III): The Third Circuit's Rejection of Younger Abstention*

In *Smith & Wesson (III)*, the Third Circuit summarily rejected this Court's abstention finding. *Smith & Wesson (III)* at 888. In rendering its decision, the Third Circuit disposed of the notion that subpoena enforcement proceedings constitute a valid basis for *Younger* abstention under any of the three exceptional categories enumerated by the Supreme Court in *Sprint*. *Id.* at 891-93 (making findings as to the applicability of *Sprint* Categories Two and Three as to state subpoena-enforcement proceedings like those before this Court). In doing so, the Third Circuit noted the importance of access to federal courts where a federal court has a jurisdictional basis to hear a claim, writing that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given." *Id.* at 888 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)) (alteration in original).

The Third Circuit, in making its findings, identified that after this Court abstained, Smith & Wesson "eventually produced the subpoenaed documents under a protective order" that demanded the State "return the documents if the subpoena is later held unlawful." *Id.* at 890. In so deciding, the Third Circuit found that in this post-protective-order factual posture, much was still unknown about the subpoena enforcement process playing out against Smith & Wesson. *See id.* at

---

[9] In *Sprint*, the Supreme Court made clear that *Younger* abstention is a narrow doctrine, and abstention is only appropriate in "three exceptional categories": (1) criminal prosecutions; (2) certain civil enforcement proceedings ("*Sprint* Category Two"); and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial function." *Sprint*, 571 U.S. at 78 (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989)).

894. For example, in discussing what qualifies as a state order under *Sprint* Category Three, the Third Circuit wrote that:

> [W]hen Smith & Wesson went to federal court there was much more for the state court to do than merely implement a predetermined outcome. New Jersey courts still had to adjudicate Smith & Wesson's constitutional arguments; and even if those arguments were resolved against Smith & Wesson, the state courts still had to give the company an opportunity to produce the required documents before holding it in contempt.

*Id.* Of particular note in this language is that the Third Circuit contemplates contempt, a moment of tangible injury, as the end of a process wherein "there [is] much more for the state court to do," including "adjudicate [the subpoena-recipient's] constitutional arguments." *Id.* What *Smith & Wesson (III)* affirmatively established, however, is that while that process plays out in state court, abstention is not an appropriate action for this Court to take.

### 4.    *Smith & Wesson (IV): This Court's Application of Res Judicata*

By the time the Third Circuit rendered its decision in *Smith & Wesson (III)* and remanded the matter to this Court, the state court enforcement proceedings had progressed separately. *See Smith & Wesson (IV)* at \*3. Specifically, the Superior Court had heard argument on a motion to stay enforcement of the subpoena pending a decision by the Appellate Division as to the correctness of the state court's previous decision to enforce the subpoena against Smith & Wesson. *Id.* It was in this context that *Smith & Wesson (III)* was decided by the Third Circuit and this Court looked anew at Smith & Wesson's TRO and PI request. *See generally Smith & Wesson IV.*

This time, however, this Court found that Plaintiff's claims were barred on res judicata grounds because the Superior Court's initial enforcement decision constituted: (1) a final decision on the merits; (2) between identical parties; and (3) despite some disagreement, the claims in the federal action grew out of the state action. *Id.* at \*4-5, \*9. This Court's res judicata findings

concluded the concurrent state and federal litigations, pending a final assessment of this Court's res judicata findings on appeal.

### 5.    *Smith & Wesson (V): The New Jersey Appellate Division's Findings*

The jurisdictional seesaw continued when the New Jersey Appellate Division rendered a decision on Smith & Wesson's appeal of the Superior Court's enforcement decision, while federally, the parties awaited a Third Circuit decision on the applicability of res judicata. *See generally Smith & Wesson (V)*. In affirming *Smith & Wesson (I)*, the Appellate Division credited the lower court with addressing "defendant's constitutional arguments." *Id.* at 486 (referring necessarily to the lower court's brief discussion of *NAACP* and Second Amendment discussion because those were the only federal-constitution-related discussions in *Smith & Wesson (I)*).

Of note, when considering the Superior Court's *NAACP* discussion, the Appellate Division found that "[e]ven if [it] were persuaded that *NAACP*" operated outside the context of the freedom of association, which the Appellate Division was not persuaded it did, it "would find [Smith & Wesson's] constitutional claims not ripe for" adjudication. *Id.* at 493. In so finding, it decided that under New Jersey state law, a claim is only ripe if there "is an actual controversy, meaning the facts present 'concrete contested issues conclusively affecting' the parties' adverse interests." *Id.* (quoting *Matter of N.J. Firemen's Ass'n Oblig. v. Doe*, 166 A.3d 1125, 1134-35 (N.J. 2017) (finding that the New Jersey courts are forbidden from "declar[ing the] rights or status of parties upon a state of facts which are future, contingent, and uncertain") (alteration in original). In this context, the Appellate Division found that the lower court did not err in failing to consider Smith & Wesson's constitutional claims where there were "few actual facts," Smith & Wesson

"preserved its claims,[10] and the parties, in conjunction with the trial court, can take steps to protect any proprietary materials identified during discovery." *Id.* at 494 (noting further that the Appellate Division ended its analysis because to not do so would risk "premature adjudication" and entanglement in "abstract disagreements").

6.    ***Smith & Wesson (VI): Res Judicata Affirmed***

Finally, the oscillation from federal to state courts came to a close earlier this year when the Third Circuit made its findings in *Smith & Wesson (VI)*. While walking a fine line around the ripeness issue that lurked when considering whether *Smith & Wesson (I)* was determined on the merits, the Third Circuit ultimately did find that the Superior Court's holdings in *Smith & Wesson (I)* were final, on the merits, between the same parties, and grew from the same transaction or occurrence. *See generally Smith & Wesson (VI)*. Notably, the Third Circuit agreed that in summary state proceedings, like the subpoena enforcement proceedings here, the Superior Court's findings *can* constitute a final decision on the merits with preclusive effect. *Id.* at 79-80. As such, if the Superior Court makes substantive constitutional findings on a motion to quash in enforcement

---

[10] This preservation language is what Judge Adubato expressly relied on in finding Plaintiff's constitutional claims not ripe for review in this litigation. (May 28, 2024 Bench Decision 14-15 (crediting language from the New Jersey Appellate Division where it found that a subpoena recipient subject to subpoena enforcement proceedings would suffer "no hardship" where a court declined "to address [the subpoena recipient's] constitutional arguments" because the subpoena recipient "preserved its claims[] and the parties, in conjunction with the trial court . . . can take steps to protect any proprietary materials identified during discovery" (quoting *Smith & Wesson (V)* at 486)).)

proceedings, so long as the movant had a full and fair opportunity to litigate its claims in state court, the Superior Court judgment may be preclusive in federal court.[11] *Id.*

## II.   **LEGAL STANDARD**

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."[12] *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if plaintiffs establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harms favors them"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted). With respect to the first factor, "on an application for injunctive relief, the movant need only make a showing of reasonable probability, not the certainty, of success on the merits." *Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (internal quotation marks and citations omitted). In the end, however, "[t]he burden is on the moving party 'to convince the district court that all four factors favor preliminary relief.'" *Peter v. Att'y Gen. of N.J.*, No. 23-3337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (quoting *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

---

[11] As a final note, the Third Circuit limited its ruling to *the subpoena* at issue. *Smith & Wesson (VI)* at 84 ("We note that the operation of claim preclusion is quite modest in this case . . . [t]he preclusive effect of the state court judgment only concerns the subpoena at issue— not any nascent and further investigative step or future enforcement action."). The same is true of the Court's current Memorandum Opinion: Plaintiff only seeks an injunction of the State's investigation through the Subpoena, as the Subpoena is all that exists of the State's investigation at this early juncture.

