Lincoln Davis Wilson
FIRST & FOURTEENTH PLLC
784 S. Clearwater Loop # 8011
Post Falls, Idaho 83854
Telephone: (719) 234–0938
lincoln@first-fourteenth.com

Travis C. Barham**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
tbarham@ADFlegal.org

Erik C. Baptist**
Erin M. Hawley**
Gabriella M. McIntyre*
Daniel J. Grabowski**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
ebaptist@ADFlegal.org
ehawley@ADFlegal.org
gmcintyre@ADFlegal.org
dgrabowski@ADFlegal.org

* admitted *pro hac vice*
** *pro hac vice* motion forthcoming

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| **FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.**, *Plaintiff,* v. **JENNIFER DAVENPORT**, in her official capacity as Attorney General for the State of New Jersey, *Defendant.* | **Case No. 3:23-cv-23076-MAS-TJB** **THE HONORABLE MICHAEL A. SHIPP** **First Amended Verified Complaint for Declaratory & Injunctive Relief** |

## INTRODUCTION

1. For over four decades, First Choice Women's Resource Centers, Inc. ("First Choice"), a non-profit Christian ministry, has served women and men facing planned and unplanned pregnancies in New Jersey with counseling, medical services (*e.g.*, ultrasounds and pregnancy

tests under the direction of a licensed medical doctor), and practical and material support.

2. First Choice is a Christian pregnancy center that serves people of all backgrounds and beliefs for free and that openly advertises both its pro-life views and the fact that it does not perform or refer for abortions.

3. Defendant, New Jersey's Attorney General, has frequently and openly proclaimed fervent pro-abortion views, as well as hostility towards and suspicion of pregnancy centers like First Choice.

4. In 2023, the Attorney General issued a subpoena demanding that First Choice produce a wide range of documents under the pretense of conducting a civil investigation into possible violations of three state statutes regarding consumer fraud,[1] charitable registration,[2] and the handling of patient data and statements about the lawful practice of Abortion Pill Reversal.[3]

5. The Attorney General explicitly asked people to submit complaints about pregnancy centers, yet despite receiving zero complaints about First Choice, he still launched an exploratory probe into the lawful and constitutionally protected activities, speech, association, religious observances, and nonpublic internal communications and records of a nonprofit organization that holds a view on a matter of public concern with

[1] Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1–227.

[2] Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17A-18–40.

[3] Professions and Occupations Law, N.J. STAT. ANN. § 45:1-18.

which he (and later, she) disagrees as a matter of public policy.

6. The information the Attorney General demands First Choice provide is so overbroad that it encompasses massive amounts of information, confidential internal communications, and documents unrelated to his (and later, her) stated purpose for the investigation.

7. The Attorney General targeted First Choice for this investigation, though dozens of other organizations operating in New Jersey also advertise and offer many similar services and similarly collect client information.

8. The Attorney General's demands violate First Choice's rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and should be enjoined in their entirety.

9. The Attorney General's demands have already impeded First Choice from achieving its mission and religious calling to serve women and men facing planned and unplanned pregnancies in New Jersey. If forced to comply with those demands, First Choice would be thwarted in pursuing its Christian ministry.

10. For two and a half years, the Attorney General has sought to enforce this subpoena, including by filing a state-court enforcement action.

11. The Attorney General continues to try to enforce this subpoena in state court even after the Supreme Court of the United States ruled unanimously that First Choice is entitled to have its constitutional claims adjudicated in federal court.

12. To avoid further violation of First Choice's constitutional rights and to limit the additional time and resources it is forced to spend on the Attorney General's unconstitutional investigative demands, First Choice requests that this Court enjoin the Attorney General from enforcing this subpoena so that it may freely speak its beliefs, exercise its faith, associate with like-minded individuals and organizations, safeguard sensitive and donor-related information, and continue to provide services in a caring, compassionate environment to women and men facing difficult pregnancy circumstances.

## JURISDICTION & VENUE

13. This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

14. This Court has subject matter jurisdiction over First Choice's federal claims under 28 U.S.C. §§ 1331 and 1343.

15. This Court can issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and FED. R. CIV. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

16. Venue lies in this district pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims detailed herein occurred within the District of New Jersey and the Attorney General resides and operates in the District of New Jersey.

## PLAINTIFF

17. Plaintiff First Choice Women's Resource Centers, Inc., is a non-profit faith-based entity organized under the laws of New Jersey, with a principal place of business at 82 Speedwell Avenue, Second Floor, Morristown, New Jersey 07960.

18. First Choice first incorporated under the laws of New Jersey in 1984, under its original name: Friendship Crisis Pregnancy Center.

19. First Choice reincorporated as a religious nonprofit organization under the laws of New Jersey in 2007.

20. First Choice currently operates out of five New Jersey locations: Jersey City, Montclair, Morristown, Newark, and New Brunswick.

21. First Choice began providing services in 1985 and has since served over 40,000 women facing unplanned pregnancies.

## DEFENDANT

22. Defendant Jennifer Davenport is the Attorney General of the State of New Jersey, with a principal place of business at Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, New Jersey 08611. She succeeds former Attorney General Matthew Platkin, the prior defendant (in his official capacity) in this case.

23. The Attorney General issued subpoenas and investigated First Choice under the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1–227; the Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17 A-18–40; and the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18.

24. The Attorney General is sued in her official capacity.

## FACTUAL BACKGROUND

### I. For over four decades, First Choice, an openly faith-based ministry, has served women and men facing unplanned pregnancies in New Jersey.

25. First Choice is a faith-based, non-profit ministry that serves women and men facing planned and unplanned pregnancies, providing counseling, medical services (*e.g.*, ultrasounds and pregnancy tests under the direction of a licensed medical doctor), and practical support to encourage and equip women and men to make informed pregnancy decisions.

26. As a Christian ministry, all of First Choice's employees, board members, and volunteers must adhere to its statement of faith and profess a personal relationship with Jesus Christ. A true, accurate, and complete copy of First Choice's Statement of Faith is attached to this Complaint as Exhibit 1.

27. In addition, First Choice asks prospective employees and volunteers questions about their religious beliefs and requires that those individuals provide a reference from their pastor.

28. First Choice's Statement of Principle also highlights how First Choice's religious beliefs and purpose influence every aspect of its operations. A true, accurate, and complete copy of First Choice's Statement of Principle is attached to this Complaint as Exhibit 2.

29. First Choice's centers "are an outreach ministry of Jesus Christ through His church," and they and their volunteers "are

committed to presenting the gospel of our Lord to women with crisis pregnancies—both in word and deed." Ex. 2 at 1.

30. First Choice seeks "to follow the example of Jesus Christ in His identification with the poor, the afflicted, the oppressed, the marginalized; in His special concern for children; in His respect for the dignity bestowed by God on women equally with men; in His challenge to unjust attitudes and systems; in His call to share resources with each other; in His love for all people without discrimination or conditions; in His offer of new life through faith in Him." *Id.*

31. First Choice "believe[s] that God is the author and creator of all life, and that we are created in His likeness and image." *Id.* So it "believe[s] and affirm[s] that all life has inherent value, worth, and dignity because it is created by God. On the basis of this inherent value, [it] seeks to protect and care for life in all stages of God's creation, from conception to natural death." *Id.*

32. First Choice "believes and affirms that life begins at conception, at which time the full genetic blueprint for life is in place." *Id.* Thus, it "believe[s] that [its] expression of love and service to God requires that [it] work to protect and honor life in all stages of creation. *Id.*

33. Consistent with these religious beliefs and as part of exercising them, First Choice does not discriminate in providing services based on its clients' race, creed, color, national origin, age, or marital status. *Id.*

34. Consistent with these religious beliefs and as part of

exercising them, First Choice does not perform or refer for abortions, and it states in its welcome forms to clients and on its websites that donors, clients, and volunteers access that it does not perform or refer for abortions. But it does provide accurate, evidence-based information about abortion procedures and risks. *Id.*

35. First Choice's preeminent core value is "[f]aithfulness to the Word of God," meaning that the "Bible is our compass for ministry and the beginning and end point in all dreaming about what God desires for First Choice." A true, accurate, and complete copy of First Choice's Core Values is attached to this Complaint as Exhibit 3.

36. Of First Choice's seven core values, five are explicitly rooted in Scripture, one (*i.e.*, integrity) aligns with the Ten Commandments and historic Christian teachings about honesty, and the other (*i.e.*, passion) refers to passion for "God, for each other, for our clients, for our potential clients, for life" as First Choice staff and volunteers cultivate a "sense of anticipation of God's presence and power in whatever we're doing." Ex. 3 at 1.

37. When First Choice annually reviews the performance of its staff and volunteers, it assesses whether they are growing in their religious faith and continuing to pursue Christ.

38. First Choice's full-time staff and directors meet weekly for a time of Bible study and prayer, and attendance is mandatory, though all are eager to participate.

39. First Choice's board opens its meetings with prayer led by one

person and concludes them with everyone present praying individually.

40. First Choice's board, employees, and volunteers regularly discuss issues but postpone decisions to give those involved time to pray about which decision is best.

41. In addition, First Choice's staff regularly prays throughout the day for clients, and they often pray together at the start of each day.

42. Twice a week, First Choice sends text messages to its 197 prayer partners, asking them to pray for specific ministry needs.

43. Once a year, First Choice closes its centers, and its staff calls donors to thank them for their support and ask how the staff can pray for them.

44. First Choice aims to help pregnant women facing unplanned pregnancies evaluate their alternatives, empowering them to make informed decisions concerning the outcome of their pregnancies. Further, it seeks to counsel women and men experiencing unplanned or unwanted pregnancies, as well as those seeking post-abortion support, to help them cope and take control of their lives.

45. To achieve these aims, First Choice provides a variety of wrap-around services under the direction of a medical director, who is a licensed physician, including, but not limited to: pregnancy testing; pregnancy options counseling; sexually transmitted disease and sexually transmitted infection referral; limited obstetric ultrasounds; parenting education; and the administration of material support, such as baby

clothes and furnishing, diapers, maternity clothes, and baby formula.

46. First Choice provides all of its services entirely free of charge to the client.

47. First Choice thus relies entirely on donations from private donors who seek to further its faith-based, pro-life mission and to continue its ministry to women and men facing unplanned pregnancies.

48. Additionally, First Choice participates in the Abortion Pill Reversal network. Under the Abortion Pill Reversal protocol, upon request from a pregnant woman who has changed her mind about having an abortion after taking mifepristone and wishes to continue her pregnancy, First Choice prescribes progesterone to counter the effects of mifepristone. It diligently attempts to follow up with all clients to whom it administers Abortion Pill Reversal to track its effectiveness.

49. Abortion Pill Reversal is not guaranteed to save a pregnancy, and First Choice makes that clear to women seeking it.[4]

50. First Choice believes that its expression of love and service to God requires that it work to protect and honor human life in all stages of development. This belief also compels First Choice's statements regarding Abortion Pill Reversal.

51. Because of its Christian faith, First Choice is committed to

[4] *E.g.*, First Choice, *Can I Continue My Pregnancy After Taking the Abortion Pill*, perma.cc/73HR-RTEM ("What is the success rate of abortion pill reversal? Initial studies of APR have shown it has a 64–68% success rate.").

providing clients with accurate, evidence-based, and complete information about both prenatal development and abortion.

52. To be true to its beliefs, teaching, missions, and values, First Choice abides by its Christian beliefs in how it operates, including in what it teaches and how it treats others.

53. First Choice's religious beliefs serve as the foundation for all of its policies and practices, as it seeks to provide tender, compassionate care to women and men who are navigating an unplanned pregnancy.

54. As such, First Choice's Christian beliefs guide and permeate everything it does.

55. As a Christian ministry, First Choice seeks to share the Gospel of Jesus Christ with its clients, and it trains its staff every year in how to do so.

56. As a common practice, when meeting with clients, First Choice staff and volunteers ask how they can pray for the clients.

57. Last year, First Choice's employees and volunteers shared the Gospel of Jesus Christ—explaining how Jesus Christ died on the cross to pay for our sins, rose again from the dead, and provides eternal life to all who believe on Him—at least 104 times, resulting in at least 36 women who either professed faith in Christ or rededicated their lives to Him.

## II. Since at least 2022, pregnancy centers like First Choice faced a wave of violence, as well as political and legal hostility, which the Attorney General has done nothing to counteract.

58. Since the Supreme Court's decision in *Dobbs v. Jackson*

*Women's Health Organization*, 597 U.S. 215 (2022), was leaked, pregnancy centers and other pro-life organizations have endured over 100 criminal attacks—including arson, assault, and violence.[5]

59. For example, extremists vandalized the home of one pregnancy center board member by breaking her windows and spray-painting her garage and driveway in red to say, as depicted below: "Jeanne, if abortions aren't safe neither are you!"[6]




[5] *Tracking Attacks on Pregnancy Centers & Pro-Life Groups*, CATHOLICVOTE (Jan. 21, 2025), perma.cc/U5PP-MJ3Z (documenting 96 attacks); Jessica Chasmar, *More than 100 Pro-Life Orgs, Churches Attacked Since Dobbs Leak*, FOX NEWS (Oct. 20, 2022), perma.cc/5FMM-6DEH; *accord* Jeff Jacoby, *Attacks on Pregnancy Centers, Like Attacks on Abortion Clinics, Should Be Intolerable,* BOS. GLOBE (July 17, 2022), perma.cc/S78B656D.

[6] Francis X. Donnelly, *Pro-Life Pregnancy Center in Eastpointe, Board Member's House Spray-Painted with Graffiti*, DETROIT NEWS (Dec. 17, 2022), perma.cc/GL6F-PQUA.

60. In Asheville, North Carolina, vandals shattered the windows and doors of Mountain Area Pregnancy Services and spray-painted the message, "[I]f abortions aren't safe, neither are you!"[7]

61. In Orlando, Florida, extremists "decapitated, mutilated, and dumped" three animals in front of a pro-life pregnancy center.[8]

62. In Buffalo, New York, a pregnancy center was firebombed (as depicted below) and tagged with spray paint reading, "Jane Was Here."[9]





63. In Glendale, California, Avenues Pregnancy Clinic was

---

[7] Ingraham Angle, *Victim of Anti-Abortion Terrorism Joins Laura: We Will Not Back Down*, Fox News (Jun. 7, 2022), perma.cc/W9TT-XCH2.

