Lincoln Davis Wilson
FIRST & FOURTEENTH PLLC
784 S. Clearwater Loop # 8011
Post Falls, Idaho 83854
Telephone: (719) 234–0938
lincoln@first-fourteenth.com

Travis C. Barham*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
    Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
tbarham@ADFlegal.org

Erik C. Baptist*
Erin M. Hawley*
Gabriella M. McIntyre*
Daniel J. Grabowski*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
ebaptist@ADFlegal.org
ehawley@ADFlegal.org
gmcintyre@ADFlegal.org
dgrabowski@ADFlegal.org

* *pro hac vice* admission filed
    concurrently

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE**

| | |
|---|---|
| **FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.** <br><br> *Plaintiff*, <br><br> v. <br><br> **JENNIFER DAVENPORT**, in her official capacity as Attorney General for the State of New Jersey, <br><br> *Defendant*. | **Case No. 3:23-cv-23076-MAS-TJB** <br><br> **THE HONORABLE MICHAEL A. SHIPP** <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION** <br><br> MOTION DAY: July 20, 2026 |

**TABLE OF CONTENTS**

Table of Authorities.................................................................... iii

Introduction ....................................................................................1

Background.....................................................................................2

I.      The Attorney General openly opposes pregnancy centers. ............2

II.     The Attorney General's subpoena demands significant information—including donor identities. ........................................5

III.    Complying with the subpoena would require significant effort and resources. ..................................................................6

IV.     Justification for the subpoena is wanting. ...................................7

V.      The subpoena has caused much litigation.....................................9

VI.     The Supreme Court unanimously holds First Choice has standing to challenge the subpoena..............................................11

Argument......................................................................................15

I.      First Choice is likely to succeed....................................................15

        A.      The subpoena is unlawful retaliation against protected First Amendment activity....................................................16

                1.      Retaliation is a motivating factor for the subpoena....17

                2.      The Attorney General cannot show she would have issued the subpoena anyway. .....................................21

        B.      The subpoena violates First Choice's associational rights...24

                1.      The donor demand fails exacting scrutiny. .................24

                2.      Other demands also fail exacting scrutiny..................31

        C.      The subpoena violates First Choice's right to religious autonomy...............................................................33

II.     The other injunction factors all favor First Choice. .......................38

Conclusion ..........................................................................................39

## TABLE OF AUTHORITIES

### Cases

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95 (3d Cir. 2022)..............................................16, 38

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ............................................................ passim

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025) ......................................................................34

*Doe v. Reed*, 561 U.S. 186 (2010) .....................................................................24

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................................38

*Falcone v. Dickstein*, 92 F.4th 193 (3d Cir. 2024) ...................................................17, 18

*First Choice Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026) ............................................................ passim

*Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116 (3d Cir. 2020)........................................................16

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ......................................................................34

*Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) .................................................................16, 17

*KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) ...................................................15, 38

*Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018)........................................................22

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................................ passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ............................................................. 17

*Nat'l Rifle Assoc. of Am. v. Vullo*,
    602 U.S. 175 (2024) ....................................................... 16–19

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ............................................... 16–18, 22

*NLRB v. Cath. Bishop of Chi.*,
    440 U.S. 490 (1979) ...................................................... 35, 36

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ............................................................. 33

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) .............................................. 38

*Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*,
    27 F.4th 886 (3d Cir. 2022) .............................................. 21

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ...................................................... 25, 27

*Whole Woman's Health v. Smith*,
    896 F.3d 362 (5th Cir. 2018) ................................... passim

*Wyo. Gun Owners v. Gray*,
    83 F.4th 1224 (10th Cir. 2023) ................................... 26, 30

**Statutes**

N.J. ADMIN. CODE § 13:48-13.2(7) ........................................ 28

N.J. STAT. ANN. § 45:1-18(a) ................................................. 32

N.J. STAT. ANN. § 56:8-2 ......................................................... 28

## INTRODUCTION

By now, this case needs no introduction. No doubt, the Court knows the Supreme Court unanimously held that First Choice Women's Resource Centers, Inc., has standing to challenge the New Jersey Attorney General's subpoena. *First Choice Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). First Choice is entitled to litigate its federal constitutional claims in federal court.

Yet apparently the Attorney General did not get the memo. The day after the Supreme Court issued its decision, the Attorney General filed a letter in state court urging that court to resolve the subpoena's enforceability. Am. Compl. Ex. 10 at 1. And for the Attorney General, there was no time to waste—else First Choice would get its "preferred federal forum." *Id.* at 2. No matter the Supreme Court's holding that First Choice is entitled to that forum under § 1983. *First Choice*, 146 S. Ct. at 1129. No matter the federal case was filed first. Indeed, the Attorney General even claimed that the Supreme Court's mandate had issued and the state-court stay had lifted. Am. Compl. Ex. 10 at 1. Not so, as First Choice explained. Am. Compl. Ex. 11 at 1.

But the Attorney General leaves no doubt that she still aggressively seeks to obtain donor names and other constitutionally protected information. So First Choice renews its motion for a preliminary injunction. Now more than ever after the Supreme Court's decision, it is likely to succeed on its claims.

1

## BACKGROUND

The Court is familiar with this case, so recall just the key details. In 2022, then-Attorney General Matthew Platkin created a "Reproductive Rights Strike Force." *First Choice*, 146 S. Ct. at 1119 (citation omitted). The Strike Force issued a "consumer alert" accusing pregnancy centers like First Choice of giving "false or misleading information about abortion" to "prevent people from accessing comprehensive reproductive health care." *Id.* (citation omitted). The alert expressly asked "members of the public who believed they were victims of fraudulent, deceptive, misleading, or unlawful conduct" to file a complaint. *Id.* at 1120 (citation modified).

Yet the Attorney General's office did not receive "any complaints from the public about First Choice." *Id.* Even still, the Attorney General served a subpoena on First Choice. Why?

The record speaks for itself. Attorney General Platkin made no secret of his hostility toward pregnancy centers. And his successor, Attorney General Jennifer Davenport, is just as transparent.