[12] TROs and PIs require the same elements be met. *Koons v. Reynolds*, 649 F. Supp. 3d 14, 22 (D.N.J. 2023).

### III.    <u>DISCUSSION</u>

For the reasons set forth below, the Court finds that Plaintiff has again failed to show that its claims are ripe for review given the nature of the New Jersey subpoena enforcement proceedings, the Superior Court's findings, and this Court's previous findings. The Court also finds that to the extent Plaintiff can narrowly state a ripe constitutional injury, the harm alleged does not constitute irreparable harm justifying a TRO or PI. Simply put, all roads lead to a denial of Plaintiff's TRO and PI, and for the reasons set forth below, that is this Court's decision.

### A.    **Plaintiff's Claims Are Not Ripe for a Federal Court's Review**

Plaintiff's constitutional claims are not ripe for review by this Court. The Court begins where it left off in the Previous Opinion.

Article III of the Constitution limits the federal judiciary's authority to exercise its "judicial Power" to "Cases" and "Controversies" over which the federal judiciary is empowered to decide. *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017) (quoting U.S. CONST. art. III, § 2). "This case-or-controversy limitation, in turn, is crucial in 'ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society.'" *Id.* at 539 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). The existence of a case or controversy, therefore, is a necessary "prerequisite to all federal actions[.]" *Phila. Fed'n of Tchrs. v. Bureau of Workers' Comp.*, 150 F.3d 319, 322 (3d Cir. 1998) (quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994)).

Federal courts ensure that they are properly enforcing the case-or-controversy limitation through "several justiciability doctrines that cluster about Article III . . . including 'standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions.'" *Plains*, 866 F.3d at 539 (quoting *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir.

2009)).[13] "[R]ipeness concerns whether the legal issue at the time presented in a court is sufficiently concrete for decision." *United States ex rel. Ricketts v. Lightcap*, 567 F.2d 1226, 1232 (3d Cir. 1977). "Courts will not decide abstract legal issues posed by two parties; the issue in controversy must have a *practical* impact on the litigants." *Id.* (emphasis added) (citing *Abbott Laby's v. Gardner*, 387 U.S. 136, 148-54 (1967)). In its most basic form, an unripe claim is evident if upon inspection it is necessarily hypothetical, speculative, or contingent on some other yet-to-happen event. *Trump v. New York*, 592 U.S. 125, 131 (2020) (defining "ripe" as, in part, an issue that is "not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Where a federal court finds that a claim is not ripe, the court lacks subject-matter jurisdiction to adjudicate the unripe claim. *Renne v. Geary*, 501 U.S. 312, 316 (1991) ("Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so."). Importantly, federal courts are to "presume" they "lack jurisdiction 'unless "the contrary appears affirmatively from the record."'" *Id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986)). Ultimately, "[i]t is the responsibility of the complainant [to

---

[13] "Federal Courts are courts of limited jurisdiction and have an obligation to establish subject matter jurisdiction, even if they must decide the issue sua sponte." *Cepulevicius v. Arbella Mut. Ins.*, No. 21-20332, 2022 WL 17131579, at *1 (emphasis omitted) (D.N.J. Nov. 22, 2022) (citing *Liberty Mut. Ins. Co. v. Ward Trucking Corp.*, 48 F.3d 742, 750 (3d Cir. 1995)); *see also Council Tree Commc'ns, Inc. v. F.C.C.*, 503 F.3d 284, 292 (3d Cir. 2007) (finding that federal courts have an unflagging responsibility to reach the correct judgment of law, especially when considering subject-matter jurisdiction "which call[s] into question the very legitimacy of a court's adjudicatory authority" (citation omitted)); *Gov't Emps. Ret. Sys. of Gov't of U.S. V.I. v. Turnbull*, 134 F. App'x 498, 500 (3d Cir. 2005) ("Considerations of ripeness are sufficiently important that [federal courts] are required to raise the issue sua sponte, even when the parties do not question [the court's] jurisdiction." (emphasis omitted) (citing *Felmeister v. Off. of Att'y Ethics*, 856 F.2d 529, 535 (3d Cir. 1988)); *Suburban Trails, Inc. v. N.J. Transit Corp.*, 800 F.2d 361, 365 (3d Cir. 1986) ("[R]ipeness of issues for adjudication is a matter [the court] must raise and examine independently of the parties' wishes.").

clearly] allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Id.* (quoting *Bender*, 475 U.S. at 546 n.8).

For the reasons set forth in detail below, Plaintiff, the complainant, has again failed to demonstrate facts to suggest it is a proper party to invoke this Court's remedial powers. In explaining how, this Court sets forth: (1) how the State's contentions against this Court imposing a TRO are inapplicable here; (2) why, procedurally, constitutional ripeness remains firmly before the Court as a concern despite the parties' agreement to the contrary; (3) how New Jersey subpoena enforcement proceedings, by their nature, render Plaintiff's claims unripe until contempt is threatened; (4) why the September 20, 2024 Superior Court Hearing affirmatively established that Plaintiff's claims are not ripe for this Court's review; and (5) why no matter how Plaintiff attempts to contort its claims to sound in ripeness, Plaintiff cannot demonstrate ripeness because the Subpoena, the sole act of investigation by the State, has not ripened.

### 1.    The Failure of the State's Primary Contentions

As an initial matter, the State brings two primary contentions in opposing Plaintiff's motion: one sounding in full faith and credit to state proceedings, i.e., res judicata, and the other sounding in prudential ripeness, i.e., *Younger* abstention. (*See generally* Def.'s Opp'n Br.) The Court briefly addresses each before turning to constitutional ripeness.

### a.    Res Judicata

First, res judicata does not appear to be applicable here because it is not clear whether the Superior Court made a final decision on the merits as to Plaintiff's constitutional claims. "Under federal law, '[t]he . . . judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State[.]'" *Davis v. U.S. Steel Supply, Div. of U.S. Steel Corp.*, 688 F.2d 166, 170

(3d Cir. 1982) (first, second, third, and fourth alterations in original) (quoting 28 U.S.C. § 1738). As such, Section 1738 "requires federal courts to give res judicata effect to a state judgment to the extent the state would give its own prior judgment such effect." *Id.*

Here, the State contends that the Superior Court's denial of Plaintiff's motion to quash constituted an adjudication of its constitutional claims with preclusive effect. (*See* Def.'s Moving Br. 19-21.) As such, the Court applies the law of New Jersey in considering res judicata as that is the state where the alleged judgment occurred. 28 U.S.C. § 1738.

Under New Jersey law, for res judicata to apply:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.

*Delacruz v. Alfieri*, 145 A.3d 695, 707 (N.J. Super. Ct. L. Div. 2015) (citing *Watkins v. Resorts Int'l Hotel & Casino*, 591 A.2d 592, 599 (N.J. 1991)). Ultimately, because res judicata is an affirmative defense, the party asserting it, here the State, bears the burden of showing that it applies. *Davis*, 688 F.2d at 170.