[8] Stephanie Buffamonte, *Decapitated, Mutilated Animals Left at Florida Pro-Life Pregnancy Center*, Fox35 Orlando (May 12, 2023), perma.cc/9V99-Z2K4.

[9] *CompassCare's Buffalo Office Firebombed by Abortion Terrorists*, CompassCare (June 7, 2022), perma.cc/P6NN-TCUT.

vandalized with messages like:

a. "Jane was here."

b. "Abort the court."

c. "If abortions aren't safe neither are you!"[10]

64. An extremist group linked to at least 17 such attacks, Jane's Revenge, celebrated the vandalism in Glendale with this chilling post:

> To all the conservatives, Fox News anchors, judges, cops, Christian extremists, or federal agents reading this:
>
> This attack is nothing in compare [sic] to what is in store for you. Some spray paint will be the least of your worries. For decades you have bombed abortion clinics and murdered doctors. We fight not just for abortion rights, but for trans liberation, ecological harmony, decolonization, the destruction of white supremacy and capitalism, and the uprooting of the entire global civilization.
>
> *We will hunt you down and make your lives a living hell.* You started this war but we will win it. *So far its [sic] just been pregnancy crisis centers, but tomorrow it might be your cars, your homes, or even your lives.* We support a diversity of tactics and we will not step down in this fight.[11]

65. The Attorney General has never condemned the violence and vitriol aimed at pro-life advocates or pregnancy centers like First Choice. Nor has the Attorney General taken any actions to protect these advocates and centers from this violence.

66. But it is not just violence that pregnancy centers have faced

---

[10] *Jane's Revenge—Night of Rage Communique*, Jane's Revenge (June 26, 2022), perma.cc/Z9W4-8XMR; *accord* Jessica Chasmar, *Zero Arrests in at Least 17 Jane's Revenge Attacks on Pro-Life Organizations*, FOX NEWS (Sept. 14, 2022), perma.cc/3ZLY-6ASK.

[11] Jane's Revenge, *supra* note 10 (emphasis added); *accord* Chasmar, *supra* note 10.

since 2022. They have also faced legal and political hostility.

67. Federal lawmakers targeted pregnancy centers with legislation that would weaponize the Federal Trade Commission against nonprofits that discuss pregnancy from a pro-life viewpoint.[12]

68. Individual legislators have called on the private sector to "shut [pregnancy centers] down all around the country."[13]

69. By 2023, state legislators had introduced over two dozen bills targeting pregnancy centers for offering alternatives to abortion.[14]

70. State attorneys general have filed lawsuits and threatened enforcement actions against pregnancy centers.[15]

71. Some attorneys general have issued consumer alerts and labeled pregnancy centers "fake clinics," accusing them of employing "tactics" to get women to choose life, and lamented that pregnancy centers outnumber abortion clinics three to one.[16]

72. The governor of Massachusetts launched a $1 million billboard campaign targeting pregnancy centers in the state.[17]

---

[12] *See* Nick Popli & Vera Bergengruen, *Lawmakers Scramble to Reform Digital Privacy After Roe Reversal*, TIME (July 1, 2022), perma.cc/7RAP-7B7Y.

[13] Jessica Chasmar, *Google to Crack Down on Search Results for Crisis Pregnancy Centers After Dem Pressure*, FOX BUSINESS (Aug. 25, 2022), perma.cc/7TS4-ZAWW.

[14] Adam Edelman, *Democrats Eye a New Approach to Rein in Crisis Pregnancy Centers*, NBC NEWS (May 18, 2023), perma.cc/N8HU-MYBQ.

[15] *See e.g.*, *National Inst. for Fam. & Life Advocs. v. James*, 746 F. Supp. 3d 100, 110 (W.D.N.Y. 2024).

[16] *See e.g.*, Off. of Att'y Gen. Maura Healey, *AG Healey Warns Patients About Crisis Pregnancy Centers* (Jul. 6, 2022), perma.cc/7NMU-YUPX.

[17] Mass. Exec. Off. of Health & Hum. Servs., *Healey-Driscoll*

73. After observing the violence that other pregnancy centers experienced in the wake of *Dobbs*, First Choice proactively spent thousands of dollars in additional security measures, including video intercoms, video cameras, bullet-proof glass, and panic buttons.

74. The night *Dobbs* was released, First Choice hired security to ensure that its pregnancy center in Montclair was not vandalized and alerted the police departments in other cities where it operates so they could patrol the area more frequently.

75. During this time, First Choice received a threatening letter and online harassment, including the scheduling of fictitious appointments and the posting of fictitious reviews to prevent people from availing themselves of First Choice's ministry and services.

## III. Since at least 2022, the Attorney General's office has promoted abortion and exacerbated the hostility pro-life pregnancy centers face.

76. Since at least 2022, the Attorney General's Office has displayed a well-documented zeal for abortion, antipathy for groups that protect pregnant women and unborn children from the harms of abortion, and animus for pregnancy centers like First Choice. In so doing, it has perpetuated this wave of hostility towards pro-life advocates and pregnancy centers.

---

*Administration Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers* (Jun. 10, 2024), perma.cc/3Z48-BJMU.

**A. The Attorney General regularly advocates for abortion.**

77. On February 3, 2022, Governor Phil Murphy appointed Matthew Platkin as Attorney General for New Jersey, and New Jersey's Senate confirmed him to that position on September 29, 2022.

78. During his tenure in office, Attorney General Platkin made liberalizing the laws and regulations related to abortion a central focus of his policy advocacy and political persona.

79. Indeed, on the main page of his office website, Attorney General Platkin listed advocacy for abortion as one of the top five priorities of his office.

80. Attorney General Platkin referred to the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturning *Roe v. Wade*, 410 U.S. 113 (1973), as an "extreme right-wing decision"[18] that is a "devastating setback for women's rights in America" and threatens to "harm millions throughout the country."[19]

81. Attorney General Platkin responded to *Dobbs* in a joint statement with a coalition of attorneys general, stating "[i]f you seek access to abortion ... we're committed to using the full force of the law to support

---

[18] N.J. Off. of the Att'y Gen., *Acting AG Platkin, U.S. Attorney Sellinger Establish State-Federal Partnership to Ensure Protection of Individuals Seeking Abortion and Security of Abortion Providers* (July 20, 2022), perma.cc/YVT9-VQ7M.

[19] N.J. Off. of the Att'y Gen., *Acting AG Platkin Establishes "Reproductive Rights Strike Force" to Protect Access to Abortion Care for New Jerseyans and Residents of Other States* (July 11, 2022), perma.cc/EU9B-L6VZ.

you. You have our word."[20] He further stated he would "continue to use all legal tools at our disposal to fight for your rights,"[21] despite *Dobbs'* plain language that there is no constitutional right to abortion.

82. Just months into his tenure as *acting* Attorney General, Attorney General Platkin established a "Reproductive Rights Strike Force" comprised of officials in his office.[22] He mobilized the strike force to "use all available civil and criminal enforcement tools to protect the right to obtain abortion care in New Jersey."[23]

83. Attorney General Platkin also instituted a state-federal partnership with the U.S. Attorney for the District of New Jersey to ensure access to abortion for New Jersey residents and non-residents.[24]

84. In the wake of *Dobbs*, Attorney General Platkin issued guidance to all of New Jersey's county prosecutors "about charges they may bring against individuals who interfere with access to abortion rights."[25]

85. Also in response to *Dobbs*, Attorney General Platkin—New Jersey's chief *legal* official—instituted a $5 million grant program to fund

[20] N.J. Off. of the Att'y Gen., *Acting Attorney General Platkin, National Coalition of Attorneys General Issue Joint Statement Reaffirming Commitment to Protecting Access to Abortion Care* (June 27, 2022), perma.cc/VL7Q-49EW.
[21] *Id.*
[22] N.J. Off. of the Att'y Gen., *supra* note 19.
[23] N.J. Off. of the Att'y Gen., *Acting AG Platkin Establishes "Reproductive Rights Strike Force" to Protect Access to Abortion Care for New Jerseyans and Residents of Other States* (July 11, 2022), perma.cc/EU9B-L6VZ.
[24] N.J. Off. of the Att'y Gen., *supra* note 18.
[25] *Id.*

abortion training and expand the pool of abortion providers in the state.[26]

86. On January 20, 2026, Attorney General Davenport succeeded Attorney General Platkin, serving as acting Attorney General until she was confirmed to this office on February 24, 2026.

87. Attorney General Davenport has taken no actions to countermand any of Attorney General Platkin's directives and initiatives related to abortion or to contradict any of his statements on the topic.

88. Attorney General Davenport has maintained the Reproductive Rights Strike Force and boasts of her office's "partnership" with "the U.S. Attorneys' Office for the District of New Jersey to protect reproductive rights."[27]

89. Attorney General Davenport continues to tout the $5 million grant "to expand the pool of abortion care providers in New Jersey that Attorney General Platkin announced."[28]

90. Attorney General Davenport joined 20 other states, the District of Columbia, and the Governor of Pennsylvania in submitting an *amicus* brief to the Supreme Court in *GenBioPro, LLC v. Louisiana*, No. 25A1208, arguing that the Supreme Court should stay the Fifth Circuit's order enjoining distribution of mifepristone.[29]

---

[26] N.J. Off. of the Att'y Gen., *AG Platkin Announces $5 Million in Grant Funding to Provide Training and Education to Expand Pool of Abortion Providers in New Jersey* (Dec. 2, 2022), perma.cc/KCY6-DCPQ.

[27] N.J. Off. of the Att'y Gen., *Standing Up for Reproductive Rights*, perma.cc/KXP8-9PAZ.

[28] *Id.*

[29] Brief for States of New York, *et al.*, *GenBioPro, LLC v. Louisiana*, No.

91. Attorney General Davenport celebrated the Supreme Court's May 14, 2026, order in *GenBioPro, LLC v. Louisiana*, No. 25A1208,[30] which stayed the Fifth Circuit's order pending resolution of that litigation, by saying: "We will always stand up for your right to critical, life-saving reproductive health care."[31]

**B. The Attorney General often denigrates pro-life advocates.**

92. Attorney General Platkin referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need" and accused the Supreme Court of making it "abundantly clear that the rights of women will not be protected" in its jurisprudence on abortion.[32]

93. Attorney General Platkin referred to the plaintiff in *Alliance for Hippocratic Medicine v. U.S. Food & Drug Administration*, 78 F.4th 210 (5th Cir. 2023), who challenged the FDA's approval of mifepristone (*i.e.*, the abortion pill), as a "shadowy organization" and accused its lawsuit of "unleash[ing] significant confusion and misinformation about the medical safety and legal status of both mifepristone and abortion itself."[33]

---

25A1208, perma.cc/SV8M-UB3M.

[30] *GenBioPro, Inc. v. Louisiana*, 608 U.S. ___ (2026), perma.cc/X99V-QTNX.

[31] Att'y Gen. Jennifer Davenport (@NewJerseyOAG), X (May 14, 2026, 6:44 PM), perma.cc/85NK-BU4D.

[32] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Oct. 11, 2023, 1:49 PM), perma.cc/VS9R-K8UC.

[33] Matthew J. Platkin, *AG: Mifepristone Is Available in New Jersey and We'll Fight to Keep It that Way*, NJ.COM (Apr. 30, 2023), perma.cc/N9UB-55WH; *see* David C. Reardon, *et al.*, *Deaths Associated with Abortion Compared to Childbirth—A Review of New and Old Data and the Medical*

94. Attorney General Platkin joined over 20 other states in supporting the federal government in *Alliance for Hippocratic Medicine* to "support[ ] mifepristone's legality."[34]

95. Attorney General Platkin worked strategically with other state officials to attack pro-life laws enacted by a host of states, including Idaho,[35] Indiana,[36] and Texas.[37]

96. Attorney General Davenport has taken no actions to countermand any of Attorney General Platkin's directives and initiatives denigrating pro-life advocates or to contradict any of his statements about them.

**C. The Attorney General partners with pro-abortion groups.**

97. Attorneys General Platkin and Davenport have been transparent in their support for organizations like Planned Parenthood that perform abortion and share their expansive views on abortion policy.

98. Attorney General Platkin spoke alongside Planned Parenthood of Metropolitan New Jersey's CEO at a roundtable hosted by then-Vice President Kamala Harris with "advocates who are fighting on the frontlines to protect reproductive rights."[38]

---

*and Legal Implications*, J. OF CONTEMP. HEALTH L. & POL'Y, 20 (2), 279 (2004), perma.cc/F2WF-PBPA.

[34] Platkin, *supra* note 33.

[35] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Aug. 2, 2023, 11:03 AM), perma.cc/G4U3-F2HZ.

[36] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Nov. 9, 2021, 4:18 PM), perma.cc/5ETV-9F5S.

[37] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Oct. 27, 2021, 3:02 PM), perma.cc/D8HQ-EBJW.

[38] The White House, *Readout of Vice President Kamala Harris's Meeting with New Jersey State Legislators on Reproductive Rights* (July 18, 2022),

99. Attorney General Platkin appeared at an online panel discussion hosted by the Planned Parenthood Action Fund of New Jersey.[39]

100. In a press release announcing his appointment of Sundeep Iyer as Director of the New Jersey Division on Civil Rights, Attorney General Platkin quoted praise for the appointment from Planned Parenthood Action Fund of New Jersey, highlighting its approval of Iyer's commitment to the abortion business's concept of reproductive rights.[40]

101. Attorney General Davenport has taken no actions to change the Office of the Attorney General's close relationship with pro-abortion organizations like Planned Parenthood.

102. Instead, Attorney General Davenport has continued down the path that Attorney General Platkin blazed, filing briefs and celebrating legal decisions that erode protections for unborn life. *See supra* ¶¶ 87–91.

**D. The Attorney General disparages pregnancy centers, partnering with pro-abortion groups to do so.**

103. On his office's website, Attorney General Platkin publicly touted steps he had taken "to protect consumers' private reproductive health data," and he highlighted his "warning" to the public about

perma.cc/56JE-EAK8; *accord* N.J. Off. of the Att'y Gen., *Acting AG Platkin Joins Vice President Harris for Roundtable on Reproductive Rights in the Aftermath of Supreme Court's Decision to Overturn Roe v. Wade* (July 18, 2022), perma.cc/FP53-G9EZ.

[39] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Apr. 26, 2022, 12:35 PM), perma.cc/FGZ9-B6AS.