## I.    The Attorney General openly opposes pregnancy centers.

Besides creating the Strike Force and issuing the consumer alert, Attorney General Platkin co-authored an open letter with other attorneys general about pregnancy centers. Am. Compl. ¶ 116. He expressed his "increasing concern" that pregnancy centers outnumber "abortion clinics by a three-to-one ratio." *Id.* He also accused pregnancy centers of

2

misleading consumers because they "do not provide abortions or abortion services." *Id.* And he pledged to take "numerous actions" against such centers. *Id.*

Similarly, Attorney General Platkin filed amicus briefs disparaging such groups and attacking pro-life laws in other states. *Id.* ¶¶ 93–95. He regularly tweeted critiques about pregnancy centers, telling people "seeking reproductive care" to "beware of Crisis Pregnancy Centers" and claiming that they pretend "to be legitimate medical facilities." *Id.* ¶ 114. Similarly, he referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need." *Id.* ¶ 92. And the Attorney General frequently praised and partnered with Planned Parenthood and other organizations openly hostile to pro-life pregnancy centers. *Id.* ¶¶ 97–100. Indeed, the Strike Force enlisted Planned Parenthood to help draft its consumer alert, which unsurprisingly urged women to go to Planned Parenthood. *Id.* ¶ 107.

Attorney General Davenport has continued that open hostility to pregnancy centers. She has doubled down, filing the letter in state court seeking to enforce the subpoena the *first day* after the Supreme Court's unanimous decision *against* her. Am. Compl. Ex. 10 at 1. Likewise, she has continued her predecessor's Strike Force, filed briefs against pro-life causes, and claimed without evidence that pregnancy centers provide "misleading information about the safety and legality of abortion." Am.

Compl. ¶¶ 90, 109. The Attorney General has also continued her office's close relationship with Planned Parenthood.

Perhaps that's why the Attorney General has not investigated or issued any subpoena to Planned Parenthood, despite having reasons to do so. For one thing, Planned Parenthood has repeatedly disseminated deceptive statements that the abortion drug mifepristone it sells is safer than over-the-counter Tylenol. *Id.* ¶ 122. Planned Parenthood even recognizes such statements are false, claiming in litigation that they are mere "puffery" that no "reasonable" woman would rely on. *Id.* ¶ 123. Hardly. *See id.* ¶ 124 (noting court denied Planned Parenthood's motion to dismiss). For another, there are several recent documented instances of Planned Parenthood exposing consumer data, including sensitive patient information. *Id.* ¶ 118. And for a third, Planned Parenthood—no less than First Choice—had donation website pages that omitted any mention of its mission. *Id.* ¶ 126.

Rather than going after Planned Parenthood, which charges for services, the Attorney General targeted First Choice—a Christian, non-profit ministry that for decades has served New Jersey women and men for free. *Id.* ¶¶ 26, 46. Indeed, First Choice seeks to live out its religious mission in all that it does, with staff and volunteers cultivating a "sense of anticipation of God's presence and power in whatever [they're] doing." *Id.* ¶¶ 29, 36. That's why it offers pregnancy testing, counseling options,

education, material support, and the like. *Id.* ¶ 45. And it's why First Choice does not perform or refer for abortions. *Id.* ¶ 34.

That last bit explains the Attorney General's opposition. At root, it's the reason he served an expansive subpoena on First Choice—despite receiving no complaints *after* requesting victims come forward. And make no mistake, the subpoena is expansive.

## II.   The Attorney General's subpoena demands significant information—including donor identities.

The subpoena demands "production of 28 categories of documents (categories that themselves include[ ] as many as 29 subcategories)." *First Choice*, 146 S. Ct. at 1120. Take a few examples.

First, the biggest-ticket item: the subpoena demands "documents reflecting the names, phone numbers, addresses, and places of employment of all individuals who" donated to First Choice "by any means other than through one specific webpage." *Id.* (citation modified). So First Choice must provide personal information of all donors who gave "through two other websites, through the group's various social media pages, by mail, in person, or by any other means." *Id.* That includes disclosing the names behind some 5,000 donations. Am. Compl. ¶ 130.

Second, the subpoena demands the identity of every licensed professional performing any service for clients at First Choice. Am. Compl. Ex. 7 at 15.

Third, it demands all documents related to First Choice's relationships with partner pro-life organizations Heartbeat International, the Abortion Pill Reversal Network, and Care Net. *Id.*

Fourth, the subpoena demands all documents provided to personnel to guide their interactions with clients, including volunteer handbooks, training materials, and scripts. *Id.*

Fifth, the subpoena demands all documents supporting at least 39 different scientific and other statements about abortion from First Choice's websites. *Id.* at 12–14.

## III. Complying with the subpoena would require significant effort and resources.

Given the subpoena's expansive scope, First Choice would have to expend considerable time and money to comply. All told, the subpoena demands thousands on thousands of pages of documents, or an estimated 20 terabytes of data. Am. Compl. ¶ 186. To begin searching for those documents, First Choice would have to conduct device imaging and virtualization. *Id.* ¶ 183. Doing so would require over 50 hours of work, not to mention expenses. *Id.* Then First Choice would have to filter all the documents by search terms and individually review them. *Id.* ¶ 185. That would require significantly more hours and expense. *Id.* ¶¶ 187–92.

First Choice would be unable to use that money to further its religious mission. And its staff would be unable to perform key functions when working to meet all the demands. *Id.* ¶¶ 191–93. Its executive

director, director of health services, center directors, and many others would have to engage in a dedicated effort to comply. *Id.* That would consume leadership and other staff's time for over a month. *Id.* ¶ 192.

In fact, the subpoena itself has already significantly cut into leadership time, even setting aside litigation. For example, after being served the subpoena, First Choice grew concerned that some client internet videos included staff names. *Id.* ¶ 145. Though such videos resonate more given their first-person stories, First Choice took them down. *Id.* Still, the effort in weighing and acting on decisions like that is little compared to complying with all the subpoena's document demands.

## IV.   Justification for the subpoena is wanting.

The subpoena did not disclose why it demanded all those documents. But during litigation, the Attorney General insisted that he needed donor names and phone numbers so that he could contact and interrogate a "representative sample" of donors to see whether they "had 'been misled' by First Choice about its 'mission and operations.'" *First Choice*, 146 S. Ct. at 1120 (citation omitted). Never mind the intimidating effect on a pro-life donor—as if receiving a call from a hostile Attorney General's office wouldn't be terrifying. The Attorney General's alleged justification has to do with First Choice's websites. There are three: a donor website (https://1stchoicefriends.org/), a client website (https://1stchoice.org/), and a woman-center website (https://firstchoicewomancenter.com/).