The State fails to show that res judicata applies here where under New Jersey Law, judgments on jurisdictional grounds are not "valid and final." *Velasquez v. Franz*, 589 A.2d 143, 147 (N.J. 1991). In New Jersey courts, like in this Court, "[s]ubject-matter jurisdiction involves 'a threshold determination as to whether the [c]ourt is legally authorized to decide the question presented.'" *In re Registrant J.R.*, 310 A.3d 11, 15 (N.J. Super. Ct. App. Div. 2024) (quoting *N.J. Citizen Action v. Riviera Motel Corp.*, 686 A.2d 1265, 1270 (N.J. Super. Ct. App. Div. 1997)); *see also State v. Osborn*, 160 A.2d 42, 45 (N.J. 1960) ("Jurisdiction over the subject matter is the power of a court to hear and determine cases of the class to which the proceeding in question

belongs."). Ripeness is one such justiciability doctrine which, under New Jersey state law, absolves a court of jurisdiction. *In re Registrant J.R.*, 310 A.3d at 15 ("Standing, ripeness[,] and mootness . . . are justiciability doctrines, and they refer [] to whether a matter is appropriate for judicial review."). Crucially, a dismissal for lack of jurisdiction does not constitute a valid final judgment for res judicata purposes. *Velasquez*, 589 A.2d at 147.

Here, Judge Adubato found that Plaintiff's constitutional claims were not ripe. (May 28, 2024 Bench Decision 22 ("My determination, as pointed out by the [State] here, is that there are no ripe constitutional arguments."); *id.* at 32 ("In large part, the constitutional arguments, number one, as I already indicated, are premature[.]").) Importantly, unlike in the *Smith & Wesson* Litigation, this was the *only* clear reason Judge Adubato gave for denying Plaintiff's motion to quash and allowing enforcement proceedings to move forward. *See generally Smith & Wesson (VI)* (finding it critical in finding that res judicata could attach to the Superior Court's decision in *Smith & Wesson (I)* that the Appellate Division in *Smith & Wesson (V)* discussed the substance of Smith & Wesson's constitutional claims, as opposed to basing its decision solely on ripeness grounds); (May 28, 2024 Bench Decision.) As such, the State fails to show that there was a final decision on the merits where Judge Adubato's sole articulated reason for denying Plaintiff's motion to quash and to allow enforcement proceedings was that Plaintiff's constitutional claims were not ripe.

### b.    *Younger* Abstention

Second, the Court recognizes that the State's primary contention in opposing Plaintiff's motion is that abstention, a prudential ripeness doctrine, is appropriate here. (Def.'s Opp'n Br. 11-18.) Specifically, the State contends that under *Smith & Wesson (III)*, this litigation has progressed to a point where Plaintiff is in actual violation of a state court order, and thus, the threat

of contempt is imminent. (*See id.* at 13, 15-16.) The State, however, reads too much into *Smith & Wesson (III)*. Contempt needs to be certain, or a violation of a court order needs to be certain, to access abstention under either *Sprint* Category Two or *Sprint* Category Three. *See Smith & Wesson (III)* at 894. Not only is there no indication in the record that Plaintiff faces an immediate contempt threat, but the Superior Court has expressly stated that Plaintiff's motion to enforce the Initial Compliance Order is "in abeyance." (Sept. 20, 2024 Hearing Tr. 19.) As such, abstention is not available on the facts before the Court under *Smith & Wesson (III)*, as will become clear below.

### 2.    *The Continued Constitutional Ripeness Concern*

Having disposed of the State's contentions, the Court turns to Plaintiff's claims. Before it can do so, however, it has to satisfy itself that it can consider Plaintiff's TRO and the claims that underlie it. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) (holding that "Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case. 'For a court to pronounce upon [the merits] when it has no jurisdiction to do so . . . is . . . for a court to act ultra vires.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998)). Here, while the parties seemingly agree that Plaintiff's constitutional claims are ripe for a federal court's review, as evidenced by the Third Circuit's Certified Order, the parties' agreement cannot establish subject-matter jurisdiction and, importantly, this Court finds that the parties have come to the incorrect jurisdictional conclusion. (Certified Order 2 (finding that "it is now undisputed" between the parties that Plaintiff's "claims are ripe")); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)). To be sure, by the language of the Previous

Opinion, the threshold to ripeness has not been crossed, and the Previous Opinion remains in full force.

First, the State concluded after the May 28, 2024 Bench Decision was issued that Plaintiff's constitutional claims were now ripe for a federal court's review. (Def.'s Opp'n Br. 10-11.) (*Id.*) This conclusion was premature. This Court in the Previous Opinion found that when the Subpoena was enforced in its "then current form," Plaintiff's claims would ripen. (Previous Op. 8 ("Plaintiff's claims related to the Subpoena's enforceability in this matter would ripen only after the contingent future event that forms the basis of its alleged injury occurs, i.e., if and when the state court enforces the Subpoena in its current form.").) Critically, this Court in finding the Subpoena must be enforced in its "then current form," importantly and necessarily, found that the Subpoena must be enforced in an unconstitutional form before this Court can consider the Subpoena's constitutionality. (*Id.* ("New Jersey state law's allowance for a state court to modify or quash a subpoena if an enforcement proceeding is brought and 'compliance would be unreasonable or oppressive' supports a finding that a constitutionally-sufficient injury can only occur here if the state court tasked with enforcing the subpoena refuses to quash or modify *the constitutionally-infirm* subpoena." (citing N.J. STAT. ANN. § 1:9-2) (emphasis added)).)

To date, Plaintiff has not been compelled to disclose the alleged constitutionally-protected information it covets because its claims as to those documents are "preserved." (May 28, 2024 Bench Decision 14-15.) As such, it remains an open question as to whether Plaintiff will be ordered to disclose materials that it believes are constitutionally protected, as discussed more fully below. (*See* May 28, 2024 Bench Decision 11-12 (contemplating that both parties should have "an opportunity to confer and to address possible narrowing or adjustments of the [S]ubpoena" that might obviate the need for a ruling on the constitutional claims) (emphasis added)); Sept. 20, 2024

Hearing Tr. 19 (holding the Initial Compliance Order "in abeyance" such that First Choice is under no legal obligation to disclose allegedly constitutionally protected materials).) In this way, under the Previous Opinion, Plaintiff's claims are not ripe because the Superior Court did not enforce a "constitutionally-infirm" subpoena against Plaintiff. (Previous Op. 8.)   As such, the State's presumption that Plaintiff's claims are now ripe is not in lockstep with the Previous Opinion and the express findings of the Superior Court. Accordingly, it is rejected.

Second, after the State moved to dismiss Plaintiff's appeal of this Court's ripeness findings as moot, the Third Circuit did so. (Certified Order 2 ("We therefore dismiss the appeal as moot and remand this action to the District Court for further proceedings.").) Plaintiff, on remand, concluded that the Third Circuit's Certified Order was something more than just a remand based on a mooted appeal; Plaintiff concluded that the Third Circuit necessarily found that Plaintiff's claims are constitutionally ripe for review, decisively establishing subject-matter jurisdiction moving forward. (Pl.'s Moving Br. 10 (characterizing the Certified Order as the Third Circuit affirmatively ruling that Plaintiff's claims are ripe); Sept. 20, 2024 Hearing Tr. 12 (representing to the Superior Court that the Third Circuit "agreed" that Plaintiff's claims were ripe for adjudication by a federal court).) This is also objectively not so.