[40] N.J. Off. of the Att'y Gen., *Attorney General Platkin Appoints Sundeep Iyer as Director of the New Jersey Division on Civil Rights* (Dec. 16, 2022), perma.cc/HN54-9QWP.

pregnancy centers like First Choice, and Attorney General Davenport does the same.[41]

104. Citing no evidence, Attorney General Platkin issued a statewide "consumer alert" alleging that pregnancy care centers like First Choice "provid[e] false or misleading information about the safety and legality of abortion."[42]

105. In this alert, Attorney General Platkin "warn[ed] the public that crisis pregnancy centers [like First Choice] do not provide abortion care."[43]

106. Through the alert, Attorney General Platkin accused pregnancy centers of lying about the services they provide, providing inaccurate or misleading ultrasounds, and providing inaccurate information about reproductive health care services.[44]

107. Attorney General Platkin urged women to avoid pregnancy centers and explicitly urged them to seek out abortion facilities instead, such as Planned Parenthood and the National Abortion Federation.[45]

---

41 N.J. Off. of the Att'y Gen., *supra* note 27.

42 N.J. Off. of the Att'y Gen., *AG Platkin Announces Actions to Protect Reproductive Health Care Providers and Those Seeking Reproductive Care in New Jersey* (Dec. 7, 2022), perma.cc/QHK9-KBNJ; *accord* N.J. Div. of Consumer Affairs, *Consumer Alert: Crisis Pregnancy Centers* (Dec. 1, 2022), perma.cc/3RXD-WVXM.

43 N.J. Off. of the Att'y Gen., *supra* note 42; *accord* N.J. Div. of Consumer Affairs, *supra* note 42 ("Crisis Pregnancy Centers (CPCs) do NOT provide abortion care.").

44 N.J. Off. of the Att'y Gen., *supra* note 42; *accord* N.J. Div. of Consumer Affairs, *supra* note 42.

45 N.J. Off. of the Att'y Gen., *supra* note 42; *accord* N.J. Div. of Consumer Affairs, *supra* note 42.

108. In this alert, Attorney General Platkin invited people who believed that pregnancy centers had deceived or defrauded them to report this to the New Jersey Division of Consumer Affairs, which the Attorney General oversees.[46]

109. Attorney General Davenport continues to tout this "consumer alert warning" alleging, again without any evidence, that pregnancy centers like First Choice "provid[e] misleading information about the safety and legality of abortion."[47]

110. Attorney General Platkin enlisted the assistance of pro-abortion groups and abortion businesses such as the ACLU and Planned Parenthood, who are outspokenly opposed to pro-life pregnancy centers, to help his office draft the consumer alert.

111. Specifically, on October 17, 2022, Mr. Iyer forwarded a draft of the consumer alert and requested comment from Kaitlyn Wojtowicz, Vice President of Public Affairs at Planned Parenthood Action Fund of New Jersey. A true, accurate, and complete copy of Mr. Iyer's email forwarding this draft consumer alert to Ms. Wojtowicz is attached to this Complaint as Exhibit 4.

112. The same day, Mr. Iyer forwarded a draft of the consumer alert and requested comment from Amol Sinha, Executive Director of ACLU New Jersey. A true, accurate, and complete copy of Mr. Iyer's

[46] N.J. Off. of the Att'y Gen., *supra* note 42; *accord* N.J. Div. of Consumer Affairs, *supra* note 42.
[47] N.J. Off. of the Att'y Gen., *supra* note 27.

email forwarding this draft consumer alert to Mr. Sinha is attached to this Complaint as Exhibit 5.

113. Mr. Iyer also forwarded a draft and requested comment from Roxanne Sutocky (now Roxanne McNellis), Director of Community Engagement for The Women's Centers[48] (*i.e.*, a group of abortion providers with facilities in New Jersey, Connecticut, Georgia, and Pennsylvania[49]) and thanked her for her and her organization's "partnership." A true, accurate, and complete copy of Mr. Iyer's email forwarding this draft consumer alert to Ms. Sutocky is attached to this Complaint as Exhibit 6.

114. In speaking about the alert, Attorney General Platkin warned: "If you're seeking reproductive care, beware of Crisis Pregnancy Centers!"[50] And he accused pro-life pregnancy centers of "pretend[ing] to be legitimate medical facilities."[51]

115. Attorney General Platkin's consumer alert, which Attorney General Davenport maintains, has been exploited by other New Jersey elected officials to disparage pregnancy centers like First Choice. One New Jersey congressman cited the consumer alert in a press release calling pregnancy centers "Brainwashing Cult Clinics."[52]

---

[48] *Roxanne McNellis*, LINKEDIN, perma.cc/4LLD-6AMY.
[49] The Women's Centers, perma.cc/9A8K-DS8P.
[50] Att'y Gen. Matt Platkin (@NewJerseyOAG), TWITTER (Dec. 7, 2022, 3:20 PM), perma.cc/46Q5-EQTN.
[51] *Id.*
[52] U.S. House of Representatives Off. of Josh Gottheimer, *Gottheimer Launches Campaign to Shutdown [sic] Deceptive Anti-Choice Clinics Posing as Women's Healthcare Providers in NJ; Brainwashing Cult Clinics Are Dangerous to Women's Health* (Oct. 6, 2023), perma.cc/CD4A-YX7B.

116. Attorney General Platkin also co-authored an open letter falsely accusing pregnancy centers of misleading consumers, complaining that they “do not provide abortion or abortion services” (as makes sense for pro-life centers), and pledging “numerous actions” against them.[53] The letter further expressed “increasing concern” that pregnancy centers outnumber “abortion clinics by a three-to-one ratio.”[54]

**E. The Attorney General turns a blind eye to the false statements pro-abortion groups make that mislead women.**

117. The Attorney General’s concern about the privacy of reproductive health information and about misleading statements regarding abortion is entirely one-sided—targeting pro-life pregnancy centers (despite a lack of evidence to support these claims) while ignoring documented errors from abortion advocates and providers.

118. Attorneys General Platkin and Davenport have said nothing about several large, recent, and well-publicized instances where Planned Parenthood Federation of America exposed consumer data without consent, causing breaches of sensitive patient information, such as the abortion method used and the specific Planned Parenthood clinic where an appointment was booked.[55]

---

[53] State of Cal. Off. of the Att’y Gen., *Open Letter from Attorneys General Regarding CPC Misinformation and Harm* at 1, 8 (Oct. 23, 2023), perma.cc/DL74-3K6L.

[54] *Id.* at 1.

[55] *See, e.g.*, Tatum Hunter, *You Scheduled an abortion. Planned Parenthood’s Website Could Tell Facebook*, WASH. POST (June 29, 2022), perma.cc/6JWL-4V3K; Gregory Yee & Christian Martinez, *Hack Exposes Personal Information of 400,000 Planned Parenthood Los Angeles*

119. On information and belief, Attorneys General Platkin and Davenport launched no investigations into Planned Parenthood and issued Planned Parenthood no subpoenas to assess whether it is adequately safeguarding patient information based on these reports.

120. In addition, Planned Parenthood makes erroneous statements about chemical abortions that mislead women. For example, it states that a woman may have an abortion "[u]sing only misoprostol" and claims that "it's safe, effective, and legal to use in states where abortion is legal. It works 85–95% of the time and can be used up to 11 weeks from the first day of your last period."[56]

121. Several studies have proven this claim false and have instead demonstrated that chemical abortions attempted using only misoprostol have higher failure rates and are dangerous in part because it can cause significant birth defects.[57]

122. Furthermore, Planned Parenthood publicly claims, contrary to the FDA-approved labeling, that the prescription-only abortion drug

---

*Patients,* L.A. TIMES (Dec. 1, 2021), perma.cc/BUM2-X4U3; Brittany Renee Mayes, *D.C.'s Planned Parenthood Reports Data Was Breached Last Fall,* WASH. POST (Apr. 16, 2021), perma.cc/ZVK3-BH6L.

[56] Planned Parenthood, *How Do I Have an Abortion Using Only Misoprostol?*, perma.cc/WU6Q-ST8A.

[57] *See*, *e.g.*, Vauzelle C, et al., *Birth Defects After Exposure to Misoprostol in the First Trimester of Pregnancy: Prospective Follow-Up Study*, 36 REPROD. TOXICOL. 98 (2012), doi: 10.1016/j.reprotox.2012.11.009 (2010 study comparing use of standard mifepristone and misoprostol with use of misoprostol alone and documenting that using misoprostol only to induce abortion led to 23.8% failure rate requiring surgery).

(mifepristone) is safer than over-the-counter Tylenol.[58]

123. That statement is empirically false—not even Planned Parenthood defends it. Indeed, Planned Parenthood is currently engaged in litigation with the Florida Attorney General about whether such statements are false and misleading. In a motion to dismiss, Planned Parenthood argued at length that such statements are mere "puffery" on which no "reasonable" woman would rely.[59]

124. The Florida trial court has not agreed. It recently denied Planned Parenthood's motion to dismiss. As the court put it, in claiming "abortion-inducing medications" were "safer than other medications," Planned Parenthood "went beyond vague promotional language."[60]

125. On information and belief, Attorneys General Platkin and Davenport launched no investigations into Planned Parenthood and issued Planned Parenthood no subpoenas to assess whether it is making false statements that mislead women about the safety of abortion.

---

[58] *Compare* Planned Parenthood, *How Safe Is the Abortion Pill?*, perma.cc/WAU5-98KB, *with* FDA-approved label for MIFEPREX (mifepristone), perma.cc/GZ58-48SV (instituting FDA's black-box labeling and warning, among other things, of "[s]erious and sometimes fatal infections and bleeding").

[59] Mot. Dismiss at 2, *State of Fla., Off. of the Att'y Gen., Dep't of Legal Affs. v. Planned Parenthood Fed'n of Am. Inc.*, No. 25-CA-790 (Fla. Cir. Ct. Jan 15, 2026).

[60] Order at 4, *State of Fla., Off. of the Att'y Gen., Dep't of Legal Affs. v. Planned Parenthood Fed'n of Am. Inc.*, No. 25-CA-790 (Fla. Cir. Ct. May 27, 2026).

126. In addition, Planned Parenthood of Metropolitan New Jersey maintained a donation website that omits any mention of its pro-abortion mission, as depicted below:



Planned Parenthood of Metropolitan New Jersey
Search
Planned Parenthood of Metropolitan New Jersey › Get Involved and Support Us › Donate Locally

**Donate Locally**

**PPMNJ Needs You. Give Now.**

**See ways you can donate below:**

**Give your gift online** - Click HERE.

**Mail your gift to** - Planned Parenthood of Metropolitan New Jersey, Development Office, 238 Mulberry Street, Newark, NJ 07102

**Stock and Securities** - Support PPMNJ through the gift of an appreciated asset.

- **Transfer stocks to:** Charles Schwab, 800-435-4000
- **Account Name:** Planned Parenthood of Metro NJ (please use the exact words)
- **Account #:** 7126-4305
- **DTC#:** 0164

**Matching Gifts from Your Workplace** - Find out if your company makes matching gifts. Email completed forms to: kimberly.cerf@ppmnj.org

## IV. In 2023, the Attorney General targeted First Choice with a broad subpoena based on nothing.

### A. In 2023, the Attorney General issued a sweeping subpoena to First Choice, demanding donor-related and other sensitive information.

127. On November 15, 2023, Attorney General Platkin issued a subpoena to First Choice. A true, accurate, and complete copy of this subpoena is attached to this Complaint as Exhibit 7.

128. The Attorney General's subpoena states that it was issued under the authority of the Consumer Fraud Act, the Charitable Registration and Investigation Act, and the Professions & Occupations Law. Ex. 7 at 2.

129. The Attorney General's subpoena demands 28 categories of

documents and information (some with as many as 29 sub-categories), including, among other things, during the stated period, the production of (italics added):

a. A copy of *every* solicitation and advertisement, including those appearing on any First Choice website (except one), social media, print media, including newspapers and magazines, Amazon or other e-commerce platform, sponsored content, digital advertising, video advertising, other websites, Pinterest, radio, podcasts, and pamphlets.

b. *All* documents concerning the distribution and placement of First Choice solicitations and advertisements and the research used to identify the intended audience.

c. "*All* Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets."

d. *All* videos shown to clients and donors.

e. "*All* Documents Concerning representations made by [First Choice] to Clients about the confidentiality of Client information, Including privacy policies."

f. *All* documents from December 1, 2013, substantiating a broad host of statements (at least 39) made on First Choice's websites, including statements that:

i. "Knowing the gestational age, and viability of your

pregnancy will determine if a medical abortion is even an option";

ii. "The abortion pill reversal process involves a prescription for progesterone to counteract the mifepristone"; and

iii. "According to the Abortion Pill Rescue Network, there have also been successful reversals when treatment was starting within 72 hours of taking the first abortion pill."

g. "*All* Documents Concerning any complaints or identifying any concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors."

h. "Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service."

i. "Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images."

j. *All* documents concerning Heartbeat International and the Abortion Pill Reversal Network.

k. *All* documents concerning First Choice's affiliation with Care Net and those provided to First Choice by Care Net.

l. Documents sufficient to identify the identity of First Choice's

owners, officers, directors (including medical directors), partners, shareholders, and board members.

m. "Documents sufficient to Identify donations made to First Choice."

Ex. 7 at 11–16.

130. Among other things, the Attorney General's subpoena requires First Choice to disclose donor information for some 5,000 individual contributions, including everyone who gave at First Choice's benefit dinners and church baby-bottle campaigns.

131. The Attorney General's subpoena twice warns that First Choice's failure to comply "may render you liable for contempt of court and such other penalties as are provided by law." Ex. 7 at 2.

132. The Attorney General's subpoena contains this warning because, under the Consumer Fraud Act, the Attorney General's subpoena has "the force of law." N.J. STAT. ANN. § 56:8-4(a).

133. Indeed, if a person fails to "obey any subpoena issued by the Attorney General, the Attorney General may apply to the Superior Court and obtain an order ... [a]djudging such person in contempt of court." N.J. STAT. ANN. § 56:8-6(a).

134. In addition, penalties for failing to comply with the Attorney General's subpoena include vacatur of a corporate charter and revocation of a business license. N.J. STAT. ANN. § 56:8-6(b)–(d).

135. The Attorney General's subpoena does not reflect the

existence of a complaint, nor does it reflect any factual basis for suspecting that First Choice violated the cited New Jersey laws.