The Attorney General's gripe is that she thinks the latter two websites may have misled donors into thinking First Choice is pro-abortion because those websites don't expressly say First Choice is pro-life. But page after page of those websites has a disclaimer at the bottom stating that First Choice does not provide or refer for abortions. Am. Compl. ¶ 219. Besides, one of the websites does not even have a link to donate. Only the donor and client websites do. But the client website is hardly unclear. Just take a look at the donation-page header:



Am. Compl. ¶ 220. Pictures of happy parents holding babies aren't ambiguous. As the Supreme Court incredulously put it: in the Attorney General's "view, First Choice's solicitation materials—including a donation webpage featuring pictures of parents holding infants and young children—could mislead donors into thinking First Choice provides abortions." *First Choice*, 146 S. Ct. at 1120 (citation omitted). (More on the Supreme Court's overt skepticism later.)

8

If that weren't enough, First Choice sends monthly newsletters that expressly thank donors for saving lives. Am. Compl. ¶ 224. Even the envelope is clear about its pro-life mission. Here's an example:



*Id.* ¶ 225. All that explains why a group of donors submitted an anonymous declaration noting that they never felt misled by First Choice's websites, advertisements, or staff. Am. Compl. ¶ 173. The declaration notes other things too, like how the subpoena deters the donors from continuing to partner with First Choice. *Id.*

Despite all that evidence suggesting First Choice did not mislead donors, the Attorney General still insists on enforcing the subpoena. The result: two and a half years of interference with and chilling of First Choice's First Amendment rights—and counting.

## V.    The subpoena has caused much litigation.

As the Court knows firsthand, the subpoena has generated "much litigation." *First Choice*, 146 S. Ct. at 1120. Before the subpoena's compliance deadline, First Choice sued in this Court to protect its constitutional rights. *Id.* The Attorney General then sued in state court.

*Id.* Parallel litigation followed in which neither the federal nor state court ruled on First Choice's constitutional claims. But the Attorney General aggressively tried to enforce the subpoena in state court and ensure that no federal court would resolve the constitutional claims.

Take an example. In 2024, the state court—without reaching the constitutional claims—directed First Choice to respond to the subpoena and the parties to meet and confer about its scope. Am. Compl. ¶¶ 237–38. That prompted First Choice to serve written responses and objections and to produce more than 2,300 pages of documents. *Id.* ¶ 242. Given its First Amendment objections, those documents did not include any donor, staff, or volunteer personal information. *Id.* But that wasn't good enough for the Attorney General. He moved "to enforce litigant's rights" and sanction First Choice. *Id.* ¶ 247. He claimed that for First Choice to fully respond to the subpoena meant it had to turn over everything requested—including all donor identities. *Id.* ¶ 248. The state court disagreed. It chastised the Attorney General for his stance, held that First Choice had fully responded, and denied the motion. *Id.* ¶ 253.

Amid that state-court litigation, this Court twice held that First Choice's claims were not ripe. *Id.* ¶¶ 228, 256. Recall just the second: the Court denied the preliminary-injunction motion and dismissed the case for lack of standing. So First Choice appealed to the Third Circuit.

There, the day before oral argument, the Attorney General sent First Choice a letter. It said that "at this time" he was seeking the donor

10

identities of only those who gave "through links on First Choice's client-facing websites." *Id.* ¶ 259. But the letter expressly reserved "the right to seek identities of other donors as needed." *Id.* ¶ 260.

A divided panel of the Third Circuit then affirmed this Court. So First Choice petitioned the Supreme Court for certiorari. The Supreme Court granted that petition and reversed.

## VI. The Supreme Court unanimously holds First Choice has standing to challenge the subpoena.

In a unanimous decision, the Supreme Court held that First Choice has shown "a present injury to its First Amendment associational rights." *First Choice*, 146 S. Ct. at 1124. To be sure, the Court did not "decide the merits," only standing. *Id.* at 1121. But its decision offers plenty of guidance on both.

Start with the Supreme Court's factual account. The Court expressly noted that the Attorney General created the Strike Force that issued the consumer alert. *Id.* at 1119. As the Court highlighted, the alert directed "women to abortion providers and ask[ed] members of the public who believed they were victims of fraudulent, deceptive, misleading, or unlawful conduct to" file a complaint. *Id.* at 1120 (citation modified). And the Court juxtaposed that ask with the Attorney General receiving no "complaints from the public about First Choice." *Id.*

In fact, the Court was openly skeptical about the Attorney General's motives. It left little doubt how it viewed the Attorney General's alleged

11

need for donor identities: wondering how "a donation webpage featuring pictures of parents holding infants and young children" would "mislead donors into thinking First Choice provides abortions." *Id.*

Move to the Court's legal analysis. It began by stressing the importance of the right to association: "Without such a right, no two men could safely share the same soapbox, no two women the same church." *Id.* at 1122. Take it away, and "all of society [is] poorer for it." *Id.* That's why associational harms "warrant 'the closest scrutiny' under the First Amendment." *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958)). And such harms can come "in varied ways." *Id.* From requiring a group to accept unwanted members, to denying benefits based on a group's message, to punishing individuals for their affiliation, the Court has held such harms violate "freedom of association." *Id.*

In the same way, the Attorney General's subpoena caused that harm. By demanding First Choice's "private member or donor information," the subpoena burdened First Choice's "constitutional rights." *Id.* at 1125. That burden occurs "not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id.* The Court reiterated that holding: First Choice experiences that injury "so long as the subpoena remains outstanding." *Id.* at 1128. And that is the whole point: the "value of a sword of Damocles is that it hangs—not that it drops." *Id.* at 1127 (citation omitted).

12

As the Court highlighted, organizations "spanning the ideological spectrum" agree with just that. *Id.* at 1125 (citation modified). "Groups ranging from the American Civil Liberties Union to the National Taxpayers Union Foundation to the Church of Jesus Christ of Latter-day Saints" filed briefs explaining that a subpoena "targeting First Amendment activity," regardless of whether it's enforced, necessarily gives an organization "a very good reason to clam up" and its "members and supporters a very good reason to abandon the cause." *Id.* at 1125–26 (citation omitted). Indeed, those groups noted that "officials 'across the political spectrum' have sometimes issued subpoenas and other investigatory demands in order to secure just these results." *Id.* at 1126 (citation omitted). At bottom, the "demand for private donor information injures" First Choice's associational rights. *Id.*

Nothing the Attorney General argued changed that. Consider a few examples. First, the Court explained that § 1983 has "the express goal of ensuring a federal forum to citizens who claim that state actors have violated their constitutional rights." *Id.* And because no abstention doctrines apply, federal courts' "virtually unflagging obligation to exercise the jurisdiction given them" applies. *Id.* (citation modified). The Court highlighted the impropriety of forcing "First Choice to litigate in state court before coming to federal court." *Id.* at 1129. Doing so threatened First Choice "with a 'preclusion trap'"—meaning "§ 1983's promise of a federal forum would die aborning." *Id.* (citation modified).