To be clear, the Third Circuit's Certified Order neither expressed "agreement" nor included any language indicating an affirmative finding on ripeness. (*See* Certified Order.) Instead, the Third Circuit wrote the following with respect to: (1) Plaintiff's motion for Injunction Pending Appeal or, Alternatively, for Summary Vacatur and Remand; and (2) the State's motion to "Dismiss Appeal as Moot":

> The foregoing motions are denied as presented. In this appeal, [Plaintiff] seeks review of [the Previous Order] dismissing its complaint for lack of subject matter jurisdiction. Because the District Court concluded that [Plaintiff's] claims were not ripe, it did

22

> not reach the merits of the claims or the request for injunctive relief. Based on subsequent developments in state court, it is now undisputed that [Plaintiff's] claims are ripe. We therefore dismiss this appeal as moot and remand this action to the District Court for further proceedings. We leave it to the District Court to address any requests for injunctive relief in the first instance.

(*Id.*)

Importantly, the only legally viable conclusions that can be drawn from the Third Circuit's Certified Order are that: (1) both Plaintiff's and Defendant's motions before the Third Circuit were denied (*id.* ("The foregoing motions are denied as presented.")); (2) the Third Circuit found that ripeness, the issue on appeal before it, was "undisputed" by the parties, a fact that notably cannot establish ripeness itself because parties cannot agree to subject-matter jurisdiction (*id.* ("[I]t is now undisputed that [Plaintiff's] claims are ripe.")); *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004) ("[P]arties can[not] write their own jurisdictional ticket. Subject matter jurisdiction 'cannot be conferred by consent' of the parties." (quoting *Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 854 (3d Cir. 1996)))[14]; (3) based on the parties' ripeness representations, Plaintiff's appeal was dismissed as moot (Certified Order (denying the State's motion to dismiss the appeal as moot but ultimately dismissing the appeal as moot suggesting that the Third Circuit did not reach the substance of the motions and mooted the appeal as a procedural matter)); and (4) the case should be sent back to this Court for further consideration because no issue for appeal remains (*id.* ("We leave it to the District Court to address any requests for injunctive relief in the first instance.").)

Notably, the Third Circuit's Certified Order did *not* find that: (1) Plaintiff's claims are in fact ripe for consideration; (2) this Court's Previous Opinion is in any way vacated, reversed, or

---

[14] Moreover, commonsensically, the language "undisputed" cannot be construed to implicate the Third Circuit in the "dispute" or suggest its stance on the issue. The Third Circuit is not in a dispute with the parties or itself. Any suggestion that this language may have constituted an affirmative finding by the Third Circuit that Plaintiff's claims are, in fact, ripe, is untenable.

inaccurate; or (3) the Third Circuit has any opinion on the previous ripeness determinations of this Court. (*See generally id.*) Plaintiff also provides no basis for its belief that the Third Circuit satiated itself, or for that matter, had reason to consider constitutional ripeness before remanding this matter. (Pl.'s Oct. 18 Correspondence 2, ECF No. 62 (maintaining, without support, that "the Third Circuit held [its claims] ripe when it remanded First Choice's appeal as moot").) Instead, it appears that the Third Circuit simply identified that the parties agreed that Plaintiff's appeal was moot and dismissed the matter as such. The Court, therefore, squarely rejects Plaintiff's declaration that the Third Circuit found this matter ripe.

As a final note on this point, there is also no reason to believe that the Article III ripeness issue was ever squarely before this Court or the Third Circuit in this case, other than in the Previous Opinion, or in the *Smith & Wesson* Litigation. As this litigation and the *Smith & Wesson* Litigation illuminate, the Article III ripeness[15] concern hides in the cross-section between parallel proceedings and other prudential concerns like comity, abstention, and full faith and credit. In this amorphous, seldom clearly defined landscape, if the Article III concern is not introduced, it can easily be left unconsidered. That is what the Court believes happened here.

---

[15] There is a critical distinction between prudential ripeness concerns, which do not absolve this Court of jurisdiction, and constitutional ripeness concerns, which do. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993))); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (finding that it may not be appropriate for federal courts to find claims nonjusticiable on prudential grounds alone rather than on constitutional grounds because "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (internal quotation marks and citations omitted)).

### 3. *Ripeness in the Context of New Jersey Subpoena Enforcement Proceedings*

Based on the above confusion, this Court finds it prudent to engage in a more elaborative discussion of New Jersey subpoena enforcement proceedings to fully illuminate what it perceives as the moment of ripeness for Plaintiff's claims.[16] In short, New Jersey state enforcement proceedings progress through five stages: (1) subpoena issuance; (2) party response, after which enforcement proceedings typically begin; (3) motion practice; (4) appeal; and (5) forced compliance.[17] The Court takes each in turn.

First, under the CFA, the State's broad investigatory powers include the power to subpoena documents. N.J. STAT. ANN. § 56:8-3(c). This power permits the State to conduct investigations[18] based "merely on suspicion that the law is being violated, or even just because [the State] wants assurance that it is not." *In re Addonizio*, 248 A.2d 531, 539 (N.J. 1968). Thus, subpoena issuance is a low bar and of no practical consequence in and of itself where the subpoena is

---

[16] For square consideration, this is the ultimate question in this litigation: Can Plaintiff, which is subject to a state non-self-executing administrative investigatory subpoena, which the state legislature specifically authorized state courts to enforce under threat of contempt if enforceable, maintain a suit in federal court on constitutional grounds before the state court has enforced the subpoena against it under threat of contempt or before the state court has otherwise committed to any position on whether the subpoena should be quashed or modified such that it need only simply decline to abide by the subpoena under no threat of legal consequence?

[17] The Court will focus its state enforcement proceeding analysis on the CFA, for conceptual ease.

[18] For purposes of this Memorandum Opinion, the Court considers the State's investigation of First Choice as synonymous with the Subpoena because the Subpoena is the only manifestation of the State's investigation to date. As such, any cognizable irreparable harm alleged to have been caused by the investigation more generally would necessarily only occur through the Subpoena at this early stage. All of Plaintiff's claims, therefore, relate to the Subpoena for purposes of this Memorandum Opinion. (*See, e.g.*, Compl. ¶¶ 89-104 (detailing Plaintiff's selective enforcement claim and alleging that the State, in issuing the Subpoena, engaged in unconstitutional viewpoint discrimination and that it was being "investigated" for engaging in constitutionally protected speech).)

non-self-executing, as here, because the Subpoena itself does not yet carry the power of law; a recipient can simply decline to respond at step two with no legal consequence. N.J. STAT. ANN. § 56:8-6; *U.S. ex rel. Ricketts*, 567 F.2d at 1232 ("Courts will not decide abstract legal issues posed by two parties; the issue in controversy must have a *practical* impact on the litigants." (emphasis added)). Instead, where a subpoena recipient does not respond to the subpoena, to compel compliance, the onus is on the State to seek the state court's involvement.[19]

Second, the party responds to the subpoena. This traditionally goes one of three ways: (1) a party responds to the subpoena without court involvement; (2) a party fails to obey the subpoena, prompting the State to file a lawsuit seeking the Superior Court to issue an order compelling compliance and at which time the subpoena recipient can move to quash the subpoena, (*Smith & Wesson (I)* at 7-8 (describing this outcome as the "expected action" and expressing disapproval for Smith & Wesson's decision to run to federal court prior to enforcement proceedings being initiated)); or (3) the subpoena recipient can go directly to the state court seeking relief from the subpoena, *Slumped Kitchen, LLC v. Div. of Consumer Affs.*, No. 21-2096, 2023 WL 4113367, at *2-*3 (N.J. Super. Ct. App. Div. June 22, 2023) (detailing an instance where the subpoena recipient was the first to file an action in state court, after which the State cross-moved to enforce the subpoena).