136. The Attorney General did not "receive[ ] any complaints from the public about First Choice." *First Choice Women's Res. Ctr. v. Davenport*, 146 S. Ct. 1114, 1120 (2026).

137. During oral arguments at the Supreme Court, the Attorney General's counsel admitted: "[W]e haven't had any complaints about this specific pregnancy center [*i.e.*, First Choice]."[61]

### B. The Attorney General's retaliatory subpoena burdens and chills First Choice's speech, association, and free exercise of religion—impeding it from pursuing its mission.

#### 1. The Attorney General's retaliatory subpoena has increased First Choice's insurance expenses, diverting resources from the women and men it is called to serve.

138. First Choice's insurance policies with its insurance provider expired in their ordinary course on or about December 22, 2023.

139. During the normal renewal investigation, First Choice's insurance agent informed First Choice that the underwriter had agreed to cover First Choice until he saw the Attorney General's subpoena, at which time he determined he could not cover First Choice until the Attorney General's investigation was resolved.

140. As a result, First Choice had to seek similar coverage from a different provider, but it was only available on much worse terms.

---

[61] Oral Arg. Tr. at 81:15–25, *First Choice Women's Res. Ctr. v. Davenport*, 146 S. Ct. 1114 (2026) (No. 25-965) perma.cc/9VLD-5PCC.

141. Because of the Attorney General's subpoena and related investigation, First Choice's insurance premiums increased from $1,100 to over $6,000 per year, and First Choice's deductible increased from $500 per claim to $50,000 per claim.

142. Because First Choice has had to spend more to cover these insurance expenses that increased solely because of the Attorney General's subpoena and related investigation, it had fewer resources to dedicate to its religious mission and to ministering to the women and men it serves.

**2. The Attorney General's retaliatory subpoena forced First Choice to remove testimonial videos, hampering its ability to promote its work to the women and men who most need it.**

143. Before receiving the Attorney General's subpoena, First Choice promoted on its YouTube channel the stories of clients who wished to share their experiences as clients.

144. But after learning it was under the Attorney General's investigation, First Choice became concerned that some of the videos it posted included the names of First Choice staff, and that such videos could subject these individuals to harassment like the harassment First Choice was experiencing.

145. To protect these staff members from such scrutiny, First Choice took these videos down from its public YouTube channel, leaving the public with only videos that do not identify staff, even though those videos are less impactful than those containing first-person testimony.

146. Removing these videos to protect its staff—an action done solely because of the Attorney General's subpoena and related investigation—deprived First Choice of an irreplaceable avenue for promoting its work to the very people it seeks to serve.

**3. The Attorney General's retaliatory subpoena hinders First Choice's ability to recruit and retain staff.**

147. Naturally, First Choice retains various staff to help it carry on its mission.

148. On information and belief, divulging the identities of First Choice's staff would impair First Choice's ability to retain current staff members. Likewise, on information and belief, divulging those identities would impair First Choice's ability to recruit new staff members.

149. For example, other centers have experienced difficulty retaining staff given the Attorney General's open hostility to pregnancy centers. True Women's Center, another pregnancy center operating within New Jersey, lost its medical director because of the Attorney General's actions.[62] The medical director, who is a local physician, abruptly resigned after he learned of the Attorney General's consumer alert and other actions. His stated reason was concern about reprisals affecting his medical practice because of his affiliation with a pregnancy center.

150. Indeed, the Attorney General has already contacted four

[62] Br. for Christian Legal Soc'y, *et al.* as *Amici Curiae* Supporting Pet'r at 22–23, *First Choice*, 146 S. Ct. 1114 (2026) (No. 24-781), perma.cc/84RV-Y35V.

former First Choice employees in 2025 pursuant to his (now her) investigation. First Choice's counsel sent a letter to the Attorney General's Office informing it that those former employees were now represented. A true, accurate, and complete copy of that letter is attached as Exhibit 8.

**4. The Attorney General's retaliatory subpoena discourages volunteers from partnering with First Choice.**

151. In addition to relying on donations from those who believe in its work, First Choice also relies on volunteers who donate their time and effort to serve in its five locations.

152. Because these volunteers believe so deeply in First Choice's work, many of them also become donors to First Choice.

153. In 2024, at least two people expressed interest in volunteering for First Choice but then decided against it after learning of the Attorney General's subpoena and related investigation.

154. These would-be volunteers stated they would consider volunteering for First Choice in the future, but only after the Attorney General's subpoena and related investigation were resolved.

155. On information and belief, many other would-be volunteers have decided not to join First Choice's ministry because of the Attorney General's subpoena and related investigation but have not told First Choice of their decision or the rationale behind it.

156. On information and belief, individuals who choose not to volunteer with First Choice because of the Attorney General's subpoena and

related investigation also choose not to support First Choice financially due to that subpoena.

157. On information and belief, individuals who choose not to support First Choice financially because of the Attorney General's subpoena and related investigation would also choose not to support First Choice if it is forced to comply with the subpoena and disclose donor-related information, lest they face retribution from the Attorney General or others.

158. On information and belief, since the Attorney General's subpoena and investigation have deterred people from volunteering with First Choice (lest they get entangled in the legal proceedings), it has had and continues to have the same impact on people who would otherwise seek employment with First Choice.

159. This risk of loss of volunteers and employees greatly jeopardizes First Choice's ability to carry out its religious mission.

#### 5. The Attorney General's retaliatory subpoena discourages donors and other partners from affiliating with First Choice.

160. Complying with the Attorney General's subpoena will significantly and adversely impact First Choice's faith-based, pro-life mission because the subpoena seeks confidential information that will harm First Choice's relationships with donors and others.

161. Confidentiality regarding information about donors, clients, personnel, and affiliates is critical to First Choice.

162. The Attorney General's subpoena requires that First Choice

divulge confidential information about these individuals and organizations, including: (1) all documents First Choice provided to clients and donors; (2) documents identifying donations; (3) all communications First Choice made or received about Abortion Pill Reversal, the risks of abortion, and contraceptives; (4) communications with personnel about interacting with clients and donors; and (5) all documents about Heartbeat International, Inc., the Abortion Pill Reversal Network, and Care Net. *See* Ex. 7, *Document Requests* ¶¶ 3, 9, 11, 19–20, 22–23.

163. Many donors desire for their donations and communications with First Choice to remain confidential, and First Choice avidly safeguards the confidentiality of donor information. Failure to protect their identities would cause them to cease donating to First Choice.

164. Since the publication of a leaked draft of the *Dobbs* opinion in 2022, pro-life organizations, especially pregnancy centers like First Choice, have been subjected to an increased level of criminal acts, intimidation, and harassment, as well as political and legal threats. *See supra* Part III.

165. Based on this pattern of violence and intimidation, First Choice and many of its donors are concerned that if donor identities became public, donors may be subjected to similar threats. Thus, First Choice safeguards donors' identities to protect them from potential violence and harassment.

166. In addition, many donors give to First Choice for deeply

personal reasons, which they communicate to First Choice staff in confidence. Many donors have themselves faced unplanned pregnancies without support and give to First Choice to help women in similar situations.

167. First Choice staff and volunteers often contribute to the ministry's mission for personal reasons, and some do not want their involvement in the ministry to be publicly disclosed.

168. First Choice respects the confidentiality of all organizations it affiliates with and accordingly does not publicly divulge its communications with those organizations or share private information about them.

169. The large majority of First Choice's donors, clients, personnel, and affiliates have a strong expectation that First Choice will keep their information and communications private.

170. Divulging information about such individuals and affiliates as the Attorney General's subpoena requires would betray their confidences, harm First Choice's relationships with these individuals and affiliates, and deter them from continuing to support First Choice.

171. Divulging information about such individuals and affiliates as the Attorney General's subpoena requires would undermine First Choice's ability to recruit new donors, personnel, volunteers, and affiliates, as prospective partners would hesitate to risk the revelation of their personal information through government investigation. And First Choice would lose current donors, personnel, and affiliates were this confidentiality breached.

172. The existence of the Attorney General's subpoena and related investigation alone undermines First Choice's ability to recruit new donors, personnel, volunteers, and affiliates, as prospective partners hesitate to risk the revelation of their personal information through government investigation. The threat of breaching this confidentiality—especially by exposing this sensitive information to government officials hostile to First Choice's mission—deters donors, personnel, volunteers, and affiliates from partnering with First Choice and undermines First Choice's ability to maintain its existing relationships.

173. Many of First Choice's donors have already testified that:

a. They believe they would be harmed if the Attorney General knew of their identities as supporters of a pro-life ministry.

b. They always understood that First Choice is a pro-life organization and that it does not perform or refer for abortions.

c. They never felt misled or deceived by First Choice's personnel, websites, or advertisements regarding First Choice's mission, operations, or anything else.

d. They expected the information regarding their donations to First Choice would remain confidential.

e. They would have been less likely to support First Choice financially if they knew that their information would be disclosed to a government official as hostile to pro-life ministries as the Attorney General.

f. They would be deterred from continuing to partner with First Choice if that ministry were forced to comply with the Attorney General's subpoena by releasing their personal information.

Decl. of Couns. for Donors to First Choice Women's Res. Ctrs., Inc. ¶¶ 2(d), 2(j), 2(k), 2(m), 2(o), 2(p), ECF No. 41-6, a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 9.[63]

174. This risk of loss of donors and associates greatly jeopardizes First Choice's ability to carry out its religious mission.

175. As a result, the existence of the Attorney General's subpoena and related investigation harms First Choice's ability to accomplish its religious mission, and the enforcement of that subpoena would only exacerbate this harm.

176. Other pregnancy resource centers, such as the Obria Group in Washington, which faced an investigation similar to the Attorney General's here, have already experienced these harms, including the chilling of its speech (as it discontinued its website and self-censored about Abortion Pill Reversal), association harm (as several vendors stopped working with it fearing retaliation), and financial harm (from increased insurance costs).[64]

---

63 *See generally* Br. of Anonymous Donors to Pregnancy Res. Ctrs. as *Amici Curiae* Supporting Pet'r, *First Choice*, 146 S. Ct. 1114 (2026) (No. 24-781), perma.cc/VJS8-3RMU.

64 Br. for Christian Legal Soc'y, *et al.* as *Amici Curiae* Supporting Pet'r at 14–18, *First Choice*, 146 S. Ct. 1114 (2026) (No. 24-781), perma.cc/84RV-Y35V.

177. The Attorney General targeted Gateway Pregnancy Center in New Jersey with a similar subpoena and investigation that had similar effects: chilling its speech (by preventing it from updating its website), preventing it from finding and training new leadership, and distracting it from accomplishing its mission of sharing the Gospel of Jesus Christ.[65]

178. In addition, yet another New Jersey pregnancy center informed First Choice that, in May 2026, it lost a major donor who had supported that center through his company. The donor explained that he no longer wanted his company associated with the center because of the Attorney General's subpoena to First Choice and the related investigation because he feared that his company's contracts with the state would be jeopardized if that center were subpoenaed like First Choice.

**6. The Attorney General's retaliatory subpoena imposes compliance-related costs on First Choice, diverting resources from the women and men it is called to serve.**

179. Complying with the Attorney General's subpoena will require, among other things, searching First Choice's electronic devices for relevant documents.

180. The subpoena requests, to provide just a few examples, all of First Choice's advertisements, all documents supporting a host of claims on First Choice's websites, and all communications sent or received about the risks of Abortion Pill Reversal, the risks of abortion, and contraception. *See* Ex. 7, *Document Requests* ¶¶ 1, 6–9, 11.

[65] *Id.* at 19–21.

181. The documents responsive to those requests reside not on a dedicated server but on individual devices and accounts at each of its five locations.

182. First Choice does not have dedicated information technology personnel on staff and contracts with outside companies for IT services.

183. To evaluate the burden of responding to the Attorney General's subpoena, First Choice requested an estimate of certain data review costs from an information-technology consultant. The consultant estimates that device imaging and virtualization alone, which are prerequisites to a search for relevant documents, would require 50–60 hours of work and would cost First Choice $7,000–$8,400.

184. This estimate does not include the other necessary data discovery and documentation costs.

185. Once the data is imaged and uploaded to a review platform, it would need to be filtered by search terms and then reviewed individually by attorneys for responsiveness, privilege, and redaction of information protected by applicable privacy laws.

186. Although it is not possible to know how many responsive documents exist before the documents have been collected, imaged, and filtered by search terms, the volume is likely to comprise up to 20 terabytes of data given the breadth of the Attorney General's demands.

187. Assuming review by contract attorneys at a modest rate of $250 per hour, even a minor collection of documents requiring two weeks

of work by a single attorney is likely to cost $20,000. A greater volume of responsive documents requiring redaction will increase those costs dramatically.

188. If forced to comply with the Attorney General's subpoena and thus to incur the additional $28,400 in expenses, First Choice will have to divert financial resources away from ministering to the women and men it is called to serve.

189. In addition, searching for much of the documentation the Attorney General's subpoena demands would require a significant effort by First Choice's limited staff.

190. For example, it is likely that many communications with clients, donors, and First Choice personnel may not be searchable on First Choice's computers, and First Choice personnel will thus be required to manually search for these documents. *See* Ex. 7, *Documents Requests* ¶¶ 3, 9, 11, 19–20, 26.

191. Searching for these documents and information would require a dedicated effort by First Choice's executive director, director of health services, center directors, bookkeeper, financial manager, medical director, and medical staff. In total, these efforts would require the support of 75% of First Choice's staff.

192. Many of these individuals would have to spend several hours a week for at least a month identifying the location of relevant documents and searching for documents to comply with the Attorney General's

subpoena. Some individuals may be required to dedicate multiple hours per day, and First Choice's executive director would likely be required to expend additional hours managing and coordinating these efforts.

193. These significant subpoena-compliance efforts would divert First Choice staff and volunteers from performing the ministry's charitable mission, and the number of services First Choice provides to the public would be reduced.

194. Time spent complying with the Attorney General's subpoena necessarily means less time accomplishing First Choice's religious and pro-life mission and less time serving women and men in need of support.

195. First Choice's medical services, such as ultrasound exams, sexually transmitted infection referrals, and Abortion Pill Reversal administration, would suffer the most.

196. First Choice's ability to schedule clients, mentor them through our parenting education program, provide material assistance such as baby clothes and furnishings, train staff, draft grant proposals, and raise funds, among other activities, would also suffer.