13

Second, the Court rejected the Attorney General's belated attempt to lessen the harm by narrowing the donor demand. *Id.* at 1130. Subtle interferences with the freedom of association, no less than "heavy-handed frontal attacks," are unconstitutional. *Id.* (citation modified). Otherwise, the government can "marginaliz[e] dissident voices and reshap[e] the marketplace of ideas to its pleasure, all while evading any legal challenge to its actions." *Id.*

Third, the Court put no stock in the Attorney General "indicating that he would be 'willing to narrow' his demands and accept information about donors who give through just two websites." *Id.* (citation omitted). For one thing, the Attorney General reserved the right to seek more donor information. *Id.* For another, "he continued to insist on the disclosure of donor information collected through two websites." *Id.* So First Choice's associational injury necessarily persists. *Id.*

Finally, the Court made clear that a promise of confidentiality could not do away with the injury. *Id.* at 1130. Even putting aside that donor information could leak and harassment ensue, with or without public disclosure, the donor demand *itself* harmed First Choice's associational rights. *Id.* at 1130–31. After all, "would it have been an answer in *NAACP v. Alabama* if the State's Attorney General promised to keep the NAACP's membership rolls to himself?" *Id.* at 1131.

So the Court remanded the case "for further proceedings consistent with [its] opinion." *Id.* The Third Circuit then remanded the case to this

14

Court. Order, ECF 76. Back again, First Choice amended its complaint and now renews its motion for a preliminary injunction.

## ARGUMENT

For two and a half years, the Attorney General's subpoena has violated First Choice's constitutional rights. That needs to end.

First Choice is entitled to a preliminary injunction. At a minimum, it is likely to succeed on three claims, and the other factors weigh heavily in its favor. The subpoena is First Amendment retaliation, violates First Choice's associational rights, and infringes its right to religious autonomy.

The Supreme Court has made the first two analyses easy. For retaliation, the Supreme Court all but said the Attorney General's actions weren't based on fear of fraud. For the associational claim, all that's left to decide is exacting scrutiny, and the Attorney General cannot clear that high bar. The Court should follow the path paved by the unanimous decision and grant a preliminary injunction.

## I.    First Choice is likely to succeed.

The preliminary-injunction inquiry balances four well-known factors: likelihood of success, irreparable harm to the moving party without an injunction, irreparable harm to the non-moving party from an injunction, and the public interest. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 225 (3d Cir. 2026). The first two are the most important. *Id.*

15

In First Amendment cases like this one, the "rule favors the grant of an injunction." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 110 (3d Cir. 2022). First Choice must "make a colorable claim" that government action harms First Amendment rights, then the government must justify its action under the applicable scrutiny. *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (citation modified).

First Choice makes several more-than-colorable First Amendment claims, and the Attorney General cannot show her subpoena passes scrutiny. Take them in turn.

### A. The subpoena is unlawful retaliation against protected First Amendment activity.

Start with an overarching problem. The entire subpoena is unlawful retaliation against protected First Amendment activity. Officials cannot "use the power of the State to punish or suppress disfavored expression" or association. *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 188 (2024). In general, "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions" for engaging in protected speech or activity. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation modified). If an official takes a material, adverse action "based on that forbidden motive" and other motives do not justify the action, there is a valid First Amendment claim. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

16

A burden-shifting framework applies. *Id.* at 404; *Vullo*, 602 U.S. at 204 (Jackson, J., concurring). The plaintiff must show that he engaged in protected conduct, the official took a material, adverse action, and there's a "causal link" between the two. *Falcone v. Dickstein*, 92 F.4th 193, 205 (3d Cir. 2024). Establishing the causal link is where the burden shift happens. The plaintiff "must show that the retaliation was a substantial or motivating factor behind" the adverse action. *Nieves*, 587 U.S. at 404 (citation omitted). The official then "can prevail only by showing that" he would have initiated the adverse action "without respect to retaliation." *Id.* (citation omitted). In "a number of retaliation claims"—apart from prosecution and arrest cases—that is the entire analysis, because "establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward." *Id.* at 399.

Under that framework, First Choice is likely to succeed.

### 1.    Retaliation is a motivating factor for the subpoena.

This is not a retaliatory arrest or prosecution case. So the normal burden-shifting framework applies. First Choice readily meets its burden. It engages in constitutionally protected activities: speech and association. Its faith-based, pro-life message is constitutionally protected. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776–78 (2018). So too are its pro-life associational activities.

The subpoena is also a "material" adverse action. *Hou. Cmty.*, 595 U.S. at 477. Requiring an organization to produce confidential donor

17

identities, staff identities, and documents is more than "sufficient to deter a person of ordinary firmness from exercising her constitutional rights." *Falcone*, 92 F.4th at 205 (citation modified); *see also First Choice*, 146 S. Ct. at 1123 ("[D]emands for private donor information inevitably carry with them a deterrent effect on the exercise of First Amendment rights." (citation modified)). That objective chill resulted in actual chill too. It was confirmed by declarations submitted by both First Choice and its donors. *First Choice*, 146 S. Ct. at 1125. Indeed, the donors' declaration described their reluctance to partner with First Choice moving forward given the subpoena. Am. Compl. ¶ 173. And First Choice has censored its speech in response to the subpoena, taking down certain videos posted online. *Id.* ¶ 145.

Finally, retaliation was "a substantial or motivating factor behind" the subpoena. *Nieves*, 587 U.S. at 404. That showing views facts or allegations comprehensively, not "in isolation." *Vullo*, 602 U.S. at 194. And it includes both personal and official statements, such as press releases, guidance letters, and the like. *Id.*

Given that, there's ample evidence showing First Choice's pro-life speech and association were a motivating factor behind the subpoena. Buckle up—it's a long list.