Here, this tradition was, of course, broken when Plaintiff filed in this Court for review of the Subpoena and avoided the state court altogether. Putting aside this extraordinary and novel maneuver, this litigation ultimately worked itself into the second, more traditional bucket: Plaintiff failed to obey the Subpoena, citing constitutional concerns, and the State initiated enforcement

---

[19] The Court notes that the last time it considered Plaintiff's claims, it was asked to intervene at this stage of enforcement proceedings, i.e., prior to the state court's involvement, but after issuance of the Subpoena. (*See* Previous Op. 2.)

proceedings. (*See generally Smith & Wesson (I)*.) Once again at stage two, however, Plaintiff has not yet suffered any cognizable injury;[20] rather, Plaintiff only risks a potential injury *if* the Superior Court does not quash the Subpoena *and* the Superior Court threatens Plaintiff with contempt. *Smith & Wesson (III)* at 894 (noting that even subsequent to stage two, "there [is] much more for the state court to do than merely implement a predetermined outcome. New Jersey courts still [have] to adjudicate [a subpoena recipient's] constitutional arguments; and even if those arguments [are] resolved against [the recipient], the state courts still [have] to give the company an opportunity to produce the required documents" before the recipient feels the practical consequence of non-compliance: contempt).

Third, where applicable, the proceeding advances to motion practice. At this stage, the State typically has initiated a summary proceeding and presented its complaint to the Superior Court. N.J. Stat. Ann. § 56:8-8; N.J. Ct. R. 4:67-1(a); N.J. Ct. R. 1:9-6; (*see also* Def.'s Superior Court Order to Show Cause Mem. 19.) If the Superior Court is satisfied with the sufficiency of the State's application, it orders the subpoena recipient to show cause why final judgment should not

---

[20] As the Court noted in the Previous Opinion, "[t]he constitutional component of ripeness overlaps with the "injury in fact" analysis for Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citations omitted); *see also* 13B Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 3532.1 (3d Ed. 2023) ("'[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not "actual or imminent," but instead "conjectural or hypothetical."'" Logically, it makes no difference that a claim not ripe today *might* in the future ripen into an injury that establishes standing." (alteration in original) (emphasis added) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688-89 & nn.6-7 (2d Cir. 2013)); *Presbytery of N.J. of Orthodox Presbyterian Church*, 40 F.3d at 1462, 1470 n.14 (3d Cir. 1994) (acknowledging that standing and ripeness are related and often "confused or conflated," and finding that a plaintiff had Article III standing for the same reasons his claims were ripe). In a posture like the one before the Court, it is appropriate to view ripeness as akin to an "injury-in-fact" in a standing analysis, i.e., where the Court finds there is no ripeness it also finds there is no constitutionally-sufficient injury for it to adjudicate Plaintiff's claims. This is because Plaintiff's claims, as presented, are not *ripe* because they are hypothetical, which also means they are not *actual or imminent* because at least one condition precedent stands between the claims and an actual constitutional injury.

be rendered for the relief sought in the State's application. N.J. Ct. R. 4:67-2. Where applicable, as here, the subpoena recipient can then move to quash the subpoena, on, for example, constitutional grounds. (*See generally* Pl.'s Superior Court Mot. to Quash \*29, ECF No. 44-6.) Again, at this preliminary stage, a plaintiff is not legally obligated to produce what it believes to be constitutionally protected documents. As such, there is no constitutional injury, actual or imminent, after a subpoena-recipient has moved to quash a subpoena in Superior Court. Several contingencies remain.

Still at the third stage is also, of course, the Superior Court's decision on the parties' motions. In the case before the Court, it was Judge Adubato's decision, at this third stage posture, that led the State to believe Plaintiff's claims were now ripe for a federal court's review. (Pl.'s Moving Br. 9-10; *see also* May 28, 2024 Bench Decision 16-17.) This belief, as described above, however, was misguided; while Judge Adubato denied Plaintiff's motion to quash, the Superior Court's enforcement of the Subpoena was not an enforcement of the Subpoena in an unconstitutional form because the Superior Court "preserved" Plaintiff's constitutional claims and encouraged the parties to discuss whether they could narrow the Subpoena to avoid Plaintiff's constitutional concerns. (*See* May 28, 2024 Bench Decision 11, 14-15.) All told then, again, at the third stage of subpoena enforcement proceedings Plaintiff was under no legal obligation to comply with the Subpoena. As such, Plaintiff, after the motions were decided, still did not risk actual or imminent constitutional injury based on the Superior Court's findings. Plaintiff still could simply decline to disclose the materials it believed were constitutionally protected without legal or practical consequence as proceedings continued.

That brings the Court to the fourth stage of the subpoena enforcement process: appeal. This is the current posture of the state enforcement proceedings. Plaintiff appealed Judge Adubato's

decision denying its motion to quash, and the matter is pending review by the Appellate Division. (*See generally* Sept. 20, 2024 Hearing Tr.) Plaintiff's constitutional challenges remain very much alive in state court, and neither the Superior Court nor the Appellate Division has practically required First Choice to comply with the Subpoena with respect to allegedly constitutionally protected materials or otherwise summarily rejected Plaintiff's constitutional challenges. (*See generally id.*) As such, even at this fourth stage, Plaintiff's constitutional injury remains strictly hypothetical and not actual or imminent. In fact, the pending appeal has proven to be somewhat of an insulation for Plaintiff, because the pending appeal is precisely why Judge Adubato decided to hold the Compliance Order in abeyance. (*See id.* at 19.)

That leaves the Court at the fifth and final stage of New Jersey subpoena enforcement proceedings: enforcement through sanction-threatened compliance ("Enforcement"[21]).[22] Once appeals have been filed in the proceedings, if not earlier, the Superior Court may require the subpoena recipient to respond to the subpoena under threat of contempt. *See, e.g.*, N.J. STAT. ANN. § 56:8-6. It is then, and only then, that this Court can cognize that Plaintiff's constitutional injury would become imminent and sufficiently non-speculative for this Court's review of the constitutionally challenged subpoena.

---

[21] The Court's definition of Enforcement as set forth herein is its intended meaning of the term under the Previous Opinion. As such, the Court stands by the Previous Opinion, and this Memorandum Opinion is merely intended to supplement and illuminate the Court's findings therein.

[22] The Court notes that it is possible for the Superior Court to threaten contempt at any point during the proceedings and not each stage in the New Jersey subpoena enforcement proceedings necessarily occurs. Each case is different, but this Court finds that constitutional injury can only occur here if there is an actual or imminent threat of forced compliance by the state court, which, to date, there has not been.