#### 7. The Attorney General's retaliatory subpoena prevents First Choice from accomplishing its religious mission.

197. First Choice's mission and every service it provides are expressions of the ministry's faith-based beliefs.

198. Central to First Choice's mission is the belief that every person is created in the image of God and is valuable at all times, from

conception to death.

199. To protect the lives of the unborn, First Choice offers services such as Abortion Pill Reversal, which is undertaken to increase the chances that an unborn child will survive after a woman takes the first pill in the chemical abortion protocol. This service is provided in response to women who seek this service and to support vulnerable women facing unplanned pregnancies.

200. First Choice seeks to serve the unborn and their parents as the Bible instructs in James 2:26, "As the body without the spirit is dead, so faith without deeds is dead."

201. Subpoena compliance would divert First Choice's resources from the charitable services compelled by its faith and would undermine its ministry by compromising its ability to coordinate with clients, donors, personnel, and affiliate organizations. All of these harms would be a substantial burden on First Choice's expression of its faith.

**8. The Attorney General's retaliatory subpoena violates First Choice's religious autonomy and impermissibly seeks information related to matters of faith, doctrine, and internal government.**

202. Many of the demands in the Attorney General's subpoena force First Choice to reveal information related to matters of faith, doctrine, and internal government, compromising its religious autonomy.

203. Further, complying with the subpoena would hinder First Choice's ability to actively govern itself. Given the subpoena's expansive

scope, compliance would require significant effort from First Choice's leadership and staff, which would divert its ability to effectively carry on its religious operations for weeks on end.

204. In addition, many of the demands in the Attorney General's subpoena would require the Attorney General to sort religious content from non-religious content, thereby entangling the Attorney General in First Choice's religious mission and decision-making processes.

205. For example, Request #2 in the Attorney General's subpoena requires First Choice to disclose the research used in placing and distributing its advertisements. Thus, it requires First Choice to disclose religious judgments about which populations it is called to serve, which are decisions informed by its theological understanding of its mission field. Disclosing this information would allow the government to scrutinize the religious reasoning embedded in First Choice's outreach strategy.

206. Request #10 in the Attorney General's subpoena requires First Choice to disclose all documents and communications that concern the development of several of its websites. This targets First Choice's internal deliberations about how to express its religious message. Many of these documents—especially drafts, editorial discussions, revisions, and internal feedback—reveal how First Choice's leaders reason through doctrinal questions about messaging, including what to emphasize, how to frame its religious perspective, and what language faithfully conveys its beliefs. Plus, since "communications" includes oral conversations, First

Choice would have to log conversations on these topics and disclose their contents to the Attorney General. These disclosures would chill frank internal religious discussions and would require the Attorney General to sort religious reasoning from non-religious content, entangling the Attorney General in religious issues beyond his jurisdiction and competence.

207. Request #19 in the Attorney General's subpoena requires First Choice to disclose personnel training materials, including handbooks and scripts for client interaction. These materials are the primary means by which First Choice transmits its religious convictions to those who carry out its ministry. These training handbooks and scripts encapsulate First Choice's theological understanding of how to counsel pregnant women, how to present alternatives to abortion, and how to integrate prayer and faith-based support into client interactions. Thus, they reflect First Choice's theological decision-making processes on matters of doctrinal import. Furthermore, the breadth of this request, including even oral conversations, would force First Choice to monitor and catalog informal spiritual guidance between pastors, directors, and volunteers, thus intruding into sensitive pastoral and ministry relationships beyond the Attorney General's jurisdiction and competence.

208. Request #20 of the Attorney General's subpoena requires First Choice to disclose information about its interactions with donors, including its solicitation strategies and information about its charitable purpose. This requires First Choice to disclose its instructions on how to

express its religious calling: its understanding of why God has called it to serve pregnant women and protect unborn life and what it means to fulfill that calling. Those instructions address the formulation and expression of First Choice's religious identity, and the Attorney General lacks both the jurisdiction and competence to second-guess either (even under the guise of assessing their "accuracy").

209. Request #22 in the Attorney General's subpoena requires First Choice to disclose all documents concerning Heartbeat International, a Christian pregnancy center network that sets standards rooted in shared theological commitments. First Choice's decision to affiliate with Heartbeat International and to comply with its standards is an exercise in ecclesiastical self-government, as it involves First Choice choosing with which religious body it will align and whose spiritual authority it will recognize on matters of practice. Thus, this request requires First Choice to reveal the religious basis for affiliating with Heartbeat International, including its shared doctrinal commitments, coordinated ministry philosophy, and mutual spiritual accountability. Disclosing this information would reveal the internal doctrinal criteria by which First Choice governs itself and would require the Attorney General to evaluate whether its adherence to a religious network's standards constitutes "fraud"—something that is beyond the Attorney General's jurisdiction and competence.

210. Similarly, request #23 in the Attorney General's subpoena

requires First Choice to disclose all documents concerning Care Net, including Care Net's certificate of compliance for First Choice and training, marketing, and informational materials Care Net provides. This also requires First Choice to disclose materials from a Christian ministry network that sets standards rooted in shared theological commitments. First Choice's decision to affiliate with Care Net, to comply with its standards, and to receive its training and other materials is an exercise in ecclesiastical self-government, as it involves First Choice choosing with which religious body it will align and whose spiritual authority it will recognize on matters of practice. Thus, this request requires First Choice to reveal the religious basis for affiliating with Care Net, including its shared doctrinal commitments, coordinated ministry philosophy, and mutual spiritual accountability. Disclosing this information would reveal the internal doctrinal criteria by which First Choice governs itself and would require the Attorney General to evaluate whether its adherence to a religious network's standards constitutes "fraud"—something that is beyond the Attorney General's jurisdiction and competence.

211. Request #24 of the Attorney General's subpoena requires First Choice to disclose internal governance documents, including bylaws, organizational charts, and the identity of all board members, officers, and directors. This requires First Choice to disclose its internal religious governance structure, including who leads its ministry, how authority is allocated, and what qualifications it requires for leadership.

This is quintessentially ecclesiastical information, beyond the Attorney General's jurisdiction and competence.

212. These examples illustrate, but do not exhaust, how the Attorney General's subpoena intrudes on the religious decision-making and deliberations of First Choice and entangle the Attorney General in religious matters beyond his (or her) jurisdiction and competence.

## V. Since 2023, the Attorney General has zealously sought to enforce this subpoena, even after the Supreme Court ruled for First Choice.

### A. The Attorney General lacks a legitimate basis for such a broad, intrusive subpoena.

213. The Attorney General's subpoena identifies no practice declared unlawful that he (and now she) may investigate under the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18.

214. The Consumer Fraud Act cannot constitutionally apply to First Choice because it is not engaged in commercial speech.

215. The Attorney General claims to be concerned about "whether First Choice's donors were misled" into believing that First Choice provides abortions. Def's Br. in Opp'n to Pl.'s Mot. for TRO at 34, ECF 24. And so the Attorney General demanded donors' names and contact information so that office could "contact a representative sample and determine what they did or did not know about their charitable giving." Def.-Appellee Br. at 35, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-3124 (3d Cir. Dec. 2, 2024), ECF No. 43. *Accord First Choice*, 146 S.

Ct. at 1120.

216. Yet the Attorney General's subpoena demands the identities and contact information of donors who could not possibly have been misled, such as those contributing through church baby-bottle campaigns.

217. The Attorney General's donor-confusion claim centers on the donation page for First Choice's client website. Verified Compl. ¶¶ 10–12, *Platkin v. First Choice Women's Res. Ctr., Inc.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. Jan. 30, 2024); Tr. at 8:19–9:7, *Platkin v. First Choice Women's Res. Ctr., Inc.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. May 28, 2024).

218. Of the donations First Choice receives, approximately 52% of the number of cash donations and 71% of the total dollars donated to First Choice from June 1, 2022, to July 31, 2024, were submitted through channels other than First Choice's donor website.[66]

219. But a donor reaches this page only by selecting "About" and then "Give" on the client website, which states repeatedly that First Choice "is an abortion clinic alternative that does not perform or refer for termination services."[67] And the "About" tab also includes an FAQ page that answers the question, "Do you do abortions?," with: "No."[68]

---

[66] *See* First Choice Friends, *Give Today!*, https://www.myegiving.com/App/Giving/firstchoicewrc, perma.cc/6GXC-FEAW.

[67] *E.g.*, First Choice Women's Res. Ctrs., https://1stchoice.org, perma.cc/678D-RPVS; First Choice Women's Res. Ctrs., *Give to First Choice*, www.myegiving.com/App/Form/24dff450-d338-49d3-b2f9-7ac52352d9f4, perma.cc/FN65-36Z8.

[68] First Choice Women's Res. Ctrs., *FAQs*, https://-1stchoice.org/faqs/,

220. Even if a donor reached First Choice's donation page without reading any of this language or without understanding that First Choice is pro-life, that page would eliminate any confusion, as it features a photo collage of smiling families with their young children, both when the Attorney General issued the subpoena (as depicted in the first picture below) and now (as depicted in the second picture below).[69] *First Choice*, 146 S. Ct. at 1120.







perma.cc/3XZ6-FZ2K.

[69] *Give to First Choice*, *supra* note 67.

221. First Choice's donation page contrasts sharply with Planned Parenthood's donation page (as depicted below), and that contrast highlights the differences between their respective positions on abortion.




222. First Choice's donation form also explains that the platform is administered by "Ministry Brands Amplify" and directs donors to "contact your church or organization if you have questions or need assistance with your donation."[70]

223. After contributing, every First Choice donor who does not opt out of the mailing list receives monthly communications from First Choice highlighting its pro-life mission.

224. These monthly newsletters contain clearly pro-life statements, such as thanking donors for their "commitment to working [with First Choice] to save every life we possibly can" or inviting donors to say yes once more "to sav[ing] more lives." Pl.'s Reply in Supp. of Renewed

---

70 *Id.*

Emergency Mot. for Inj., Ex. 3 at 5, ECF 45-4.

225. Indeed, First Choice highlights its pro-life mission in various forms, such as with the envelopes in which these monthly communications are frequently sent, including the example depicted below:




*Id.* at 2.

**B. First Choice sought protection from this Court.**

226. On December 13, 2023, First Choice filed suit in this Court, claiming that the Attorney General's subpoena violated the First, Fourth, and Fourteenth Amendments. *See* Compl., ECF No. 1 (Dec. 13, 2023).

227. Shortly thereafter, First Choice filed a motion for a temporary restraining order and preliminary injunction, asking this Court to block the Attorney General from enforcing the subpoena. *See* Pl.'s Mot. for Temp. Restraining Order & Prelim. Inj., ECF No. 12 (Dec. 15, 2023).

228. On January 12, 2024, this Court *sua sponte* denied First Choice's motion and dismissed the complaint without prejudice,

concluding that its claims were not ripe until the Attorney General "enforces the Subpoena." Mem. Op. at 34–35, ECF No. 28. The Attorney General had not contested this Court's jurisdiction.

229. Even so, this Court recognized that it was creating a preclusion trap for First Choice, noting that a federal challenge to a subpoena would "seldom if ever be ripe" because "res judicata principles will likely bar ... a claim in federal court" after state-court adjudication. Mem. Op. at 10, n.7, ECF No. 28.

### C. The Attorney General sought to enforce the subpoena in state court, which would deprive First Choice of a federal forum for its constitutional claims.

230. On January 30, 2024, after this Court's *sua sponte* dismissal, the Attorney General filed suit in state court, seeking to enforce the subpoena. Verified Compl., *Platkin v. First Choice Women's Res. Ctr.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. Jan. 30, 2024).

231. The Attorney General asked the state court to order First Choice "to respond fully to the Subpoena within thirty (30) days." *Id.* at 16.

232. The Attorney General also asked the state court to hear this case "in a summary manner," emphasizing the speed with which his office wanted to enforce the subpoena. *Id.*

### D. The Third Circuit denied emergency relief from this Court's *sua sponte* dismissal, and the Supreme Court declined to review the case.

233. Meanwhile, First Choice appealed this Court's ruling to the U.S. Court of Appeals for the Third Circuit, asking for an expedited

appeal and an injunction pending appeal.

234. The Third Circuit denied both. *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-1111 (3d Cir. Feb. 15, 2024), ECF No. 20.

235. First Choice then petitioned the Supreme Court for mandamus or certiorari before judgment, which the Supreme Court denied. *In re First Choice Women's Res. Ctrs., Inc.*, 144 S. Ct. 2552 (2024).

### E. The Attorney General again sought to enforce the subpoena in state court, and First Choice disclosed over 2,300 pages of documents.

236. On June 18, 2024, the state trial court granted the Attorney General's motion to enforce the subpoena and directed First Choice to "respond fully" within 30 days. Order at 2, *Platkin v. First Choice Women's Res. Ctr., Inc.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. June 18, 2024).

237. The state trial court also instructed the parties to confer regarding the subpoena's scope. Tr. at 153:3–10, *Platkin v. First Choice Women's Res. Ctr., Inc.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. Nov. 19, 2024).

238. The state trial court declined to reach First Choice's constitutional objections, finding them "premature." *Id.* at 43:21–25.

239. First Choice appealed this decision to the Appellate Division of the New Jersey Superior Court.

240. At the same time, First Choice began conferring with the Attorney General about the scope of the subpoena, served written responses

and objections (including an objection to divulging donor identities), and started producing documents.

241. The Attorney General demanded full compliance with the state court's enforcement order, as indicated in emails the Attorney General's staff sent First Choice's counsel. A true, accurate, and complete copy of these emails is attached to this Complaint as Exhibit 10.

242. To date, First Choice has produced more than 2,300 pages of documents, but it has not disclosed any donor, volunteer, or employee names or contact information in response to the subpoena.

### F. The Third Circuit ruled that First Choice's constitutional claims were ripe and remanded its request for a preliminary injunction.

243. After the state court enforced the Attorney General's subpoena, the parties agreed that First Choice's federal suit was ripe. Order at 2, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-1111 (3d Cir. July 9, 2024), ECF No. 56-1.

244. The Third Circuit dismissed First Choice's appeal "as moot," noting that "[b]ased on subsequent developments in state court, it is now undisputed that [First Choice's] claims are ripe." *Id.* at 1–2.

245. The Third Circuit directed the district court to consider any request for an injunction "in the first instance." *Id.* at 2.

246. On remand, First Choice again asked this court for a temporary restraining order and an injunction. Pl.'s Renewed Emergency Mot. for Temp. Restraining Order & Prelim. Inj., ECF No. 41 (July 19, 2024).