First, the Attorney General created the Strike Force, which enlisted Planned Parenthood to help issue a consumer alert about pro-life pregnancy centers. *First Choice*, 146 S. Ct. at 1119. That alert expressly

18

solicited complaints of fraud. Yet the Attorney General's office did not receive "any complaints from the public about First Choice. Even so, the Attorney General served a subpoena on the group in 2023." *Id.* at 1120. The Supreme Court's highlighting of the lack of complaints in response to the consumer alert is notable. Asking for complaints of fraud, getting none, and initiating an investigation anyway strongly suggests the subpoena was motivated by something other than fear of fraud.

Second, the Attorney General co-authored an open letter with other attorneys general that showed antagonistic views of pregnancy centers. Am. Compl. ¶ 116. He lamented that they outnumber abortion clinics three to one. *Id.* He accused pregnancy centers of misleading consumers because they "do not provide abortions or abortion services." *Id.* And he pledged to take "numerous actions" against such centers. *Id.* The subpoena is exactly such an action. Viewed "[i]n context," the open letter is more evidence that retaliation is a motivating factor. *Vullo*, 602 U.S. at 193.

Third, the Attorney General filed amicus briefs disparaging pro-life groups and attacking pro-life laws. Am. Compl. ¶¶ 90, 93–95. And he regularly posted critiques about pregnancy centers, telling people to "beware" and claiming they pretend "to be legitimate medical facilities." *Id.* ¶ 114. Likewise, he referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need." *Id.* ¶ 92. That's just more fuel to the fire.

19

Fourth, the Attorney General has aggressively tried to enforce the subpoena *before* any court has decided First Choice's constitutional claims. In state court, after First Choice served written responses and objections and produced more than 2,300 pages of documents, he moved to fully enforce the subpoena's demands and sanction First Choice. *Id.* ¶¶ 242, 247. Likewise, the day after the Supreme Court held First Choice had standing and a right to have its claims heard in federal court, the Attorney General filed a letter in state court urging it to resolve the subpoena's enforceability. Am. Compl. Ex. 10 at 1. Otherwise, First Choice would get its "preferred federal forum." *Id.* at 2. Such overzealous attempts to enforce the subpoena—without regard to either the Supreme Court or the Constitution—further show a retaliatory motive.

Fifth, the subpoena's lack of justification suggests the same. Just look at the donor request. As discussed more below, there's no reason to believe that individuals were misled into thinking First Choice is pro-abortion before donating. The Supreme Court even suggested as much: "a donation webpage featuring pictures of parents holding infants and young children" could hardly "mislead donors into thinking First Choice provides abortions." *First Choice*, 146 S. Ct. at 1120. The Attorney General's thin justification for seeking confidential donor information also points toward the true motivation: targeting First Choice's pro-life speech and associations.

20

Sixth, the subpoena's expansive scope does too. The subpoena initially demanded personal information for all donors except those who gave through the donor website. That includes disclosing the names behind some 5,000 donations—including donors who gave at benefit dinners and during church baby-bottle campaigns. Am. Compl. ¶ 130. The subpoena demanded all documents related to First Choice's relationships with three partner organizations. And the subpoena demanded all documents supporting 39 statements on First Choice's websites. That's thousands on thousands of pages of documents. They likely total 20 terabytes of data. *Id.* ¶ 186. Producing all those documents would require significant time and resources, to say the least. The breadth of the subpoena further suggests that punishment and deterrence for pro-life speech and association are a motivating factor. Indeed, "[o]ne might suspect that is the whole point." *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 897 (3d Cir. 2022) (Matey, J. concurring).

All told, there's plenty of evidence showing retaliation was a motivating factor behind the subpoena. First Choice has carried its burden.

### 2. The Attorney General cannot show she would have issued the subpoena anyway.

The burden then is on the Attorney General to show she would have issued the subpoena "without respect to retaliation." *Nieves*, 587 U.S. at 404. And she cannot do so—for two reasons.

First, the Attorney General's purported justifications for the subpoena don't pass the smell test. Again, the unanimous Supreme Court not so subtly suggested as much. It juxtaposed the Attorney General's consumer alert soliciting complaints about pregnancy centers with the lack of his office receiving *any* complaints about First Choice. *First Choice*, 146 S. Ct. at 1120. And the Court expressed disbelief that a would-be donor viewing pictures of smiling parents and their children could be fooled into thinking he was donating to a pro-abortion center. *Id.* Given the subpoena's threadbare justifications, the Attorney General cannot overcome all the evidence suggesting retaliation.

Second, that the Attorney General targeted First Choice with a subpoena but has made no attempt to investigate Planned Parenthood belies any suggestion that this isn't about targeting pro-life speech and association. Planned Parenthood is similarly situated to First Choice for this analysis, which simply requires that the two be "alike in all relevant aspects." *Karns v. Shanahan*, 879 F.3d 504, 520 n.9 (3d Cir. 2018) (citation modified). And they are.

The Attorney General's own consumer alert draws exactly that comparison. He specifically compares pregnancy centers to abortion clinics and treats them as alternatives. Am. Compl. ¶ 106. The alert urges New Jerseyans to visit Planned Parenthood—not pregnancy centers— because Planned Parenthood provides abortions. *Id.* Further, First Choice's website expressly states it's "an abortion clinic alternative." *Id.*

22

¶ 191. And there are significant overlaps in clientele and services offered. Both First Choice and Planned Parenthood are geared toward women facing unplanned pregnancies.

Plus, there's plenty of reason to investigate Planned Parenthood. For starters, it maintained donation webpages that said nothing of its mission—the very thing the Attorney General complains about here. *Id.* ¶ 126. For another thing, Planned Parenthood has repeatedly disseminated deceptive statements that the abortion drug mifepristone it sells is safer than over-the-counter Tylenol. *Id.* ¶ 122. That statement is empirically false. Not even Planned Parenthood defends its veracity, dismissing the statement as "puffery" upon which a "reasonable" woman would not rely. *Id.* ¶ 123. Finally, there are documented instances of Planned Parenthood exposing sensitive patient information. *Id.* ¶ 118.

In short, Planned Parenthood and First Choice are alike in all relevant aspects. If there's cause to investigate First Choice, which provides its services for free, there's even more cause to investigate Planned Parenthood. Yet the Attorney General has done no such thing—because Planned Parenthood is pro-abortion. The Attorney General cannot meet her burden to show the subpoena is not retaliatory. First Choice is likely to succeed on its claim; the whole subpoena is likely unconstitutional.

23

**B. The subpoena violates First Choice's associational rights.**

Turn to a narrower but no less compelling claim. The subpoena violates First Choice's associational rights three times over—by demanding donor identities, medical-staff identities, and communications with partner organizations.