The Third Circuit's discussion in *Smith & Wesson (III)* regarding the uncertainty of state subpoena enforcement proceedings in the non-self-executing administrative investigatory subpoena context appears to support this Court's findings that, prior to Enforcement, much is uncertain and therefore any alleged injury contemplating compliance is speculative in nature. *Smith & Wesson (III)* at 893. Specifically, the Third Circuit recognized that "*[i]f* an entity violates a subpoena issued by the [State] in a consumer fraud investigation, it *may* be subject to contempt, as well as a complete prohibition on 'the sale or advertisement of any merchandise' and suspension of its corporate character" and that "[t]hese statutory '[p]enalties are, by their very nature, retributive: a sanction for wrongful conduct.'" *Id.* (emphasis added) (citations omitted). The Third Circuit, however, found that given the non-self-executing nature of a CFA subpoena, "a court will impose [the penalties] *only after the subpoenaed party violates a court order.*" *Id.* (emphasis added). Here, like in the *Smith & Wesson* Litigation, albeit under slightly different factual circumstances, there has been no state court finding of a violation of a court order. *Id.* (finding that Smith & Wesson never violated a court order where it complied fully with the Subpoena at stage five above); (Sept. 20, 2024 Hearing 19 (declining to find Plaintiff in violation of the Initial Compliance Order although it had not fully complied with the Subpoena as required by the Initial Compliance Order).) Instead, the Superior Court held its Initial Compliance Order requiring Plaintiff to disclose constitutionally protected documents "in abeyance," meaning Plaintiff is at no imminent risk of facing Enforcement for simply refusing to provide the State with documents it believes are constitutionally protected. (*See* Sept. 20, 2024 Hearing 19.)

The certainty discussion in *Smith & Wesson (III)*, while in the context of *Younger* abstention, is also particularly illuminating as to the hypothetical nature of Plaintiff's alleged injuries under the Subpoena here. *Smith & Wesson (III)* at 894. In rejecting the State's contention

that subpoena enforcement proceedings fell within *Younger* Category Three, i.e., an action that "involves orders in the furtherance of state court judicial function," the Third Circuit found, as set forth earlier:

> [W]hen Smith & Wesson went to federal court there was much more for the state court to do than merely implement a predetermined outcome. New Jersey courts still had to adjudicate Smith & Wesson's constitutional arguments; and even if those arguments were resolved against Smith & Wesson, the state courts still had to give the company an opportunity to produce the required documents before holding it in contempt.

*Id.* at 893-94. (citation omitted). The Third Circuit, in so finding, lays bare the lack of concrete injury Plaintiff faces as a result of the remaining contingencies and hypothetical outcomes that remain in state court. While the Third Circuit in *Smith & Wesson (III)* did not consider ripeness, its reasoning certainly helps identify why federal judicial review may be inappropriate altogether prior to Enforcement.

In total, unless and until the New Jersey subpoena enforcement process reaches Enforcement as described above, Plaintiff's constitutional claims are not ripe where it faces no practical consequence for simply refusing to provide documents it deems protected. As such, this Court need only look to the Superior Court proceedings to assess whether there has been an Enforcement as defined above in order to appropriately consider whether Plaintiff's claims stemming from the Subpoena are, in fact, ripe. For the reasons outlined in the next section, the Court finds that Enforcement has not occurred.

### 4. *The Superior Court's Findings Establish There Has Been No Enforcement of the Subpoena*

Upon consideration of both the Superior Court's May 28, 2024 Bench Decision and the September 20, 2024 Hearing, the Court concludes that no Enforcement occurred in Superior Court, and as such, Plaintiff's claims are not ripe. To begin, Judge Adubato's May 28, 2024 Bench

Decision appears to have been predicated on a belief that the constitutional issues First Choice presented may never ripen. (*See* May 28, 2024 Bench Decision 11-12 (observing that First Choice's motion to quash "really lies in the scope of the [S]ubpoena and its claims that the demands of the State go well beyond the investigative powers conferred by the statutes . . . and, therefore, [the Subpoena is] unenforceable" but then noting that "both parties agree that th[e Superior Court] should not delve into a review of the specifics of the [S]ubpoena in detail prior to the parties having an *opportunity to confer and to address possible narrowing or adjustments of the [S]ubpoena*" that might obviate the need for a ruling on the constitutional claims) (emphasis added)).) This is presumably why Judge Adubato followed the Appellate Division in *Smith & Wesson (V)* in finding that Plaintiff's constitutional claims were not ripe, and instead, were "preserved." (*Id.* at 12, 22-23, 32 (recognizing in part that "built into" the Superior Court's order that First Choice must comply with the Subpoena is the "fact that there is . . . [a] belief that the parties will confer going forward, and it's possible that the [constitutional] concerns of the defense could be addressed in an agreement between the parties" that would not require disclosure of allegedly constitutionally-protected documents)); *see also Smith & Wesson (V)* at 494. As such, while Judge Adubato ordered compliance with the Subpoena in the Initial Compliance Order, it is not apparent from the record that Judge Adubato intended for the constitutionally-protected documents to be disclosed *prior* to the parties narrowing the scope of the Subpoena or issuance of a further court order. Instead, Judge Adubato appears to have expected the parties to rectify the constitutional concerns before Enforcement. (*See generally* May 28, 2024 Bench Decision; Sept. 20, 2024 Hearing Tr. 19 (lamenting after the parties were unable to restrict the scope of the Subpoena that the Superior Court will "know better than to leave it to the parties to try to come to some decision" in the future).)

The Superior Court's September 20, 2024 findings reaffirm, if not outright verify, that it did not intend to mandate Plaintiff to disclose constitutionally-protected documents. First, at the September 20, 2024 Hearing, the Superior Court expressly declined its "right" to "enforce" the Subpoena. (Sept. 20, 2024 Hearing Tr. 8 (characterizing the State's motion to enforce litigant's rights as seeking an Enforcement, which implies there was no Enforcement of the Subpoena in May and that the parties and the Superior Court understand forced compliance as the moment of enforcement, consistent with this Court's findings above); *id.* at 16 ("What I will say is that while I do believe I have jurisdiction to hear the enforcement, in light of everything, I am going to decline to exercise that right today."); *id.* at 19 (answering in response to the State's contention that the Superior Court has jurisdiction "to entertain [its] motion to enforce the [Initial Compliance Order]" that the Superior Court is "not going to enforce it"); *id.* at 20 (expressly declining to grant the State's motion to enforce litigant's rights pending appeal to the Appellate Division[23]).) Second, the Superior Court characterizes its May 28, 2024 Bench Decision as "permitt[ing] the enforcement" of the Subpoena. (*Id.* at 7.) This language is consistent with the third stage of subpoena enforcement proceedings, which as described above, is a stage at which constitutional claims related to the Subpoena are not yet ripe but where state enforcement proceedings are *initiated* and ongoing. This is not Enforcement as set forth above.

What is more, the parties' own interpretations of the Superior Court's findings seem to support this Court's interpretation of the same. Most notably, the State, as recently as October 11, 2024, presented its view of the current subpoena enforcement proceedings to the Appellate

---

[23] A motion to enforce litigant's rights, if granted, would certainly render Plaintiff's constitutional claims ripe because, at that time, Plaintiff would be subject to penalties for failing to comply with the Initial Compliance Order. *See* N.J. Ct. R. Appendix XI-M (detailing the legal consequences if the motion to enforce litigant's rights is granted and the subpoena recipient fails to comply with an information subpoena).