### G. The Attorney General moved to sanction First Choice in state court.

247. Back in state court, the Attorney General filed a motion "to enforce litigant's rights" and impose sanctions on First Choice. Order to Enforce Litigant's Rights, *Platkin v. First Choice Women's Res. Ctrs.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. Dec. 2, 2024).

248. The Attorney General insisted that the state court's order to "respond fully" required First Choice to hand over everything he demanded—including donor identities. *Id.* at PDF 4.

249. The state court declined to rule because of First Choice's pending appeal to the Appellate Division. *Id.* at PDF 8.

250. So the Attorney General moved to remand the case temporarily to allow the trial court to consider (and from his perspective, hopefully grant) his new motion. Order on Mot. at 1, *Platkin v. First Choice Women's Res. Ctrs.*, No. ESX-C-22-24 (N.J. Super. Ct. App. Div. Nov. 7, 2024).

251. The state appellate court granted that motion. *Id.*

252. Back in the state trial court, the Attorney General moved to enforce the subpoena and to sanction First Choice. Order to Enforce Litigant's Rights at PDF 2, *Platkin v. First Choice Women's Res. Ctrs.*, No. ESX-C-22-24 (N.J. Super. Ct. Essex Cnty. Dec. 2, 2024).

253. The state trial court denied this motion, finding that First Choice had complied with its order to "fully respond" by producing documents and serving responses and objections and chastised the Attorney General for his aggressive stance in claiming that the court had resolved

First Choice's constitutional claims when it had not addressed "the proper scope of [the Attorney General's] demands." *Id.* at PDF 6.

### H. This Court again ruled that First Choice's constitutional claims were not ripe.

254. On November 12, 2024, this Court ruled on First Choice's emergency motion for an injunction. Mem. Op. at 42, ECF No. 66.[71]

255. Despite the state court's enforcement of the subpoena, the parties' agreement that that enforcement ripened First Choice's claims, and the Third Circuit's apparent agreement with the parties, this Court again held the case not ripe and dismissed it without prejudice. *Id.* at 41–42.

256. This Court ruled that First Choice's claims would not be ripe until the state court "require[s] the subpoena recipient to respond to the subpoena under threat of contempt." *Id.* at 29.

257. First Choice appealed and moved to expedite, which the Third Circuit granted. Order, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-3124 (3d Cir. Nov. 18, 2024), ECF No. 12.

### I. In December 2024, the Third Circuit also held that First Choice's claims were not ripe.

258. The day before oral argument in the Third Circuit, the Attorney General sent First Choice a letter. A true, accurate, and complete copy of this letter is attached to this Complaint as Exhibit 11.

259. After nearly a year of litigation in five courts, the Attorney

[71] *First Choice Women's Res. Ctr., Inc. v. Platkin*, No. 23-23076 (MAS)(TJB), 2024 WL 4756044 (D.N.J. Nov. 12, 2024).

General stated that "at this time," he was seeking the identities of only those donors who gave "through links on First Choice's client-facing websites." *Id.* at 1.

260. Still, the Attorney General expressly "reserve[d] the right to seek identities of other donors as needed" and continued to insist on the disclosure of information collected through two websites. *Id.*; *accord First Choice*, 146 S. Ct. at 1130.

261. Two days after argument, the Third Circuit issued a divided per curiam decision affirming the district court's dismissal. *First Choice Women's Res. Ctrs., Inc. v. Att'y Gen. of N.J.*, No. 24-3124, 2024 WL 5088105 (3d Cir. Dec. 12, 2024).

262. The Third Circuit now ruled that First Choice's constitutional claims were not ripe because it could still assert them in state court. *Id.*

263. The Supreme Court granted certiorari, and all state court proceedings were paused while the Supreme Court reviewed the case.

**J. In April 2026, the Supreme Court reversed the lower courts, ruling that First Choice was entitled to a federal forum for its constitutional claims.**

264. On April 29, 2026, the Supreme Court issued its unanimous opinion, reversing the lower courts and deciding that First Choice was entitled to a federal forum to adjudicate its constitutional claims. *First Choice*, 146 S. Ct. at 1131.

265. The Supreme Court noted that the Attorney General's consumer alert solicited complaints for fraudulent conduct by pregnancy

centers, but "[n]either [the New Jersey Division of Consumer Affairs] nor the Attorney General's office received any complaints from the public about First Choice." *Id.* at 1120. Yet "the Attorney General targeted First Choice for investigation" and "commanded production of its private donor information." *Id.* at 1128.

266. The Supreme Court noted its holdings that "government actions tending to curtail the freedom to associate warrant the closest scrutiny under the First Amendment" *id.* at 1122 (citing *NAACP v. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) (citation modified)), and that "compelled disclosure of affiliation with groups engaged in advocacy can constitute as effective a restraint on freedom of association," *id.* at 1118 (citing *NAACP*, 357 U.S. at 462).

267. The Court also explained that "associational rights carry special significance for political, social, religious, and other minorities." *Id.* "Strip away the ability of individuals to work together free from governmental oversight and intrusion," it continued, "and the freedom to associate may become no freedom at all—individuals deterred, groups diminished, and their protected advocacy suppressed." *Id.* at 1123.

268. The government violates the associational rights of citizens when it compels "disclosure of affiliation with groups engaged in advocacy." *Id.*

269. Thus, demanding an organization's "private membership rolls burdened the constitutional right of the organization's members 'to

pursue their collective effort to foster beliefs which they admittedly have the right to advocate,' given the demand's tendency to 'induce members to withdraw from the Association and dissuade others from joining it.'" *Id.* (quoting *NAACP*, 357 U.S. at 463).

270. The Supreme Court also explained how "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (*per curiam*)).

271. Thus, when the Attorney General of California demanded donor names and addresses from a public interest law firm, the Supreme Court ruled that this demand violated the First Amendment because it chilled "protected First Amendment associational rights even when those demands contemplate disclosure only to government officials and not the general public." *Id.* at 1124 (citing *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) (citation modified)).

272. As a result, the Supreme Court ruled that "First Choice has established a present injury to its First Amendment associational rights." *Id.* "[A]n injury," it noted, "that it continues to experience so long as the subpoena remains outstanding." *Id.* at 1128.

273. The Attorney General's demands for donor information and threats of contempt were it not disclosed, First Choice's need to keep donor information private (lest it jeopardize its ability to carry out its religious mission), and testimony from donors and First Choice's executive

director were "more than enough to establish injury in fact," especially since injury in fact "can also arise when a defendant burdens a plaintiff's constitutional rights." *Id.* at 1125.

274. The Supreme Court also explained that its "cases have long recognized that demands for a charity's private member or donor information have just that effect" because (1) they "discourage people from associating with groups engaged in protected First Amendment advocacy," and (2) "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." *Id.* (citation modified).

275. As the Supreme Court noted, "[a]ll this occurs not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id.* And it credited statements by amici ranging from the ACLU to the National Taxpayers Union Foundation to the Church of Jesus Christ of Latter-day Saints explaining that "even if a subpoena targeting First Amendment activity is never enforced in court, it will give its targets a very good reason to clam up and give the target organization's members and supporters a very good reason to abandon the cause." *Id.* at 1125–26 (citation modified).

276. In short, "a demand for private donor information inevitably deters the exercise of First Amendment rights." *Id.* at 1125 (citation modified).

277. As a result of all this, the Supreme Court concluded: "First

Choice has established that the Attorney General's demand for private donor information injures the group's First Amendment associational rights." *Id.* at 1126. The subpoena "effectively restrict[s] how First Choice may interact privately with its donors." *Id.* at 1129.

278. After all, "[s]ince the 1950s, [the Supreme] Court has confronted one official demand after another like the Attorney General's. Over and again, [it has] held those demands burden the exercise of First Amendment rights." *Id.* at 1131.

### K. Immediately thereafter, the Attorney General again sought to enforce the entire subpoena in state court.

279. The day the Supreme Court issued its ruling, Attorney General Davenport stated publicly: "We look forward to defending our subpoena in court. We will continue to enforce our fraud laws without fear or favor."[72]

280. The day after the Supreme Court issued its ruling, Attorney General Davenport filed a letter with the state court, asking that court to proceed with enforcing the Attorney General's subpoena, donor demand and all. A true, accurate, and complete copy of this letter to the state court is attached to this Complaint as Exhibit 12.

281. In this letter, Attorney General Davenport states that the state court "should now proceed to resolve the enforceability of that Subpoena." Ex. 12 at 1.

---

[72] Dana Difilippo, *US Supreme Court Sides with Anti-Abortion Centers Facing NJ Probe*, N.J. MONITOR (Apr. 29, 2026), perma.cc/A7FW-P72S.

282. Attorney General Davenport acknowledged that the parties had agreed to stay proceedings in the state trial court until the "issuance of the mandate from the U.S. Supreme Court." Ex. 12 at 1.

283. But then Attorney General Davenport falsely claimed: "That mandate has now issued, and the stay has terminated." Ex. 12 at 1.

284. In actuality, the Supreme Court does not normally issue the mandate in a case until 32 days after it releases its opinion. Supreme Court Rule 45, perma.cc/X5DK-MQ7B. The Supreme Court did not issue the mandate in this case until June 1, 2026.

285. In her letter, Attorney General Davenport then stated: "There is no basis for this Court to stay its hand while the federal-court litigation proceeds simultaneously." Ex. 12 at 1.

286. Yet the Supreme Court just ruled that First Choice is entitled to a federal forum for its constitutional claims, and this Court has previously recognized that litigating those claims first in state court would prevent them from ever being heard in federal court. *See supra* ¶ 229.

287. Attorney General Davenport's letter states that "it appears unlikely that any further negotiations would resolve the core disputes between the parties." Ex. 12 at 2.

288. Thus, Attorney General Davenport urged the state court to set a conference "to discuss how best to address the still-pending legal issues in this case," claiming that "any further delay would only allow First Choice to thwart state-court review and thus ensure litigation in its

preferred federal forum." Ex. 12 at 2.

289. Attorney General Davenport's letter says nothing about a protective order or agreeing to limit the scope of the subpoena, thus indicating that she desires to enforce it in full against First Choice.

290. Indeed, prior to the Supreme Court's consideration, the parties' protective-order negotiations were at an impasse. One reason was the Attorney General's refusal to add an "Attorney Eyes Only" designation to produced documents because he intended to disclose them to non-attorney staff at the Department of Consumer Affairs. *See* Ex. 10 at 3–4.

291. On May 1, 2026, First Choice responded to the Attorney General's letter by filing its own. A true, accurate, and complete copy of First Choice's response letter is attached to this Complaint as Exhibit 13.

292. First Choice's letter highlighted how the Supreme Court ruled that it was entitled to a federal forum for its constitutional claims. Ex. 13 at 1–2.

293. First Choice's letter also points out that the Attorney General wrongly portrayed it as "sprint[ing] to the federal courthouse," even though the Attorney General's enforcement litigation in state court was the second action filed. Ex. 13 at 2.

294. By filing her letter, the Attorney General reiterated both her intent to enforce the subpoena against First Choice and her intent to retaliate against First Choice for exercising its constitutional rights.

## Statements of Law

295. At all times relevant to this Complaint, each and all of the acts and policies alleged herein were attributed to the Attorney General who acted under color of a statute, regulation, or custom of the State of New Jersey (*i.e.*, under color of state law and authority).

296. The Attorney General knew or should have known that he (and later she) was violating First Choice's constitutional rights by issuing his (and later her) retaliatory and unreasonable subpoena, by demanding that First Choice reveal sensitive information (including, but not limited to, donor-related information), and by treating First Choice differently than comparably situated organizations.

297. The Attorney General's subpoena and efforts to enforce it that led to the violation of First Choice's constitutional rights remain in full force and effect.

298. First Choice engages in constitutionally protected speech when it advances a pro-life message, including when it provides information about Abortion Pill Reversal and when it solicits donations to support its faith-based, pro-life mission. None of this speech represents commercial speech under the First Amendment.

299. First Choice has suffered and is suffering irreparable harm from the Attorney General's unconstitutional subpoena, the related investigation, and the efforts to enforce the subpoena challenged here.

300. First Choice has no adequate or speedy remedy at law to

correct the deprivation of its rights by the Attorney General.

301. The Attorney General's actions and policies, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

302. The Attorney General's unconstitutional decisions and policies are not narrowly tailored (or even reasonable) as applied to First Choice because First Choice's expression does not implicate any of the legitimate interests the Attorney General might have.

303. Unless the Attorney General's subpoena and efforts to enforce it are enjoined, First Choice will continue to suffer irreparable injury.

304. Under 42 U.S.C. §§ 1983 and 1988, First Choice is entitled to appropriate relief invalidating the Attorney General's subpoena and efforts to enforce it.

## FIRST CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Freedom of Speech, Free Exercise of Religion, and Freedom of Association
## First Amendment Retaliation
## 42 U.S.C. § 1983

305. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

306. By issuing the subpoena and conducting the related investigation, the Attorney General is retaliating against First Choice for exercising its constitutional rights in violation of the First Amendment.

307. The First Amendment prohibits government officials from

subjecting individuals and organizations to retaliatory actions because they exercised their constitutional rights.

308. A plaintiff is subject to unlawful retaliation if (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a causal connection between the protected activity and the retaliatory action.

309. If a plaintiff proves these elements, the burden shifts to the government to show that it would have taken the same action even in the absence of the protected activity.

310. First Choice engages in constitutionally protected speech when it advances a pro-life message, including when it provides information about Abortion Pill Reversal and when it solicits donations to support its faith-based, pro-life mission.

311. By subjecting First Choice to extensive and invasive investigations of that speech, the Attorney General is engaging in conduct that would chill a person of ordinary fitness from continuing to engage in protected speech and from exercising his constitutional rights.

312. Further, First Choice's exercise of its constitutional rights was actually chilled by the Attorney General's conduct.

313. The Attorney General's animus for First Choice's pro-life messaging and pro-life organizations are a substantial or motivating factor in his decision to issue the subpoena.

314. The Attorney General cannot show that he (and later, she) would have investigated First Choice in the absence of its exercise of its constitutional rights, as he (and later, she) has refused to investigate similarly situated organizations that share his (and later, her) commitment to abortion.

315. Accordingly, the Attorney General is liable to First Choice for unlawfully retaliating against First Choice for its exercise of its First Amendment rights, as incorporated and applied to the states through the Fourteenth Amendment.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment**
**Right to Free Association**
**42 U.S.C. § 1983**

316. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

317. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to free association under the First Amendment.