### 1.    The donor demand fails exacting scrutiny.

The Supreme Court's decision already held that the donor demand is an associational harm. *First Choice*, 146 S. Ct. at 1124. Such harms "warrant 'the closest scrutiny' under the First Amendment." *Id.* at 1122 (quoting *NAACP*, 357 U.S. at 461). That's at least exacting scrutiny. *Compare Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–608 (2021) (plurality opinion), *with id.* at 621 (Alito, J., concurring in part). The Attorney General must show "a sufficiently important governmental interest" to which "the disclosure requirement" bears a "substantial relation" and is "narrowly tailored." *Id.* at 611 (majority opinion) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

Unpack the first two prongs together. They require the interest's strength to "reflect the seriousness of the actual burden on First Amendment rights." *Id.* at 607 (plurality opinion) (quoting *Reed*, 561 U.S. at 196). And an important interest in the abstract isn't good enough. The "substantiality" of the interest must exist in a particular "instance." *NAACP*, 357 U.S. at 464. To show that a disclosure requirement bears a substantial relation to an important interest, the Attorney General "must

24

demonstrate that the recited harms are real, not merely conjectural, and that" the requirement "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (applying *O'Brien* intermediate scrutiny).

Consider *NAACP*, for example. There, the Supreme Court looked to the particular "instance" in which Alabama sought the NAACP's membership lists. *NAACP*, 357 U.S. at 464. As the Court put it, the justification turned "solely on the substantiality of Alabama's interest" in "this instance." *Id.* So it did not matter whether Alabama had an important interest in the abstract of ensuring the NAACP complied with its foreign-corporation-registration law. *Id.* Disclosure of the NAACP's members did not have "substantial bearing" on that interest because Alabama did not need that information to ensure the NAACP was complying with the law. *Id.* at 464–65.

Or take *Americans for Prosperity*. There, the Supreme Court held that California's disclosure requirement for charitable organizations' major donors failed exacting scrutiny. *Ams. for Prosperity*, 594 U.S. at 618. Its key holding was on narrow tailoring, but the Court also noted a problem with the government's asserted interest. *Id.* at 614. To be sure, protecting the public from fraud was an important interest. *Id.* at 612. But "[i]n reality," the government's interest was "less in investigating fraud and more in ease of administration" because the disclosure requirement was not substantially related to preventing fraud. *Id.* at 614.

25

Any information gleaned would "become relevant in only a small number of cases involving filed complaints." *Id.* That meant the interest did "not remotely reflect the seriousness of the actual burden" on association rights from demanding donor identities. *Id.* at 615 (citation modified).

As for narrow tailoring, that requirement calls for a "reasonable" or proportionate fit. *Id.* at 609 (citation omitted). Included in that, the Attorney General must "adequately consider[ ] the potential for First Amendment harms before requiring that organizations reveal sensitive information about their members and supporters." *Id.* at 609. She must consider "the extent to which the burdens are unnecessary" and "alternatives to the … disclosure requirement." *Id.* at 611, 613; *see also Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247 (10th Cir. 2023) ("A critical feature of the narrow tailoring inquiry turns on whether the government seriously undertook to address the problems it faces with less intrusive tools readily available to it." (citation modified)).

That was the key problem in *Americans for Prosperity*. There was a "dramatic mismatch" between California's interest of preventing wrongdoing by charitable organizations and the disclosure regime. *Ams. for Prosperity*, 594 U.S. at 611–12. The government cast "a dragnet for sensitive donor information from tens of thousands of charities each year, even though that information w[ould] become relevant in only a small number of cases involving filed complaints." *Id.* at 614. Plus, California

never "considered alternatives to the current disclosure requirement" that would burden associational rights less. *Id.* at 613.

Same here. The Attorney General can show neither an important interest to which the donor disclosure demands are substantially related nor that those demands are narrowly tailored.

### a. The donor demand is not substantially related to an important interest.

The Attorney General's asserted interest is identifying fraud. Again, her theory is that "First Choice's solicitation materials—including a donation webpage featuring pictures of parents holding infants and young children—could mislead donors into thinking First Choice provides abortions." *First Choice*, 146 S. Ct. at 1120 (citations omitted). Put differently, she worries that individuals who donated through First Choice's client website were misled into thinking First Choice is pro-abortion, not pro-life.

But just like in *NAACP* and *Americans for Prosperity*, a general interest isn't good enough. The interest as it relates to the disclosure requirement must exist "[i]n reality." *Ams. for Prosperity*, 594 U.S. at 614. The interest must be substantiated in "this instance"—in the context of the disclosure requirement. *NAACP*, 357 U.S. at 464. Otherwise, the harms aren't "real" but "merely conjectural," and there is no substantial relation. *Turner*, 512 U.S. at 664. So the Attorney General must show two things: that First Choice's donor identities would help show it committed

27

fraud and that her suspicion about First Choice engaging in fraud is substantiated. She can do neither.

On the one hand, the Attorney General does not need First Choice's donor identities to determine whether First Choice committed fraud. In New Jersey, fraud is an objective standard. It exists "whether or not any person has in fact been misled." N.J. STAT. ANN. § 56:8-2. That goes for charitable solicitations too. N.J. ADMIN. CODE § 13:48-13.2(7) (including statements that have "the capacity to mislead"). So the Attorney General in no way needs First Choice's donor identities to show fraud. Just like Alabama didn't need the NAACP's membership lists to see if the group complied with its law, the Attorney General doesn't need First Choice's donor identities. *NAACP*, 357 U.S. at 465.

On the other hand, all the evidence suggests the Attorney General cannot substantiate her suspicion that First Choice misled donors. First, the Attorney General received no complaint about First Choice—after the consumer alert expressly asked the public to submit complaints about pregnancy centers. *First Choice*, 146 S. Ct. at 1120.

Second, the client donation link—which is the only way someone could donate through the two websites the Attorney General takes issue with—leaves little doubt that First Choice is pro-life. It pictures happy parents holding their babies. Am. Compl. ¶ 220. A would-be donor would necessarily see those pictures *before* donating.

28

Third, both the client website and woman-center website expressly say at the bottom of page after page that First Choice does not provide or refer for abortions. *Id.* ¶ 219.

Fourth, after someone donates, he receives thank-you mailings from First Choice that are unmistakably pro-life. *Id.* ¶ 225.