Division in seeking a limited remand. (Mot. Limited Remand 1, ECF No. 60-1.) The State wrote that it perceived the Initial Compliance Order requiring Plaintiff to provide documents as being "in limbo." (*Id.* at 5.) It continued that the Order "has not been stayed, yet the *trial court has declined to enforce it*" and argued that "enforcement of the [Initial Enforcement] Order is critical to the State's ongoing investigation." (*Id.* at 5-6 ("Without a limited remand, the State lacks recourse to enforce the [Initial Compliance Order] and ensure compliance with the Subpoena").) Moreover, Plaintiff does not dispute that it has not yet fully complied with the Subpoena, suggesting that there has been no Enforcement of the Subpoena against it, and contingencies remain before Plaintiff faces a cognizable constitutional injury. (Pl.'s Moving Br. 9 ("The [Superior Court] noted that [Plaintiff] 'has preserved its [federal constitutional] claims' to raise at some other stage." (quoting May 28, 2024 Bench Decision 14)); *see* Pl.'s Reply Br. 3, 5, ECF No. 45; Pl.'s Oct. 18, 2024 Correspondence 1-2 (conceding that Plaintiff, for example, has not produced the donor lists it believes are constitutionally protected); Pl.'s Moving Br. 32 (arguing that "*[i]f* this Court fails to protect donor and other information before the constitutionality of the underlying subpoena has been adjudicated, [Plaintiff] *could* face contempt citations for failing to produce constitutionally protected information" but inherently recognizing that it does not face any such threat at this time) (emphasis added); Pl.'s Oct. 18, 2024 Correspondence 2 (recognizing that "the [Superior Court's] order that the [Subpoena] is immediately *enforceable* represents an emergent threat," and thus necessarily agreeing that the Subpoena has not been *enforced* in its unconstitutional form, and there is still only a threat that it might be) (emphasis added).)

At this time, the record does not support a finding that the Subpoena has been Enforced, and Plaintiff can simply refuse to comply with the Subpoena without consequence. To this end, the Court finds that Plaintiff's claims relating to the Subpoena are not ripe, and therefore, this

Court lacks subject-matter jurisdiction to adjudicate Plaintiff's constitutional claims related to the Subpoena's enforceability.

### B.    Plaintiff's Alleged Injuries Sounding in Ripeness

Having found that it does not have subject-matter jurisdiction to adjudicate Plaintiff's claims related to the enforceability of the Subpoena, constitutional or otherwise, the Court briefly turns to Plaintiff's Complaint to see if it alleges any other ongoing injury outside the Subpoena enforcement context that might warrant injunctive relief. To be clear, Plaintiff's request for a TRO and/or PI seeks to enjoin "enforcement of [the State's] Subpoena in its entirety or, in the alternative, modify[] that Subpoena to eliminate those provisions that infringe on the constitutional protections of [Plaintiff]." (Compl. 33, ECF No. 1.) Facially, and as previously noted, this request is solely directed at the Subpoena, which is the only manifestation of the State's investigation. As Plaintiff's claims all relate to the Subpoena, this Court does not have the power to give Plaintiff the relief it seeks.

With that said, the Court would like to address Plaintiff's contentions, while not necessarily plead, that sound in the Subpoena *itself* actively causing harm by virtue of being issued and served, even if it has yet to be Enforced. (Pl.'s Oct. 18, 2024 Correspondence 2 ("[E]very day the Subpoena remains in force, First Choice experiences irreparable harm from the chilling of its First Amendment rights."); *see* Pl.'s Moving Br. 20).) Said differently, a narrow path to a PI or TRO may be available to Plaintiff if it can support a finding that it is suffering a practical ongoing harm, not a speculative future disclosure harm, as a result of the Subpoena's service and the Superior Court's refusal to quash it, i.e., a chilling of Plaintiff's First Amendment rights where it has had to take practical steps responsive to the Subpoena's issuance. *U.S. ex rel. Ricketts*, 567 F.2d at 1232 ("Ripeness concerns whether the legal issue at the time presented in a court is sufficiently concrete

for decision. Courts will not decide abstract legal issues posed by two parties; the issue in controversy must have a *practical* impact on the litigants.") (emphasis added). The Court addresses this narrowly construed and isolated contention under the preliminary injunction standard elucidated at the beginning of this Memorandum Opinion. *Issa*, 847 F.3d at 131 (citation omitted) (finding that the extraordinary remedy of preliminary injunctive relief should only be granted if a party can show: (1) it is "likely to succeed on the merits of their claims"; (2) it is "likely to suffer irreparable harm without relief"; (3) "the balance of harms favors [it]"; and (4) "relief is in the public interest" (citation omitted)).

Plaintiff appears to contend that it is suffering active ongoing harm as a result of the Subpoena's issuance as opposed to the investigation more generally where: (1) it is unable to get insurance until the state investigation is resolved; (2) Plaintiff had to edit certain YouTube videos to protect Plaintiff's clients' identities; and (3) the cost of electronic discovery inherent in having to answer the Subpoena is high. (*See generally* Huber Decl., ECF No. 41-5.) With respect to the insurance injury, Plaintiff alleges it had to acquire a new insurance policy after its previous underwriter refused to offer a new policy as a result of the State's investigation. (*Id.* at 2-3.) "As a result, First Choice had to seek similar coverage from a different provider," and "First Choice's insurance premiums increased from $1,100 to over $6,000 per year, and First Choice's deductible increased from $500 per claim to $50,000 per claim." (*Id.* at 3.) Plaintiff's alleged damages to this end are strictly monetary. As such, Plaintiff's insurance injury does not constitute irreparable harm sufficient for preliminary injunctive relief. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("[I]n order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." (internal citations and quotation marks omitted)). The same goes for the cost of electronic

36

discovery, which itself is also strictly economic in nature. (Huber Decl. 6-8 (setting forth the burdensome cost of discovery in order to comply with the Subpoena).) That leaves Plaintiff's contention regarding the "impact on First Choice's Speech" caused by the Subpoena as the lone contention remaining that can be considered for a PI or TRO. (*Id.* at 3; *see also id.* at 4-5 (discussing generally an impact on First Choice's donors were their names to have to be disclosed, which goes to the enforceability of the Subpoena and is not ripe for review for the reasons outlined in this Memorandum Opinion).)

Plaintiff's final contention submits that the Subpoena's issuance impacted Plaintiff's speech where it had to alter YouTube videos to protect clients from harassment as a result of its issuance. (*Id.* at 3.) The Court is unpersuaded to this end that the alleged injury, the alteration of YouTube videos to protect clients after the Subpoena's service, constitutes irreparable harm.

While it is true that a loss of First Amendment rights, even briefly, can constitute irreparable injury, should: (1) the Subpoena ultimately be deemed unenforceable; (2) the State's investigation amount to nothing; or (3) the parties agree to acceptable responsive parameters, Plaintiff can alter the video back to its original form. Therefore, the harm is, by definition, reparable. Importantly, notwithstanding the above oft-cited rule, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction"); *but see id.* at 72 (providing the "well-established" rule that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." *Id.* (quoting *Goldie's Bookstore*

*v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)). To that end, "it is the 'direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury.'" *Id.* (internal citation omitted)

From the Court's perspective, the alteration of YouTube videos to protect clients from "harassment" that First Choice alleges it is experiencing is an incidental inhibition of speech; here, it was an impact on speech discretionarily made after the issuance of a lawfully issued subpoena under the powers granted to the State that did not target First Choice's YouTube videos. *Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 150 (N.J. 2020) (finding that the New Jersey state legislature, in passing the CFA "intended to confer on the [State] the broadest kind of power to act in the interest of the consumer public" (quoting *Kugler v. Romain*, 279 A.2d 640, 648 (N.J. 1971)). Moreover, Plaintiff appears to generally refer to the Subpoena as harassment and speculates that because the State issued the Subpoena against it, it must also be imminently seeking to issue subpoenas upon Plaintiff's clients such that their identities must be protected. (*See* Huber Decl. 3; Pl.'s Oct. 18, 2024 Correspondence 2.) In this way, Plaintiff's sole remaining contention sounding in ripeness itself devolves into speculation of harassment and the contemplated next steps of the investigation should the Subpoena be Enforced.