318. An investigation that unjustifiably targets individuals and entities with whom First Choice associates violates its First Amendment freedom of association.

319. The First Amendment protects the right of people to associate with others in pursuit of many political, social, economic, educational, religious, and cultural ends.

320. The First Amendment also prohibits the government from discouraging people from associating with others to express messages.

321. First Choice is involved in an expressive association because people with like-minded beliefs, including those on staff and volunteers at its facilities, join together to serve and educate pregnant women and the fathers of their babies, and to express their beliefs about the value of unborn human life.

322. First Choice's directors, donors, staff, and volunteers, and many other people and organizations with whom First Choice associates advocate the view that unborn human life has value and deserves dignity, respect, and protection.

323. First Choice likewise engages in expressive association when its staff and volunteers partner with each other and with pregnant mothers and expectant fathers to discuss these values.

324. First Choice likewise engages in expressive association when it affiliates with other pro-life entities, such as Heartbeat International and CareNet.

325. In offering services and education to those who seek them, First Choice expressively associates with pregnant women and the fathers of their babies to communicate desired messages to those individuals.

326. The Attorney General's subpoena demands that First Choice reveal the identities of and communications with its donors, clients, staff, vendors, ministry associates, owners, officers, directors, partners,

shareholders, and board members.

327. By investigating First Choice without a complaint or other factual basis, the Attorney General will inevitably cause individuals and entities who associate with First Choice to infer that it has engaged in wrongdoing, thereby discouraging those individuals and entities from associating with First Choice.

328. The Attorney General's investigation also may cause individuals and entities who associate with First Choice to fear reasonably that they themselves will face retaliation or public exposure and thus discourage those individuals and entities from associating with First Choice.

329. In addition, the First Amendment freedom to speak and associate protects the ability of persons and groups to retain privacy in their associations.

330. The First Amendment protects First Choice's freedom to engage in broad and uninhibited nonpublic communications to advance its shared operational, religious, and political goals—both internally (*e.g.*, with employees and volunteers) and externally (*e.g.*, with like-minded pro-life entities).

331. Compelled disclosure of associations adversely affects protected speech and association by inducing members to withdraw from the association and dissuading others from joining it for fear of exposure of their beliefs, speech, and associations.

332. First Amendment protections extend not only to

organizations, but also to their staff, members, and others who affiliate with them.

333. Government actions that have a deterrent effect on the exercise of First Amendment rights are subject to rigorous scrutiny.

334. The chilling effect on First Amendment rights is not diminished simply because disclosure of private information is compelled by government process or because government officials promise to keep that information confidential.

335. The Attorney General's subpoena demands, without limitation, disclosure of vast swathes of First Choice's sensitive and confidential information, communications, and policies, such as—to name just a few examples—personal employee and volunteer information, documents related to First Choice's relationships with other pro-life groups, all complaints lodged against First Choice, and identities of First Choice's officers and directors.

336. These unreasonable demands harass First Choice and discourage individuals and entities from associating with First Choice.

337. The Attorney General has no substantive evidence that First Choice has engaged in any violation of New Jersey law, much less any grounds suggesting that the disclosures of the private information he (and now she) seeks justifies the deterrent effect on First Choice's exercise of the constitutionally protected right of association.

338. Investigating First Choice for engaging in constitutionally

protected association and forcing it to disclose information related to the individuals and entities with whom it associates is not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

339. Accordingly, the Attorney General is liable to First Choice for violating its free association rights under the First Amendment, as incorporated and applied to the states through the Fourteenth Amendment.

## THIRD CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Free Speech
## Content and Viewpoint Discrimination
## 42 U.S.C. § 1983

340. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

341. By issuing the subpoena and conducting the related investigation, the Attorney General is engaging in content and/or viewpoint discrimination in violation of the First Amendment.

342. The First Amendment to the Constitution protects First Choice's rights to speak and to be free from content and viewpoint discrimination.

343. First Choice engages in constitutionally protected speech when it advances a pro-life message, including when it provides information about Abortion Pill Reversal and when it solicits donations to support its faith-based, pro-life mission.

344. Under the First Amendment, laws and regulations must not only be facially neutral but also enforced in a non-discriminatory and

viewpoint-neutral manner.

345. The Attorney General may not exercise enforcement discretion based on viewpoint, targeting for investigative demands only organizations expressing one particular point of view on a controversial subject. Such action threatens and chills First Amendment rights.

346. First Choice is similar to many other reproductive health-related clinics in New Jersey in that it and these other clinics serve similar clientele (*i.e.*, women and men seeking reproductive health services), offer many of the same services (*e.g.*, pregnancy testing, sexually transmitted disease or infection referrals, and ultrasounds), and collect sensitive client health information.

347. First Choice differs from any of the dozens of abortion providers in New Jersey because it does not perform or refer for abortions (as part of its religious beliefs), but this is not a legitimate basis on which to base a decision to investigate First Choice's provision of *other* services.

348. The Attorney General has not investigated any of the dozens of similarly situated reproductive health related clinics in New Jersey to determine the truthfulness of their marketing or whether they adequately safeguard client health information.

349. The dissimilar treatment of similarly situated entities evinces viewpoint discrimination in the form of selective enforcement.

350. The Attorney General's public statements also demonstrate that he (and now she) is intentionally targeting First Choice with an

unreasonable, intrusive, overbroad, and unduly burdensome subpoena and investigation based on its speech and views about abortion.

351. The Attorney General has repeatedly allied himself (and now herself) with and spoken favorably toward organizations that perform abortions or seek to eliminate restrictions on abortions, while persistently and aggressively impugning the motives of pro-life entities like First Choice and accusing them of misleading their clients.

352. The Attorney General issued the subpoena to First Choice based on the viewpoint of First Choice's speech, targeting (among other things) its protected speech in defense of the sanctity of life, including its solicitations for support and regarding Abortion Pill Reversal.

353. The Attorney General's refusal to exercise his (and now, her) authority against similar entities who share his (and now, her) views on abortion while targeting First Choice violates First Choice's First Amendment right to be free from viewpoint discrimination.

354. Accordingly, the Attorney General's subpoena and related investigation are unconstitutional selective enforcement and viewpoint discrimination that violate First Choice's First Amendment rights.

355. In addition, the First Amendment prohibits the government from imposing speech restrictions that delegate unbridled discretion to the government officials empowered to enforce those restrictions.

356. Speech restrictions that grant enforcing officials unbridled discretion are treated as viewpoint-discriminatory.

357. The investigatory provisions of (1) the Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17A-33(c); (2) the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-3; and (3) the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18, lack objective standards for enforcement, empowering the Attorney General to launch an investigation whenever he (or she) thinks doing so is "in the public interest."

358. The investigatory provisions of (1) the Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17A-33(c); (2) the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-3; and (3) the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18, lack any objective standards for determining whether a true statement violates those statutes or whether an investigation is in the public interest.

359. The Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law necessarily require the Attorney General to appraise facts, exercise judgment, and form an opinion that raises a danger of censorship and invites decisions based on the content of the speech and the viewpoint of the speaker, including by demanding that First Choice disclose the scientific basis of non-commercial speech it offers to pregnant women.

360. The Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law allow the Attorney General to exercise arbitrary enforcement power to suppress pro-life points of view or any other point of view with which the Attorney

General disagrees.

361. With so few restraints on the Attorney General's authority, the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law grant the Attorney General extraordinary power and unconstitutionally unbridled discretion to suppress disfavored messages and is thus unconstitutional facially and as-applied to First Choice.

362. The Attorney General exercised the unbridled discretion given him (and now, her) under the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law when he (and now, she) issued the subpoena against First Choice, launched the related investigation, and sought to enforce that subpoena even though none of First Choice's expression subject to that subpoena represents commercial speech.

363. The Attorney General retains the unbridled discretion given him (and now, her) under the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law.

364. Accordingly, the Attorney General's exercise of unbridled discretion through the subpoena and related investigation of First Choice is unconstitutional viewpoint discrimination that violates First Choice's First Amendment rights.

365. Viewpoint-based enforcement of New Jersey law on the basis of views on abortion would have a chilling effect on a reasonable person's

willingness to engage in protected activities.

366. Investigating First Choice for engaging in constitutionally protected speech is not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

367. In addition, specific parts of the Attorney General's subpoena and investigation discriminate based on content and viewpoint. For example, the demands that First Choice substantiate various informational statements punish First Choice for its constitutionally protected noncommercial speech and discriminates based on content and viewpoint.

368. First Choice's informational statements are noncommercial speech not made incidental to conduct. The Attorney General can neither regulate the statements themselves nor demand the basis for such statements without satisfying strict scrutiny.

369. The demands to substantiate the various informational statements are not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

370. Accordingly, the Attorney General is liable to First Choice for violating its rights under the First Amendment's Free Speech Clause, as incorporated and applied to the states through the Fourteenth Amendment.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Free Exercise of Religion**
**42 U.S.C. § 1983**

371. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

372. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to free exercise of religion under the First Amendment.

373. First Choice's pro-life statements and beliefs—including those made soliciting donations and in support of Abortion Pill Reversal—are sincere, rooted in its Christian faith, and an exercise of its Christian faith.

374. The First Amendment's Free Exercise Clause forbids government action that is not neutral toward religion unless it satisfies strict scrutiny.

375. The Attorney General's subpoena and related investigation of First Choice are not neutral to religion for several reasons.

376. First, the Attorney General's discretion to decide where and when to serve subpoenas shows that his (and now her) actions are not neutral to religion or generally applicable.

377. Second, the Attorney General treats comparable secular activity—including the operation of abortion facilities such as Planned Parenthood—more favorably than First Choice's religious activity, having declined to investigate them despite their well-known failures in data security and misleading statements on their websites.

378. The existence of an individualized assessment and discretionary mechanism to grant exemptions—including the Attorney General's discretion to treat comparable secular organizations more favorably than First Choice—is sufficient to render a policy not generally applicable.

379. Third, the Attorney General has shown direct hostility toward First Choice's Christian pro-life mission and its speech in support of that mission.

380. Fourth, the Attorney General's subpoena and related investigation burden several of First Choice's constitutional rights—including its First Amendment rights (*e.g.*, freedom of speech, freedom from retaliation, free exercise of religion, religious autonomy), its Fourth Amendment rights, and its Fourteenth Amendment rights (*e.g.*, due process and equal protection).

381. The Attorney General lacks a legitimate or compelling state interest to justify his (and now her) action against First Choice, since First Choice is explicitly exempt from the Consumer Fraud Act and the laws he (and now she) invokes do not or cannot apply to First Choice's conduct and speech.

382. The Attorney General's actions are not narrowly tailored or rationally related to furthering a legitimate or compelling state interest because he (and now she) has not served subpoenas on secular or pro-abortion pregnancy clinics, despite their well-known data breaches and misleading public statements.

383. Investigating First Choice for engaging in constitutionally protected speech is not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

384. Accordingly, the Attorney General is liable to First Choice for violating its rights under the First Amendment's Free Exercise Clause, as incorporated and applied to the states through the Fourteenth Amendment.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right**
**Under the Establishment & Free Exercise Clauses**
**Religious Autonomy & Excessive Entanglement**
**42 U.S.C. § 1983**

385. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

386. By issuing the subpoena and conducting the related investigation, the Attorney General is interfering with First Choice's religious autonomy and entangling himself (and now, herself) in First Choice's religious decision-making processes in violation of the First Amendment.

387. Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

388. Under the Free Exercise and Establishment Clauses of the First Amendment, government may not engage in entangling inquiries

into religious matters, since the "very process of inquiry" can "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). In *Catholic Bishop*, that meant the National Labor Relations Board did not have jurisdiction over claims of unfair labor practices at religious schools. *See id.*; *see also Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 718 (1976) ("detailed review" of church proceeding was "impermissible under the First and Fourteenth Amendments").

389. Government actors may not intervene in an "internal ecclesiastical dispute and dialogue protected by the First Amendment." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 659 (10th Cir. 2002).

390. Religious autonomy also forbids the "forced disclosure" of religious organizations' "internal communications." *Whole Woman's Health v. Smith*, 896 F.3d 362, 374 (5th Cir. 2018). Forcing First Choice to hand over these internal documents would "interfere[ ] with [its] decision-making processes on a matter of intense doctrinal concern" and intrude on its "self-government." *Id.* at 373.

391. First Choice is a religious ministry engaged in religious decision-making and ministry, and it applies its religious beliefs and doctrines to its ministry to women and men facing unplanned pregnancies. These decisions constitute matters of internal governance, faith, doctrine, and practice.

392. The Attorney General's subpoena and related investigation

were prompted by the Attorney General's disagreement with First Choice's religious beliefs, practices, and ministry.

393. The Attorney General's subpoena and related investigation target and interfere with First Choice's religious governance and decision-making.

394. The Attorney General's subpoena and related investigation are an attempt to influence First Choice's decisions regarding faith and doctrine.

395. The Attorney General's subpoena and related investigation were prompted by the Attorney General's disagreement with First Choice's religious beliefs, practices, and ministry.

396. This violates both Religion Clauses, which "protect the right of churches and other religious institutions to decide matters '"of faith and doctrine' without government intrusion.... State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

397. The Attorney General's subpoena and related investigation infringe First Choice's right to govern itself according to its religious principles, frame its policies and doctrines, and conduct its religious ministry according to those religious principles without government interference.

398. The First Amendment's Establishment Clause "complement[s]" the Free Exercise Clause, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022), and protects religious organizations from "state interference [on] matters of [internal] government," *Kedroff*, 344 U.S. at 116.

399. The Attorney General's subpoena and related investigation deprive First Choice of the freedom from "state interference," forces it to disclose sensitive faith-based information about matters of internal government, and forces the Attorney General to parse religious information from non-religious content.

400. The First Amendment's Establishment Clause also prohibits the government from disapproving of or showing hostility towards a particular religion or religion in general.

401. In the wake of *Dobbs*, the Attorney General has targeted pregnancy centers that adhere to traditional Christian views on the sanctity of unborn life for retaliatory and intrusive investigations.

402. The Attorney General also violates the Establishment Clause to the extent that he (and now, she) enforces the subpoena by parsing each document demanded to determine whether it contains religious or non-religious information.

403. The Attorney General's subpoena and related investigation thus violate the Establishment Clause by causing excessive government entanglement with First Choice's religious decisions on internal government and by preferring other organizations that hold different views

from traditional Christian views on the sanctity of unborn life.

404. The Attorney General's subpoena and related investigation will impinge rights guaranteed to First Choice by the Religion Clauses of the First Amendment.

405. Accordingly, the Attorney General is liable to First Choice for violating its rights under the First Amendment's Establishment and Free Exercise Clauses, as incorporated and applied to the states through the Fourteenth Amendment.

## Seventh Cause of Action
## Violation of Plaintiff's Fourth Amendment Right Against Unreasonable Search & Seizure
## 42 U.S.C. § 1983

406. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

407. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to be free from unreasonable government searches and seizures under the Fourth Amendment.

408. The Attorney General's demands for information unrelated to an investigation authorized by law violate First Choice's Fourth Amendment protection against unreasonable searches and seizures.

409. The Fourth Amendment to the United States Constitution—made applicable to the states through the Fourteenth Amendment—protects First Choice from unreasonable searches and seizures and imposes

on the Attorney General the obligation to state with particularity the place to be searched and the things to be seized.

410. The Attorney General's investigative demands must be reasonably related to legitimate investigative inquiries and based on more than mere speculation or animus toward First Choice's views, speech, and religion.

411. The Attorney General's subpoena cites no complaint or reason to suspect that First Choice has information relating to a violation of the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1–227, specifically N.J. STAT. ANN. §§ 56:8-3 and 56:8-4; the Charitable Registration & Investigation Act, N.J. STAT. ANN. §45:17A-18–40, specifically N.J. STAT. ANN. § 45:17A-33(c); or the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18. In fact, the Attorney General's subpoena fails to allege what, if any, potential violation has occurred.

412. Many requests for documentation and materials in the Attorney General's subpoena have no rational relation to a legitimate investigation, and the Attorney General has no substantial evidence of any colorable violation of the aforementioned statutes.

413. The Consumer Fraud Act does not apply to First Choice because it explicitly exempts non-profit entities. N.J. STAT. ANN. § 56:8-47.

414. The Attorney General has cited no practice declared unlawful that he (and now she) may investigate under the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18.

415. The Attorney General's subpoena also calls for production of documents over a ten-year period even though the relevant statute of limitations is a maximum of six years.

416. The Attorney General has made numerous contemporaneous statements showing his (and now her) disdain for organizations that seek to protect unborn human life in general and for pregnancy centers First Choice in particular.

417. The Attorney General's subpoena cites no complaint or reason to suspect that First Choice has information relating to a violation of the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1–227, specifically N.J. STAT. ANN. §§ 56:8-3 and 56:8-4; the Charitable Registration & Investigation Act, N.J. STAT. ANN. §45:17A-18–40, specifically N.J. STAT. ANN. § 45:17A-33(c); or the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18. In fact, the Attorney General's subpoena fails to allege what, if any, potential violation has occurred.

418. The Attorney General is engaged in an intrusive, oppressive, unnecessary, unjustified, and irrelevant investigation of First Choice's organizational structure; personal information of leadership, volunteers, and personnel; associations; internal policies; irrelevant lawful activities; tax-exempt status; and other lawful aspects of First Choice's operations and relationships.

419. The Attorney General's many unspecific demands for "any" and "all" information or materials "without limitation," and for

"communications" (including oral conversations) are not particular, as required by the Fourth Amendment.

420. The overbreadth of the Attorney General's subpoena and related investigation in time and scope are unreasonable.

421. The Attorney General's subpoena and related investigation harass First Choice and causes it to spend limited time and resources responding to these demand for no apparent reason other than the Attorney General's disdain for First Choice's religious views, speech, associations, and exercise.

422. The Attorney General has threatened contempt of court and "other penalties" against First Choice to coerce it into complying with his (and now her) unconstitutional demands.

423. Thus, the Attorney General's subpoena constitutes an unreasonable search and seizure under the Fourth Amendment.

424. Accordingly, the Attorney General is liable to First Choice for violating its right to be free from unreasonable searches and seizures under the Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment.

## EIGHTH CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Free Speech and Fourteenth Amendment Right to Due Process of Law
## Overbreadth
## 42 U.S.C. § 1983

425. First Choice repeats and realleges each of the allegations

contained in paragraphs 1–304 of this Complaint.

426. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to free speech and due process of law under the First and Fourteenth Amendments.

427. The Attorney General's subpoena and related investigation are overbroad because they encompass a substantial amount of constitutionally protected speech and association.

428. First Choice's speech regarding the sanctity of life—including its solicitations for donations, its interactions with employees and volunteers (as well as those with other pro-life organizations), and its speech related to Abortion Pill Reversal, abortion, and contraception—is speech that the First Amendment protects.

429. By issuing the subpoena and launching the related investigation, the Attorney General is punishing First Choice for engaging in expression that the First Amendment protects.

430. To the extent that the Attorney General's subpoena and investigation enforce the Consumer Fraud Act, they are overbroad because that statute does not apply to First Choice. N.J. STAT. ANN. § 56:8-47.

431. Further, to the extent that the Attorney General's subpoena and investigation enforce the Consumer Fraud Act, they are over-broad because they seek information substantiating protected, non-commercial speech. If the underlying speech is protected, so too is the basis for that speech.

432. To the extent that the Attorney General's subpoena and investigation enforce the Professions & Occupations Law, they are overbroad because the Attorney General has cited no practice declared unlawful that he (and now she) may investigate under that law.

433. To the extent that the Attorney General's subpoena and investigation enforce the Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17A-18–40, they are overbroad because the Act's mandate that all statements made by charitable organizations "shall be truthful" is unconstitutionally overbroad facially and as-applied, as is the authority it grants the enforcer to investigate statements that "although literally true, are presented in a manner that has the capacity to mislead the average consumer." N.J. STAT. ANN. § 45:17A-32(a), (c)(7).

434. First, these nebulous standards reach a substantial amount of constitutionally protected conduct and expression that will deter people from engaging in constitutionally protected speech and inhibit the free exchange of ideas. For example, requiring all statements to be truthful includes significant amounts of protected speech, such as noncommercial speech that is not incidental to conduct.

435. Second, the number of valid applications of the Charitable Registration & Investigation Act pales in comparison to the historic and likely frequency and the actual occurrence of impermissible applications against constitutionally protected conduct and speech the Attorney General disfavors, even outside the context of abortion.

436. Third, the activity or conduct the Attorney General seeks to regulate is the expression of First Choice's constitutional rights to speak and associate freely and to exercise its religion.

437. Fourth, no compelling interest in regulating false and deceptive speech in connection with charitable solicitations applies to statements made only to inform, not to solicit contributions.

438. Fifth, the apparent interest in regulating false and deceptive speech in connection with charitable solicitations cannot possibly override First Choice's constitutional liberties because (1) these purposes cannot be said to be compelling if they are only applied to pregnancy centers that do not support abortion, but not pregnancy centers that do support abortion; and (2) the statutes can be achieved with a more narrowly tailored provision requiring a bona fide complaint or substantial evidence of wrongdoing.

439. The Charitable Registration & Investigation Act's overbreadth has not only created a likelihood that its application will inhibit free expression; it has already had that actual effect.

440. Thus, the Charitable Registration & Investigation Act's investigation provisions and the Attorney General's subpoena and investigation launched under those provisions are unconstitutionally overbroad facially and as applied to First Choice.

441. Accordingly, the Attorney General is liable to First Choice for violating its right to free speech and due process of law under the First and Fourteenth Amendments.

## NINTH CAUSE OF ACTION
## Violation of Plaintiff's Fourteenth Amendment Right to Due Process of Law
## 42 U.S.C. § 1983

442. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

443. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to due process of law under the Fourteenth Amendments.

444. The Attorney General's subpoena and related investigation are unconstitutionally vague.

445. A statute is unconstitutionally vague if it (1) grants officials unbridled discretion to determine whether a given activity contravenes the statute's mandates or prohibitions; (2) fails to provide people of ordinary intelligence with a reasonable opportunity to understand what conduct is required or prohibited; or (3) fails to give people of ordinary intelligence fair notice of what constitutes a violation.

446. Laws that interfere with free speech or free exercise are subject to more exacting scrutiny and must be more definite than laws in other contexts.

447. The Charitable Registration & Investigation Act's investigatory provisions fail to give persons of ordinary intelligence constitutionally fair notice of what constitutes a truthful statement and what statements have the capacity to mislead.

448. The Charitable Registration & Investigation Act fails to give

fair warning of what is prohibited and is so imprecise that discriminatory enforcement is not only a real possibility but also a reality.

449. The investigatory provisions of (1) the Charitable Registration & Investigation Act, N.J. STAT. ANN. § 45:17A-33(c); (2) the Consumer Fraud Act, N.J. STAT. ANN. § 56:8-3; and (3) the Professions & Occupations Law, N.J. STAT. ANN. § 45:1-18, lack objective standards for enforcement, empowering the Attorney General to launch an investigation whenever he (or she) thinks doing so is "in the public interest."

450. The investigatory provisions of these three statutes impermissibly grant the Attorney General unbridled discretion to decide what conduct or expression violates these statutes and who should be investigated for violating them.

451. The Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law necessarily require the Attorney General to appraise facts, exercise judgment, and form an opinion that raises a danger of censorship and invites decisions based on the content of the speech and the viewpoint of the speaker.

452. The Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law allow the Attorney General to exercise arbitrary enforcement power to suppress pro-life points of view or any other point of view with which the Attorney General disagrees.

453. With so few restraints on the Attorney General's authority,

the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law grant the Attorney General extraordinary power and unconstitutionally unbridled discretion to suppress disfavored messages and are thus unconstitutional facially and as-applied to First Choice.

454. The Attorney General exercised the unbridled discretion given him (and now her) under the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law when he (and later she) issued the subpoena against First Choice, launched the related investigation, and sought to enforce that subpoena.

455. The Attorney General retains the unbridled discretion given him (and now her) under the Charitable Registration & Investigation Act, the Consumer Fraud Act, and the Professions & Occupations Law.

456. The lack of objective factors in these three statutes render any subpoenas or investigations based on them (including the Attorney General's against First Choice) unconstitutionally vague.

457. Accordingly, the Attorney General is liable to First Choice for violating its right to due process of law under the Fourteenth Amendment.

## Tenth Cause of Action
## Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law
## 42 U.S.C. § 1983

458. First Choice repeats and realleges each of the allegations contained in paragraphs 1–304 of this Complaint.

459. By issuing the subpoena and conducting the related investigation, the Attorney General is violating First Choice's right to equal protection of the law under the Fourteenth Amendment.

460. First Choice is similarly situated to many other reproductive health-related clinics in New Jersey in that it and these other clinics serve similar clientele (*i.e.*, women and men seeking reproductive health services), offer many of the same services (*e.g.*, pregnancy testing, sexually transmitted disease or infection referrals, and ultrasounds), and collect sensitive client health information.

461. First Choice differs from any of the dozens of abortion providers in New Jersey because it does not perform or refer for abortions (as part of its religious beliefs), but this is not a legitimate basis on which to base a decision to investigate First Choice's provision of *other* services.

462. The Attorney General has not investigated any of the dozens of similarly situated reproductive health-related clinics in New Jersey to determine the truthfulness of their marketing or whether they adequately safeguard client health information.

463. The dissimilar treatment of similarly situated entities evinces viewpoint discrimination in the form of selective enforcement.

464. The Attorney General's public statements also demonstrate that he (and now, she) is intentionally targeting First Choice with an unreasonable, intrusive, overbroad, and unduly burdensome subpoena and investigation based on its speech and views about abortion.

465. The Attorney General has repeatedly allied himself (and now herself) with and spoken favorably toward organizations that perform abortions or seek to eliminate restrictions on abortions, while persistently and aggressively impugning the motives of pro-life entities like First Choice and accusing them of misleading their clients.

466. The Attorney General issued the subpoena to First Choice based on the viewpoint of First Choice's speech, targeting (among other things) its protected speech in defense of the sanctity of life and about Abortion Pill Reversal.

467. The Attorney General's subpoena and related investigation also discriminate intentionally against First Choice for exercising its rights to freedom of speech, free exercise of religion, free association, freedom from unreasonable searches and seizures, and due process of law. Thus, discriminatory intent is presumed.

468. The Attorney General's subpoena and related investigation burden First Choice's fundamental rights and have no rational basis.

469. The Attorney General's subpoena and related investigation of First Choice are underinclusive, targeting First Choice while leaving other expression and conduct equally violative of the statutes the Attorney General purports to enforce unprohibited and uninvestigated.

470. Accordingly, the Attorney General is liable to First Choice for violating its right to equal protection of the law under the Fourteenth Amendment.

## Prayer for Relief

Wherefore, First Choice respectfully requests that this Court enter judgment against the Attorney General and provide it with the following relief:

A. A preliminary and permanent injunction barring the Attorney General, her agents, officials, servants, employees, and any other person acting on her behalf from enforcing the subpoena against First Choice or continuing to investigate First Choice;

B. A declaratory judgment that the Attorney General's subpoena and related investigation of First Choice violated its rights under the First, Fourth, and Fourteenth Amendments;

C. An order requiring the Attorney General to return all documents First Choice has already disclosed to comply with the subpoena and then to delete any copies of those documents that remain in the Attorney General's possession and control;

D. First Choice's reasonable attorneys' fees, costs, and other costs and disbursements in this action under 42 U.S.C. § 1988; and

E. All other further relief to which First Choice may be entitled.

Respectfully submitted this 15th day of June, 2026.

*s/ Lincoln Davis Wilson*
Lincoln Davis Wilson
FIRST & FOURTEENTH PLLC
784 S. Clearwater Loop # 8011
Post Falls, Idaho 83854
Telephone: (719) 234–0938
lincoln@first-fourteenth.com

Travis C. Barham*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
tbarham@ADFlegal.org

Erik C. Baptist**
Erin M. Hawley**
Gabriella M. McIntyre
Daniel J. Grabowski**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
ebaptist@ADFlegal.org
ehawley@ADFlegal.org
gmcintyre@ADFlegal.org
dgrabowski@ADFlegal.org

* admitted *pro hac vice*
** *pro hac vice* motion forthcoming

*Counsel for Plaintiff*

## DECLARATION UNDER PENALTY OF PERJURY

I, AIMEE HUBER, a citizen of the United States and a resident of the State of New Jersey, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 12th day of June, 2026, at Morristown, New Jersey.

Aimee Huber

AIMEE HUBER