And fifth, a group of donors submitted an anonymous declaration stating that they were not deceived by First Choice. *Id.* ¶ 173.

In short, nothing supports the Attorney General's stated interest in investigating whether donors were misled by First Choice. "In reality," the Attorney General's "interest is less in investigating fraud and more" in something else. *Ams. for Prosperity*, 594 U.S. at 614. That cannot justify "the seriousness of the actual burden" that the donor demand imposes on association rights. *Id.* at 615 (citation omitted).

Remember, that burden is heavy. Associational harms like those here discourage "people from associating with groups engaged in protected First Amendment advocacy" and encourage "groups and individuals to cease or modify protected First Amendment advocacy." *First Choice*, 146 S. Ct. at 1125. They give both "good reason to clam up" and "good reason to abandon the cause"—"leaving all of society poorer for it." *Id.* at 1122, 1125–26 (citation omitted). The Attorney General cannot satisfy the first two prongs.

29

### b. The donor demand is not narrowly tailored.

Nor can the Attorney General satisfy narrow tailoring. For starters, like in *Americans for Prosperity*, there is a "dramatic mismatch" between the Attorney General's asserted interest and her disclosure demand. 594 U.S. at 612. The interest is only about donors who gave through the link on the client website. But the demand goes well beyond that. It includes all donors except those who gave through the donor website—those who gave through the client website *and* by other means. From benefit dinners, to church baby-bottle campaigns, to gifts of stock, the subpoena includes them all. That by itself means the subpoena cannot be narrowly tailored.

And the Attorney General's later purported limiting of his demand cannot change that. Put aside that the Attorney General said only that "at this time" he was limiting the request for donor identities to those who gave "through links on First Choice's client-facing websites." Am. Compl. ¶ 259. And put aside that the letter expressly reserved "the right to seek identities of other donors as needed." *Id.* ¶ 260. With or without that limiting, the demand is still not narrowly tailored.

Nothing in the record suggests that the Attorney General considered alternatives to her demand. But narrow tailoring requires just that. *Ams. for Prosperity*, 594 U.S. at 613; *Wyo. Gun Owners*, 83 F.4th at 1247. She had to show that she seriously undertook to address her concern that some of First Choice's donors mistakenly gave thinking that the nonprofit

30

is pro-abortion without burdening its associational rights. And she hasn't. Rather than requesting significant amounts of donor identities, there were other "less intrusive tools readily available" that the Attorney General did not pursue. *Ams. for Prosperity*, 594 U.S. at 613 (citation omitted).

For example, the Attorney General could have simply sought any documents related to donor complaints. Or she could have issued another consumer report on pregnancy centers more specific than the last. The report could have instructed anyone who believed they had donated to a pro-abortion center to contact her office to verify the center's mission. But the Attorney General tried neither route—nor any other less intrusive means. The subpoena is not narrowly tailored.

### 2. Other demands also fail exacting scrutiny.

The donor demand is not the only associational problem. There are two more. First, the Attorney General's demand for the identities of First Choice's medical staff also violates its associational rights.

The identities of staff bear on associational rights no less than the identities of donors. Time and again, the Supreme Court has made clear that "governments can infringe freedom of association in varied ways." *First Choice*, 146 S. Ct. at 1122. And just as donors may be less likely to continue to donate if their identities are disclosed to the government, staff likewise may be less likely to continue working there. First Choice submitted a declaration detailing just that. Given the current environ-

31

ment of hostility toward pregnancy centers, divulging the identities of staff would both impair its "ability to recruit" staff and make it harder "to retain current" staff. Am. Compl. ¶ 148. Notably, after hearing about the subpoena to First Choice, the medical director of another New Jersey pregnancy center resigned out of fear of reprisals. *Id.* ¶ 149.

Those objective burdens on association interests mean the Attorney General must again pass exacting scrutiny. But she can't. This time, her purported interest is ensuring First Choice's staff are properly licensed because its nurses are onsite but its medical director is offsite. That cannot substantiate the interest. There is nothing remotely illegal, let alone problematic, about that arrangement. So there is no important interest to which the disclosure requirement is substantially related.

Besides, demanding the identities of all medical staff is not narrowly tailored. The Attorney General has not shown she seriously undertook alternatives. *Ams. for Prosperity*, 594 U.S. at 613. And such an alternative readily exists. She could require First Choice to file "a statement or report in writing under oath" explaining "the facts and circumstances concerning the rendition of any service." N.J. STAT. ANN. § 45:1-18(a). She could ask about any of the services First Choice offers and whether each service is provided by staff with appropriate licenses. And First Choice would have to answer under oath. That's a far-less-intrusive alternative.

Second, the demand for documents related to First Choice's relationships with partner pro-life organizations likewise violates its associational rights. The freedom to associate readily covers those documents. They are about First Choice's "affiliation with groups engaged in advocacy." *First Choice*, 146 S. Ct. at 1123 (quoting *NAACP*, 357 U.S. at 462). And the Attorney General again cannot pass exacting scrutiny. Her purported interest is that First Choice may be partnering with other pro-life organizations to provide abortion pill reversal (prescribing progesterone to counteract the mifepristone used in chemical abortion when a woman changes her mind after taking mifepristone). But it's legal in New Jersey to prescribe progesterone for that purpose. The Attorney General cannot show a substantiated important interest, let alone narrow tailoring.

At the very least, First Choice is likely to succeed on its associational claims. The subpoena cannot compel disclosure of First Choice's donors, staff, or communications with other groups.

### C. The subpoena violates First Choice's right to religious autonomy.

There's one more claim to mention here: First Choice's religious-autonomy claim. First Choice is likely to succeed there too.

Religious autonomy in part protects the independence of religious organizations "in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v.*

33

*Morrissey-Berru*, 591 U.S. 732, 747 (2020). It stems from the Free Exercise Clause's protection for a religious group "to shape its own faith and mission" and from the Establishment Clause's protection against government involvement in "ecclesiastical decisions." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012). In other words, it springs from the joint recognition of the Religion Clauses that "church and state are 'two rightful authorities,' each supreme in its own sphere." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257 (2025) (Thomas, J., concurring).

The doctrine applies alike to churches and to "religious groups." *Hosanna-Tabor*, 565 U.S. at 189; *see also Our Lady*, 591 U.S. at 739, 743 (about purely religious schools). Both have the right to be "free from state interference" in "matters of church government." *Id.* at 737. Relevant here, church or religious government includes two things.

First, it includes a religious organization's ability to actively govern itself. If an organization cannot effectively run its operations due to government interference, there's likely a religious-autonomy violation. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018).

Second, religious governance includes protecting past acts of governance. That covers "internal deliberations and decision-making," as well as staff directives. *Id.* at 374. How else does an organization govern but by telling its staff what to do? And the "very process of inquiry" into a religious organization's internal deliberations, decisions, or directives

34

can violate religious autonomy. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979). Government intrusion into those acts of governance itself harms the religious organization.

The Supreme Court suggested as much in *Catholic Bishop*. There, the Court explained how granting the NLRB jurisdiction over questions of religious governance was suspect. The Board's conclusions "impinge on rights guaranteed by the Religion Clauses"—and the "very process of inquiry leading to findings and conclusions" could do the same. *Id.*

Or take the Fifth Circuit's discussion in *Whole Woman's Health*. There, the court considered an "extraordinary discovery order by the district court to a religious body." *Whole Woman's Health*, 896 F.3d at 364. The plaintiffs in a challenge to a fetal-remains law served a third-party religious organization a demand for a significant number of documents, without making "exception for confidential internal or religious communications." *Id.* at 366. To say the least, the Fifth Circuit was concerned about "compelling discovery of internal communications within a religious body concerning its activities in the public square." *Id.* at 370.

That concern included the effects of the subpoena: "significant" compliance costs, including "100 work hours and over $20,000 in attorney's fees," "delayed and missed ministry opportunities," relationship damage with other groups, and cancellations of planned organizational actions. *Id.* at 373. As the court explained, those burdens flowed

35

"naturally" into the protections "afforded religious organizations and practice under the Constitution." *Id.* And the mere fact that "internal communications" would be revealed interfered with the organization's "decision-making processes on a matter of intense doctrinal concern." *Id.* In turn, that would "induce similar ongoing intrusions against religious bodies' self-government." *Id.* Besides, the mere attempt "to parse the internal communications and discern which are 'facts' and which are 'religious'" was constitutionally problematic. *Id.*

The same is true here. First Choice is a religious organization with a right to religious autonomy. Am. Compl. ¶¶ 25–26. It seeks to live out its religious principles in all that it does, with staff and volunteers cultivating a "sense of anticipation of God's presence and power in whatever [they're] doing." *Id.* ¶¶ 29, 36. So it has a constitutional right to autonomy in its religious governance. Yet the subpoena infringes on that right several times over. Consider two—one from a part of the subpoena and one from the whole.

Start with the part. The subpoena demands all documents provided to personnel to guide their interactions with clients, including handbooks, training materials, and scripts. Am. Compl. Ex. 7 at 15. Such documents are internal directives to staff. They fall under governance. And demanding their production—the very inquiry into them—violates religious autonomy. *Cath. Bishop*, 440 U.S. at 502. Just by itself, First Choice is harmed by the Attorney General's intrusion into its internal

36

governance communications. *Whole Woman's Health*, 896 F.3d at 373. And if allowed, that intrusion could "induce similar ongoing intrusions against" First Choice's self-government, causing further harm. *Id.*

Move to the whole. First Choice's religious autonomy is also violated by the subpoena hindering its ability to actively govern itself. Given the subpoena's expansive scope, compliance would prevent First Choice from effectively carrying on its religious operations for weeks. Recall, the subpoena demands well over thousands of pages of documents—an estimated 20 terabytes of data. Am. Compl. ¶ 186. Device imaging and virtualization alone would require over 50 hours of work. *Id.* ¶ 183. Filtering and individually reviewing that information would require significantly more hours, not to mention likely expenses. *Id.* ¶¶ 185–92.

Of course, any such expenses would divert funds from First Choice's religious mission. More than that, the compliance effort would divert First Choice's leadership and staff from carrying on its intended activities. *Id.* ¶¶ 191–93. Its executive director, director of health services, center directors, and many others would have to engage in a dedicated effort to comply with the subpoena. *Id.* That would consume leadership and other staff's time for over a month. *Id.* ¶ 192. Just like the organization in *Whole Woman's Health*, First Choice would suffer significant compliance costs, including "delayed and missed ministry opportunities" and cancellations of planned organizational actions. 896

37

F.3d at 373. Put differently, First Choice would be unable to effectively carry on its operations. It would be stopped from actively governing itself in accord with its religious beliefs. First Choice is likely to succeed on its religious-autonomy claim.

## II.    The other injunction factors all favor First Choice.

Because First Choice is likely to succeed on its retaliation, association, and religious-autonomy claims, the first preliminary-injunction factor weighs fully in its favor. From there, the others all fall into place.

First Choice will suffer irreparable harm absent an injunction. As both the Third Circuit and the Supreme Court have held, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And here, First Choice has suffered the loss of its associational, free-speech, and religious rights for a substantial period—two and a half years. There's no getting back that loss. But there is a chance to finally put a stop to it.

That means the two most important factors favor First Choice. *KalshiEX*, 172 F.4th at 225. So do the other two. The Attorney General faces no irreparable harm from an injunction. All a grant would mean is that her so-called investigation remains on hold. There is no change from the last two and a half years. And the public interest necessarily lies in upholding the Constitution: there's "a strong public interest in upholding

38

the requirements of the First Amendment." *Amalgamated Transit*, 39 F.4th at 109. In other words, that interest favors the Attorney General not violating First Choice's First Amendment rights. All the factors tip decisively toward First Choice.

## CONCLUSION

First Choice merits an injunction. Up, through, and around both state and federal court systems, it has maintained that the subpoena violates its constitutional rights. The Supreme Court did not decide that question. But it lit the way. This Court should follow it and grant the motion for a preliminary injunction.

Respectfully submitted this 15th day of June, 2026.

*s/ Lincoln Davis Wilson*
Lincoln Davis Wilson
FIRST & FOURTEENTH PLLC
784 S. Clearwater Loop # 8011
Post Falls, Idaho 83854
Telephone: (719) 234–0938
lincoln@first-fourteenth.com

Travis C. Barham*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
    Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
tbarham@ADFlegal.org

Erik C. Baptist*
Erin M. Hawley*
Gabriella M. McIntyre*
Daniel J. Grabowski*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
ebaptist@ADFlegal.org
ehawley@ADFlegal.org
gmcintyre@ADFlegal.org
dgrabowski@ADFlegal.org

* *pro hac vice* admission filed
    concurrently

*Counsel for Plaintiff*

39