As such, no matter how this Court construes Plaintiff's claims, it lacks subject-matter jurisdiction over them. Accordingly, the Court denies Plaintiff's TRO and PI, and dismisses Plaintiff's Complaint without prejudice.

### C.    Federalism Considerations

To fully elucidate its findings, the Court pauses on a final concern which the State raises in its opposition brief: federalism. (Def.'s Opp'n Br. 3, 38, 39.) To contextualize, "the issue of ripeness inevitably becomes intermingled with considerations of federalism and the precept of

avoiding unnecessary decision of constitutional and other issues." *Suburban Trails*, 800 F.2d at 366 (quoting *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 247-48 (1952) and *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974)). That intermingling, as typified above, is the jurisprudential thicket this Court wanders into in this Memorandum Opinion. As such, federalism bears some discussion here so as to fully illuminate this Court's opinion that a focus on Article III and its dictates is the only tenable approach to take on the unique facts of this case. In its discussion, this Court will briefly address: (1) why the "access to federal courts" principle cannot jump from the prudential to constitutional ripeness context; and (2) how it would be a subversion of the federalist structure of our government should this Court be called to task before the state court has fulfilled the role it was delegated by the state legislature.

First, the Court recognizes that its Memorandum Opinion, in light of the so-called "preclusion trap," might be read to totally prohibit Plaintiff from accessing federal courts to challenge a state investigation initiated through a non-self-executing state administrative investigatory subpoena.[24] Based on this Court's Article III findings, this principle, however, is not apposite here.

---

[24] The Court finds it important to note, that conceptually, Plaintiff is not *entirely* prohibited from bringing its claims in federal court, though its path is narrow given this Court's ripeness finding. Under this Court's Memorandum Opinion, *Smith & Wesson (III)*, and *Smith & Wesson (VI)*, the current state of the law on these matters is this: (1) a challenge in federal court to a non-self-executing state administrative investigatory subpoena is not ripe under Article III unless and until a plaintiff is at risk of being held in contempt or faces another practical consequence as a result of noncompliance; (2) at that point, before contempt is imposed but after compliance is required under threat of contempt, a plaintiff may bring its claims in federal court, prior to a federal court being able to abstain under *Smith & Wesson (III)*, so long as the claims are brought in federal court before contempt is found; but (3) res judicata will attach to the state court's decision to enforce the subpoena so long as it expressly considers the constitutional claims before requiring compliance. *Smith & Wesson (III)* at 894; *see generally Smith & Wesson (VI)*. As such, there is a cognizable moment of federal court review, albeit a small one: if the state court does not reach the substance of a subpoena-recipient's constitutional claims in state enforcement proceedings, and, like here, only finds that they are not ripe, and then the subpoena recipient is threatened with imminent

It is true, and the Third Circuit reaffirmed in *Smith & Wesson (III)*, that "federal courts [have a] virtually unflagging obligation to exercise their jurisdiction." *Smith & Wesson (III)* at 890 (internal quotation marks and citations omitted); *Sprint*, 571 U.S. at 77 ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given'" (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). This principle is particularly acute, if not exclusively applicable, however, in the context of abstention and other prudential doctrines. This Court cannot exercise jurisdiction it does not have under Article III. As such, this Court does not intend to diminish or, in fact, digress from this principle in any way—it finds that it does not have jurisdiction, and thus, *cannot* exercise its jurisdiction.

Second, to the extent that Plaintiff seeks to frustrate action by a state agency and subvert the New Jersey state legislature's intent to have a state court first consider whether a subpoena is enforceable before it takes on the power of law, such is not tolerable to our Nation's federalism. *See Moore v. Harper*, 600 U.S. 1, 22 (2023) (crediting Alexander Hamilton's proclamation that "courts of justice have the duty . . . to declare all acts contrary to the manifest tenor of the Constitution void" (internal quotation marks omitted) (quoting THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (C. Rossiter ed., 1961))). Here, the Court agrees with Defendant that it should not sit in judgment on a matter the state legislature has set aside for initial consideration by a state tribunal. This is especially true where that state tribunal has the same power to adjudicate

---

contempt if it fails to comply, but contempt has not yet been found, a subpoena-recipient may bring claims in this Court and this Court would be obliged to hear them.

the constitutional claims before it,[25] and all constitutional paths, state or federal, lead to the Supreme Court.

## VI.    **CONCLUSION**

For the reasons set forth herein, Plaintiff's motion for a TRO and PI is denied. This Court does not have subject-matter jurisdiction to hear any claims Plaintiff brings related to the enforceability of the Subpoena because Plaintiff has yet to suffer any actual or imminent harm related to it. As it appears all claims in Plaintiff's Complaint are related to the Subpoena, Plaintiff's Complaint is again dismissed without prejudice. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss

---

[25] In Federalist Paper No. 82, Alexander Hamilton explored the power state courts held and how those powers interplayed with those granted to federal courts under the pending United States Constitution. THE FEDERALIST NO. 82, at 593-97 (Alexander Hamilton) (Jacob E. Cooke ed., 1977); *Moore v. Harper*, 600 U.S. 1, 22 (2023) (recognizing the Federalist Papers as "[w]ritings in defense of the proposed Constitution" and looking to them as a reference for how the Framers understood the state and federal relationship when writing the Constitution). Hamilton began his discussion by identifying that under the Constitution, "the states will retain all *pre-existing* authorities, which may not be exclusively delegated to the federal head." *Id.* at 593. While this general constitutional principle is largely set forth in the context of the legislative branch, Hamilton identified that this general federalist structure of the Constitution extended to the judiciary, and the state and federal courts jointly within it. *Id.* at 593-94 ("I shall lay it down as a rule that the state courts will *retain* the jurisdiction they have now, unless it appears to be taken away in one of the enumerated modes.") This recognized federalist interrelationship is what we now know as "concurrent jurisdiction," alternatively referred to as "parallel proceedings." *Id.* at 595 ("When . . . we consider the state governments and the national governments as they truly are, in the light of kindred systems and as part of ONE WHOLE, the inference seems to be conclusive that the state courts would have a concurrent jurisdiction in all cases arising under the laws of the union, where it was not expressly prohibited." (emphasis in original)); *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 (1981) (acknowledging that the Constitution recognizes "concurrent sovereignty" of the American government, and that the relationship between state and federal courts shares this concurrent structure by way of concurrent jurisdiction (citing THE FEDERALIST NO. 82)). Crucially, inherent in this idea of concurrent jurisdiction is that state and federal courts have an equal power to adjudicate any claim not exclusively reserved for federal court adjudication. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) ("Under our 'system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.'" (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)).

the compliant in its entirety."). Plaintiff may refile its Complaint if and when its claims ripen in the manner set forth above. An accompanying order will follow.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE